Jeffrey S. Davidson (S.B.N. 143633)
jeffrey.davidson@kirkland.com
Luke L. Dauchot (S.B.N. 229829)
luke.dauchot@kirkland.com
Martin R. Boles (S.B.N. 124159)
martin.boles@kirkland.com
R. C. Harlan (S.B.N. 234279)
rc.harlan@kirkland.com
Sean Christofferson (S.B.N. 240474)
sean.christofferson@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA  90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Esha Bandyopadhyay (S.B.N. 212249)
esha.bandyopadhyay@kirkland.com
KIRKLAND & ELLIS LLP
950 Page Mill Road
Palo Alto, CA  94304
Telephone:     (650) 859-7000
Facsimile:     (650) 859-7500

Attorneys for Defendants
MEDTRONIC INC.,
MEDTRONIC SPINE LLC,
and KYPHON SARL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| CAREFUSION CORPORATION and CAREFUSION 2200, CORPORATION<br><br>                    Plaintiffs,<br><br>v.<br><br>MEDTRONIC, INC., MEDTRONIC SPINE LLC d/b/a KYPHON INC., and KYPHON SARL<br><br>                    Defendants. | **CASE NO. CV10-01111 VRW**<br><br>**DEFENDANTS' NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS ANTITRUST CLAIMS (COUNTS I AND II)**<br><br>Hearing Date:   August 5, 2010<br>Time:             10:00 am<br>Judge:           Hon. Vaughn R. Walker<br>Courtroom:      6 |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on August 5, 2010, at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Vaughn R. Walker, Judge of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102 in Courtroom 6, 17th Floor, defendants Medtronic, Inc., Medtronic Spine LLC (incorrectly named Medtronic Spine LLC d/b/a Kyphon Inc.), and Kyphon SARL (collectively "Defendants") will move, and hereby do move, this Court to dismiss Counts I (Monopolization) and II (Attempted Monopolization) of plaintiffs CareFusion Corporation and CareFusion 2200, Corporation's (collectively "Plaintiff" or "CareFusion") Complaint for Antitrust Violations and a Declaratory Judgment of Patent Invalidity and Noninfringement ("Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Motion will be based on this Notice of Motion, Motion and Memorandum of Points and Authorities in Support, the Request for Judicial Notice and accompanying exhibits filed herewith, any Reply memorandum, the files and records of this action, and any additional evidence and argument that may be elicited at the hearing of this Motion.

The Court action sought by this motion is dismissal of Count I ("Monopolization Under 15 U.S.C. § 2") and Count II ("Attempted Monopolization Under § 2") of the Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

Page

I.     INTRODUCTION................................................................................................1

II.    STATEMENT OF RELEVANT FACTS.........................................................2

    A.     Balloon Kyphoplasty ...............................................................................2

    B.     Vertebroplasty...........................................................................................3

    C.     Defendant Kyphon's Innovation of Kyphoplasty ...................................3

    D.     Procurement of the '404 and '888 Patents .............................................4

    E.     Kyphon's Acquisition of Additional Patents .........................................6

    F.     Kyphon's Lawsuit Against, and Acquisition of, Disc-O-Tech..............7

    G.     Medtronic's Acquisition of Kyphon .......................................................8

    H.     '404 and '888 Patent "Threats" and CareFusion's Allegedly Delayed Entry .........9

    I.      Expiration of '404 and '888 Patents; CareFusion's Launch; and Continued "Threats" ........................................................................10

III.   IN PLEADING ITS TWO THEORIES OF INJURY, CAREFUSION OMITS KEY ELEMENTS AND RELIES ON IMPERMISSIBLE BOILERPLATE............11

    A.     The "Delayed Entry" Theory Fails Because CareFusion Has Not Alleged, and Cannot Allege, the Elements of A *Walker Process* Claim. ...................................11

        1.     Fraud ..............................................................................................12

        2.     But For Causation .........................................................................14

        3.     Enforcement...................................................................................14

        4.     Preparedness to Enter the Market ...............................................17

    B.     The "Threatened Cloud" Theory Lacks Allegations Sufficient to Confer Article III Standing and Fails to Allege "Antitrust Injury" by Tying CareFusion's "Injury" to Acts Unlawful Under Antitrust Law. ...........................18

        1.     Article III Standing ......................................................................18

        2.     Antitrust Injury.............................................................................18

IV.    CONCLUSION ................................................................................................21

i

# TABLE OF AUTHORITIES

**Cases**

*Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.,*
    826 F.2d 1235 (3d Cir. 1987) .................................................................................. 8

*American Ad Mgmt., Inc. v. General Tel. Co. of Cal.,*
    190 F.3d 1051 (9th Cir. 1999) ......................................................................... 18, 19

*Associated General Contractors v. Cal. State Council of Carpenters,*
    459 U.S. 519 (1983) .............................................................................................. 19

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ....................................................................................... passim

*Bourns, Inc. v. Raychem Corp.,*
    331 F.3d 704 (9th Cir. 2003) .......................................................................... 12, 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ................................................................................................ 7

*Brunswick Corp. v. Riegel Textile Corp.,*
    752 F.2d 261 (7th Cir. 1984) ..................................................................... 9, 11, 22

*Bubar v. Ampco Foods,*
    752 F.2d 445 (9th Cir. 1985) ............................................................................... 19

*Correct Craft IP Holdings, LLC v. Malibu Boats, LLC,*
    No. 6:09-cv-813-Orl-28KRS, 2010 WL 598693,
    2010 U.S. Dist. Lexis 13577 (M.D. Fla. Feb. 17, 2010) ............................... 14, 18

*Datagate, Inc. v. Hewlett-Packard Co.,*
    941 F.2d 864 (9th Cir. 1991) ................................................................................ 1, 8

*Dippin' Dots, Inc. v. Mosey,*
    476 F.3d 1337 (Fed. Cir. 2007) ......................................................................... 13, 14

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.,*
    882 F.2d 1556 (Fed. Cir. 1989) ............................................................................. 12

*Hoganas AB v. Dresser Indus., Inc.,*
    9 F.3d 948 (Fed. Cir. 1993) .................................................................................... 5

*In re Netflix Antitrust Litig.,*
    506 F. Supp. 2d 308 (N.D. Cal. 2007) ........................................................... passim

*Kaempe v. Myers,*
    367 F.3d 958 (D.C. Cir. 2004) ............................................................................... 5

*Los Angeles Memorial Coliseum Comm'n v. National Football League,*
    791 F.2d 1356 (9th Cir. 1986) ............................................................................. 19

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .............................................................................................. 18

ii

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................. 8, 9

*McFarland v. Memorex Corp.*,
    493 F. Supp. 631 (N.D. Cal. 1980) ...................................................................... 13

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998).) ...................................................................... 13, 14

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................................. 13

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981) ........................................................................... 13, 21

*Temple v. Haft*,
    73 F.R.D. 49 (D. Del. 1976) .................................................................................. 13

*United States v. Syufy Enter.*,
    903 F.2d 659 (9th Cir. 1990) ................................................................................... 1

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
    382 U.S. 172 (1965) ............................................................................................... 12

**Statutes**

35 U.S.C. 154 (a)(2) ...................................................................................................... 4

35 U.S.C. 154 (c)(1) ...................................................................................................... 4

**Other Authorities**

1 Chisum on Patents, Glossary (2010) ......................................................................... 13

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................. 2

Fed. R. Civ. P. 9(b) ...................................................................................................... 13

1

## STATEMENT OF THE ISSUES

2        Whether Plaintiffs have failed to properly plead allegations sufficient to state a claim for

3 Monopolization (Count I) and Attempted Monopolization (Count II).

4 **I.**     **INTRODUCTION**

5        The touchstone of monopolization is the power to exclude competition.[1]  That of "attempted

6 monopolization" is the "dangerous probability" of doing so.[2]  These fundamental principles go to the

7 heart of the Complaint's failure to state a claim.  By Plaintiff's own admission, Plaintiff is entering

8 the market as a confident new competitor, showcasing its product at medical conventions and

9 boasting to the media that it's not afraid of Defendant Medtronic.  (*See* Doc. # 1 at ¶¶ 109-111 & Ex.

10 AA at 7.)  Plaintiff CareFusion has not been excluded from the market by Defendant Medtronic, and

11 the Complaint quotes CareFusion's CEO saying that he is unafraid of Medtronic patents.  (*Id.*)

12        Thus, hollow at the core, the Complaint spins largely tangential allegations.  A careful

13 reading reveals that many of the allegations are legally irrelevant, because they are not tied to an

14 injury to CareFusion.  An antitrust claim requires that the alleged wrong have caused injury—not in

15 general—but to the plaintiff.[3]  Sifting the allegations with this criterion, only two theoretical injuries

16 surface.  Neither is legally cognizable.

