1  Claude M. Stern (SBN: 96737)
   claudestern@quinnemanuel.com
2  Thomas R. Watson (SBN: 227264)
   tomwatson@quinnemanuel.com
3  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   555 Twin Dolphin Dr., 5th Floor
4  Redwood Shores, California 94065
   Telephone: (650) 801-5000
5  Facsimile: (650) 801-5100
6
7  Timothy J. Malloy, *pro hac vice*
   tmalloy@mcandrews-ip.com
8  James R. Nuttall, *pro hac vice*
   jnuttall@macandrews-ip.com
9  Christopher M. Scharff, *pro hac vice*
   csharff@mcandrews-ip.com
10 Stephanie F. Samz, *pro hac vice*
   ssamz@macndrews-ip.com
11 McANDREWS, HELD & MALLOY LTD.
12 500 West Madison Street, Suite 3400
   Chicago, Illinois 60661
13 Telephone: (312) 775-8000
   Facsimile: (312) 775-8100
14
15 Attorneys for Plaintiffs
   CareFusion Corporation and
16 CareFusion 2200 Corporation
17
18          UNITED STATES DISTRICT COURT
          NORTHERN DISTRICT OF CALIFORNIA
19            SAN FRANCISCO DIVISION
20
21                                          )
22 CAREFUSION CORPORATION and               )
   CAREFUSION 2200 CORPORATION,             )   Case No. CV10-01111-VRW
23                                          )
             Plaintiffs,                    )   **CAREFUSION'S OPPOSITION TO**
24                                          )   **MEDTRONIC'S MOTION TO DISMISS**
        v.                                  )   **ANTITRUST CLAIMS (COUNTS I AND**
25                                          )   **II)**
   MEDTRONIC, INC., MEDTRONIC               )
26 SPINE LLC d/b/a KYPHON INC., and         )   Hearing Date: September 16, 2010
   KYPHON SARL                              )   Time:        10:00 a.m.
27                                          )   Judge:       Hon. Vaughn Walker
             Defendants.                    )   Courtroom:   6
28                                          )

**<u>TABLE OF CONTENTS</u>**

I.    INTRODUCTION ................................................................................................ 1

II.   STATEMENT OF ISSUES TO BE DECIDED ............................................... 4

III.  STATEMENT OF FACTS—DEFENDANTS' SCHEME TO EXCLUDE
      COMPETITION IN VERTEBRAL COMPRESSION FRACTURE TREATMENTS ........... 4

      A.    The History Of The Market And The Parties' Competing Products ............................. 4

      B.    Medtronic Willfully Achieved And Maintained A Near-100% Monopoly
            Through Anticompetitive And Illegal Conduct ................................................ 9

      C.    CareFusion Has Been Harmed By Medtronic's Anticompetitive Conduct ................ 13

IV.   ARGUMENT—CAREFUSION HAS PLED FACTS STATING A CAUSE OF ACTION
      FOR ANTITRUST VIOLATIONS ............................................................. 15

      A.    A Motion To Dismiss Is Unwarranted If The Complaint States A Plausible
            Claim ............................................................................................... 15

      B.    Medtronic Does Not Argue That CareFusion's Pleadings of Monopoly Power
            Are Insufficient ................................................................................ 17

      C.    CareFusion Pled Facts To Show Medtronic Intentionally Acquired Or
            Maintained Its Monopoly Through Anticompetitive Conduct ................................... 18

            1.    Medtronic's Acquisition And Threatened Enforcement of Knowingly Invalid
                  And Unenforceable Patents Constitutes Anticompetitive Conduct Under
                  Section 2 Of The Sherman Act.................................................... 19

                  a.    Medtronic Indisputably Knew That The '404 And '888 Patents
                        Were Invalid And Unenforceable ...................................... 19

                  b.    Medtronic Threatened To Enforce Its Invalid And Unenforceable
                        Patent Rights ....................................................... 21

                  c.    Medtronic's Threatened Enforcement Of Its Invalid And
                        Unenforceable Patent Rights Was In Bad Faith ....................... 27

            2.    Medtronic's Illegal Pricing Scheme Constitutes Anticompetitive Conduct
                  Under Section 2 of the Sherman Act........................................... 29

            3.    Medtronic's Willful Acquisition of Competitors And Patents To Build A
                  Monopoly Constitutes Anticompetitive Conduct............................... 30

      D.    CareFusion Pled Antitrust Injuries Tied To Medtronic's Anticompetitive
            Conduct And Has Article III Standing To Sue ........................................... 34

            1.    CareFusion Was Injured By Its Delay Into Kyphoplasty Caused By
                  Medtronic's Threatened Enforcement of Knowingly Invalid Patents.................. 35

2.   CareFusion Was Injured By Medtronic's Illegal Pricing Scheme ......................... 37

3.   CareFusion Has Been And Continues To Be Injured By Medtronic's
Monopoly As A Whole ................................................................................... 38

V.    CONCLUSION .................................................................................................................... 40

1

## TABLE OF AUTHORITIES

2

3

**Cases**

4

*Abbott Labs. v. Mylan Pharm., Inc.*

5

No. 05-6561, 2007 U.S. Dist. LEXIS 12839 (N.D. Ill. Feb. 23, 2007) .........................................35

6

*Abbott Labs. v. Teva Pharms. USA, Inc.*,

7

432 F. Supp. 2d 408 (D. Del. 2006).........................................................35

8

*Abbyy Software House, Inc. v. Nuance Communications, Inc.*,

9

No. 08-1035, 2008 U.S. Dist. LEXIS 90308 (N.D. Cal. Nov. 6, 2008) .........................................32

10

*Alien Tech. Corp. v. Intermec, Inc.*,

11

No. 06-51, 2007 U.S. Dist. LEXIS 2851 (D.N.D. Jan. 4, 2007) .........................................26

12

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,

13

183 F.3d 568 (7th Cir. 1999) .........................................34

14

*Alternative Electrodes, LLC v. Empi, Inc.*,

15

597 F. Supp. 2d 322 (E.D.N.Y. 2009) .........................................27, 28

16

*Amarel v. Connell*,

17

102 F.3d 1494 (9th Cir. 1997) .........................................38, 40

18

*American Ad Mgmt., Inc. v. General Tel. Co.*,

19

190 F.3d 1051 (9th Cir. 1999) .........................................37

20

*Arcade, Inc. v. Minnesota Mining & Mfg. Co.*,

21

No. 88-141, U.S. Dist. LEXIS 19768 (E.D. Tenn. July 2, 1991) .........................................19, 21, 23

22

*Ashcroft v. Iqbal*,

23

129 S.Ct. 1937 (2009).........................................16

24

*Bell Atlantic Corp. v. Twombly*,

25

550 U.S. 544 (2007).........................................16

26

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,

27

182 F.3d 1096 (9th Cir. 1999) .........................................34

28

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft,*
    49 F. Supp. 2d 750 (D.N.J. 1999) ..................................................................22

*Black & Decker, Inc. v. Hoover Serv. Center,*
    765 F. Supp. 1129 (D. Conn. 1991) ..........................................................31, 32

*Bourns, Inc. v. Raychem Corp.,*
    331 F.3d 704 (9th Cir. 2003) .......................................................................36

*Brader v. Allegheny Gen. Hosp.,*
    64 F.3d 869 (3d Cir. 1995).........................................................................34

*Brandt Consol., Inc. v. Agrimar Corp.,*
    801 F. Supp. 164 (C.D. Ill. 1992) ...............................................................22

*Broadcom Corp. v. Qualcomm, Inc.,*
    501 F.3d 297 (3rd Cir. 2007) ......................................................................29

*Brunswick Corp. v. Riegel Textile Corp.,*
    752 F.2d 261 (7th Cir. Ill. 1984) ................................................................22

*Bubar v. Ampco Foods, Inc.,*
    752 F.2d 445 (9th Cir. 1985) ......................................................................36

*Burbank Aeronautical Corp. II v. Aeronautical Dev. Corp.,*
    No. 89-6244, 1990 U.S. Dist. LEXIS 15028 (C.D. Cal. May 23, 1990) ......................22

*Catch Curve, Inc. v. Venali, Inc.,*
    519 F. Supp. 2d 1028 (C.D. Cal. 2007) ...........................................15, 27, 28

*City of Anaheim v. S. Cal. Edison Co.,*
    955 F.2d 1373 (9th Cir. 1992) ....................................................................38

*Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.,*
    99 F.3d 937 (9th Cir. 1996) .......................................................................17

*CVD, Inc. v. Raytheon Co.,*
    769 F.2d 842 (1st Cir. 1985).......................................................................19

*Dr. Reddy's Labs., LTD v. AaiPharma, Inc.,*
    No. 01-10102, 2002 U.S. Dist. LEXIS 17287 (S.D.N.Y. Sept. 19, 2002) ........................24, 25, 26

*ErinMedia, LLC v. Nielsen Media Research, Inc.*,

    401 F. Supp. 2d 1262 (M.D. Fla. 2005) ...................................................32, 33

*Fed. Tel. & Radio Corp. v. Associated Tel. & Tel. Co.*,

    169 F.2d 1012 (3d Cir. 1948) ...............................................................................24

*Finnsugar Bioproducts, Inc. v. Monitor Sugar Co.*,

    No. 00-10381, 2002 U.S. Dist. LEXIS 25014 (E.D. Mich. June 10, 2002) ....................22

*Forsyth v. Humana, Inc.*,

    114 F.3d 1467 (9th Cir. 1997) .........................................................................34, 40

*Gilligan v. Jamco Dev. Corp.*,

    108 F.3d 246 (9th Cir. 1997) ...............................................................................15

*Glaxo Wellcome, Inc., v. Pharmadyne Corp.*,

    No. 96-455, 1996 U.S. Dist. LEXIS 10959 (D. Md. July 23, 1996) .......................24, 26

*Glen Holly Entm't, Inc. v. Tektronix Inc.*,

    352 F.3d 367 (9th Cir. 2003) ...............................................................................34

*Go-Video, Inc. v. Matsushita Elec. Indus. Co.*,

    11 F.3d 1460 (9th Cir. 1993) ...............................................................................36

*Grid Sys. Corp. v. Texas Instruments Inc.*,

    771 F. Supp. 1033 (N.D. Cal. 1991) .....................................................................19

*Handgards, Inc. v. Ethicon, Inc. (Handgards I)*,

    601 F.2d at 993 (9th Cir. 1979) ......................................................................19, 20

*Handgards, Inc. v. Ethicon, Inc.*,

    743 F.2d 1282 (9th Cir. 1984) ("*Handgards II*")...............................................2, 19

*Harrison v. Institutional Gang of Investigators*,

    No. 07-3824, 2009 WL 1277749 (N.D. Cal. May 6, 2009).........................................5, 7

*High Tech. Careers v. San Jose Mercury News*,

    996 F.2d 987 (9th Cir. 1993) ...............................................................................33

*Hoffman-La Roche, Inc. v. Genpharm, Inc.*,

    50 F. Supp. 2d 367 (D.N.J. 1999) .........................................................................27

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,

    627 F.2d 919 (9th Cir. 1980) ................................................................29, 37

*ICOS Vision Sys. Corp. v. Scanner Techs. Corp.*,

    No. 05-6322, 2006 U.S. Dist. LEXIS 13847 (S.D.N.Y. Mar. 27, 2006)................................27, 28

*IGT v. Alliance Gaming Corp.*,

    No. 04-1676, 2007 U.S. Dist. LEXIS 20668 (D. Nev. Mar. 22, 2007) ........................................20

*Image Tech. Servs. v. Eastman Kodak Co.*,

    125 F.3d 1195 (9th Cir. Cal. 1997)...................................................... passim

*In re Gabapentin Patent Litig.*,

    649 F. Supp. 2d 340 (D.N.J. 2009) ................................................................35

*In re Netflix Antitrust Litig.*,

    506 F. Supp. 2d 308 (N.D. Cal. 2007) ................................................................26

*International Travel Arrangers, Inc. v. Western Airlines, Inc.*,

    623 F.2d 1255 (8th Cir. 1980) ................................................................29

*Kobe v. Dempsey Pump Co.*,

    198 F.2d 416 (10th Cir. 1952) ................................................................31, 32

*La Salvia v. United Dairymen of Arizona*,

    804 F.2d 1113 (9th Cir. 1986) ................................................................3, 38

*Local Number 93, International Asso. of Firefighters, etc. v. Cleveland*,

    478 U.S. 501 (U.S. 1986)................................................................10

*Los Angeles Memorial Coliseum Comm'n v. National Football League*,

    791 F.2d 1356 (9th Cir. 1986) ................................................................39, 40

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (U.S. 1992).................................................................34, 40

*MedImmune, Inc. v. Genentech, Inc.*,

    127 S. Ct. 764 (2007)................................................................24

*Medi-Temp, LLC v. CVS Pharm., Inc.*,

    No. 05-3241, 2006 U.S. Dist. LEXIS 51331 ................................................................21

*Momento, Inc. v. Seccion Amarilla USA*,

    No. 09-1223, 2009 U.S. Dist. LEXIS 85295 (N.D. Cal. Sept. 16, 2009) ....................15, 16, 17, 32

*Morton Grove Pharm., Inc. v. Par Pharm. Cos.*,

    No. 04-7007, 2006 U.S. Dist. LEXIS 13779 (N.D. Ill. Mar. 28, 2006)..........................................20

*Movie 1 & 2 v. United Artists Communications, Inc.*,

    909 F.2d 1245 (9th Cir. 1990) .............................................................................................................33

*Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*,

    No. 06-4264, 2008 WL 914448 (N.D. Cal. Mar. 21, 2008) ...........................................................16

*Multiflex, Inc. v. Samuel Moore & Co.*,

    709 F.2d 980 (5th Cir. 1983) ...........................................................................................................3, 37

*N. Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*,

    163 F.3d 449 (7th Cir. 1998) ...............................................................................................................5

*Netflix, Inc. v. Blockbuster, Inc.*,

    No. 06-2361, 2006 U.S. Dist. LEXIS 63154 (N.D. Cal. Aug. 22, 2006) ...........................20, 27, 28

*Nobelpharma AB v. Implant Innovations, Inc.*,

    141 F.3d 1059 (Fed. Cir. 1998)...........................................................................................................21

*Panache Broad. v. Richardson Elecs., Ltd.*,

    No. 90-6400, 1995 U.S. Dist. LEXIS 14339 (N.D. Ill. Sept. 29, 1995) .........................................33

*Pecover v. Elec. Arts Inc.*,

    633 F. Supp. 2d 976 (N.D. Cal. 2009) ...................................................................................... passim

*Picante, Inc. v. Jimenez Food Prods., Inc.*,

    No. 81-625 U.S. Dist. LEXIS 15260 .................................................................................................23

*Pierce v. Ramsey Winch Co.*,

    753 F.2d 416 (5th Cir. 1985) .............................................................................................................39

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,

    508 U.S. 49 (1993)..............................................................................................................................19

*SecurityPoint Media, LLC v. Adason Group, LLC*,

    No. 07-444, 2007 U.S. Dist. LEXIS 57349 (M.D. Fla. Aug. 7, 2007) ...........................................27