17        ***First***, CareFusion alleges that it elected to delay entering the market until the expiration of

18 two Medtronic patents, the '404 and the '888.  (*See* Doc. # 1 at ¶¶ 101-102.)  CareFusion alleges that

19 these patents were invalid (*id.* at ¶¶ 152, 165), that Medtronic knew them to be invalid (*id.*), and that

20 Medtronic nevertheless "had a history" of "threatening competitors" with the patents (*id.* at

21 ¶¶ 101-02).  This claim is deficient because it does not allege what is necessary to overcome the

22 general rule that patents, by their very nature, lawfully exclude competitors.  In particular,

---

23    [1]     "Absent any power to exclude competition, the government cannot prevail on its claim of
24 monopolization under Section 2 of the Sherman Act, as that requires a showing that [defendant] possesses monopoly power."  *United States v. Syufy Enter.,* 903 F.2d 659, 671 n.21 (9th Cir. 1990)
25 (Kozinski, J.).
    [2]     "Similarly, the attempted monopolization claim fails because the government cannot show
26 that there was a dangerous probability that [defendant] would succeed in destroying competition." *Id.*
27    [3]     *Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 868-69 (9th Cir. 1991) (rejecting an antitrust claim for lack of standing where the plaintiff "failed to show a causal connection between
28 its own injuries and the alleged antitrust injuries" and did not show "any injury to itself" that resulted from the alleged anticompetitive acts).

CareFusion has not alleged the elements of a "*Walker Process*" claim:  (1) fraud on the Patent Office; (2) but-for causation of the patent issuance; (3) enforcement of the patents against CareFusion; and (4) cognizable antitrust injury.  *See* Part III.A *infra*.

**Second**, CareFusion alleges that, now that the '404 and '888 patents have expired, other patents owned by Medtronic "threaten" to "cast a cloud" over CareFusion's newly-launched product. (*See* Doc. # 1 at ¶ 159.)  This terminology highlights the deficiency of the pleading.  A "threatened" "cloud" does not meet Article III's requirements of concreteness, particularity, and immediacy.  *See* Part III.B.1 *infra*.  CareFusion has not alleged that its product—released this year—is threatened by infringement of any Medtronic patent.  To the contrary, both the Complaint and CareFusion's CEO deny any infringement.  Moreover, with respect to the four patents named in the Declaratory Judgment Counts, there is no allegation that these patents were acquired, as opposed to developed internally, as required for antitrust liability.  Nor does CareFusion identify the subject matter of any other unexpired patent, let alone explain how it operates to exclude competitors.  Instead the Complaint repeatedly invokes the boilerplate allegation that patent acquisitions "had the effect of eliminating and/or diminishing competition," without alleging facts showing how.  That does not suffice.  The Supreme Court in *Bell Atlantic v. Twombly* rejected precisely this sort of conclusory pleading in antitrust cases.  550 U.S. 544, 555 (2007).  Given the "protracted," "massive" and costly nature of complex antitrust litigation, the Court insisted that an antitrust complaint allege more than "formulaic" "legal conclusions couched as a factual allegation."  *Id.* at 555, 558.  *See* Part III.B.2 *infra*.

## II.   STATEMENT OF RELEVANT FACTS

At this procedural juncture, the legal sufficiency of Plaintiff's antitrust claims is tested assuming the truth of well-pleaded allegations, most of which Medtronic vigorously disputes.  In this section, Medtronic sorts through the facts alleged in the Complaint that are pertinent to the arguments in Part III.

### A.   Balloon Kyphoplasty

Plaintiff CareFusion just launched products for treating vertebral fractures.  (*See* Doc. # 1 at ¶¶ 101-111.)  The products are used in a procedure called "balloon kyphoplasty."  (*Id.*)  Defendant

2

1   Medtronic, too, sells products for balloon kyphoplasty, a technology invented by Defendant Kyphon

2   (which was later acquired by Medtronic (*see id.* at ¶ 77)).  (*Id.*, Ex. G *passim*.)

3        Balloon kyphoplasty is used to treat a condition called vertebral "compression fracture," or

4   "VCF."  (*See* Doc. # 1 at ¶ 24.)  VCF is typically caused by osteoporosis.  (*Id.*)  As VCF progresses,

5   the affected vertebra collapses.  (*See id.*, Ex. G at 8.)  This condition can lead to spinal curvature and

6   stooped posture, known as "kyphosis" (from the Greek word for "hump").  (*See id.* at 2.)  Because

7   most patients with osteoporosis are elderly and particularly vulnerable to trauma attendant to

8   surgery, kyphosis was, prior to the invention of kyphoplasty, principally treated non-invasively, such

9   as through pain management.  (*Id.* at 3, 8, 9.)

10       Defendant Kyphon's invention of balloon kyphoplasty was thus a major breakthrough.  (Doc.

11  # 1 at 7-8.)  The procedure is minimally invasive.  An incision less than one centimeter is made, and

12  a tube is inserted, penetrating to the vertebra.  The outer vertebral bone is penetrated, and an

13  uninflated balloon is inserted into the softer inner bone tissue.  The balloon is inflated.  As it inflates,

14  it restores the original anatomy of the collapsed vertebrae.  (*Id.* at 8.)  Then the balloon is deflated

15  and withdrawn, and cement is injected into the void to restore the integrity of the compromised

16  vertebra.  (*Id.* at 9-10.)

17       **B.    Vertebroplasty**

18       An alternative procedure used for patients with VCF is "vertebroplasty."  It is also minimally

19  invasive.  In vertebroplasty, no balloon is used to create a void for injecting cement.  Instead, the

20  cement is injected into the softer interior vertebral bone without creation of a hosting void.  In order

21  to permit the cement to spread through the uncompacted interior bone structure, the cement must be

22  less viscous than that used in balloon kyphoplasty.  (Doc. # 1, Ex. G at 16-18.)  This creates a risk

23  that the cement will leak out of the cracked vertebra to areas such as the lungs.  (*Id.* at 18.)  The

24  cement also contains chemicals that are cardiotoxic.  (*Id.* at 18.)  Leaks can lead to paralysis, and a

25  number of vertebroplasty patients have died from complications of the surgery.  (*Id.*)  Plaintiff

26  CareFusion also sells products for use in vertebroplasty.  (*See id.* at ¶¶ 99-100.)

27       **C.    Defendant Kyphon's Innovation of Kyphoplasty**

28       Plaintiff insinuates in the Complaint that Kyphon's founders were imposters who got a

3

1   monopoly by taking credit for the inventions of others.  For example, the Complaint alleges that

2   Kyphon's founders obtained the original patents for kyphoplasty by "copying" balloon catheters

3   used in angioplasty and "building upon" pre-existing "vertebroplasty procedures."  (*See* Doc. # 1 at

4   ¶ 26.)

5          A different story is told in the article that the Complaint cites for this allegation, which is

6   attached to the Complaint as Exhibit G.  The balloons used in kyphoplasty are "a very different type

7   of balloon" than is used in angioplasty.  (Doc. # 1, Ex. G at 4.)  Angioplasty engineers "never

8   thought that a balloon could function in bone."  (*Id.*)  The very idea caused them "amazement."  (*Id.*)

9   Kyphon's co-founder, Dr. Mark Reiley (*id.* at ¶¶ 25-30), a "highly innovative orthopedic surgeon"

10  (*id.*, Ex. G at 2), "pioneer[ed]" the development of kyphoplasty (*id.* at 14).  Reiley and others were

11  forced to found Kyphon because existing companies in the spinal-care field declined to invest in a

12  procedure that was "so novel."  (*Id.* at 7.)  For the end-user surgeons as well, the procedure

13  represented "several conceptual leaps."  (*Id.* at 3.)  The common "bias" amongst orthopedists was

14  that the procedure would not work.  (*Id.* at 10.)  Far from "building upon" "vertebroplasty

15  procedures" (Doc. # 1 at ¶ 26), Dr. Reiley's experiments were, according to CareFusion's own

16  exhibit, a "precursor" to vertebroplasty, "though no one knew it at the time."  (*Id.*, Ex. G at 17.)

17      **D.     Procurement of the '404 and '888 Patents**

18         In order to encourage innovation and investment, the law permits inventors to obtain patents,

19  which lawfully exclude others from practicing the patented art for a period of years.  *See* 35 U.S.C.