*SMC Corp. v. Xerox Corp.,*

    645 F.2d 1195 (2d Cir. 1981)..............................................................................31

*Stewart-Warner Corp. v. Staley,*

    42 F. Supp. 140 (W.D. Pa. 1941)........................................................................31

*Teva Pharm. Indus., Ltd. v. Apotex, Inc.,*

    No. 07-5514, 2008 U.S. Dist. LEXIS 60418 (D.N.J. Aug. 7, 2008) ...............28

*Tucker v. Apple Computer, Inc.,*

    493 F. Supp. 2d 1090 (N.D. Cal. 2006) .............................................................33

*United States v. Microsoft Corp.,*

    253 F.3d 34 (D.C. Cir. 2001)........................................................................29, 30

*United States v. Parker-Rust-Proof Co.,*

    61 F. Supp. 805 (E.D. Mich. 1945)....................................................................31

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,*

    375 F.3d 1341 (Fed. Cir. 2004)..........................................................................24

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.,*

    382 U.S. 172 (1965).............................................................................................1

*Walter Kiddie Portable Equip. Inc. v. Universal Sec. Instruments, Inc.,*

    669 F. Supp. 2d 895 (N.D. Ill. 2009) ............................................................21, 22

*Western Concrete,*

    760 F.2d at 1018.................................................................................................37

*Xerox Corp. v. Media Sciences Int'l, Inc.,*

    511 F. Supp. 2d 372 (S.D.N.Y. 2007)...............................................................33

**Rules**

Fed. R. Civ. P. 11(b) ....................................................................................................20

Fed. R. Civ. P. 8(a) ......................................................................................................16

**Treatises**

3 Areeda & Hovenkamp, Antitrust Law, P651d, at 80..............................................29

William C. Holmes, Antitrust Law Handbook, at p. 885 (West 2009).......................39

**Regulations**

37 C.F.R. § 1.56(b) ................................................................................................................11

# I.     INTRODUCTION

CareFusion's antitrust claims in this case seek redress for Defendants' illegal monopoly relating to the market for a type of spinal procedure product—minimally invasive vertebral compression fracture ("VCF") products—including products for a procedure known as "kyphoplasty."[1]  Defendants do not dispute that they absolutely have a monopoly (i.e., 85-97% of the market) or that they acquired their monopoly by, *inter alia*: (1) enforcing and threatening to enforce patents that the Defendants knew were invalid and unenforceable; (2) using an illegal and fraudulent Medicare pricing scheme, and (3) acquiring hundreds of patents, licenses, and numerous companies to eliminate and restrain competition.  The Defendants' illegal monopoly has and will continue to injure CareFusion, other competitors, health care providers and patients, for example by continuing to exclude and hinder competitors such as CareFusion that offer beneficial and less expensive products.

Defendants seek to avoid liability for their illegal monopoly by asserting that CareFusion has not properly pled: (1) a "*Walker Process*" antitrust claim; or (2) an antitrust injury.  Defendants' arguments, however, completely miss the mark – CareFusion did not even plead a *Walker Process* claim,[2] but rather several other anticompetitive actions (e.g., "*Handgards*" claim, illegal Medicare pricing, and numerous acquisitions) that support CareFusion's claims.[3]  CareFusion has also pled numerous antitrust injuries, including lost vertebroplasty sales in one of the alleged markets, delayed entry into the market with a kyphoplasty product, and lost profits and growth due to competing against a monopolist, all of which are well established antitrust injuries.

---

[1] Defendants Medtronic, Inc., Medtronic Spine LLC d/b/a Kyphon, Inc., and Kyphon SARL are herein collectively referred to as "Medtronic" or "Defendants."  CareFusion Corporation and CareFusion 2200 Corporation are herein collectively referred to as "CareFusion."

[2] A Walker Process antitrust claim generally refers to the enforcement of patents that were procured by common law fraud, not just inequitable conduct.  *See Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).  At this time, however, CareFusion has not yet pled a conventional *Walker Process* claim, as much of the evidence on this issue is solely in Medtronic's control.  The facts, however, surrounding Medtronic's key patents do indeed suggest such a *Walker Process* antitrust violation and if, after discovery, CareFusion finds that the patents were procured by actual common law fraud, CareFusion will seek to amend its Complaint at that time.

[3] A "*Handgards*" antitrust claim generally refers to enforcing a patent that is known to be invalid or unenforceable.  *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282 (9th Cir. 1984) ("*Handgards II*")

In addition to missing the mark with respect to CareFusion's allegations, the Defendants also ask the Court to make numerous factual findings that are contrary to CareFusion's complaint. The Court, however, cannot make factual findings at this stage, as it must take CareFusion's factual pleadings as true and construe them in the light most favorable to CareFusion. *See* § IV *intra*. This is especially the case here, where the Defendants have asked the Court to make factual findings that are contrary to their own inventors' sworn testimony and documents!

The sole question for the Court on Defendants' motion is whether CareFusion's antitrust pleadings set forth facts that state a claim under the law. If CareFusion's Complaint contains allegations that, taken as true, adequately state a cause of action, the Court must deny Defendants' motion. Here, CareFusion has more than properly pled (a) monopoly power, (b) anticompetitive actions, and (c) injury required to state antitrust causes of action based on Defendants' conduct. Specifically, CareFusion described in its Complaint how Defendants have engaged in a concerted pattern of antitrust violations that includes the following:

(1)     Medtronic's purchase, maintenance, and enforcement of knowingly invalid patents: In 2005, Medtronic was sued by Kyphon, Inc. for infringing several patents allegedly necessary to perform kyphoplasty. Medtronic stated in verified pleadings that those patents were invalid and unenforceable. But mere months later, Medtronic purchased Kyphon and those very same patents that Medtronic knew were invalid and unenforceable. Medtronic then filed assignments with the Patent Office so that it could fully enforce those patents, and subsequently threatened to enforce those patents against other competitors in the market. Because of this conduct and these patents, CareFusion delayed releasing a competing kyphoplasty product for nearly two years, until these patents expired. Medtronic's conduct constitutes a well-recognized "*Handgards*" antitrust violation. *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282 (9th Cir. 1984) ("*Handgards II*"). The only facts that CareFusion needs to show to establish this violation—which CareFusion pled in detail—are that Medtronic used the threat of those patents to acquire or maintain a monopoly, that Medtronic threatened enforcement of those patents knowing them to be invalid and unenforceable, and that CareFusion was injured as a result.

1       (2) <u>Defendants' acquisition and maintenance of monopoly through illegal Medicare</u>

2    <u>pricing scheme:</u>  In 2007, two former Kyphon employees filed a whistle-blower lawsuit describing an

3    illegal scheme by the Defendants to market their kyphoplasty products.  Those former employees

4    detailed how Kyphon had for years convinced doctors and hospitals to switch from competing

5    vertebroplasty products to the company's kyphoplasty products via an illegal inflated Medicare

6    reimbursement scheme.  After Medtronic acquired Kyphon it settled these allegations with the federal

7    government for $75 million dollars.  But while that penalty may have reimbursed some of the harm

8    caused to Medicare, it did not remedy the harm the illegal pricing scheme caused to competition and

9    to CareFusion in particular.  Kyphon's illegal actions helped it acquire and/or maintain its strangle-

10   hold monopoly in the market, and caused CareFusion to lose significant sales of competing

11   vertebroplasty products.  *See, e.g.*, *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 992 (5th

12   Cir. 1983) (affirming §2 Sherman Act violation where defendant "maintains its monopoly power

13   through illegal means").

14      (3) <u>Defendants' acquisition and maintenance of monopoly through acquisitions of</u>

15   <u>companies and patents</u>:  Defendants' overall plan to acquire a monopoly through acquisition of

16   patents and potential competitors also constitutes an antitrust violation.  Over the past 10-15 years,

17   Defendants intentionally acquired as many competing companies, patents, and exclusive licenses in

18   the market as they could.  Many of those assets were acquired to shelve competing products and

19   technology, so that they could not be used by any competitor, and to help build Defendants'

20   monopoly.  CareFusion and other competitors in the market have been and will be harmed due to the

21   difficulty in competing against a monopolist (e.g., lost sales growth, lost sales, etc.).  *See, e.g.*, *La*

22   *Salvia v. United Dairymen of Arizona*, 804 F.2d 1113, 1116 (9th Cir. 1986) (pattern of exclusionary

23   conduct including acquisitions constituted an "unlawful quest for market dominance" that resulted in

24   harm "precisely the sort that the antitrust laws were intended to remedy").

25      Any one of the illegal courses of conduct pled by CareFusion gives rise to a cause of action

26   for antitrust violations.  Because each of these antitrust violations and the corresponding antitrust

27   injuries were pled in abundant detail by CareFusion, they more than meet the pleading requirements

28   and Defendants' motion to dismiss should therefore be denied.

## II.   STATEMENT OF ISSUES TO BE DECIDED

The sole issue to be decided by the Court is whether CareFusion's Complaint has put Defendants on notice of its antitrust claims and with enough factual details, which assumed to be true, raise a right to relief "above the speculative level."   Accordingly, the Court must deny Defendants' motion to dismiss if CareFusion has pled in sufficient detail that:

(1)      Defendants possess monopoly power in a relevant market (Count I) and/or have a dangerous probability of achieving monopoly power in a relevant market (Count II);

(2)      Defendants engaged in exclusionary conduct to acquire or maintain a monopoly (Count I) and/or engaged in anticompetitive conduct with an intent to monopolize (Count II); and

(3)      Defendants' anticompetitive conduct has or will injure competition in general and CareFusion in particular (Counts I and II).

## III.   STATEMENT   OF   FACTS—DEFENDANTS'   SCHEME   TO   EXCLUDE COMPETITION IN VERTEBRAL COMPRESSION FRACTURE TREATMENTS

### A.   The History Of The Market And The Parties' Competing Products

CareFusion and Medtronic are direct competitors in the market for minimally invasive vertebral compression fracture treatment products ("VCF" treatments).   (*See* Complaint at ¶¶ 17, 97-111.)   Vertebral compression fractures are fractures of the spine commonly caused by osteoporosis.   (*Id.* at ¶ 24.)   One type of VCF treatment is "vertebroplasty," which is essentially a two step process where first a needle is inserted into a vertebrae and then bone cement or related material is injected:



(*Id.* at ¶ 24.)   It is well recognized that vertebroplasty was first developed in France at least as early as 1984.   (*Id.*)   Numerous articles in both French and English were published relating to vertebroplasty between 1984 and 1992, and the procedure was widely known (contrary to Medtronic's assertions in

1    its motion)  Vertebroplasty has been performed in the United States since the mid-1990s, and

2    CareFusion has been selling vertebroplasty cement delivery products since 2006.  (*Id.* at ¶¶ 97-100.)

3         In 1988—a number of years <u>after vertebroplasty was developed</u>—Dr. Mark Reiley ("Reiley")

4    and Dr. Arie Scholten ("Scholten") allegedly developed a similar procedure called "kyphoplasty."[4]

5    As shown in the figure below, kyphoplasty is identical to vertebroplasty, except that before cement is

6    injected, an angioplasty-type balloon is first inflated in the vertebrae to create a cavity.  (*Id.* at ¶ 25.)

7

8
9    
10
11
12

13   Drs. Reiley and Scholten "developed" kyphoplasty by using balloon angioplasty catheters to create a

14   void in the vertebrae prior to injecting cement.  (*See id.* at ¶ 26, citing Ex. G at 4; Ex. H to at 1; Ex. I

15   at ¶¶ 67-77 (Medtronic's own statements in prior litigation).)[5]  Balloon angioplasty catheters were

16   well known and sold for decades before Drs. Reiley and Scholten allegedly invented kyphoplasty.

---

18   [4] Medtronic falsely asserts in its motion, without any support, that Drs. Reiley and Scholten: (a)
     independently developed vertebroplasty; and (b) developed kyphoplasty in 1984 before
19   vertebroplasty was developed in France.  (*See* Med. Br. at 13, fn. 8, 5:8-9, and 4:14-16.)  In fact,
     while not necessary to defeat Medtronic's motion, Drs. Reiley and Scholten <u>previously stated in a</u>
20   <u>sworn declaration that they did not invent kyphoplasty until 1988</u>.  Vertebroplasty, meanwhile, was
     developed about <u>four years</u> earlier, was described in French language publications at least as early as
21   1984 and English language publications at least as early as 1987, and was therefore prior art to all of
     Defendants' kyphoplasty patents which were filed in or after 1989.

22   [5] Medtronic suggests that the alleged inventors did not copy angioplasty balloons, and cites to some
     self-serving Medtronic statements in the exhibits attached to Carefusion's Complaint.  This allegation
23   is contrary to CareFusion's pleadings, which are to be accepted as true for purposes of Medtronic's
     motion.  Contrary to Medtronic's suggestion (Med. Br. at 4, 5, 13 n.8) CareFusion is not deemed to
24   have adopted in its pleading every word of every exhibit attached thereto–especially the self-serving
     statements to which Medtronic points.  *See, e.g., N. Indiana Gun & Outdoor Shows, Inc. v. City of*
25   *South Bend*, 163 F.3d 449, 454-57 (7th Cir. 1998); *Harrison v. Institutional Gang of Investigators*,
     No. 07-3824, 2009 WL 1277749, at *3 (N.D. Cal. May 6, 2009).  Moreover, Dr. Reiley testified
26   under oath that he did in fact copy angioplasty balloons in coming up with the alleged "invention" of
     kyphoplasty. (*See* Ex. 1, Reiley *Disc-O-Tech* trial testimony at 140-141 ("And [Scholten] suggested
27   why don't we use some of the medical balloon technology.  So we went down and got a balloon from
     the operating room, went to the cadaver lab, and tried it, and it worked.").)  Although this testimony
28   was not cited in CareFusion's Complaint, and is not necessary to defeat Medtronic's motion, it is
     probative of Medtronic's misrepresentations.

For example, Medtronic asserted that Kyphon's balloon kyphoplasty product infringed several of Medtronic's balloon angioplasty patents.



In 1989, Drs. Reiley and Scholten filed their first patent application relating to kyphoplasty, which eventually led to two patents—U.S. Patent Nos. 4,969,888 ("the '888 patent") and 5,108,404 ("the '404 patent"). (*Id.* at ¶¶ 27-28.)  Drs. Reiley and Scholten, however, never disclosed any of the numerous vertebroplasty references or their knowledge of vertebroplasty to the Patent Office during the prosecution of these two patents.  (*Id.* at ¶ 74.)  Medtronic previously asserted, and now must concede, that Drs. Reiley and Scholten were aware of vertebroplasty.  (*See id.*)  Incredulously, however, Medtronic argues that Drs. Reiley and Scholten were not required to disclose any vertebroplasty references to the Patent Office because they disclosed other allegedly similar references, i.e., references disclosing cement injected into leg bones (not the spine).  (*See* Med. Br. at 5.)  Not only is that position false and contrary to the Patent Office's disclosure requirements, it is directly contrary to what Medtronic itself asserted in prior litigation.  Indeed, Medtronic expressly asserted that the patents were unenforceable because the inventors' knowledge of prior vertebroplasty procedures was material and should not have been withheld.  (*See* Complaint at ¶ 74.)  Moreover, the vertebroplasty information was material because it contradicted the inventor's representation to the Patent Office that the only then-current treatments for vertebral body compression fractures were "bed rest, analgesics, and intravenous hydration."[6]  (*See id.*)

---

[6] Medtronic previously asserted the inventors made this false statement with the intent of deceiving the Examiner.  (Complaint at ¶ 74.)  Medtronic contradicts its own prior statements by interjecting different factual arguments into their motion.  Such factual determinations, especially determinations that CareFusion vehemently disputes, are inappropriate on a motion to dismiss.