20  154(a)(2); (c)(1).  After years of work innovating and investing to create kyphoplasty (*see* Doc. # 1,

21  Ex. G at 4, 12, 14, 17), Dr. Reiley and his Kyphon co-founder obtained two patents "covering the

22  basic kyphoplasty procedure" (*see id.* at ¶¶ 27-31).  These patents, the '404 and the '888, are at the

23  core of Plaintiff's antitrust allegations.  (*See id.* at ¶¶ 55-75, 86-102.)  The patents expired in

24  February 2009.  (*Id.* at ¶ 32.)  CareFusion nevertheless alleges that it was injured by them because it

25  "made a business decision to wait until the '888 and '404 patents expired before launching its

26  balloon kyphoplasty product."  (*Id.* at ¶ 103.)  CareFusion alleges that its delayed launch is an

27  antitrust violation because Medtronic, who by then had acquired Kyphon, knew the patents to be

28  invalid but nonetheless caused CareFusion to think that it might enforce them.  (*See id.* at ¶¶ 152,

4

1    165.)

2            CareFusion supports this allegation by incorporating several pages from a counterclaim filed

3    by Medtronic against Kyphon when the latter sued the former for infringement of the '404 and '888

4    patents.  (Doc. # 1 at ¶¶ 71-74.)  The counterclaim alleges a theory of defense to an infringement

5    action called "inequitable conduct."  The counterclaim alleges that the patents were unenforceable

6    because, when Dr. Reiley and his co-founder applied for the patents, their description of existing

7    treatment options did not include vertebroplasty, and this omission was material to the question of

8    the patentability of the invention.  (*Id.*)  Of course, CareFusion's own exhibit says that vertebroplasty

9    did not exist when Dr. Reiley invented Kyphoplasty.  *See* Part C *supra*.  But even accepting one set

10   of contradictory allegations over the other, CareFusion nowhere alleges that any misrepresentation

11   or omission was a "but for" cause of the Patent Office's issuance of the '404 and '888 patents, which

12   is necessary for CareFusion to state a claim.  *See* Part III.A.2 *infra* ("but for" causation of patent

13   issuance required to state antitrust claim).

14           This omission cannot be cured.  Public records show that the Patent Office knew about the

15   prior art of injecting cement into inner bone tissue, of which vertebroplasty is one application (*see*

16   Part B *supra*).  These records can be considered on a motion to dismiss.[4]  The '888 and '404 patents

17   both stem from Patent Application No. 308,724.  (Doc. # 1 at ¶¶ 27-28 & Ex. E.)  The '724

18   application discusses procedures for treating numerous types of bone, not just vertebrae, including

19   wrist bones and the long bones of the leg.  (*See* Medtronic's Request for Judicial Notice, filed

20   herewith ("Req. Jud. Notice"), Ex. A at 15-19 ('888 Patent Specification).)  During prosecution of

21   the '724 application, Dr. Reiley and his co-founder informed the Patent Office examiner of the prior

22   art of cement injection into bone.  (*See id.* at 59-64 (Office Action), 65-68 (Information Disclosure

23   Statement).)  In particular, they cited numerous references that disclosed procedures where bone

24   cement is injected into the long bones of the leg.  Based on these references, the examiner initially

25   rejected the claims in the '724 application.  To overcome this rejection, Dr. Reiley amended the

26   ────────────────

27   [4]      *See Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 954 n. 27 (Fed. Cir. 1993) (taking
     judicial notice of publicly available records of the Patent Office); s*ee also Kaempe v. Myers,* 367
     F.3d 958, 965 (D.C. Cir. 2004) ("The documents recorded by the PTO were not attached to
28   Kaempe's complaint.  However, the cited documents are public records subject to judicial notice on
     a motion to dismiss.").

1   proposed patent claims to distinguish the unique kyphoplasty step of "compacting . . . the bone

2   marrow in the bone to increase the volume of a recess so that the recess can be filled with a flowable

3   material capable of setting to a hardened condition."  (*See id.* at 75, 69-76 ('724 Application,

4   11/28/89 Amendment).)  Plaintiff alleges that this is the key difference between kyphoplasty and

5   vertebroplasty.  (*See* Doc. # 1 at ¶ 25.)  The examiner accepted this distinction in deciding in favor of

6   patentability, and allowed the claims of the '724 application to issue in the '888 patent.  (*See id.*)

7          In light of this prosecution history, the alleged nondisclosure of vertebroplasty would not

8   have prevented the '888 or '404 patents from issuing.  Had the examiner possessed references to

9   vertebroplasty, it could have been distinguished in the same way as the other disclosed prior art of

10   injecting cement into bone, because vertebroplasty, like its companions, does not meet the

11   "compacting bone" criteria for kyphoplasty.  The Complaint does not (and in light of this public

12   record, cannot) allege that omission of specific reference to "vertebroplasty" was the "but for" cause

13   of the patent's issuance.  *See* Part III.A.2 *infra* ("but for" causation is required element).

14          **E.      Kyphon's Acquisition of Additional Patents**

15          The Complaint alleges that in 2002, Kyphon began acquiring patents as "part of a scheme to

16   eliminate and/or reduce competition . . . ."  (*See, e.g.*, Doc. # 1 at ¶ 36.)

17          Four acquisitions are alleged:  (1) the 2002 acquisition of 23 patents from Dr. Peter M.

18   Bonutti (*id.* at ¶¶ 37-38); (2) the 2003 acquisition of four pending patent applications as part of the

19   Sanatis GmbH acquisition (*id.* at ¶¶ 40-41); (3) the 2005 acquisition of five patents from Dr. J. Lee

20   Berger (*id.* at ¶¶ 43-45); and (4) an exclusive license to technology developed by Dr. Harvinder S.

21   Sandhu (*id.* at ¶ 46).

22          For each acquisition, the Complaint alleges wrongfulness in identical terms, namely that the

23   acquisition "was part of Defendants' scheme to eliminate competition . . . and had the effect of

24   eliminating and/or diminishing competition . . . ."  (*Id.* at ¶¶ 39, 42, 45, 47.)  The repeated use of this

25   boilerplate is defective pleading under the standard of *Bell Atlantic v. Twombly*, 550 U.S. 544, 555,

26   127 S. Ct. 1955 (2007) (antitrust complaint must allege "more than labels and conclusions . . . and a

27   formulaic recitation of the elements . . .").

28          CareFusion alleges no particularized facts about these acquired patents.  There is no

6

identification of patents that exclude competitors such as CareFusion.  CareFusion denies that its products infringe any patents.  (*See* Doc. # 1 at ¶¶ 180, 190, 200, 210, Ex. AA at 7.)

The four patents attacked in the Declaratory Judgment Counts are not among these allegedly-acquired patents.  The inventors for those patents were Dr. Reiley and other Kyphon colleagues.  (*See* Doc. # 1, Exs. A, B, C & D.)  *See* Part III.B.2 *infra* (no antitrust liability for internally-developed patent).

In sum, the Complaint includes no allegations showing that the patents acquired by Kyphon are relevant to CareFusion and to its ability to launch new kyphoplasty products.

### F.    Kyphon's Lawsuit Against, and Acquisition of, Disc-O-Tech

The Complaint alleges that in 2004, Kyphon sued a competitor called Disc-O-Tech for patent infringement.  (*See* Doc. # 1 at ¶¶ 56-59.)  The suit was based on the '404 and '888 patents, as well as the four patents at issue in the four Declaratory Judgment Counts (the '043, '110, '734 and '054 patents).  (*See id.* at ¶¶ 56, 58, 172-81 (Count III seeking Declaratory Judgment re '043 patent); 182-191 (Count IV seeking Declaratory Judgment re '734 patent); 192-201 (Count V seeking Declaratory Judgment re '110 patent); and 202-211 (Count VI seeking Declaratory Judgment re '054 patent).)  Plaintiff does not disclose in the Complaint that Kyphon won a jury verdict of infringement (a public record, as easily accessible as the other litigation documents that the Complaint cites and quotes).