Drs. Reiley and Scholten also did not disclose the well known angioplasty balloon prior art to the Patent Office. (*See* Complaint ¶ 26, Exs. G-I to Complaint.)  This is also staggering given that the Applicants merely made a small revision to vertebroplasty by using a prior art angioplasty balloon before injecting cement.[7]  Thus, despite having knowledge of both vertebroplasty and angioplasty balloons, the inventors withheld this prior art and claimed the combination of this prior art.



In about 1994, Drs. Reiley and Scholten, among others, founded Kyphon based on the '404 and '888 patents.  (*Id.* at ¶ 30.)  According to Kyphon, the broad claims of the '888 and '404 patents covered the entire kyphoplasty procedure and prevented any competitor from selling kyphoplasty products.  (*Id.* at ¶ 29.)  In subsequent years, Kyphon obtained approximately 50 more patents for trivial, obvious modifications to its kyphoplasty products.  (*Id.* at ¶ 33.)  In 2007, Medtronic acquired

---

[7] Medtronic now seeks to diffuse these facts by citing to self-serving comments of one of Kyphon's owners, asserting that the "balloons used in kyphoplasty were very different type of balloons than used in angioplasty." (Med. Br. at 4.)  CareFusion's Complaint (*see* ¶ 26) pleads facts directly contrary to Medtronic's argument, which must be taken as true.  *See, e.g., N. Indiana,* 163 F.3d at 454-57; *Harrison,* 2009 WL 1277749, at *3.  Furthermore, Medtronic's argument contradicts the sworn testimony of its own inventor, who testified the balloon used in their alleged conception of kyphoplasty was an off-the-shelf angioplasty balloon and that it "worked."  (*See supra* at fn. 5.)

1    Kyphon and all of these patents.  (*See id.* at ¶ 77.)  In 2009 the '888 and '404 patents both expired.

2    (*Id.* at ¶ 103.)  But by that time, the Defendants had used those patents in combination with a series of

3    anticompetitive actions to gain a monopoly in kyphoplasty and in the VCF treatment market as a

4    whole.  (*Id.* at ¶¶ 36-96.)  Since Medtronic's acquisition of Kyphon, Medtronic's market share has

5    been at least 85% in VCF treatment (including vertebroplasty) and has been approximately 97% in

6    kyphoplasty.  (*Id.* at ¶ 150.)

7            In about 2006, because CareFusion already possessed a sales force, manufacturing facilities,

8    and supply chain for vertebroplasty, it began the process to design and release a kyphoplasty product.

9    (*Id.* at ¶ 101.)  Because kyphoplasty is a minor modification from vertebroplasty (e.g., adding a

10   balloon product to the already existing vertebroplasty product line), it would have been natural for

11   CareFusion to offer a kyphoplasty product at that time.  (*Id.*)  However, because of the Defendants'

12   enforcement and continued threats to enforce the '404 and '888 patents against any competitors,

13   CareFusion delayed releasing a kyphoplasty product for nearly two years.  (*Id.* at ¶¶ 102, 158, 169.)

14   On January 28, 2009—strategically timed to coincide with the expiration date of Medtronic's two

15   main kyphoplasty patents—CareFusion applied for FDA approval for its kyphoplasty product.  (*Id.* at

16   ¶¶ 104-105.)  On July 1, 2009, CareFusion received approval for its first kyphoplasty product.  (*Id.* at

17   ¶ 106.)  CareFusion recently launched its kyphoplasty product and became one of the first serious

18   competitors to the Defendants' kyphoplasty product.  (*Id.* at ¶¶ 109-111.)  CareFusion's new

19   kyphoplasty product is not only less expensive than Medtronic's kyphoplasty product, it also

20   provides a meaningful choice with clinically differentiated features.  (*Id.* at Ex. AA (CareFusion's

21   products are "very competitively priced" and "safer and more effective for surgeons and

22   interventional radiologists to use").)[8]

23           In response to CareFusion's release of a competing kyphoplasty product, Medtronic made

24   immediate threats that it would "vigorously defend its intellectual property" in balloon kyphoplasty

---

[8] The Complaint does not set forth all of the details regarding the beneficial features of CareFusion's
26   kyphoplasty product compared to Medtronic's product, and a recitation of such facts is not necessary
to defeat Defendants' motion.  However, the evidence will show that among other things, (1)
27   CareFusion's products subject the doctor to less radiation, (2) CareFusion's products offer doctors the
choice of either performing vertebroplasty or kyphoplasty, (3) CareFusion's products offer an
28   advantageous cement mixing system, (4) CareFusion's products offer the ability for precise cement
delivery, and (5) CareFusion's products are less expensive.

against CareFusion. (*Id.* at ¶ 113.) Medtronic's CEO also told industry analysts that Medtronic was "very confident in [its] current family of BKP [balloon kyphoplasty] intellectual property and the protection it gives" and that Medtronic allegedly had a number of patents that "protect the space" of kyphoplasty. (*Id.* at ¶¶ 138-140.) Faced with Medtronic's continued efforts to exclude competition, CareFusion filed the present lawsuit, seeking (1) a declaratory judgment that four of Medtronic's patents are not infringed by CareFusion and/or are invalid and (2) damages against Medtronic for antitrust violations. CareFusion simply seeks the freedom to compete in the market on even footing and redress from the Defendants' antitrust violations.

### B. Medtronic Willfully Achieved And Maintained A Near-100% Monopoly Through Anticompetitive And Illegal Conduct

Defendants have an extensive history of using anticompetitive schemes in order to discourage competitors from launching competing kyphoplasty products. By doing so, Defendants have secured a monopoly in the VCF treatment market as a whole, as well as in the alternative kyphoplasty market. The anticompetitive schemes that allowed Defendants to secure a monopoly include at least: (1) illegal pricing schemes; (2) no less than seven acquisitions of competitors and/or their intellectual property; and (3) baseless enforcement and threatened enforcement of patents covering a monopolistic portion of the aforementioned markets.

Defendants began their anticompetitive scheming in at least 2000 when they engaged in an illegal pricing scheme aimed at artificially raising the prices on its kyphoplasty products and diverting business away from alternate treatments for vertebral compression fractures (e.g., vertebroplasty). (*See generally* Complaint at ¶¶ 49-54, Ex. K.) Starting in or around 2000 and continuing on for years, Defendants marketed kyphoplasty by inappropriately suggesting that hospitals and doctors could charge more for the procedure by keeping patients overnight, rather than doing the procedure on a typical outpatient basis. (*Id.* at ¶ 51, Ex. K.) Kyphon's illegal pricing scheme provided the hospitals and doctors with large monetary incentives to switch from vertebroplasty to kyphoplasty. Specifically, under Kyphon's illegal pricing scheme the hospitals and doctors could charge and be reimbursed by Medicare at a higher rate than would normally be allowed if the procedure had been done on an outpatient basis (as it was supposed to be done and as vertebroplasty was typically done). (*Id.*) This illegal pricing scheme misappropriated millions of

1    dollars from Medicare, allowed Defendants to sell their kyphoplasty products at artificially high

2    prices and wrongly diverted business away from alternate VCF treatments, namely the less-expensive

3    option of vertebroplasty.  (*Id*. at ¶ 52.)  Defendants do not dispute that its pricing scheme was

4    anticompetitive–and cannot credibly do so in light of the fact that Kyphon's scheme was the subject

5    of an investigation by the Department of Justice that resulted in Defendants paying the government

6    $75 million.  (*See* Med. Br. at 9 n.6; Complaint at ¶ 54, Ex. K.)

7        In addition to carrying out their illegal pricing scheme, in 2002 the Defendants also began to

8    acquire potential competitors and/or their intellectual property rights in the VCF treatment market.

9    (*See* Complaint at ¶¶ 36-48.)  As part of its scheme to eliminate competitors from the market, the

10   Defendants not only acquired these competitors and intellectual property rights but then proceeded to

11   "shelve" and never utilize many of the rights and products that it had acquired.  (*Id*. at ¶ 64.)

12       Defendants also furthered their anticompetitive scheme by embarking on a plan to enforce

13   invalid and unenforceable patents.  In 2005, Kyphon sued Disc-O-Tech for allegedly infringing the

14   '404 and '888 patents immediately after learning of Disc-O-Tech's competing kyphoplasty product.

15   (*Id*. at ¶¶ 55-65.)  Before Disc-O-Tech could invalidate the patents, however, Defendants eliminated

16   Disc-O-Tech as a competitor by settling the lawsuit and later acquiring Disc-O-Tech.  (*Id*. at ¶¶ 60-

17   65.)  On information and belief, the Defendants forced Disc-O-Tech to sign a consent degree of

18   validity on these basic patents in order to create the color of valid patents rights and scare future

19   competitors from launching competing products.[9]  (Med. Br. at 22.)  After acquiring Disc-O-Tech,

20   Kyphon removed Disc-O-Tech's kyphoplasty product from the market.  (*Id*. at ¶ 64.)

21       A similar pattern played out when Medtronic announced that it would be launching a

22   competing kyphoplasty product.  As it had done with Disc-O-Tech, Kyphon sued Medtronic for

23   infringement of the '404 and '888 patents.  (*Id*. at ¶¶ 66-69.)  Indeed, the day after Medtronic

24   launched its product, Kyphon filed a motion for a preliminary injunction.  During the course of that

25

26   [9]  Medtronic misleadingly asserts that "an Article III court has already determined" that "the ['888
     and '404] patents were valid."  (Med. Br. at 22.)  But a consent decree is <u>not</u> a determination of
27   validity.  Nor is it binding or enforceable on anyone not a party to the lawsuit.  *See Local Number 93,
     International Asso. of Firefighters, etc. v. Cleveland,* 478 U.S. 501, 529 (U.S. 1986) ("And, of course,
     a court may not enter a consent decree that imposes obligations on a party that did not consent to the
28   decree.").  Further, the consent decree at issue here contained no findings of fact, no conclusions of
     law, was not based on any evidence, witness testimony, or the like.

1   litigation, <u>Medtronic alleged in at least five separate pleadings, including three summary judgment</u>

2   <u>motions, that the '404 and '888 patents were invalid as a matter of law.</u>  (*Id*. at ¶¶ 70-72, 75-76,

3   Exs.O-Q.)   <u>Medtronic also alleged that the '404 and '888 patents were unenforceable due to</u>

4   <u>inequitable conduct.</u>  (*Id*. at ¶ 74, Ex. I.)  Specifically, Medtronic contended that Scholten and Reiley

5   had "specific knowledge" prior to the filing of the patent applications that issued as the '404 and '888

6   patents that "vertebroplasty was being performed as a method of treating vertebral fractures."  (*Id*. at

7   ¶ 74, Ex. I at ¶¶ 71-72 & 75-76.)  Medtronic alleged that "vertebroplasty is material prior art to the

8   ['888 and '404] patent[s]."  (*Id*. at ¶ 74.)  Medtronic asserted that Scholten and Reiley not only failed

9   to disclose this "highly material art" but also intentionally misrepresented to the Patent Office that the

10  only known treatments for vertebral compression fractures were "bed rest and aspirin."  (*Id*. at ¶ 74,

11  Ex. I at ¶¶ 70-77.)  According to Medtronic, these acts were done with the "intent to deceive the

12  PTO" and as such these deceptive acts "render[] the claims of the ['404 and] '888

13  patent[s]...unenforceable."  (*Id*. at ¶ 74, Ex. I at ¶¶ 73 & 77.)[10]  Several months later, however,

14  Medtronic acquired and merged with Kyphon, and purchased the very same patents Medtronic

15  asserted were invalid and unenforceable.  (*Id*. at ¶ 77.)  After acquiring Kyphon, Medtronic removed

16  its own competitive kyphoplasty product from the market.[11]  This approximately $4 billion

17  merger/acquisition allowed the Defendants to maintain and enhance their monopoly by combining

18  Kyphon's monopoly with Medtronic's capabilities as one of the world's largest medical device

19  companies (e.g., manufacturing, selling, funding, etc.).  Additionally, by acquiring the knowingly

20  _____

21  [10]  Medtronic's current litigation-inspired suggestion that the vertebroplasty prior art was merely
    cumulative of the prior art already before the patent examiner (Med. Br. at 5-6 & 13-14) cannot be

22  squared with its' previous assertions.  As noted above, Medtronic admitted that the vertebroplasty
    prior art was "highly material art" to the '404 and '888 patents.  (Complaint at ¶ 74, Ex. I at ¶¶ 73,

23  77.)  Prior art is only considered "material" if it is noncumulative.  *See* 37 C.F.R. § 1.56(b) (providing
    that "information is material to patentability when it is not cumulative...").  Moreover, Medtronic

24  does not, and indeed cannot, dispute that the statements made by the inventors to the PTO were false.
    Medtronic likewise does not dispute that the vertebroplasty art was not before the examiner.

25  Medtronic's assertion that the vertebroplasty prior art would not have prevented the '404 and '888
    patents from issuing, although not germane to the issues before the Court, is incorrect.

26

27  [11]  Prior to Medtronic's acquisition of Kyphon, the investment community recognized that Medtronic
    would have been a strong competitor to Kyphon in the minimally invasive vertebral compression

28  fracture treatment product market and in the alternative kyphoplasty product market. (*See* Complaint
    at ¶78, citing Exhibit T to Complaint.)

1   invalid '404 and '888 patents, Medtronic ensured that it could continue to use them to deter

2   competitors from launching competing kyphoplasty products.

3   After Medtronic acquired Kyphon, the Defendants continued their scheme of eliminating

4   competition.  For example, Defendants continued to acquire companies and intellectual property

5   related to VCF treatment, including kyphoplasty.  (*Id.* at ¶¶ 81-85.)  Medtronic also combined its

6   general aggressive patent enforcement policy with Kyphon's aggressive enforcement of its invalid

7   and unenforceable kyphoplasty patents.  (*See id*. at ¶¶ 86-96.)  For example, after acquiring the

8   knowingly invalid '404 and '888 patents, Medtronic made multiple statements threatening

9   enforcement of those patents should anyone launch a competing kyphoplasty product.  (*Id.*)

10  Specifically, on May 20, 2008, when Medtronic's CEO spoke about its now-subsidiary Kyphon, he

11  informed the public that Medtronic "remained committed to enforcing our portfolio of intellectual

12  property," warned of future litigation, and bolstered his threats by referencing Medtronic's alleged

13  recent litigation successes in the spinal field. (*Id.* at ¶ 92; *see also id*. at ¶¶ 86-91.)  Around the same

14  time, Medtronic took specific affirmative steps to protect its interest in the '404 and '888 patents.

15  (*Id*. at ¶¶ 93-95.)  In order to ensure its ability to fully enforce the invalid and unenforceable patents,

16  Medtronic's subsidiary, Medtronic Spine, recorded its patent assignments to those patents with the

17  PTO.  (*Id*. at ¶ 94.)  Just months later Defendants recorded assignments of those patents from

18  Medtronic Spine to another subsidiary, Kyphon SARL.  (*Id*. at ¶ 95.)

19  In light of Medtronic's previous admissions that the '404 and '888 patents were invalid and

20  unenforceable, Medtronic's threatening statements and actions were both objectively and subjectively

21  baseless.  Moreover these actions were undertaken with the intention of discouraging competitors

22  from launching competing kyphoplasty products thereby eliminating competition in the VCF

23  treatment market and the alternative kyphoplasty market.  (*Id*. at ¶¶ 1, 23, 90, 94-96, 152, 154, 165,

24  167.)  Medtronic's actions have therefore allowed Medtronic to continue to enjoy its monopoly of the

25  VCF treatment market and the alternative kyphoplasty market—a monopoly that was (as outlined

26  above) not the product of business growth as a consequence of superior product, business acumen or

27  historic accident, but rather was achieved through illegal pricing schemes, multiple competitor and

28  patent acquisitions, and bad faith patent enforcement.