In 2006 Kyphon acquired Disc-O-Tech.  (*See* Doc. # 1 at ¶ 61.)  CareFusion insinuates that the acquisition violated antitrust law because "the Federal Trade Commission filed a complaint against Kyphon's acquisition . . . ."  (*Id.* at ¶ 62.)  In fact, the exhibits to the Complaint show that the lawsuit resulted in a Consent Order *permitting* the acquisition to proceed, contingent on divestment of a vertebroplasty cement technology.  In other words, the acquisition as it finally resulted—and as it affected anyone in the marketplace—was given the green light by the FTC after an antitrust review.  (*See id.*, Exs. L & M.)  And at the time of this FTC review, the prior Kyphon patent acquisitions (which CareFusion now alleges were monopolistic) had already taken place.  (*See id.* at ¶¶ 36-46, 77 (Kyphon patent acquisitions preceded FTC antitrust review).)

The Complaint also alleges that the acquisition was anticompetitive because Kyphon did not

7

1    thereafter sell Disc-O-Tech's VCF-treatment product.  (*Id.* at ¶¶ 64-65.)  Of course, if that product

2    had been ruled by a jury to infringe Kyphon patents (as it had been), its removal from the market

3    would not be unlawful.  Nor does CareFusion allege facts ruling out pro-consumer explanations for

4    the withdrawal, such as comparative efficacy or safety.  *See Twombly*, 550 U.S. at 554-58, 566

5    (antitrust complaint must allege more than facts which could *possibly* constitute unlawful conduct,

6    and "neutral" facts coupled with "naked" conclusory assertions do not suffice; courts should "insist

7    upon some specificity in pleading" facts which make plaintiff's characterization not just possible,

8    but plausible).  But in any event the Complaint alleges no facts showing that the Disc-O-Tech

9    acquisition injured CareFusion.  Elimination of a competitor ordinarily helps other competitors, and

10   hence does not furnish standing to a surviving competitor to sue under the antitrust laws.[5]

11        **G.    Medtronic's Acquisition of Kyphon**

12        Medtronic acquired Kyphon in 2007.  (*See* Doc. # 1 at ¶ 77.)  The Complaint does not allege

13   that Medtronic owned kyphoplasty patents or had any other form of kyphoplasty market power prior

14   to the acquisition.  There is no allegation of facts explaining how this acquisition increased the

15   power to exclude competition beyond any such power already inherent in Kyphon's patents.  *See*

16   Part III.B.2 *infra*.

17        According to the Complaint, Medtronic thereafter stopped selling its own vertebroplasty and

18   kyphoplasty products.  (Doc. # 1 at ¶ 79.)  The Complaint once again fails to allege facts negating

19   lawful motivations for this decision, such as considerations of comparative efficacy or safety.  *See*

20   *Twombly*, 550 U.S. at 554-58, 566 (antitrust complaint must allege more than facts which could

21   *possibly* constitute unlawful conduct, nor do "neutral" facts coupled with "naked" conclusory

22   assertions suffice; courts should "insist upon some specificity in pleading" facts which make

23   plaintiff's characterization not just possible, but plausible).  Nor does the Complaint allege how this

24   caused injury to CareFusion.  Elimination of a third-party's competing product does not furnish

25   _____

26   [5]      *See Datagate, Inc. v. Hewlett-Packard Co.,* 941 F.2d 864, 868 (9th Cir. 1991) ("As an
     existing competitor, Datagate would be benefited from any chilling of new entry into the market.");
27   *Alberta Gas Chems. Ltd. v. E.I. Du Pont de Nemours & Co.*, 826 F.2d 1235, 1242-43 (3d Cir. 1987)
     (no antitrust injury from competitor's acquisition of a potential entrant because "elimination of a
28   potential increase in output" would "inevitably aid[ ]" existing competitors) (relying on *Matsushita
     Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986).

1    standing for competitor to sue under the antitrust laws.[6]

2    **H.       '404 and '888 Patent "Threats" and CareFusion's Allegedly Delayed Entry**

3          CareFusion launched its product last month.  (Doc. # 1 at ¶¶ 110-111.)  But CareFusion

4    alleges that the launch was delayed "for at least two (2) years."  (*Id.* at ¶¶ 158 & 169.)  The delay

5    was allegedly caused by fear of two patents originally owned by Defendant Kyphon, the '404 and

6    the '888.  (*Id.* at ¶ 102.)  Those patents expired in February 2009.  (*Id.* at ¶ 103.)  CareFusion alleges

7    that it "made a business decision to wait until the '888 and '404 patents expired before launching" its

8    product.  (*Id.* at ¶ 102.)  The "business decision" was allegedly based on "Defendants'" "history" of

9    litigation and "threatening competitors," including alleged "threats" by Medtronic.  (*Id.*)

10         The Complaint does not explain why CareFusion was afraid of patents that it now alleges to

11   be unenforceable.  CareFusion's CEO touts having "done our homework" regarding Medtronic's

12   patents (Doc. # 1, Ex. AA at 7), and its lawyers now quote pleadings from prior litigation asserting

13   patent invalidity.  As Judge Posner stated in *Brunswick Corp. v. Riegel Textile*:  "a patent known to

14   the trade to be invalid will not discourage competitors from making the patented product or using the

15   patented process, and so will not confer monopoly power . . . ."  752 F.2d 261, 265 (7th Cir. 1984);

16   *see Twombly,* 550 U.S. at 557 (antitrust pleading must be "plausible").

17         The Medtronic "threats" which allegedly cowed CareFusion into delay are alleged in

18   paragraphs 86-95 of the Complaint.  (*See* Doc. # 1 at ¶ 102 (cross-referencing between CareFusion's

19   delay and Medtronic "threats").)  They consist of (1) a July 2006 article in the Sonoma County *Press*

20   *Democrat* (*id.* at ¶ 87); (2) the April 2008 Medtronic 10-K (*id.* at ¶ 91); and (3) a May 2008 stock-

21   analyst teleconference with Medtronic CEO Bill Hawkins (*id.* at ¶ 92).  The Complaint appends

22   exhibits containing the alleged "threats."  None of them mentions CareFusion, or any other

23   kyphoplasty competitor.  They do not even relate to the '404 and '888 patents.  Thus, the allegations

24   ────────────────
   [6]      *See* fn. 5 *supra.*  Nor, of course, does CareFusion have standing to sue for alleged "Medicare
25   fraud."  *See* Doc. # 1 at ¶¶ 49-54.  These allegations are a transparent effort to incite prejudice and
     are obviously irrelevant, because even if the Complaint's very distorted depiction were true,
26   CareFusion would lack any resulting antitrust injury, since competitors benefit from another
     competitor's increased prices.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574,
27   583 (1986) (Plaintiffs cannot "recover damages for any conspiracy by [defendants] to charge higher
     than competitive prices in the American market.  Such conduct would indeed violate the Sherman
28   Act, but it could not injure [plaintiffs]: as [defendants'] competitors, [plaintiffs] stand to gain from
     any conspiracy to raise the market price . . . ." (internal citations omitted)).

1    concerning the '404 and '888 patents are legally insufficient to state a claim.  *See* Part III.A.3 *infra*.

2    **I.    Expiration of '404 and '888 Patents; CareFusion's Launch; and Continued**
     **"Threats"**

3

4    The '404 and '888 patents expired on February 9, 2009.  (*See* Doc. # 1 at ¶ 103.)  On that

5    day, CareFusion's CEO announced that his company would launch kyphoplasty products.  (*See id.* at

6    ¶ 116.)

7    CareFusion spent the rest of that year getting FDA approval for its kyphoplasty products.

8    (*See* Doc. # 1 at ¶¶ 104-08.)  The products were launched in 2010.  (*See id.* at ¶¶ 109-111.)

9    Medtronic allegedly continued to "threaten" CareFusion, even after the expiration of the '404

10   and '888 patents.  (*See* Doc. # 1 at ¶¶ 112-47.)  The Complaint alleges that these "threats" "threaten

11   . . . to cast a cloud" over CareFusion's products.  (*See id.* at ¶¶ 159, 170.)

12   The alleged threats consisted of two statements by Medtronic's CEO Hawkins during

13   "earnings conference calls" with stock analysts, and a series of published reports from stock

14   analysts.  (*See id.* ¶¶ 112-47.)  The Complaint alleges nothing in the first Hawkins call specifically

15   referencing CareFusion or a threatened lawsuit.  (*See id.* at ¶¶ 113-15.)  The Complaint quotes

16   selectively from the second Hawkins call to suggest that Medtronic intends to use its patents to block

17   any competitors from the kyphoplasty "space."  (*See id.* at ¶ 140.)  The actual transcript (appended to

18   the Complaint) shows that "multiple competitors" were expected to enter the market.  (*See id.*, Ex. JJ

19   at 15; footnotes 1 & 2 *supra* (monopolization claim requires exclusion of competitors).)  The

20   transcript also shows that Medtronic's CEO expected not to exclude, but to compete with, any new

21   entrants, and would do so with "market-leading technology" and superior distribution system.  (*See*

22   *id.*, Ex. JJ at 15.)