1  **C.   CareFusion Has Been Harmed By Medtronic's Anticompetitive Conduct**

2  Medtronic's years-long concerted effort to exclude all competitors in the VCF treatment

3  market has caused millions of dollars in injury to competition as a whole, to consumers, and to

4  CareFusion in particular.  Medtronic's scheme has eliminated and diminished competition in the VCF

5  market and in kyphoplasty.  Moreover, each of Medtronic's specific anticompetitive actions has

6  injured CareFusion and other competitors as well as consumers.[12]

7  First, Medtronic harmed competition as a result of maintaining its monopoly through the

8  enforcement and threatened enforcement of the knowingly invalid '888 and '404 patents.  (*See*

9  Complaint at ¶¶ 154-155, 158-160 and 55-80, 86-96, 112-147.)   As discussed above, there is no

10  question that Medtronic knew that these patents were invalid and unenforceable—Medtronic itself set

11  forth in detailed pleadings (that were required to have a good faith Rule 11 basis) the evidence

12  proving their invalidity and unenforceability before it purchased Kyphon.  (*See supra* at 10-11.)  If

13  Medtronic had successfully invalidated the '888 and '404 patents rather than buying them, other

14  competitors (including CareFusion) could have released competing kyphoplasty products much

15  earlier.  (*See* Complaint at ¶ 80.)  But instead, by acquiring the knowingly invalid patents, recording

16  their purchase in the Patent Office, and continuing to threaten to enforce them, Medtronic prevented

17  any competition.  (*See id.* at ¶¶ 86-96.)

18  As a result, no significant competitor released a competing kyphoplasty product between 2007

19  (when Medtronic purchased the '888 and '404 patents knowing them to be invalid) and 2009 (when

20  the patents expired).  (*See id.* at ¶ 96.)  During this time, consumers suffered from a lack of choice in

21  the market that should have been available.  (*See id.*)  CareFusion intentionally delayed releasing a

22  kyphoplasty product due to Medtronic's threatened enforcement of the '888 and '404 patents.  (*See*

23  *id.* at ¶ 102.)  Now that CareFusion has recently released a kyphoplasty product, its product has been

24  described as less-expensive than and clinically differentiated from Medtronic's product.  (*See*

25  Complaint at Ex. AA (CareFusion's products are "very competitively priced" and "safer and more

26

27  ---
[12] Defendants incorrectly assert CareFusion was not excluded and/or afraid of the Defendants' patents
because CareFusion has <u>now</u> entered the market.  Defendants, however, ignore the fact that their '888
and '404 patents are now expired and that CareFusion was improperly excluded from selling a
kyphoplasty product for approximately two years before these patents expired.  CareFusion was,
therefore, prevented from building a competitive foundation in the market.

28

effective for surgeons and interventional radiologists to use").)  But CareFusion's product would have been available to consumers much earlier had it not been for Medtronic's anticompetitive conduct.  (*See id.* at ¶¶ 155-160, 169-171.)  CareFusion, therefore, lost millions of dollars because it could not release its kyphoplasty product earlier.  (*Id.*)  CareFusion's growth in its kyphoplasty products also has been hindered by having to compete against a monopolist that has the upper hand in establishing a clinical track record, industry acceptance, and customer relations.  (*See id.*)

Second, the Defendants harmed competition as a result of acquiring and maintaining its monopoly through an illegal Medicare pricing scheme.  By growing their kyphoplasty sales through illegal Medicare pricing, the Defendants improperly diverted sales away from competing vertebroplasty manufacturers, including CareFusion. (*See* Complaint at ¶¶ 51, 54, 97-100, 148, 151, 155, 157, 169, 170.)  Contrary to Defendants' assertion that vertebroplasty is unsafe, vertebroplasty has been performed thousands of times over the last two decades and makes up (dollar-wise) approximately 15% of the VCF market.  (*See id.* at ¶¶ 97-100, 163; *see also* Ex. CC to Complaint (CareFusion's vertebroplasty product line is "well received (but small)").)  Due to Defendants' illegal overcharging of Medicare, however, hospitals and surgeons adopted Defendants' kyphoplasty products in situations where they otherwise would have purchased vertebroplasty products from CareFusion or other competitors.  (*See id.* at ¶¶ 49-53, 155, 157, 170; *see also* Ex. K to Complaint (describing Defendants' illegal pricing as "aggressive marketing schemes intended to increase sales of unnecessary devices or procedures").)   CareFusion lost millions of dollars in vertebroplasty sales to the Defendants as a result of their illegal Medicare pricing.  (*See id.* at ¶¶ 97-100, 155-160.)

Third, the Defendants' pattern of anticompetitive conduct as a whole (including their acquisition of companies, patents, and licenses) has injured competition by further expanding the Defendants' monopoly.  (*See* Complaint at ¶¶ 155-160, 164-171.)  Because the Defendants have a strangle-hold on the market, it is more difficult for competitors to compete.  (*See* Complaint at ¶ 22, 155-156, 164-166.)  For example, consumers (i.e., doctors and hospitals) are more likely to purchase from a monopolist because its product is seen as the industry standard.  (*See id.*)  They are also more likely to use a product that is more widely used by others due to its established clinical history—a clinical history that is much easier for a monopolist to establish.  (*See id.*)  Because of these and other

reasons, CareFusion and other competitors have made and will make fewer sales than they otherwise would have in a non-monopolist market, and have experienced and continue to experience less sales growth.  (*See id.* at ¶¶ 22, 155-156, 170.)  Consumers in turn have suffered due to the decreased availability of less expensive, safer, and more effective alternatives to the Defendants' kyphoplasty products.  (*See id.* at ¶¶ 155-160, 164-166, 170; *see also* Complaint at Ex. AA (CareFusion's products are "very competitively priced" and "safer and more effective for surgeons and interventional radiologists to use"); Complaint at Ex. DD (CareFusion's product lower priced than Medtronic's); Ex. EE (CareFusion is "the first company on the market to offer both [vertebroplasty and kyphoplasty] and through the same delivery system").)

## IV.   ARGUMENT—CAREFUSION HAS PLED FACTS STATING A CAUSE OF ACTION FOR ANTITRUST VIOLATIONS

Defendants' illegal actions to obtain and maintain a near 100% monopoly are exactly the types of anticompetitive conduct that the Sherman Act is intended to remedy.  Medtronic does not dispute in its motion that it possesses a monopoly.  Rather, Medtronic's motion only disputes that: (1) Medtronic's actions constitute a willful acquisition of that monopoly and/or an intent to destroy competition; and (2) CareFusion was injured and has standing as a result.   But Medtronic's arguments in this regard mischaracterize CareFusion's pleadings and relate to an antitrust allegation CareFusion did not even plead.  Medtronic also mischaracterizes or does not address the various antitrust injuries suffered by CareFusion.  Once the Court cuts through Medtronic's misdirection and analyzes the numerous antitrust violations and injuries that CareFusion did in fact plead, it is apparent that Medtronic's motion is meritless.

### A.   A Motion To Dismiss Is Unwarranted If The Complaint States A Plausible Claim

"Motions to dismiss for failure to state a claim are disfavored, and [Rule] 12(b)(6) dismissals are proper only in 'extraordinary cases.'"  *Catch Curve, Inc. v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1034 (C.D. Cal. 2007) (citing *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir. 1997); *see also Momento, Inc. v. Seccion Amarilla USA*, No. 09-1223, 2009 U.S. Dist. LEXIS 85295, at *1-2, 12-13 (N.D. Cal. Sept. 16, 2009) ("[M]otions to dismiss 'are particularly disfavored in fact-intensive antitrust cases.") (emphasis added).  That is because a motion to dismiss under Rule 12(b)(6) simply "tests the legal sufficiency of the claim."  *Pecover v. Elec. Arts Inc.*, 633 F. Supp. 2d 976, 979 (N.D.

Cal. 2009) (emphasis added) (Walker, J.); *see also Momento*, 2009 U.S. Dist. LEXIS 85295, at *12 (explaining that to overcome a motion to dismiss "the plaintiff must plead its claim but it need not plead its evidence"); *Multi Denominational Ministry of Cannabis & Rastafari, Inc. v. Gonzales*, No. 06-4264, 2008 WL 914448, at *3 (N.D. Cal. Mar. 21, 2008) (Walker, J.) ("The standard is a liberal one that does not require a plaintiff to set forth all the factual details of the claim. . . .").

Accordingly, a motion to dismiss can only be granted "if [the] plaintiff fails to proffer 'enough facts to state a claim to relief that is plausible on its face.'" *Pecover*, 633 F. Supp. 2d at 979 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)[13]; *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"). "Allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. Moreover, all inferences reasonably drawn from these facts must be construed in favor of the responding party." *Pecover*, 633 F. Supp. 2d at 979 (citations omitted) (emphasis added). In other words, in ruling on a motion to dismiss, the Court must focus "on the sufficiency of the claim—and not on the claim's substantive merits." *Id.*; *Twombly*, 550 U.S. at 563 n.8 (a complaint that adequately states a claim may not be dismissed based on a premature assessment of evidentiary support).

Antitrust claims are not subject to any special heightened pleading requirements. *See Momento*, 2009 U.S. Dist. LEXIS 85295, at *2 ("There is no special pleading rule requiring greater factual specificity in antitrust cases."). Rather, antitrust claims are governed by the "short and plain statement" rule provided for in Federal Rule of Civil Procedure 8. *See id.*; Fed. R. Civ. P. 8(a).

In particular, a claim for "actual monopolization" under the Sherman Act is proper if it alleges: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has

---

[13] *Twombly* is distinguishable from this case. *Twombly* dealt with a Section 1 conspiracy allegation. *Twombly*, 550 U.S. at 556-57. The plaintiffs sought to plead an antitrust conspiracy with factual allegations of mere parallel conduct by the defendants and conclusory allegations of an agreement to conspire that was inferred from the parallel conduct. *Id.* at 564-65. The Supreme Court held these allegations insufficient. *Id.* at 556-57 ("[L]awful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.") Here, in contrast, CareFusion has provided factual (not conclusory) allegations detailing both Defendants' anticompetitive conduct under Section 2 and the injury suffered by CareFusion. CareFusion's complaint easily meets the pleading standards set forth in *Twombly*.

willfully <u>acquired or maintained that power</u>; and (3) the defendant's conduct has caused <u>antitrust</u> <u>injury</u>." *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 949 (9th Cir. 1996) (emphasis added). "Willful acquisition" or "maintenance of monopoly power" is shown by evidence of "exclusionary conduct." *Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. Cal. 1997). Similarly, a claim for "attempted monopolization" is proper if it alleges: "(1) <u>specific</u> <u>intent</u> to control prices or destroy competition; (2) predatory or <u>anticompetitive conduct</u> to accomplish this monopolization; (3) <u>dangerous probability</u> of success [of achieving a monopoly]; and (4) causal <u>antitrust injury</u>." *Id.* at 949-50 (emphasis added); *see also Momento*, 2009 U.S. Dist. LEXIS 85295, at *12. The causal antitrust injury prong of both actual and attempted monopolization claims simply requires the plaintiff to allege that "his loss flows from an anticompetitive aspect or effect of the defendant's behavior." *Cost*, 99 F.3d at 949 n.13.

### B.    Medtronic Does Not Argue That CareFusion's Pleadings of Monopoly Power Are Insufficient

Medtronic <u>does not dispute</u> in its motion that CareFusion has sufficiently pled the "monopoly power in the relevant market" required for an "actual monopolization" claim and the specific intent "to destroy competition" and "dangerous probability of success" in achieving market power of an "attempted monopolization" claim.[14] (*See* Med. Br.)

First, CareFusion defined the relevant market as "the minimally invasive vertebral compression fracture treatment product market, which includes, but is not limited to, kyphoplasty (by balloon or otherwise) and vertebroplasty" or alternatively "the kyphoplasty product market," both in the United States. (*See* Complaint at ¶¶ 18-19.) *See also Image Tech.*, 125 F.3d at 1203 ("The relevant market is the field in which meaningful competition is said to exist.") Medtronic does not dispute CareFusion's pleadings of the relevant market.

Second, CareFusion pled that Medtronic owns a dominant share in either market. Specifically, Medtronic obtained and continues to maintain "approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market" and

---

[14] To demonstrate market power, a plaintiff must: "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Image Tech.*, 125 F.3d at 1202.

"approximately a 97% or more market share in the alternative kyphoplasty product market." (Complaint at ¶ 150.) Courts "generally require a 65% market share to establish a prima facie case of market power." *Image Tech.*, 125 F.3d at 1206. Again, Medtronic does not dispute CareFusion's pleadings that Medtronic owns a dominant share in the market.

Third, CareFusion described the significant barriers to entry and expansion in the market. *See Image Tech.*, 125 F.3d at 1208 (the third requirement of monopoly power "concerns barriers to market entry and barriers to expansion"). CareFusion described barriers to entry and expansion including "extensive regulatory approval time, the high cost of developing and producing a minimally invasive vertebral compression fracture treatment product, physician unwillingness to switch product manufacturers, physician preferences toward devices with long clinical track records, and Kyphon's/Medtronic's perceived market leadership." (Complaint at ¶ 22.) The Ninth Circuit recognizes exactly these types of "barriers to entry." *Image Tech.*, 125 F.3d at 1208. Medtronic does not dispute CareFusion's pleadings of barriers to entry.

Accordingly, the Court need not engage in a detailed analysis as to whether CareFusion sufficiently pled the requisite "monopoly power in the relevant market" and/or "specific intent to control prices or destroy competition" and "dangerous probability of success." Medtronic does not dispute that CareFusion properly pled these key antitrust requirements.

### C.   CareFusion Pled Facts To Show Medtronic Intentionally Acquired Or Maintained Its Monopoly Through Anticompetitive Conduct

Medtronic's attacks on CareFusion's pleadings of anticompetitive conduct fail for numerous reasons, including because they are based on a fundamentally flawed premise that CareFusion's Complaint alleges a *Walker-Process* claim (i.e., antitrust liability arising from the enforcement of a patent procured by common law fraud on the PTO, not mere inequitable conduct). Medtronic's motion to dismiss, however, completely fails to address the antitrust allegations actually raised in CareFusion's complaint, namely: (1) Defendants' bad faith patent enforcement under *Handgards* and its progeny; (2) Defendants' illegal Medicare fraud pricing scheme; and (3) Defendants' illegal acquisitions of patents, licenses and companies. Thus, the vast majority of Medtronic's motion is irrelevant because it relates to an allegation that CareFusion has not yet made, and ignores those allegations that CareFusion has made.

1
2
                    **1.    Medtronic's Acquisition And Threatened Enforcement of Knowingly
                           Invalid And Unenforceable Patents Constitutes Anticompetitive
                           Conduct Under Section 2 Of The Sherman Act**

3          Medtronic completely fails to address CareFusion's pleading of Defendants' bad faith

4   enforcement of knowingly invalid and unenforceable patents under *Handgards*.  Under *Handgards*

5   and its progeny, "the threat of unfounded [patent] litigation in bad faith is sufficient to constitute a

6   cause of action under the antitrust laws, provided that the other essential elements of a violation are

7   proven." [15]  *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985); *see also Handgards, Inc. v.