23   The Complaint does not identify particular patents that were brandished as "threats" in these

24   analyst calls and reports.  However, CareFusion alleges that it received e-mails from Morgan Stanley

25   analysts which "identified" six patents as "threats."  (*See* Doc. # 1 at ¶¶ 117-118.)  The patents were

26   the '404 and '888 and the four patents which are the subject of the Complaint's Declaratory

27   Judgment Counts.  (*See id.* at ¶ 119.)  The Complaint alleges that, in sending this e-mail, the Morgan

28   Stanley analysts were parroting information fed to them by Medtronic.  (*See id.* at ¶¶ 117-119.)  No

explanation is given as to why Medtronic would try to threaten CareFusion by giving analysts patent numbers for expired patents.  Nor are facts alleged tending to negate the alternative interpretation that the analyst reports were made independently.  *See Twombly*, 550 U.S. at 554-58, 566 (antitrust complaint must allege more than facts which could *possibly* constitute unlawful conduct, nor do "neutral" facts coupled with "naked" conclusory assertions suffice; courts should "insist upon some specificity in pleading" facts which make plaintiff's characterization not just possible, but plausible).

The Complaint also does not link these "threats" with any (unexpired) patents other than the four Declaratory Judgment Patents.  (*See* Doc. # 1 at ¶ 119 and fn. 8.)  The Complaint does not allege that these patents were procured by fraud on the Patent Office.  *See* Part III.A *infra* (fraud on Patent Office is an element of *Walker Process* claim).  The Complaint does not allege that the patents were obtained by Kyphon via acquisition, as opposed to internal development (the patents themselves name Kyphon inventors (*see* Doc. # 1, Exs. C, D, E & F).).  *See* Part III.B.2 *infra* (no antitrust claim where patents are developed internally).  In short, the Complaint does not identify any actionable patent "threat" at all, and therefore does not contain legally sufficient allegations to state a claim.  *See* Part III.B *infra*.

### III.   IN PLEADING ITS TWO THEORIES OF INJURY, CAREFUSION OMITS KEY ELEMENTS AND RELIES ON IMPERMISSIBLE BOILERPLATE.

When the irrelevant and inactionable (by CareFusion) allegations are set aside, *see* Part II *supra*, there remain only two allegations of injury to CareFusion:  (1) that CareFusion delayed the launch of its product until the expiration of Kyphon's original patents, the '404 and '888 (Doc. # 1 at ¶¶ 101-110) (hereinafter, "the Delayed Entry Theory"); and (2) that Medtronic "threatens to continue to harm CareFusion's ability to compete . . . by using illegally acquired third party patent rights to threaten litigation against CareFusion and cast a cloud over its Ava*max*™ balloon kyphoplasty products" (*id.* at ¶¶ 159, 170) (hereinafter, "the Threatened Cloud" theory).

### A.   The "Delayed Entry" Theory Fails Because CareFusion Has Not Alleged, and Cannot Allege, the Elements of A *Walker Process* Claim.

A patent, by its very nature, conveys a lawful monopoly.[7]  To hold a patentee liable under

---

[7]   *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 264 ("[a] patent entitles the patentee to prevent others from making or selling the patented product . . . and he may be able to use this legal right to restrict competition.").

Section 2 of the Sherman Act, a plaintiff must properly allege the elements of some exception to this general rule.  CareFusion is attempting to make a claim under a narrow exception formulated by the Supreme Court in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965).  *Walker Process* held that "possession and use of a fraudulently-acquired patent . . . could be treated as an offense under the antitrust laws if the patent was employed to produce monopoly power in a specified market" with resulting antitrust injury.  *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711 (9th Cir. 2003).

To state a *Walker Process* claim, CareFusion must allege, *inter alia*, that: (1) the '404 and '888 patents were procured from the Patent Office by fraud; (2) the patents would not have been issued but for the fraud; (3) Defendants enforced, or threatened to enforce, the patents against CareFusion; (4) CareFusion was ready to enter the market when Defendants enforced or threatened to enforce the patents against them  *See In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 314 (N.D. Cal. 2007); *Bourns v. Raychem*, 331 F.3d at 711-12 (readiness to enter market element).  CareFusion fails to allege these necessary elements.

### 1.    Fraud

CareFusion alleges that Kyphon fraudulently obtained the '404 and '888 patents by (1) misrepresenting that the only known treatment for vertebral compression fracture was bed rest and aspirin; and (2) failing to disclose the prior art of vertebroplasty.  (*See* Doc. # 1 at ¶¶ 74.)

CareFusion quotes pleadings from prior litigation involving these patents in which Medtronic asserted the defense of "inequitable conduct."  (*See id.* at ¶¶ 70-75.)  The fact that CareFusion quotes these allegations, verbatim, as the entirety of its *Walker Process* allegation, is itself indicative of the failure to allege the fraud element, because the standard for pleading *Walker Process* fraud is markedly higher than that for the defense of inequitable conduct.  "[A]n extremely high level of misconduct, actual fraud, is necessary to sustain a *Walker Process* antitrust claim . . . .  When a party seeks to collect monetary damages from a patentee because of alleged violations of the antitrust laws, it is appropriate to require a higher degree of misconduct for that damage award than when a party asserts only a defense against an infringement claim."  *Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 882 F.2d 1556, 1563 (Fed. Cir. 1989).  This is especially true because "*Walker Process*

12

1  claimants wield that conduct as a 'sword' to obtain antitrust damages rather than as a mere 'shield'

2  against enforcement of the patent[.]"  *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1348 (Fed. Cir.

3  2007) (internal citation omitted).

4        CareFusion must not only plead fraud, but do so with the level of particularity required under

5  Federal Rule of Civil Procedure 9(b).  *See In re Netflix Antitrust Litig.*, 506 F. Supp. 2d at 316-17.

6  For example, "Plaintiffs must identify with particularity the reference" allegedly not disclosed to the

7  Patent Office.  *Id.*  A "reference" refers to evidence of prior art such as a preexisting patent or

8  printed publication.  *See* 1 Chisum on Patents, Glossary at GI-20 (2010).  CareFusion does not

9  "identify with particularity" any fraudulently-omitted reference.[8]

10        Rule 9 requires pleading facts with particularity so that plaintiffs cannot blithely expose

11  defendants to the odium of accusations of fraud.[9]  Fraud is required to plead a *Walker Process* claim

12  so that plaintiffs cannot endanger the policies favoring patents and the First Amendment right to sue

13  for infringement.[10]  CareFusion has not alleged fraud with particularity, and therefore fails to state a

---

[8]     CareFusion cannot meet this requirement without revealing the implausibility of its case. That is exactly why the Supreme Court forbids antitrust plaintiffs from hiding behind boilerplate obscurity, requiring them to allege concrete facts so a court can see whether the allegations support a plausible claim.  *See Twombly,* 550 U.S. at 555-59.  For example, if CareFusion were to amend to plead as its "particular reference" the existence of a publication reflecting the alleged development of vertebroplasty in France in 1984 (*see* Doc. # 1 at ¶ 24), then CareFusion would have to also plead with particularity that, when Kyphon founder Dr. Reiley applied for his patents in 1989 (*see id.* at ¶ 27), he somehow had obtained the publication (despite the primitive state of the Internet at the time), and was able to read it in French or had a translation.  (A mere failure to cite a reference to the Patent Office does not constitute *Walker Process* fraud.  *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1071 (Fed. Cir. 1998).)  Such hypothetical facts are implausible on their face, and would conflict with the more realistic history narrated in Exhibit G to the Complaint, which describes how Dr. Reiley developed vertebroplasty procedures independently while doing the experiments leading up to the eventual development of kyphoplasty.  *See* Part II.C *supra*.  In any event, CareFusion must plead facts negating the more benign explanation that its own Exhibit G presents.  *See Dippin' Dots, Inc. v. Mosey*, 476 F.3d at 1347 ("an omission . . . could happen for any number of nonfraudulent reasons . . ."); *Twombly*, 550 U.S. at 554-58, 566 (antitrust complaint must allege more than facts which could *possibly* constitute unlawful conduct, nor do "neutral" facts coupled with "naked" conclusory assertions suffice; courts should "insist upon some specificity in pleading" facts which make plaintiff's characterization not just possible, but plausible) (internal citations omitted).