8   Ethicon, Inc. (Handgards I)*, 601 F.2d at 993-98 (9th Cir. 1979); *Handgards II*, 743 F.2d at 1288;

9   *Grid Sys. Corp. v. Texas Instruments Inc.*, 771 F. Supp. 1033, 1041 (N.D. Cal. 1991); *Arcade, Inc. v.

10  Minnesota Mining & Mfg. Co.*, No. 88-141, 1991 U.S. Dist. LEXIS 19768, at *48-53 (E.D. Tenn.

11  July 2, 1991), *aff'd*, 1 F.3d 1253 (Fed. Cir. 1993).  A patent owner's patent enforcement threat is in

12  bad faith when the threat is "objectively baseless in the sense that no reasonable litigant could

13  realistically expect success on the merits" and the baseless threatened enforcement "conceals an

14  attempt to interfere directly with the business relationships of a competitor."  *Professional Real

15  Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).  Here, it is clear that

16  CareFusion's complaint is more than adequate.  As explained below, CareFusion's complaint pled

17  ample facts illustrating the three elements necessary to make out a *Handgards* claim, namely that:

18  (1) Medtronic knew that the '404 and '888 patents were invalid and unenforceable; (2) Medtronic

19  threatened to enforce these patent rights; and (3) Medtronic made these threats in bad faith.

20  Medtronic's motion should therefore be denied.

21                  **a.    Medtronic Indisputably Knew That The '404 And '888 Patents
                           Were Invalid And Unenforceable**

22          As noted above, in order to plead bad faith patent enforcement, a complaint must allege that

23  the threatened patent enforcement was <u>unfounded</u>.  Typically, <u>unfounded</u> patent enforcement occurs

24  when a patent owner has "actual knowledge that certain patents were invalid" or unenforceable.

25

---

26  [15] A *Handgards* claim also requires the other elements of an actual and/or attempted monopolization claim, *e.g.,* monopoly power/dangerous probability of monopoly power in a relevant market, antitrust injury, and (for attempted monopolization) specific intent to eliminate competition.  As discussed

27  *supra,* Medtronic does not dispute that CareFusion's allegations relating to monopoly power and specific intent.  Moreover, as discussed *infra*, Medtronic's arguments that CareFusion has not

28  suffered the requisite antitrust injury are meritless.

*Grid*, 777 F. Supp. at 1041 (denying motion to dismiss *Handgards* claim based on knowledge of unenforceability); *see also Morton Grove Pharm., Inc. v. Par Pharm. Cos.*, No. 04-7007, 2006 U.S. Dist. LEXIS 13779, at *31-32 (N.D. Ill. Mar. 28, 2006) (same); *IGT v. Alliance Gaming Corp.*, No. 04-1676, 2007 U.S. Dist. LEXIS 20668, at *12 (D. Nev. Mar. 22, 2007); *Handgards I*, 601 F.2d at 994.  Here, CareFusion's complaint alleges in detail that Medtronic indisputably knew that the '404 and '888 patents were invalid and unenforceable.  (Complaint at ¶¶ 70-77.)

Most notably, during a prior lawsuit in which Medtronic was sued for infringing the '404 and '888 patents, Medtronic repeatedly pled that those patents were invalid and unenforceable:

- **August 3, 2006**: Medtronic asserts the affirmative defense of invalidity of the '404 and '888 patents in its answer.  (*Id.* at ¶ 71, Ex. N.)

- **October 17, 2006**: Medtronic files summary judgment motions asserting that certain claims of the '404 patent are invalid as anticipated by the prior art and for failure to meet the written description requirement.  (*Id.* at ¶ 75,  Exs. O-P.)

- **October 28, 2006**: Medtronic files another summary judgment motion with additional reasons for invalidating claims of the '404 patent.  (*Id.* at ¶ 76, Ex. Q.)

- **April 12, 2007**: Medtronic files an amended answer in which it twice states that the '404 and '888 patents are invalid and in which it provides detailed allegations as to why those patents are also unenforceable.  (*Id.* at ¶¶ 72-74, Ex. I.)

Here, the only inference that can be drawn from Medtronic's multiple filed pleadings is that Medtronic knew that the '404 and '888 patents were invalid and unenforceable.  *See, e.g.,* Fed. R. Civ. P. 11(b) (signed pleadings to a court must have support both in fact and law and be based on "knowledge" obtained after a reasonable inquiry) (emphasis added); *see also Netflix, Inc. v. Blockbuster, Inc.*, No. 06-2361, 2006 U.S. Dist. LEXIS 63154, at *20-21 (N.D. Cal. Aug. 22, 2006) (denying motion to dismiss where allegations that patent owner's CEO referred to the patent as a "joke" were sufficient to establish knowledge of invalidity and/or unenforceability); *IGT*, 2007 U.S. Dist. LEXIS 20668, at *19-20 (denying motion for summary judgment in light of evidence that patent owner received a letter advising it of prior art).[16]

---

[16] *See also CVD*, 769 F.2d at 852-54 (holding that "the jury could have concluded that Raytheon knew it had no trade secrets" based on *inter alia* "extensive public disclosure" and "failure to follow its own established procedures" for trade secret protection); *Grid*, 771 F. Supp. at 1040-41 (denying motion to dismiss because allegations that patentee concealed information from the Patent Office were sufficient to plead knowledge of unenforceability).

    <u>Tellingly, Medtronic does not dispute it knew that the '404 and '888 patents were both invalid</u> <u>and unenforceable</u>. Instead, Medtronic sidesteps the issue by arguing that CareFusion did not allegedly adequately plead that "but for" the patentee's gross inequitable conduct the '404 and '888 patents would not have issued. (Med. Br. at 12-14.) However, the "but for" element is only an element of a *Walker-Process* claim–the cause of action Medtronic mistakenly asserted that CareFusion pled.[17] It is <u>not</u> an element of a *Handgards* bad faith patent enforcement claim–the cause of action that CareFusion actually pled. *See, e.g., Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068-72 (Fed. Cir. 1998) (outlining elements of *Walker-Process* claim and bad faith patent enforcement claim); *Morton*, 2006 U.S. Dist. LEXIS 13779, at *31-32 (conduct that "does not amount to fraud" can form the basis of a bad faith enforcement claim); *Medi-Temp, LLC v. CVS Pharm., Inc.*, No. 05-3241, 2006 U.S. Dist. LEXIS 51331, at *12-13 (distinguishing *Walker-Process* and *Handgards*); *Walter Kiddie Portable Equip. Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 898-99 (N.D. Ill. 2009) (same). Therefore there is no dispute that CareFusion adequately pled that Medtronic knew the '404 and '888 patents were invalid and unenforceable.

    **b.**  **Medtronic Threatened To Enforce Its Invalid And Unenforceable Patent Rights**

    CareFusion also sufficiently pled that Medtronic threatened to enforce the knowingly invalid and unenforceable '404 and '888 patents, and others, against anyone who sought to launch a competing kyphoplasty product. In the context of a bad faith patent enforcement claim, threatened enforcement, as opposed to actual enforcement, is all that is required to establish liability. *See, e.g., CVD*, 769 F.2d at 851; *Arcade*, 1991 U.S. Dist. LEXIS 19768, at *51-52 (affirming jury verdict of liability where patent owner sent threatening letters to plaintiff's customers); *Grid*, 771 F. Supp. at

---

[17] Nevertheless it appears from the evidence currently available that at least the '404 and '888 patents would not have issued but for the Defendants' inequitable conduct (withholding their knowledge of vertebroplasty and the Defendants' use of prior art angioplasty balloons). Both CareFusion in this case and Medtronic in the prior case with Kyphon pled that the two inventors (applicants) committed inequitable conduct by withholding this highly material prior art. (Complaint at ¶¶ 70-77, Exhibit I.) However, evidence relating to the higher showing of intent for a *Walker Process* claim is currently solely in the Defendants' possession. *See Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1070-71 (Fed. Cir. 1998) ("A finding of *Walker Process* fraud requires higher threshold showings of both intent and materiality than does a finding of inequitable conduct."). CareFusion believes that discovery will show a *Walker Process* violation and may seek to amend its complaint to add such a claim at that time.

1041 (denying motion to dismiss where patent owner sent threatening letters to plaintiff).[18]  Here, Medtronic's actions constitute threatened enforcement of at least the '404 and '888 patents. Specifically, CareFusion pled that Medtronic made threatening statements and that CareFusion was threatened.[19]  (*See* Complaint at ¶¶ 86-96, 101-02.)  That is all that is required at this stage.

For example, in early 2008, Medtronic broadly and publicly stated that it "intend[s] to defend against any threats to our intellectual property," i.e., that it would enforce its patents against attempts by competitors to release competing products.  (*Id*. at Ex. X at 34 (emphasis added).)  Moreover, in another public statement, made just days after recording its patent assignments to the '404 and '888 patents with the PTO, Medtronic explicitly tied its patent enforcement policy to the patents it acquired from Kyphon, including the '404 and '888 patents. [20]  (*See* Complaint at ¶ 92, Ex. Y at 3.) Specifically, Medtronic's President and CEO stated that:

> Taken together, Kyphon and Biologics helped to partially offset continued competitive pressures on our core spinal products in the United States.  We remain committed to our strategy of raising the bar of competition through continuous innovation and supporting the safety, efficacy and cost effectiveness of our products with robust

---

[18] *See also Burbank Aeronautical Corp. II v. Aeronautical Dev. Corp.*, No. 89-6244, 1990 U.S. Dist. LEXIS 15028, at *1-2, 13-15 (C.D. Cal. May 23, 1990) (same); *Finnsugar Bioproducts, Inc. v. Monitor Sugar Co.*, No. 00-10381, 2002 U.S. Dist. LEXIS 25014, at *42-43 (E.D. Mich. June 10, 2002) (finding allegations that patent owner threatened to enforce patents sufficient to withstand a motion to dismiss); *Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750, 770-71 (D.N.J. 1999) (same); *Brandt Consol., Inc. v. Agrimar Corp.*, 801 F. Supp. 164, 170 (C.D. Ill. 1992).

[19] Medtronic disputes as a factual matter whether CareFusion subjectively felt threatened.  Namely, Medtronic argues that if CareFusion did its "homework," CareFusion could not have felt threatened by the invalid '888 and '404 patents.  (Med. Br. at 22.)  Medtronic illogically argues that CareFusion must have therefore believed the patents to be valid.  (*Id*.)  These arguments contradict CareFusion's express pleadings, and are irrelevant on a motion to dismiss.  *See Pecover*, 633 F. Supp. 2d at 979. Moreover, Medtronic's arguments are wrong.  CareFusion was injured because it was forced into the dilemma of either (1) facing a threatened (albeit meritless) patent lawsuit or (2) delaying release of its kyphoplasty product and losing sales.  *See Walter Kiddie*, 669 F. Supp. 2d at 900 (the antitrust injury "is the necessity that [the victim] make a choice among alternatives each of which has an adverse economic or financial impact").  This was not a situation where the patents were "known to the trade to be invalid." (Med. Br. at 22, citing dicta in *Brunswick Corp. v. Riegel Textile Corp.*, 752 F.2d 261, 266 (7th Cir. Ill. 1984))  Rather, this was a situation where Defendants repeatedly threatened the industry with the patents to "clothe" them with "some colorable validity that might deter competitors."  *See Brunswick*, 752 F.2d at 266.

[20] Medtronic repeatedly argues, without any support, that the threatening statements are insufficient to constitute threats because they do not explicitly call out the '404 and '888 patents.  As explained *infra*, this is not required to be considered a threat or confer declaratory judgment jurisdiction. Furthermore, competitors would understand these threatening statements to be referencing at least the '404 and '888 patents, because they allegedly cover the basic kyphoplasty "space."  Indeed, these patents were acquired by Medtronic along with a history of their enforcement.  They had been aggressively enforced against every potential competitor to move into the kyphoplasty "space."

1   clinical data.  We also remain committed to enforcing our portfolio of intellectual
2   property.  During the quarter, we had a positive Markman hearing against one of our
    competitors.  This case is the first significant assertion of key intellectual property
3   including the Michelson patents against a growing number of competitors who we
    believe infringe our IP.

4   (*Id.* at Ex. Y at 3 (emphasis added); *see also id.* at Ex. W at 3.)  Here, it is reasonable to infer that

5   Medtronic's actions of specifically referencing Kyphon, stating that Medtronic "remain[s] committed

6   to enforcing our portfolio of intellectual property," informing the public of its recent litigation

7   success, and warning of future lawsuits to come, indicates Medtronic's intention to enforce its

8   kyphoplasty patents, including the '404 and '888 patents, against any and all competitors.  Indeed, the

9   circumstances under which Medtronic's CEO's statements were made, just days before Medtronic

10  recorded its patent assignments to those patents with the PTO, further illustrates the threatening

11  nature of those statements.  While Medtronic urges this Court to interpret these statements

12  differently, such arguments must be left for the jury.[21]  *See Pecover*, 633 F. Supp. 2d at 979 (in a

13  motion to dismiss all "[a]llegations of material fact [in the complaint] are taken as true," and "all

14  inferences reasonably drawn from these facts must be construed in favor of the responding party.").

15          Moreover, Medtronic's threatened enforcement activities did not end there.   Rather,

16  Medtronic backed up its patent enforcement threats with action.  After acquiring the '404 and '888

17  patents, Medtronic failed to disclaim or dedicate those invalid and unenforceable patent rights to the

18  public.  Medtronic instead twice recorded assignments to those patents with the Patent Office.  (*See*

19  Complaint at ¶¶ 93-95.)  The sole purpose for doing so ostensibly was so that Medtronic would be in

20  a position to initiate litigation as soon as a competitor launched a competing kyphoplasty product.

21  Medtronic's affirmative actions of recording assignments to patents it knew to be invalid and

22  unenforceable, combined with the aforementioned threatening statements, further supports antitrust

23  liability for bad faith patent enforcement.  *See Arcade*, 1991 U.S. Dist. LEXIS 19768, at *49-52

24  (antitrust liability found based on threatening statements that did not mention plaintiff); *Picante, Inc.*

25  *v. Jimenez Food Prods., Inc.*, No. 81-625, 1982 U.S. Dist. LEXIS 15260, at *8, 18-19 (W.D. Tex.

26  Aug. 15, 1982) (anticompetitive actions can include re-registering knowingly improper trademark).

27
28  [21] Medtronic asks the Court to make another factual finding, namely that "Medtronic expected not to
    exclude but to compete." (Med. Br. at 10.)  Not only is this a factual determination inappropriate at
    this stage, but it is contrary to CareFusion's complaint and Medtronic's own statements.

1    That Medtronic's actions constitute threatened patent enforcement is also confirmed by the

2    fact that Medtronic's actions would have been sufficient to allow CareFusion to file a declaratory

3    judgment lawsuit.[22] *Cf., Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1358 (Fed.