[9]     *See McFarland v. Memorex Corp.*, 493 F. Supp. 631, 636 (N.D. Cal. 1980) ("A primary purpose (of Rule 9(b)) is to prevent injury to the reputations of potential defendants from irresponsible, improvident, and cavalier allegations of fraud[.]" (quoting *Temple v. Haft*, 73 F.R.D. 49, 52 (D. Del. 1976)).

[10]     *See generally SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1203 (2d Cir. 1981) (enforcement of antitrust laws must be balanced against patent-law policy of encouraging invention); *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 56 (1993) (First Amendment right to petition).

1   claim for relief under its "Delayed Entry" theory.

2              **2.      But For Causation**

3              To plead a *Walker Process* claim, CareFusion must also allege that any misrepresentations or

4   omissions were a "but for" cause of the decision by the Patent Office to issue the '404 and '888

5   patents.  *Nobelpharma AB*, 141 F.3d at 1071 (plaintiff must make a "clear showing of reliance, *i.e.*,

6   that the patent would not have issued but for the misrepresentation or omission").

7              CareFusion does not allege *but for* causation.  (*See* Doc. # 1 at ¶¶ 70-75.)  By merely

8   parroting someone else's pleadings alleging the defense of inequitable conduct, CareFusion has

9   confined itself to the lesser elements of that defense.  *See* Part 1 *supra*.  Having omitted to allege

10  but-for causation, CareFusion has failed to state a claim for relief for its Delayed Entry theory.  *See*

11  *Correct Craft IP Holdings, LLC v. Malibu Boats, LLC*, No. 6:09-cv-813-Orl-28KRS, 2010 WL

12  598693, at *7, 2010 U.S.  Dist. Lexis 13577 at *23-24 (M.D. Fla. Feb. 17, 2010) (dismissing *Walker*

13  *Process* claim for failure to meet the "heightened threshold of materiality" because plaintiff failed to

14  allege that the "patent would not have issued *but for*" the alleged misconduct (*citing Dippin' Dots*,

15  476 F.3d at 1347) (emphasis in original)).  This failure cannot be cured, because the Patent Office

16  knew of the prior art of which vertebroplasty is an application.  *See* Part II.D *supra*.

17             **3.      Enforcement**

18             A third element of a *Walker Process* claim is enforcement, actual or threatened, of the

19  fraudulently obtained patents, against the plaintiff.  *See In re Netflix Antitrust Litig.*, 506 F. Supp. 2d

20  at 314.  CareFusion likewise fails to adequately allege this element.

21             For its Delayed Entry theory of injury, CareFusion alleges that it "made a business decision

22  to wait until the '888 and '404 patents expired before launching its balloon kyphoplasty product."

23  (*See* Doc. # 1 at ¶ 102.)  CareFusion alleges that the decision to delay was caused by Defendants'

24  "history of enforcing and threatening competitors" with their patents.  (*See id.*)  CareFusion alleges

25  that this history caused its product launch to be delayed "at least two (2) years."  (*Id.* at ¶¶ 158 &

26  169.) (The two years ended when CareFusion launched its products last month.  (*See id.* at ¶¶ 108-

27  11.).)

28             During those two years, Kyphon, which had brought the earlier lawsuits to enforce the '404

1   and '888 patents, did not exist as a stand-alone entity, having been acquired by Medtronic in 2007.

2   (*See id.* at ¶ 77.)  Moreover Kyphon's earlier lawsuits were not against CareFusion.  (*See id.* at

3   ¶¶ 56-60, 66-69).  Lawsuits against other companies cannot satisfy the enforcement element of a

4   *Walker Process* claim.  *See In re Netflix Antitrust Litig.*, 506 F. Supp. 2d at 318-319 (Netflix's

5   enforcement against Blockbuster was insufficient to establish threat against Amazon; complaint

6   must plead "that Netflix took some kind of enforcement against Amazon to maintain a *Walker*

7   *Process* claim").

8          CareFusion also blames its decision to delay product launch on "threats" by Medtronic.  The

9   Complaint cites three documents purportedly constituting "threats of enforcement" against

10  CareFusion.  (*See* Doc. # 1 at ¶ 102, *cross-referencing id.* at ¶¶ 85-95.)  But none of these documents

11  mentions CareFusion.  (*See id.* at ¶¶ 86-95 (*citing* Exhibits W, X & Y).)  None discusses the '404 or

12  '888 patents.  (*Id.*)  None mentions any specific patent at all.  (*Id.*)  None even discusses kyphoplasty

13  or vertebroplasty.  (*Id.*)

14         The selection of these documents appears to be a *post-hoc* compilation of published

15  statements that could be quoted out of context to conjure the specter of "threats."  For example,

16  Exhibit W is an article in the Sonoma County *Press Democrat* discussing local companies involved

17  in patent litigation, one of whom happened to be Medtronic (as a defendant) in a case involving its

18  vascular products division.  (*See* Doc. # 1, Ex. W.)  CareFusion does not allege that its executives

19  happened upon this article, or explain how they regarded it as a threat—against them—relating to

20  kyphoplasty.  The article itself shows that any such allegation would be absurd.[11]  Most importantly,

21  the article was published prior to when Medtronic acquired Kyphon (*see* Doc. # 1 at ¶ 77

22  (acquisition in 2007)), and therefore could not possibly threaten suit over the '404 and '888 patents,

23  since Medtronic did not yet own them (*see id.* at ¶¶ 75-77 (Medtronic acquires '404 and '888 patents

24

25  [11]     The article features local Sonoma County companies involved in patent litigation.  (HP
    spinoff Agilent and a start-up called Burst were the others.)  The article never mentions minimally-
26  invasive vertebral compression fracture treatment.  The Medtronic product line at issue was cardiac
    stents, and Medtronic was a defendant in the case being discussed (brought by Johnson & Johnson).
27  If anything, the article undercuts the notion that patent litigation could be perceived as a pointed
    "threat," noting such litigation is commonplace and increasing: "The biotech industry is also prone
    to patent litigation."  (*See* Doc. # 1, Ex. W.)  So the article does not support a characterization as a
28  threat being directed at CareFusion or litigation being an unusual event.

1   in 2007)).  *See Twombly*, 550 U.S. at 555-561 (antitrust complaint cannot withstand dismissal if

2   allegations are implausible).

3          The second alleged Medtronic "threat" is simply an excerpt from a standard "Risk Factors"

4   appendix to Medtronic's 10-K, warning investors about uncertainty of future earnings from

5   intellectual property litigation.  (*See* Doc. # 1, Ex. X.)[12]  If CareFusion was scared off by this

6   document, then it is afraid of its own shadow, because CareFusion's own 10-K contains a similar

7   appendix (as does that of every other medical-device company).  In any event, the Complaint does

8   not allege that CareFusion's executives read this document, or explain how they interpreted it as a

9   shot across the bow of their kyphoplasty launch.  *See Twombly*, 550 U.S. at 557-58 (antitrust

10  complaint "without some further factual enhancement . . . stops short of the line between possibility

11  and plausibility" and district court should "insist upon some specificity in pleading before allowing a

12  potentially massive factual controversy to proceed.") (internal citations omitted).

13         CareFusion's third alleged "threat" is even more of a stretch, inserting an ellipsis to change

14  the meaning of statements by Medtronic's CEO during a conference call with stock analysts.[13]  Once

15  ─────────────────
    [12]   The cited portion of the April 2008 Medtronic 10-K states:  "We rely on . . . patents to
16  protect our intellectual property" and "intend to defend against any threats . . . ."  (*See* Doc. # 1, Ex.
    X.)  This "Risk Factors" warning refers to a host of uncertainties involving patents (in either
17  offensive or defensive proceedings), noting that patents are critical in the industry.  (*See id.*)  No
    specific mention is made of CareFusion or kyphoplasty.  CareFusion does not quote the main body
18  of the 10-K, which has a section discussing Medtronic Spine Division products.  It mentions Kyphon
    but says nothing about patent litigation, CareFusion, or "threats."
19  [13]   CareFusion cherry-picks sentences from the May 20, 2008 earnings conference call, deleting
    the sentences in between the quoted portions and replacing them with an ellipsis.  CareFusion's
20  "quotation" in ¶ 92 of the Complaint says:  "Kyphon and Biologics helped to partially offset
    continued competitive pressures on our [Medtronic] spinal products in the United States.  We remain
21  committed to our strategy of raising the bar of competition . . . . We also remain committed to
    enforcing our portfolio of intellectual property."  (Doc. # 1 at ¶ 92.)  The full quotation says:

22                 Taken together, Kyphon and Biologics helped to partially offset
23                 continued competitive pressures on our core spinal products in the
                   United States.  We remain committed to our strategy of raising the bar
24                 of competition through continuous innovation and supporting the
                   safety, efficacy and cost effectiveness of our products with robust
25                 clinical data.  We also remain committed to enforcing our portfolio of
                   intellectual property.  During the quarter, we had a positive Markman
26                 hearing against one of our competitors.  This case is the first
                   significant assertion of key intellectual property including the
27                 Michelson patents against a growing number of competitors who we
                   believe infringe our IP.