4    Cir. 2004), *rev'd on other grounds by* 546 U.S. 394 (stating in an analogous context that "[t]he

5    standards that we have developed for determining jurisdiction in a Declaratory Judgment Action of

6    patent invalidity also define the minimum level of 'enforcement' necessary to expose the patentee to

7    a *Walker Process* claim for attempted monopolization.").   A patentee's actions give rise to

8    declaratory judgment jurisdiction when "the facts alleged, under all the circumstances, show that

9    there is a substantial controversy, between parties having adverse legal interests, of sufficient

10   immediacy and reality to warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v.*

11   *Genentech, Inc.*, 127 S. Ct. 764, 771 (2007).  Under this standard, courts have found that statements

12   such as Medtronic's are sufficient to raise a controversy with respect to any competitor.  *See, e.g., Dr.*

13   *Reddy's Labs., LTD v. AaiPharma, Inc.*, No. 01-10102, 2002 U.S. Dist. LEXIS 17287, at *8-24

14   (S.D.N.Y. Sept. 19, 2002) (threatening statements made to entire industry in two separate Wall Street

15   Journal articles sufficient to establish declaratory judgment jurisdiction); *Glaxo Wellcome, Inc., v.*

16   *Pharmadyne Corp.*, No. 96-455, 1996 U.S. Dist. LEXIS 10959, at *18-19 (D. Md. July 23, 1996) ("It

17   is clear that a claim of infringement can be made through a publication 'sent through the trade

18   warning that a certain product made or sold by anyone in the industry will infringe…."); *Fed. Tel. &*

19   *Radio Corp. v. Associated Tel. & Tel. Co.*, 169 F.2d 1012, 1015-16 (3d Cir. 1948).

20   Indeed, in prior litigation Medtronic successfully argued that similar industry-wide threats

21   made by a company's CEO were sufficient to create a controversy as to any competitor and as to any

22   patent in the company's portfolio for that technology.  (*See* Ex. 2 at 10-17.)  Specifically, contrary to

23   Medtronic's assertions in this case (Med. Br. at 15), Medtronic previously (successfully) argued that:

24   …Mr. Dollens [President and CEO of Guidant/CPI] did <u>not need to specifically state

25   that Guidant/CPI believed Medtronic could not market an atrial defibrillator</u> without

---

[22] Although CareFusion is not aware of any Court expressly stating that the declaratory judgment
standard is the minimum requirement for a *Handgards* claim, it is apparent that a Court would likely
find "threatened enforcement" for a *Handgards* claim where declaratory judgment jurisdiction exists.
Medtronic tacitly acknowledges in this case (by not filing a motion to dismiss for lack of jurisdiction)
that declaratory judgment jurisdiction relating to the four patents in this case was proper, and that
CareFusion was threatened by its kyphoplasty patents.

reading on its patents in order for a controversy to exist.  <u>It is sufficient that Medtronic is within the class of manufactures who would develop and market atrial defibrillators.</u>

(Ex. 2 at 15-16 (emphasis added).)  Likewise, Medtronic's assertion that its threatening statements cannot constitute patent enforcement because they do not explicitly mention the '404 and '888 patents is also erroneous.  This argument is again directly contrary to arguments Medtronic presented in previous litigation in order to secure declaratory judgment jurisdiction:

> …Defendants' assertions that no apprehension can exist in this case because the <u>threatening statements do not specifically identify by number</u> any of the seven patents set forth in the Complaint <u>is also erroneous.</u>  Mr. Dollens' statements made at the conference placed in issue all 63 of the patents held by Guidant/CPI related to atrial defibrillators.

(Ex. 2 at 14 (emphasis added).)  Medtronic's prior position was well taken in light of the numerous prior decisions that recognize threats of enforcement of specific patents based on similarly broad statements. *Fed. Tel.*, 169 F.2d at 1015 (holding that broad threatening statements meant that the patent owner "has tendered its entire stock of patents to the trade and in substance has asserted that anyone making use of the disclosures of any of them…is in danger of an infringement suit"); *Dr. Reddy's Labs.*, 2007 U.S. Dist. LEXIS 17287, at *8-11, 23-24 (generalized threatening statements created declaratory judgment jurisdiction even though no specific patent numbers were mentioned).

Medtronic's intention to enforce its patent rights is even further confirmed by statements it made immediately after learning of CareFusion's competing kyphoplasty products.  For example, shortly after CareFusion received FDA approval, Medtronic's CEO announced that:

> Medtronic has and <u>will vigorously defend its intellectual property rights</u> in all of our markets, <u>including balloon kyphoplasty.</u>

(Complaint at ¶ 113, Ex. Z (emphasis added).)  Likewise, shortly after CareFusion announced its impending launch of its kyphoplasty products Medtronic's CEO also stated:

> In regard to a recent announcement of a potential new US competitor, we are very confident in our current family of BKP [balloon kyphoplasty] intellectual property and the protection it gives our innovative products.  We will vigorously defend it against any competitor product that infringes our technology.

(*Id*. at ¶ 138, Ex. JJ.)  And in response to an analyst's question regarding possible litigation over the kyphoplasty patents, he again reiterated Medtronic's intent to enforce those patents:

> [W]e first of all are very confident in the strength of our IP and, as I said, we will <u>vigorously defend and assert our IP</u> against any of those that we have reason to believe are infringing our intellectual property.  <u>We have a number of patents which protect that space</u> that we really have, if you will, brought to market and developed.

(*Id.* at ¶ 140, Ex. JJ (emphasis added).)   Not surprisingly, industry analysts concluded that (1) the Defendants would initiate litigation against CareFusion, and indeed (2) had threatened such litigation against CareFusion.[23]   (*See, e.g., id.* at ¶¶ 117-137, 143-147, Exs. BB-HH & KK-LL.)

Furthermore, the prior litigation involving the '404 and '888 patents also shows that CareFusion was threatened by those patents.  *See, e.g., Alien Tech. Corp. v. Intermec, Inc.*, No. 06-51, 2007 U.S. Dist. LEXIS 2851, at *3-5, 10-12 (D.N.D. Jan. 4, 2007) (finding an actual case or controversy existed in light of threatening statements made during an earnings conference call and defendant's prior litigation regarding the patents at issue).[24]  Kyphon filed numerous lawsuits against competitors that launched competing kyphoplasty products, including Disc-O-Tech and Medtronic. (Complaint at ¶¶ 56-57.)    The business realities of the situation also show that CareFusion was threatened.  (*See* Ex. 2 at 21 (arguing that "[c]ourts are encouraged to take into account 'business realities' when making the 'pragmatic judgment' as to whether the totality of the circumstances supports existence of an actual controversy").)  Here, after being sued for infringing the '404 and '888 patents, Medtronic acquired Kyphon for nearly $4 billion.  (Complaint at ¶ 77, Exs. R & S.) The dominant patents in that purchase were the '404 and '888 patents which allegedly cover any kyphoplasty procedure.  In order to preserve its expensively purchased market dominance, Medtronic would have been extremely motivated to initiate litigation against any entity that tried to launch a competing kyphoplasty product.

---

[23] Medtronic relies heavily on *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308 (N.D. Cal. 2007). That case is not a *Handgards* case, however.  Moreover, in that case, the plaintiffs' allegations of a *Walker Process* enforcement claim failed because the "[p]laintiffs merely allege[d] that potential competitors' awareness of Netflix's patents deterred competition."  *Id.* at 319.  Here, in contrast, CareFusion has alleged far more than mere knowledge of the '404 and '888 patents, including specific threatening statements and activity.  (*See, e.g.,* Complaint at ¶¶ 86-96.)  Thus, Netflix is inapposite to the claims and facts in this case.

[24] *See also Medtronic v. Guidant Corp.*, No. 00-1473, Docket No. 13 at 3-5 (D. Minn. Oct. 3, 2000) (attached hereto as Ex. 3) (adopting Medtronic's arguments that declaratory judgment jurisdiction existed where patent owner made general threatening statements during an analyst call and patent owner had litigious history); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, No. 96-455, 1996 U.S. Dist. LEXIS 10959, at *18-21 (D. Md. July 23, 1996) (generalized threatening statements that the patent owner would "vigorously defend its patents" that were published in an article, combined with other litigation against other companies on the patent at issue, was sufficient to create declaratory judgment jurisdiction); *Dr. Reddy's Labs.*, 2002 U.S. Dist. LEXIS 17287, at *24-25 (prior litigation history added "additional support" to plaintiffs' jurisdictional claim).

1

2

### c.  Medtronic's Threatened Enforcement Of Its Invalid And Unenforceable Patent Rights Was In Bad Faith

3

CareFusion's Complaint also pleads the third and final element of a *Handgards* claim, namely

4

that Medtronic's threatened enforcement of invalid and unenforceable patent rights was <u>in bad faith</u>.

5

As noted above, whether a threat of patent enforcement is made in bad faith is based on <u>two highly</u>

6

<u>factual inquiries</u>: (1) whether the threatened enforcement is "objectively baseless in the sense that no

7

reasonable litigant could realistically expect success on the merits"; and (2) whether the baseless

8

threatened enforcement "conceals an attempt to interfere directly with the business relationships of a

9

competitor." *Professional Real Estate*, 508 U.S. at 60; *see also Hoffman-La Roche, Inc. v.*

10

*Genpharm, Inc.*, 50 F. Supp. 2d 367, 380 (D.N.J. 1999) (denying motion to dismiss because

11

"[r]easonableness [of the enforcement] is a question of fact, and the Court cannot make such factual

12

determinations on a factual controversy roiled by a motion to dismiss"); *Catch Curve*, 519 F. Supp.

13

2d at 1037 (explaining that whether conduct is bad faith is a question of fact).

14

In light of the highly factual nature of the bad faith inquiry, any analysis of whether a

15

threatened enforcement was in fact a bad faith sham is not appropriate at the motion to dismiss stage.

16

*See, e.g., Hoffman*, 50 F. Supp. 2d at 380.  Rather, a plaintiff's allegations are sufficient to survive

17

dismissal if the plaintiff's complaint contains allegations explaining why the patent(s) is invalid

18

and/or unenforceable and allegations that any enforcement activity was carried out with the intention

19

to interfere directly with the business relationships of a competitor.  *See Alternative Electrodes, LLC*

20

*v. Empi, Inc.*, 597 F. Supp. 2d 322, 331 (E.D.N.Y. 2009); *Catch Curve*, 519 F. Supp. 2d at 1037-38;

21

*Hoffman*, 50 F. Supp. 2d at 379; *ICOS Vision Sys. Corp. v. Scanner Techs. Corp.*, No. 05-6322, 2006

22

U.S. Dist. LEXIS 13847, at *13-15 (S.D.N.Y. Mar. 27, 2006) ("If, as alleged, Scanner knew that

23

Section 271(g) did not apply and threatened litigation for the sole purpose of harming ICOS, then its

24

threats were neither objectively reasonable nor taken in good faith.  This is all that need be alleged in

25

this early stage of the litigation."); *Netflix*, 2006 U.S. Dist. LEXIS 63154, at *20-21; *SecurityPoint*

26

*Media, LLC v. Adason Group, LLC*, No. 07-444, 2007 U.S. Dist. LEXIS 57349, at *15-16 (M.D. Fla.

27

Aug. 7, 2007).  These are precisely the allegations found in CareFusion's Complaint.

28

First, CareFusion provided ample allegations explaining precisely why Medtronic knew that

the '404 and '888 patents were invalid and unenforceable.  (Complaint at ¶¶ 70-76.)  For example,

CareFusion pled that Medtronic "could not realistically expect success on the merits" in later asserting infringement of those patents because it had previously filed numerous pleadings stating that the patents were invalid and unenforceable. *Professional Real Estate*, 508 U.S. at 60. (*See also* Complaint at ¶¶ 71-76.) *See also Alternative Electrodes*, 597 F. Supp. 2d at 331; *Catch Curve*, 519 F. Supp. 2d at 1037-38; *Teva Pharm. Indus., Ltd. v. Apotex, Inc.*, No. 07-5514, 2008 U.S. Dist. LEXIS 60418, at *16-17 (D.N.J. Aug. 7, 2008) (holding that allegations that the patent owner knew of the patent's invalidity were sufficient to satisfy the objectively baseless bad faith prong); *ICOS*, 2006 U.S. Dist. LEXIS 13847, at *13-15 (same); *Netflix*, 2006 U.S. Dist. LEXIS 63154, at *20-21 (same).

Second, CareFusion sufficiently pled that Medtronic's threatened enforcement of invalid and unenforceable patents was merely "an attempt to interfere directly with the business relationships of a competitor." *Professional Real Estate*, 508 U.S. at 60. CareFusion alleged for example that:

> 96. Defendants' policy of enforcing its patent rights (including patents acquired from third parties) combined with their refusal to disclaim, dedicate to the public, or seek reexamination on patents they acquired yet knew to be invalid and/or unenforceable were part of the Defendants' anticompetitive, predatory, exclusionary, and/or inequitable scheme and had the effect of eliminating and/or diminishing competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by preventing others from entering those markets.

(Complaint at ¶ 96; *Id*. at ¶¶ 165 & 167; *see also id*. at ¶¶ 1, 23, 90, 94-95, 152, 154.)

CareFusion's complaint, therefore, more than sufficiently pled that Medtronic's threatened enforcement was merely "an attempt to interfere directly with the business relationships of a competitor." *Professional Real Estate*, 508 U.S. at 60; *see also Alternative Electrodes*, 597 F. Supp. 2d at 331 (pleadings that litigation was an "attempt to drive [plaintiff] from the market," that litigation "was initiated in order to interfere directly with [plaintiff's] business relationships and activities" and that litigation threats were "for the purpose of foreclosing competition and retaining [defendants'] monopoly profits" sufficient); *Catch Curve*, 519 F. Supp. 2d at 1038 (allegation "that the suit was brought in bad faith with the intention of interfering with Venali's ability to service existing customers and compete for new ones" sufficient); *cf. ICOS*, 2006 U.S. Dist. LEXIS 13847, at *13-15 (allegations of asserting patents known to be invalid sufficiently pleads subjective bad faith).

In sum, Medtronic's failure to acknowledge that CareFusion's complaint is based on, *inter alia*, a *Handgards* and its progeny claim alone dooms its motion to dismiss. CareFusion's complaint outlines in painstaking detail how Medtronic's actions give rise to *Handgards* antitrust liability.

### 2. Medtronic's Illegal Pricing Scheme Constitutes Anticompetitive Conduct Under Section 2 of the Sherman Act

In addition to pleading anticompetitive conduct in the form of bad faith patent enforcement, CareFusion also pled anticompetitive conduct arising from Defendants' illegal Medicare pricing scheme. (*See supra* at 9-10, citing Complaint at ¶¶ 54, 97-100, 148, 151, 155, 157.) As discussed above, Defendants' engaged in a years-long illegal pricing scheme in which it convinced hospitals and doctors to keep patients that received the typically outpatient kyphoplasty procedure overnight so that the hospitals and doctors could charge Medicare the higher inpatient procedure rate. (*See id.*) Kyphon's illegal pricing scheme was anticompetitive in nature because it: (1) artificially raised prices for its kyphoplasty products; and (2) improperly diverted sales away from less-costly VCF treatment methods, namely vertebroplasty, by providing an illegal monetary incentive (overcharging Medicare) for hospitals and doctors to use Kyphon's kyphoplasty products over competitors' vertebroplasty products. (*See id.*; *see also* Ex. K to Complaint (describing Medtronic's illegal pricing as "aggressive marketing schemes intended to increase sales of unnecessary devices or procedures").)

The law is clear that practices that are deceptive or independently illegal constitute antitrust violations when they are in furtherance of a monopoly. *See* 3 Areeda & Hovenkamp, Antitrust Law, P651d, at 80 ("In the presence of substantial market power, some kinds of tortious behavior could anticompetitively create or sustain a monopoly . . ."); *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3rd Cir. 2007) (reversing dismissal of antitrust claims premised on Defendant's false promises to standard setting organization that led to monopoly); *International Travel Arrangers, Inc. v. Western Airlines, Inc.*, 623 F.2d 1255 (8th Cir. 1980) (affirming antitrust judgment where defendant "used false, misleading and deceptive advertising" to prevent others from becoming a competitive threat); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 923 (9th Cir. 1980) (reversing dismissal of antitrust claims where Defendant maintained monopoly through false advertising and by copying plaintiffs advertising); *United States v. Microsoft Corp.*, 253 F.3d 34, 76 (D.C. Cir. 2001) (Microsoft engaged in anticompetitive conduct when it misled customers).