28  (*Id.* at ¶ 92, Ex. Y.)  In other words, "raising the bar of competition" referred to non-litigation

                                                      16

1    again, CareFusion fails to allege that how these statements were interpreted by its decisionmakers as

2    a threat regarding the '404 and '888 patents, which were not mentioned in the call.  (*See* Doc. # 1,

3    Ex. Y.)

4          In short, none of these three statements amounts to threatened enforcement of the '888 and

5    '404 patents against CareFusion.  *See In re Netflix Antitrust Litig.*, 506 F. Supp. 2d at 317 ("threat"

6    must be directed "against certain identified ongoing or planned . . .  accused activity.") (internal

7    citations omitted).

8                    **4.      Preparedness to Enter the Market**

9          In order to have standing to assert a *Walker Process* claim, CareFusion must allege that it

10   was prepared to enter the market when it was sued or threatened by Defendants.  *See Bourns, Inc. v.*

11   *Raychem Corp.*, 331 F.3d 704, 711-12 (9th Cir. 2003) (an antitrust injury only arises when threats

12   are "addressed to a business in the market or to a business that was prepared to enter the market").

13         CareFusion does not allege that it was ready to enter the market at the time of Kyphon's

14   lawsuits or Medtronic's alleged "threats" invoking the '888 and '404 patents.  Indeed, CareFusion

15   alleges that it made a business decision to delay entry until the expiration of these patents.  (*See* Doc.

16   # 1 at ¶ 102.)  Thereafter it took CareFusion another year to be ready to launch.  (*Id.* at ¶¶ 103-08.)

17         CareFusion alleges that, notwithstanding its own business decision to delay product launch, it

18   nevertheless had "been interested" in entering the market "[f]or years."  (*Id.* at ¶ 101.)  But to have

19   standing, CareFusion must allege that it was "more than a hopeful bystander."  *See Bourns, Inc.*,

20   331 F.3d at 711.  CareFusion alleges that it had been involved in the bone cement industry.  (Doc.

21   # 1 at ¶¶ 97-100.)  But with respect to the recently-launched kyphoplasty products, CareFusion has

22   not alleged "readiness" at the time of "threats" with the kind of facts that the Ninth Circuit has held

23   are indicia of readiness:  assembling personnel, manufacturing facilities, and capital.  *See Bourns,*

24   *Inc.*, 331 F.3d at 711-12.

25                            *       *       *

26   product factors, such as safety and innovation, and the statement about "enforcing our portfolio of
     intellectual property" was a reference to litigation involving "Michelson patents," not kyphoplasty.
27   Read without ellipses, the document does not support CareFusion's characterization that these
     statements were threats of enforcement of the '888 or '404 patents (or any other kyphoplasty-related
28   patents).

1    In short, CareFusion has failed to allege key elements of a *Walker Process* claim: fraud, but-

2   for causation, enforcement or threats, or readiness to enter the market at the time of the alleged

3   threats.  *See Correct Craft IP Holdings, LLC*, 2010 WL 598693, at *7, 2010 U.S.  Dist. Lexis 13577

4   at *23-24 (dismissal is appropriate if plaintiff fails to allege an element of a *Walker Process* claim).

5   **B.    The "Threatened Cloud" Theory Lacks Allegations Sufficient to Confer Article III Standing and Fails to Allege "Antitrust Injury" by Tying CareFusion's "Injury" to Acts Unlawful Under Antitrust Law.**

6

7    CareFusion's second theory of antitrust injury alleges that Medtronic "threatens to continue

8   to harm CareFusion's ability to compete . . . by using illegally acquired third-party patent rights to

9   threaten litigation against CareFusion and cast a cloud over its Avamax™ balloon kyphoplasty

10  products."  (*See* Doc. # 1 at ¶¶ 159, 170).  The amorphousness of this formulation—"threatens to

11  threaten to cast a cloud"—is the first symptom of its insufficiency, and itself mandates dismissal for

12  failure to meet Article III's requirement of pleading injury with concreteness and immediacy.  *See*

13  Part 1 *infra*.  Nor does CareFusion allege "antitrust injury" by linking this amorphous injury with

14  any unlawful activity.  *See* Part 2 *infra*.

15          **1.    Article III Standing**

16   Article III standing requires that alleged injury be concrete, particularized, actual or

17  imminent, and not conjectural or hypothetical.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560

18  (1992).  The very words used in the Complaint negate that the alleged "threatened" "cloud" is either

19  concrete or imminent.  Nor is the alleged injury particularized.  *Id.* at 560.  CareFusion does not

20  allege facts showing what the "cloud" is.  There is no allegation of lost sales.  There is no allegation

21  of tainted goodwill.  By its own admission, CareFusion has not been excluded from the market.  It

22  launched its products last month.  (*See* Doc. # 1 at ¶¶ 110-11.)  Nor does CareFusion allege that its

23  products may infringe any of Defendants' patents; on the contrary, CareFusion's CEO says "We

24  have done our homework" and he is "very confident" that Medtronic's patents are "expired" or his

25  products are non-infringing.  (*See id.*, Ex. AA at 7.)

26          **2.    Antitrust Injury**

27   A plaintiff bringing an antitrust claim must allege "antitrust injury."  *American Ad Mgmt.,*

28  *Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).  The requirements for antitrust

18

injury are more stringent than those for Article III standing.  *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1363 (9th Cir. 1986).  There are four requirements for antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *American Ad Mgmt.*, 190 F.3d at 1055.

Taken together, these elements require the allegation of a link between alleged injury to plaintiff and a properly-pled claim of an antitrust violation.  *Bubar v. Ampco Foods*, 752 F.2d 445, 448-49 (9th Cir. 1985) (*citing Associated General Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).  CareFusion has failed to make the required link:  when the allegations are scrutinized, for each allegation of unlawful conduct, there is missing the required allegation of a cognizable injury to CareFusion.  Part II sorted the allegations and showed that many of the alleged acts, even if true, could not have caused antitrust injury to CareFusion as a matter of law.  *See, e.g.*, Part II.F (alleged elimination of a third-party competitor is not actionable by plaintiff competitor); Part II.G (defendant's removal of its own product from market is not actionable by plaintiff competitor).  Conversely, as will be shown here, even where the Complaint alleges injury to CareFusion, it does not allege a link with a properly-pled antitrust violation.  For example, Part III.A showed that, even where CareFusion alleges injury in the form of the "Delayed Entry" theory, the required link to unlawful action by Defendants is missing, because CareFusion has not alleged the elements of a *Walker Process* claim.  *See* Part III.A *supra*.

Likewise, CareFusion's second allegation of injury, the "Threatened Cloud" claim, even if it were alleged with sufficient particularity and immediacy to pass muster under Article III (*see* Part III.B.1 *supra*), is orphaned from any proper allegation of wrongdoing by Defendants.  CareFusion metaphorically links the Threatened Cloud with the "Litigation Overhang" of Defendants' patents. (*See* Doc. # 1 at ¶¶ 159, 170.)  But antitrust cases may no longer be pled by platitude.  *See Twombly*, 550 U.S. at 555-59 (proper pleading requires "more than labels").  The complaint must contain "some specificity" in "identifying" the crux of the alleged wrongdoing.  *Id.*  CareFusion makes boilerplate allegations about patents and acquisitions collectively, without identifying a single patent and alleging with respect to that patent the elements of an antitrust law violation and then how it

1    caused harm to CareFusion.  This alone is enough to dismiss the Complaint under *Twombly*.  *See id.*

2    at 557-58 ("something beyond the mere possibility of loss causation must be alleged, lest a plaintiff

3    with a largely groundless claim be allowed to take up the time of a number of other people . . . .")

4    (internal citations and quotations omitted).