Defendants' only discussion of its illegal pricing scheme is in a mere footnote, where Defendants do not even dispute that their illegal pricing scheme constitutes anticompetitive conduct under the Sherman Act.  (*See* Med. Br. at fn. 6.)  Contrary to Defendants unsupported assertion, however, conduct such as Defendants Medicare illegal pricing scheme unquestionably violates Section 2 of the Sherman Act.  *See supra*.  Thus, as Defendants tacitly admit, CareFusion has adequately pled anticompetitive conduct in the form of an illegal pricing scheme.

### 3. Medtronic's Willful Acquisition of Competitors And Patents To Build A Monopoly Constitutes Anticompetitive Conduct

Finally, CareFusion's complaint sufficiently pleads a third anticompetitive act engaged in by the Defendants.  As discussed *supra*, Defendants obtained and expanded their monopoly in the VCF treatment market and in the alternative kyphoplasty market in part by acquiring numerous competitors, licenses patents and/or other intellectual property from other competitors.   These anticompetitive acquisitions and licenses include at least the following:

- The $12.25 million exclusive license to Bonutti patents.  (Complaint at ¶¶ 37-39.)

- The $3.2 million acquisition of Sanatis, and its intellectual property.  (*Id*. at ¶¶ 40-42.)

- The $1 million exclusive license to patents owned by Dr. J. Lee Berger.  (*Id*. at ¶¶ 43-45.)

- The exclusive license to technology developed by Dr. Sandhu.  (*Id*. at ¶¶ 46-47.)

- The acquisition of Disc-O-Tech's kyphoplasty product line, including the corresponding intellectual property.  (*Id*. at ¶¶ 59-65.)

- The $4 billion acquisition of Kyphon, and its intellectual property.[25]  (*Id*. at ¶¶ 77-80.)

- The acquisition of Pabban and its intellectual property.  (*Id*. at ¶¶ 81-85.)

CareFusion's Complaint therefore alleges anticompetitive patent acquisitions and licenses by the Defendants.  (*See generally* Complaint at ¶¶ 36-85.)   While Medtronic tries to excuse its anticompetitive patent acquisitions and exclusive licenses by hiding behind the unremarkable principle that "mere patent ownership does not give rise to antitrust liability" (Med. Br. at 20), Medtronic ignores another axiomatic principle of patent and antitrust law, namely that "[i]ntellecutal property rights do <u>not</u> confer a privilege to violate the antitrust laws."  *United States v. Microsoft*

---

[25] Medtronic incorrectly asserts that the Kyphon patents were never acquired.  To the contrary, Medtronic acquired all of these patents when it acquired Kyphon.  (*See* Complaint at ¶¶ 77, 94-95.)

*Corp.*, 253 F.3d 34, 63 (D.D.C. 2001) (emphasis added).  As stated in Medtronic's own cited case:

> Patent acquisitions are not immune from the antitrust laws.  Surely, a § 2 violation will have occurred where, for example, the dominant competitor in a market acquires a patent covering a substantial share of the same market that he knows when added to his existing share will afford him monopoly power.

*SMC Corp. v. Xerox Corp.*, 645 F.2d 1195, 1205 (2d Cir. 1981).[26]  Antitrust violations can also occur, for example, when a patentee attempts to monopolize an industry by acquiring all present and future patents relevant to that industry or when the acquisition or licensing of rights was done for an anticompetitive purpose.  *See, e.g., Kobe v. Dempsey Pump Co.*, 198 F.2d 416, 419-24 (10th Cir. 1952) (affirming trial court's finding that defendant acquiring over 70 patents in the relevant market constituted a monopolistic practice); *Stewart-Warner Corp. v. Staley*, 42 F. Supp. 140, 146 (W.D. Pa. 1941) (denying motion to dismiss and explaining that "[t]he allegation is to the effect that plaintiff bought up practically all patents [in the relevant market], not for purposes of marketing devices covered by the patents, but for the purpose of intimidating and overwhelming and coercing the trade into dealing only with the plaintiff.  If so, that would constitute a violation of the Sherman Act."); *United States v. Parker-Rust-Proof Co.*, 61 F. Supp. 805 (E.D. Mich. 1945) (finding agreement for purchase of patent rights violated the Sherman Act and "enjoining [defendant] from enforcing any of the rights secured under the patents covered by the agreement"); *Black & Decker, Inc. v. Hoover Serv. Center*, 765 F. Supp. 1129, 1140 (D. Conn. 1991) (holding that defendant was likely to succeed in proving that an exclusive patent license constituted anticompetitive conduct).

Here, CareFusion meticulously outlined what patent acquisitions and licenses are the subject of its antitrust claim.  (*See generally* Complaint at ¶¶ 36-85.)  Moreover, CareFusion pled that Medtronic's acquisition and licensing of these patent rights was for an anticompetitive purpose, e.g., "to eliminate and/or reduce competition in the [VCF treatment] market and in the alternative kyphoplasty market."  (*See, e.g.*, Complaint at ¶ 36.)  If one entity seeks to hold all patent rights to a

---

[26] While the SMC Court ultimately found no antitrust liability, the facts of *SMC* are distinguishable from the facts here.  The *SMC*'s court finding of no liability rested on the fact that the relevant market did not exist until eight years after the patents in question had been acquired.  *See SMC*, 645 F.2d at 1208-09.  Here, in contrast, at the time the Defendants engaged in the multiple above-outlined patent acquisitions, the relevant market was already in existence and the Defendants were already the dominant player in that market.  (*See* Complaint at ¶ 21 and ¶¶ 37-85.)  Each additional patent acquisition added to the Defendants' monopoly power and ensured that no competitor would be able to capture an appreciable share of the relevant market.

1  particular technology through acquisitions and licensing, that entity will be able to improperly

2  foreclose competition in the market.  *See Kobe*, 198 F.2d at 419-24; *Stewart*, 42 F. Supp. at 146.

3    Medtronic asserts without any support that despite CareFusion's detailed pleading,

4  CareFusion must plead more regarding Medtronic's patent acquisitions and licenses in order to

5  survive a motion to dismiss.  However, "[t]here is no special pleading rule requiring greater factual

6  specificity in antitrust cases." *Momento*, 2009 U.S. Dist. LEXIS 85295, at *2.  Allegations similar to

7  those found in CareFusion's Complaint were found to sufficiently plead anticompetitive conduct with

8  respect to patent acquisitions.  *See ErinMedia, LLC v. Nielsen Media Research, Inc.*, 401 F. Supp. 2d

9  1262, 1267 (M.D. Fla. 2005) (rejecting defendant's argument that complaint must be dismissed

10  because plaintiffs "have failed to allege a specific competitor whom Defendant has acquired" because

11  at the motion to dismiss stage "Plaintiffs are not required to specifically state which competitors

12  Defendant has acquired"); *Abbyy Software House, Inc. v. Nuance Communications, Inc.*, No. 08-

13  1035, 2008 U.S. Dist. LEXIS 90308, at *14-15 (N.D. Cal. Nov. 6, 2008) ("Although there are no

14  details of the patents alleged, Abbyy does allege that the acquisitions of the patents was 'with the

15  purpose of stabilizing prices and/or excluding competition.  Therefore, based on the face of the

16  pleadings, Abbyy has stated a valid predatory act.").  After all, "the plaintiff must plead its claim ***but***

17  ***it need not plead its evidence***." *Momento*, 2009 U.S. Dist. LEXIS 85295, at *12.[27]

18    CareFusion also pled that Medtronic's acquisition of competitors was anticompetitive

19  conduct.  (*See generally*, Complaint at ¶¶ 36-85.)  For example, CareFusion pled that each time

20  Kyphon sued a competitor for alleged infringement of the '404 and '888 patents, rather than

21  resolving the suit on the merits, Kyphon merged itself with the competitor it had sued.  (*See*

22  Complaint at ¶¶ 55-80.)  After merging itself with the competitor, the competitive product was then

---

[27] Although Medtronic admits that the Court may not consider its alleged business justifications for acquiring certain patents, Medtronic nevertheless attempts to have the Court do just that.  (Med. Br. at 20 n.14.)  In addition to being improper at this stage, Medtronic's alleged "justifications" simply are not credible.  For example, Medtronic suggests that it was forced to acquire some of the patents because "their original owners claimed that a Defendant product infringed."  (Med. Br. at 20 n.14.)  But, as one court has noted in rejecting the identical argument "[s]ignificantly, had [Medtronic] simply wanted to protect itself from the threat of suit for infringement, it could have obtained a non-exclusive license."  *Black & Decker*, 765 F. Supp. at 1140.  Medtronic's contention that it acquired other patents in order "to enable innovation of new technologies," likewise, rings hollow since the Defendants' product has remained static for years.

CV10-01111-VRW
CareFusion's Opp to Motion to Dismiss

removed from the market.  (*See id.* at ¶¶ 64, 65, 79, 80, 81-85.)  This elimination of competitors and the removal of competitor products from the market clearly constitute anticompetitive conduct. *See, e.g., Movie 1 & 2 v. United Artists Communications, Inc.*, 909 F.2d 1245, 1255 (9th Cir. 1990) ("The fact that UA acquired its prior competitor Kindair, thus eliminating its only serious competition in the market, is further evidence of anti-competitive conduct on the part of UA.");  *ErinMedia*, 401 F. Supp. 2d at 1266-67 (denying motion to dismiss antitrust claim where plaintiff alleged that "Defendant has attempted to sustain its monopoly position by acquiring its competitors…"); *Panache Broad. v. Richardson Elecs., Ltd.*, No. 90-6400, 1995 U.S. Dist. LEXIS 14339, at *21-26, 37-38 (N.D. Ill. Sept. 29, 1995) (denying motion to dismiss antitrust claim based in part on allegations of "an acquisition strategy…to purchase competitors, or their assets and equipment, and then discontinue the product lines which competed with the Varian manufactured EPTs.").

Tellingly, Defendants do not argue that their acquisitions of competitors cannot constitute anticompetitive conduct.  Instead, Defendants again suggest that there could be possible legitimate business justifications for its acquisitions.  (Med. Br. at 7-9 & 21.)  But evaluating alleged legitimate business justifications is a highly factual inquiry which cannot be resolved on a motion to dismiss. [28] *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) ("[w]hether valid business reasons motivated a monopolist's conduct is a question of fact"); *Xerox Corp. v. Media Sciences Int'l, Inc.*, 511 F. Supp. 2d 372, 387-89 (S.D.N.Y. 2007) (denying motion to dismiss; alleged valid business justification was a "factual inquiry…not appropriate for resolution at this stage of litigation"); *Tucker v. Apple Computer, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) ("the existence of valid business reasons in antitrust cases is generally a question of fact not appropriate for resolution at the motion to dismiss stage.").  Medtronic's failure to dispute that the acquisition of

---

[28] In any event, Medtronic's proposed justifications for its conduct are illogical.  For example, Medtronic suggests its predecessor had to take the Disc-O-Tech product off the market because the product allegedly infringed the '404 and '888 patents.  (Med. Br. at 7-8.)  But Medtronic's predecessor acquired the Disc-O-Tech product <u>and</u> owned the '404 and '888 patents; a company cannot infringe its own patents.  Similarly, Medtronic asserts that "considerations of comparative efficacy or safety" may have motivated its decision to discontinue its own product after it acquired Kyphon.  (Med. Br. at 8.)  But such arguments are contradicted by its previous court-filed statements.  (*See Medtronic, Inc. v. Kyphon Inc.*, No. 06-2559, Docket No. 1 at ¶ 24 (N.D. Cal.) ("Medtronic believes that its osteotome has certain advantages over Kyphon's balloon tamps, and thus represents a threat to Kyphon's market share in the treatment of the spine using Kyphoplasty.").)

competitors constitutes anticompetitive conduct is therefore fatal to its attack on CareFusion's pleadings of anticompetitive conduct. [29]

### D.  CareFusion Pled Antitrust Injuries Tied To Medtronic's Anticompetitive Conduct And Has Article III Standing To Sue

CareFusion also pled in detail "causal antitrust injury" to CareFusion and competition, the final prong of both actual monopolization (Count I) and attempted monopolization (Count II). Specifically, to have standing to bring an antitrust case, a plaintiff must demonstrate that the harm the plaintiff has suffered or might suffer because of the Defendant's conduct is an "antitrust injury"—that is, an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999).  The injury must be "attributable to an anti-competitive aspect of the practice under scrutiny."  *Id.*[30]  Further, to have Article III standing to sue, an antitrust injury must not be conjectural or hypothetical.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555 (U.S. 1992).  It is well recognized that "[c]omplex antitrust cases, however, invariably involve complicated questions of causation and damages" and that the "speculative nature of damages are often the case in complex antitrust litigation and should not in itself foreclose antitrust standing." *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997).  Importantly, Courts recognize that "the existence of antitrust injury is not typically resolved through motions to dismiss." *Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 876 (3d Cir. 1995).

---

[29] Medtronic also alleges that its acquisitions are presumptively proper because some of them occurred before the acquisition of Disc-O-Tech, which was purportedly approved by the FTC.  (*See* Med. Br. at 7.)  Medtronic's argument, however, is contrary to the law.  *See AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 575 (7th Cir. 1999) (rejecting Defendant's argument that acquisition was proper under antitrust laws because the FTC failed to object; "Courts do not generally defer to an agency's decision not to challenge a merger.  To the contrary, federal regulators will not necessarily challenge every potentially troublesome merger, which is why Congress made private enforcement an integral part of the congressional plan for protecting competition.") (emphasis added).

[30] In the Ninth Circuit, such an antitrust injury requires five elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful . . . (4) that is of the type the antitrust laws were intended to prevent. . . . and (5) that the injured party be a participant in the same market as the alleged malefactors."  *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003).

1

### 1.   CareFusion Was Injured By Its Delay Into Kyphoplasty Caused By Medtronic's Threatened Enforcement of Knowingly Invalid Patents

2

3    One substantial antitrust injury is CareFusion's nearly two year long delay in releasing its

4    own kyphoplasty product—a delay directly caused by Medtronic's anticompetitive threatened

5    enforcement of its knowingly invalid and unenforceable patents.  (*See supra* at 10-11, 13.)  If

6    CareFusion had been able to release its kyphoplasty product earlier—a kyphoplasty product that

7    provides unique advantages and is less expensive than Medtronic's product—consumers would have

8    had a greater variety of choices, at a lower price, and CareFusion would have realized millions of

9    dollars in higher sales and profits.  (*See supra* at 13.)  This type of injury is exactly the type that the

10   antitrust laws are intended to remedy.  Some of the many recent decisions in which courts have

11   recognized pleadings of antitrust injury based on facts very similar to this case include:

12   • *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 355 (D.N.J. 2009) (denying motion to
13       dismiss; "According to Purepac, Warner-Lambert's pattern of predatory pricing and
         anticompetitive conduct delayed and hindered entry of [Purepac's product into the market].
14       Purepac further alleges that but for such anticompetitive conduct, Purepac would have
         launched its generic gabapentin products at least 18 months earlier than it did.  <u>Courts have
15       regularly held that such conduct creates the type of anticompetitive effect that the antitrust
         laws were designed to prevent, and therefore constitutes antitrust injury.</u>") (emphasis added).