5         But even doing CareFusion's homework, segregating specific patents from the collective

6    boilerplate (as far as the allegations permit), does not yield a link between the Threatened Cloud and

7    any properly alleged antitrust violation.  Reviewing the allegations as they were distilled in Part II

8    *supra*:

9         — **'404 and '888 Patents**.  These have expired, and hence could not be causing the

10   present Threatened Cloud.  *See* Part II.D *supra*.  (The Delayed Entry injury allegedly caused by

11   these patents was shown in Part III.A *supra* to be unsupported by allegation of the required

12   elements.)

13        — **Acquired Patents**:  The Complaint alleges a series of patent acquisitions by Kyphon

14   and later Medtronic.  (*See* Doc. # 1 at ¶¶ 1, 34, 36-48, 61, 65, 80.)  However, it is well-settled law

15   that mere patent ownership does not give rise to antitrust liability.  *See SCM Corp. v. Xerox Corp.*,

16   645 F.2d 1195, 1204 (2d Cir. 1981) ("[A] patent holder is permitted to maintain his patent monopoly

17   through conduct permissible under the patent laws.").  CareFusion must allege more.  Again and

18   again the only additional allegation is the boilerplate assertion that, on "information and belief," a

19   particular acquisition "was part of Defendants' scheme to eliminate competition" and "had the effect

20   of eliminating and/or diminishing competition . . . ."  (*See, e.g.*, Doc. # 1 at ¶¶ 39, 42, 45, 47.)  This

21   type of one-size-fits all arm-waving is no longer sufficient pleading in antitrust cases.  *See Twombly*,

22   550 U.S. at 555-58 ("specificity" is required, not "formulaic recitation").  CareFusion provides only

23   formulaic recitations in these allegations, and no specificity.  Nothing is alleged with respect to any

24   particular acquired patent as to, for example, what the patent covered,[14] how the patent specifically

---

25   14    In reality, many of the patents do not relate to kyphoplasty; some were acquired for defensive
26   purposes after their original owners claimed that a Defendant product infringed; others were
     acquired to enable the innovation of new technologies (a pro-competitive result encouraged by
27   antitrust law).  While these facts are not before the Court on this motion to dismiss, they illustrate the
     type of issues which, after *Twombly*, an antitrust plaintiff must address by alleging facts tending to
     negate such possible benign interpretations.  *See Twombly*, 550 U.S. at 554-58, 566 (antitrust
28   complaint must allege more than facts which could *possibly* constitute unlawful conduct, nor do

1   affects CareFusion (CareFusion denies that it infringes any of Defendants' patents (*see* Doc. # 1, Ex.

2   AA at 7)), or how the patent reduces competition in the alleged market, *see* fn. 1 *supra* (monopoly

3   claim requires reduction of competition).

4                   —   **Declaratory Judgment Patents ('043, '734, '110, '054).**

5            These patents apparently fall outside the scope of the Threatened Cloud theory, which is

6   based on patents which were allegedly "illegally *acquired*."  (*See* Doc. # 1 at ¶¶ 159, 170 (emphasis

7   added).)  These patents were internally developed by Kyphon inventors.  *See* Part II.E *supra*.

8   Therefore, Defendants presumptively cannot be liable under the antitrust laws for any resulting

9   monopoly power.  *See SCM Corp.*, 645 F.2d at 1207 (monopolization case, stating that "ordinarily

10  there is no limitation on a company's freedom to generate its own patents.").  Nor does the

11  Complaint allege facts showing how the lawful exclusionary power inherent in these patents was

12  increased by their transfer to Medtronic.  Indeed, there is no allegation of any fact explaining how

13  these patents reduce competition.  CareFusion denies that it infringes the patents, and its CEO says

14  they have "done our homework" and are "confident" that the patents do not impede CareFusion's

15  market entry.  (*See* Doc. # 1, Ex. AA at 7.)

16                  —   **Acquisitions of Other Companies**.

17           The Complaint alleges that Kyphon acquired a company called Disc-O-Tech and that

18  Medtronic acquired a company called Pabban.  Even accepting CareFusion's tendentious

19  characterization of these transactions, the Complaint alleges no resulting harm actionable by

20  CareFusion.  *See* fns. 5 & 6 *supra* and accompanying text.

21  **IV.   CONCLUSION**

22           CareFusion has not alleged the four key elements of a *Walker Process* claim: fraud, but-for

23  causation, enforcement or threats, and readiness to enter the market at the time of the alleged threats.

24  The reason these elements are not alleged is because disclosure of facts with the specificity required

25  by *Twombly* would show that CareFusion's claims are false, even absurd.  The Patent Office was

26  never defrauded, because the public record shows that the patent application disclosed the prior art

27

28  "neutral" facts coupled with "naked" conclusory assertions suffice; courts should "insist upon some
    specificity in pleading" facts which make plaintiff's characterization not just possible, but plausible).

of which vertebroplasty is a part.  And CareFusion cannot explain how it was "threatened" by the '404 and '888 patents, delaying products that it had supposedly yearned to launch "for years," only to now belatedly "discover" a basis for the alleged invalidity of these patents based on events that happened 20 years ago when the patents were issued.  CareFusion brags that it "does its homework" on patents, so if CareFusion truly delayed its product launch, it was because it knew the patents were valid, as an Article III court has already determined.  As Judge Posner stated in *Brunswick Corp. v. Riegel Textile*, "a patent known to the trade to be invalid will not discourage competitors from making the patented product or using the patented process, and so will not confer monopoly power . . . ."  752 F.2d at 265.

Equally implausible is the notion that Medtronic's statements were perceived by CareFusion's executives as enforcement "threats."  CareFusion's failure to properly allege this element is incurable, because it would be incredible to allege that CareFusion decisionmakers saw, let alone trembled in the face of, the *Sonoma Press Democrat*, a generic 10-K footnote, or Medtronic's CEO's praise of product innovation and safety.

Finally, if CareFusion truly believes that Medtronic's present patents "threaten to threaten a cloud," let them say so plainly and with particularity, as *Twombly* requires.  Let them identify a patent, and not one internally developed as the four Declaratory Judgment patents were, but acquired.  Allege what the patent covers, how its acquisition reduces market competition, and how it supposedly affects CareFusion's competition.  Only in this manner can CareFusion state a valid claim.

CareFusion has omitted these and other required allegations because it cannot make them plausibly in good faith.  But it should not be allowed to proceed with this case in the absence of a complaint that pleads the proper elements with the level of specificity that the law now requires.  The Supreme Court has imposed new stringency on antitrust pleading because these cases are so costly and time-consuming.  *Twombly*, 550 U.S. at 558.  "Deficiencies" in such cases must therefore be "exposed" at the pleading stage.  *Id.*  Even more exacting should be the scrutiny of a claim of "monopoly"—the hallmark of which is exclusion of competitors—when brought by a new market entrant who crows with confidence to the marketplace about not fearing competitors' patents.

22

1    This case is hollow at the core.  It should not be allowed to proceed based on a wrapping of

2  contradictory, irrelevant, or implausible yarns.

3    The Complaint fails to allege the elements of its claims.  (Part III.A *supra*.)  It also fails to

4  allege links between its theories of injury and any alleged antitrust violations of the Defendants.

5  (Part III.B *supra*.)  It should be dismissed.

6

7

8  DATED:  May 27, 2010                    Respectfully submitted,

9                                             */s/  Esha Bandyopadhyay*
                                           Jeffrey S. Davidson (S.B.N. 143633)
10                                          jeffrey.davidson@kirkland.com
                                           Luke L. Dauchot (S.B.N. 229829)
11                                          luke.dauchot@kirkland.com
                                           Martin R. Boles (S.B.N. 124159)
12                                          martin.boles@kirkland.com
                                           R. C. Harlan (S.B.N. 234279)
13                                          rc.harlan@kirkland.com
                                           Sean Christofferson (S.B.N. 240474)
14                                          sean.christofferson@kirkland.com
                                           KIRKLAND & ELLIS LLP
15                                          333 South Hope Street
                                           Los Angeles, CA  90071
16                                          Telephone:    (213) 680-8400
                                           Facsimile:    (213) 680-8500
17
                                           Esha Bandyopadhyay (S.B.N. 212249)
18                                          esha.bandyopadhyay@kirkland.com
                                           KIRKLAND & ELLIS LLP
19                                          950 Page Mill Road
                                           Palo Alto, CA  94304
20                                          Telephone:    (650) 859-7000
                                           Facsimile:    (650) 859-7500
21
                                           MEDTRONIC INC.,
22                                          MEDTRONIC SPINE LLC,
                                           and KYPHON SARL
23

24

25

26

27

28