16   • *Abbott Labs. v. Teva Pharms. USA, Inc.*, 432 F. Supp. 2d 408, 431 (D. Del. 2006) (denying
17       motion to dismiss where Plaintiff's pled antitrust injury consisted of its delayed entry into the
         market due to alleged anticompetitive misuse of patent; "[s]uch exclusion from the market <u>is
18       precisely the type of injury that the antitrust laws were intended to prevent, because it reflects
         an injury to competition</u>.") (emphasis added).

19

20   • *Abbott Labs. v. Mylan Pharm., Inc.,* No. 05-6561, 2007 U.S. Dist. LEXIS 12839 at *4-5 (N.D.
21       Ill. Feb. 23, 2007) (holding that Mylan properly pled antitrust injury and standing by alleging
         that Abbott used a knowingly invalid patent "to prevent Mylan's entrance into the relevant
22       market" and that Mylan had been ready to enter the market "but for Abbott's actions").

23   In these types of cases, the injured party's standing to sue does not turn on whether it could have

24   chosen to release its product earlier and fight a lawsuit with the monopolist.  Rather, the "[t]he injury

25   is the necessity that [the victim] make a choice among alternatives each of which has an adverse

26   economic or financial impact." *Walter Kidde*, 669 F. Supp. at 900.

27      In particular, it is well-recognized that "a prospective participant in a market may suffer

28   antitrust injury if it has taken substantial demonstrable steps to enter an industry and is thwarted in

that purpose by antitrust violations." *Go-Video, Inc. v. Matsushita Elec. Indus. Co.,* 11 F.3d 1460,

1   1464-65 (9th Cir. 1993) (internal citations omitted).  A prospective participant "has standing if he can

2   show a genuine intent to enter the market and a preparedness to do so." *Bubar v. Ampco Foods, Inc.,*

3   752 F.2d 445, 450 (9th Cir. 1985).  CareFusion pled in detail its intent and preparedness to release a

4   kyphoplasty product and the injury it suffered as a result of Medtronic's efforts to thwart

5   CareFusion's kyphoplasty product.  As to CareFusion's background and experience in the business, it

6   is notable that CareFusion had <u>already been a direct competitor to the Defendants in the VCF market</u>

7   <u>since at least about 2006</u>, when it began selling vertebroplasty cement delivery systems.  (*See*

8   Complaint at ¶¶ 97-100.)  Indeed, CareFusion had manufacturing facilities, a sales and marketing

9   force, and existing contracts with hospitals and physicians relating to vertebroplasty.  CareFusion was

10  more than ready and able to add a kyphoplasty product to its existing product line in the VCF market.

11          Medtronic only tangentially addresses CareFusion's pleadings of injury relating to standing,

12  improperly disputing whether CareFusion was sufficiently prepared <u>as a factual matter</u> to enter the

13  market.  (*See* Med. Br. at 17.)  *See also Pecover*, 633 F. Supp. 2d at 979 (in ruling on a motion to

14  dismiss, the Court must focus "on the sufficiency of a claim—and not the claim's substantive

15  merits").  Moreover, Medtronic's case in support of its argument relies on wholly different facts.  In

16  *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711-12 (9th Cir. 2003), antitrust claims were dismissed

17  because they were brought by potential minority stockholders of a corporation that had not yet been

18  incorporated at the relevant time, had not developed seed money, had no stock holders, and had no

19  ongoing business.  That is simply not the case here, where CareFusion was ready, willing, and able to

20  release a kyphoplasty product to supplement its existing vertebroplasty products—something it

21  successfully did after Medtronic's knowingly invalid patents expired.  (*See* Complaint at ¶ 110-111.)

22          Similarly, Medtronic alleges that CareFusion's pleadings of injury are not "tied" to

23  Medtronic's anticompetitive conduct.  (*See* Med. Br. at 19.)  This argument, too, is incorrect.  Indeed,

24  CareFusion's Complaint expressly stated that its delay in releasing a kyphoplasty product resulted in

25  injury directly caused by the Defendants' anticompetitive conduct:

26          This delay in market entry has in turn prevented CareFusion from timely capturing the
            share of the minimally invasive vertebral compression fracture treatment market and the
27          alternative kyphoplasty product market it would have been able to capture <u>but for</u>
            <u>Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct</u>.
28

CV10-01111-VRW
                                          CareFusion's Opp to Motion to Dismiss

(Complaint at ¶ 158 (emphasis added).)   CareFusion has more than sufficiently pled this first

category of injury that it suffered as a result of Medtronic's anticompetitive conduct.

### 2.   CareFusion Was Injured By Medtronic's Illegal Pricing Scheme

Another separate and independent antitrust injury pled by CareFusion relates to the harm

caused by the Defendants' illegal Medicare pricing scheme.  (*See* Complaint at ¶¶ 54, 97-100, 148,

151, 155, 157, 169.)  Courts recognize that taking sales from competitors through illegal or deceptive

conduct is a clear example of an antitrust injury.  *See, e.g.*, *American Ad Mgmt., Inc. v. General Tel.*

*Co.*, 190 F.3d 1051, 1056 (9th Cir. 1999) (vacating summary judgment of no antitrust violation where

injury derived from "conduct [that] is itself potentially unlawful"); *Hunt-Wesson Foods,* 627 F.2d at

923 (reversing dismissal of antitrust claims where Defendant maintained monopoly through false

advertising and by copying plaintiffs advertising); *Multiflex*, 709 F.2d at 995 (recognizing antitrust

injury existed where the Plaintiff lost sales resulting from the Defendant lying to potential customers;

Defendant "stepped far beyond the bounds of reasonable competitive practices in trying to maintain

its market position. . . . <u>This is the stuff of which antitrust cases are made</u>.").

Here, as discussed above, Medtronic acquired, maintained and expanded its monopoly

significantly through its illegal Medicare pricing scheme.  (*See supra* at 9-10.)  By growing its

kyphoplasty sales through illegal Medicare pricing, Medtronic wrongly took sales away from

competing vertebroplasty manufacturers, including CareFusion.  (*See* Complaint at ¶¶ 54, 97-100,

148, 151, 155, 157, 169.)  Due to Medtronic's illegal overcharging of Medicare, hospitals and

surgeons adopted Medtronic's kyphoplasty products in many situations where they otherwise would

have purchased vertebroplasty products from CareFusion or other competitors.  (*See id.* at ¶49-53,

155, 157; *see also* Ex. K to Complaint (describing Medtronic's illegal pricing as "aggressive

marketing schemes intended to increase sales of unnecessary devices or procedures").)  Because

Medtronic's intent was not just to harm CareFusion, but to take sales away from all vertebroplasty

competitors, CareFusion's harm was again "inextricably intertwined with the injury to the market."

*See Western Concrete*, 760 F.2d at 1018.

Medtronic never squarely addresses this antitrust injury in its Motion.  Rather, Medtronic

attempts to sweep the facts regarding this injury under the rug by conclusorily alleging that

kyphoplasty is superior and safer than vertebroplasty, and suggesting that those were the reasons doctors and hospitals switched to Medtronic's kyphoplasty product. (*See* Med. Br. at 3.) CareFusion has pled facts directly contrary to this, but such a factual dispute is not an issue for a motion to dismiss. *See Pecover*, 633 F. Supp. 2d at 979.[31] Accordingly, Medtronic has not shown that CareFusion's pleading of injury due to Medtronic's illegal pricing scheme is insufficient.

### 3. CareFusion Has Been And Continues To Be Injured By Medtronic's Monopoly As A Whole

A third antitrust injury pled by CareFusion relates to the harm to competition caused by Defendants' monopoly <u>as a whole</u> (*See* Complaint at ¶¶ 22, 155-160, 164-166.) Medtronic ignores this injury pled by CareFusion. Importantly, the Ninth Circuit recognizes that in analyzing antitrust injury, the Court should consider the "overall combined effect" of the acts of an accused monopolist. *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) ("It would not be proper to focus on specific individual acts of an accused monopolist while refusing to *consider their overall combined effect*. . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.") (emphasis in original). In other words, antitrust injury may result not just from the specific acts of the monopolist, but from the overall effect—the resulting monopoly. *See La Salvia*, 804 F.2d at 1116 (finding antitrust injury from "an unlawful quest for market dominance" that included the acquisition of facilities; "[t]he harm alleged is thus precisely the sort that the antitrust laws were intended to remedy").

Courts have repeatedly held that a competitor's lost profits due to a reduced ability to compete against an illegal monopolist constitutes a recognizable antitrust injury. *See Amarel v. Connell*, 102 F.3d 1494, 1509 (9th Cir. 1997) (competitor of a monopolist suffers an antitrust injury when "it was either driven out of business or suffered reduced profits because of the alleged anticompetitive acts of the attempted monopolist"); *Image Tech.*, 125 F.3d at 1222 (antitrust injury can include lost sales as the result of anticompetitive behavior resulting in a monopoly), citing *Pierce v. Ramsey Winch Co.*,

---

[31] Medtronic's attempts to disparage vertebroplasty are moreover incorrect. Medtronic ignores that although it has illegally attained more than an 85% monopoly in VCF, 15% of the market (dollar-wise) has resisted its monopoly and continues to use vertebroplasty. (*See* Complaint at ¶ 150.) As to the safety and efficacy of vertebroplasty, it is notable that CareFusion and others have sold FDA approved vertebroplasty cement delivery products since about 2006. (*See id.* at ¶ 100.)

753 F.2d 416, 436-37 (5th Cir. 1985) (antitrust injury exists when plaintiff would have earned an even higher profit but for defendant's monopoly); *see also* William C. Holmes, Antitrust Law Handbook, at p. 885 (West 2009) (antitrust injury can include "a business' lost profits from a reduced ability to compete").  A competitor in such a position has standing to sue because the injury is to competition as a whole, and not merely to a single competitor.  *See Western Concrete*, 760 F.2d at 1018 (competitor has standing to sue for its injury where the injury is "inextricably intertwined with the injury to the market"); *Los Angeles Memorial Coliseum Comm'n v. National Football League*, 791 F.2d 1356, 1364 (9th Cir. 1986) (finding causal antitrust injury where "the injury was the result of a restriction in competition").

Here, as discussed above, Medtronic's monopoly as a whole was acquired through numerous examples of anticompetitive conduct, including threatened enforcement of knowingly invalid patents, illegal Medicare pricing, and acquisitions of patents, licenses, and companies.  (*See supra* at 12.)  Medtronic's monopoly has resulted in its kyphoplasty products being entrenched with hospitals and doctors, has made it easier for Medtronic to establish a proven clinical record, and has resulted in a perception that Medtronic's kyphoplasty products are the pseudo "standard" in the industry.  (*See* Complaint at ¶ 22.)  This has made hospitals and doctors unwilling to switch product manufacturers, either to a competitor's kyphoplasty product (e.g., CareFusion's new kyphoplasty product) or a competitor's vertebroplasty product.  (*See id.*)  As a result, there is little real choice between kyphoplasty products in the market, and CareFusion has and will experience less growth and less profit than it otherwise would experience competing in a non-monopolistic market.  (*See id.* at ¶¶ 22, 155-160, 164-166.)  *See also Image Tech.*, 125 F.3d at 1221 (the injury to the plaintiff caused by a monopoly "is the difference between what the plaintiff could have made in a hypothetical free economic market and what the plaintiff actually made in spite of the anticompetitive activities") (internal citations omitted).  Medtronic's allegation that "the Complaint alleges no resulting harm actionable by CareFusion" attributable to the allegedly "tedious" recitation of Medtronic's monopoly is completely false.  (*See* Med. Br. at 21.)

CareFusion's damages in this regard are also not "conjectural" or "hypothetical"—an issue Medtronic makes much of (albeit in connection with injuries CareFusion did not plead).  Rather, the

1    calculations for determining CareFusion's injury in this regard may be factually intensive, but
2    CareFusion has and will continue to suffer concrete damages due to lessened ability to compete in the
3    market, namely, lost profits and lost market growth.  *See Forsyth*, 114 F.3d at 1478 ("[c]omplex
4    antitrust cases . . . invariably involve complicated questions of causation and damages").
5    Medtronic's reliance on *Lujan*, 504 U.S. 555 is completely misplaced.  That case, brought by a
6    wildlife interest group, alleged such remote damages as the future inability to view endangered
7    wildlife during possible future but as-yet-unplanned vacations.  *See id.* at 561.  There, the Court held
8    that the plaintiffs did not have standing to sue because they could not show that they had in fact been
9    injured or likely would be.  *See id.* at 566.  That case is wholly different from the present case, where
10   CareFusion has been specifically harmed through the difficulty in competing against a monopolist.

11         Moreover, this is not a case where Medtronic has somehow put CareFusion in a better
12   competitive position by making it easier for CareFusion to compete, as Medtronic erroneously
13   argues.  (*See* Med. Br. at 8.)  Indeed, Medtronic's allegations in this regard fundamentally
14   misconstrue CareFusion's pleadings.  Here, Medtronic did not just eliminate one of CareFusion's
15   competitors or chill entry of other third parties into the market, as was the case in the *Datagate* and
16   *Alberta Gas* cases cited by Medtronic.  (*See id.* at fn. 5, citing cases.)  Rather, Medtronic's unlawful
17   quest for market dominance harmed <u>all</u> competition, <u>including</u> CareFusion, by making it
18   exponentially more difficult for CareFusion or any other company to compete against Medtronic, and
19   by ensuring that Medtronic's inferior and more expensive products are entrenched with doctors and
20   hospitals.  (*See supra.*)  CareFusion's harm here is exactly the sort of harm recognized by the Ninth
21   Circuit in *Amarel, Image Tech., and Los Angeles Memorial Coliseum Comm'n*, and clearly
22   overcomes Medtronic's motion to dismiss.

23   **V.    CONCLUSION**

24         For the foregoing reasons, the Court should deny Medtronic's motion to dismiss CareFusion's
25   antitrust claims (Counts I and II).  CareFusion has more than sufficiently pled the requirements of its
26   antitrust counts.  Medtronic's misunderstanding and mischaracterization of CareFusion's pleadings
27   cannot avoid that Medtronic has been properly put on notice of CareFusion's claims.

28

1     Dated:  July 28, 2010                              Respectfully submitted,

2

3                                                          /s/ James R. Nuttall
4                                                         Claude M. Stern
                                                          QUINN EMANUEL
5                                                         555 Twin Dolphin Dr., 5th Floor
                                                          Redwood Shores, California 94065
6                                                         Telephone: (650) 801-5000
                                                          Facsimile: (650) 801-5100
7

8                                                         Timothy J. Malloy
                                                          James R. Nuttall
9                                                         Christopher M. Scharff
                                                          Stephanie F. Samz
10                                                        McANDREWS, HELD & MALLOY LTD.
                                                          500 West Madison Street, Suite 3400
11                                                        Chicago, Illinois 60661
                                                          Telephone: (312) 775-8000
12                                                        Facsimile: (312) 775-8100

13
                                                          **Attorneys for Plaintiffs**
14                                                        **CareFusion Corporation and**
                                                          **CareFusion 2200, Corporation**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
**CERTIFICATE OF SERVICE**

2
       The undersigned certifies that a true and correct copy of the above and foregoing document

3
has been served on July 28, 2010 to all counsel of record who are deemed to have consented to

4
electronic service via the Court's CM/ECF service per Civil Local Rule 5.4.  Any other counsel of

5
record will be served by electronic mail, facsimile and/or overnight delivery.

6

7
Dated:   July 28, 2010

8

9
                      By:    /s/ James R. Nuttall

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28