Jeffrey S. Davidson (S.B.N. 143633)
jeffrey.davidson@kirkland.com
Luke L. Dauchot (S.B.N. 229829)
luke.dauchot@kirkland.com
Martin R. Boles (S.B.N. 124159)
martin.boles@kirkland.com
R. C. Harlan (S.B.N. 234279)
rc.harlan@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA  90071
Telephone:      (213) 680-8400
Facsimile:       (213) 680-8500

Attorneys for Defendants
MEDTRONIC INC.,
MEDTRONIC SPINE LLC,
and KYPHON SARL

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| CAREFUSION CORPORATION and CAREFUSION 2200, CORPORATION | **CASE NO. CV10-01111 LHK (PVT)** |
| Plaintiffs, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS ANTITRUST CLAIMS (COUNTS I AND II)** |
| v. | |
| MEDTRONIC, INC., MEDTRONIC SPINE LLC d/b/a KYPHON INC., and KYPHON SARL | Hearing Date:   October 12, 2010 |
| Defendants. | Time:            1:30 pm |
| | Judge:           Hon. Lucy H. Koh |
| | Location:        Courtroom 4, 5th Floor |
| | 280 South First Street |
| | San Jose, California |

## **TABLE OF CONTENTS**

**Page**

I.     OVERVIEW ..................................................................................................1

II.    DELAYED ENTRY INTO THE KYPHOPLASTY MARKET DOES NOT
       GIVE RISE TO A "SHAM LITIGATION" CLAIM UNDER *HANDGARDS*
       BECAUSE CAREFUSION WAS NEVER SUED FOR INFRINGING THE '404
       AND '888 PATENTS. ...................................................................................3

       A.     *Handgards*, and More Recent Supreme Court and Ninth Circuit Authority,
              Require that the Plaintiff Be the Target of Actual Patent Infringement
              Lawsuits, Not Generalized "Threats." .................................................3

       B.     Having Abandoned One of the Complaint's Three "Threats," CareFusion
              Defends the Remaining Two Under an Inapplicable Standard and Mixes in
              "Threats" Made After the '404 and '888 Patents Expired. .....................8

III.   CAREFUSION STILL FAILS TO ALLEGE AN ANTITRUST VIOLATION
       INVOLVING PATENT ACQUISITIONS OR AN ANTITRUST INJURY
       RESULTING FROM THE ACQUIRED PATENTS. ...................................12

       A.     Patent Acquisitions Are Pled Using Cut-and-Paste Boilerplate Flouting the
              Supreme Court's Standard of Specificity in Antitrust Pleading and Omitting
              Elements Prescribed in CareFusion's Own Case Authority. .................12

       B.     The Complaint Fails as a Matter of Law to Allege Antitrust Injury.....................16

              1.     *Lujan* Applies, and "Threatened Clouds" Are Not "Concrete" or
                     "Imminent." ...............................................................................16

              2.     Elimination of Competitors' Products Cannot Injure CareFusion as a
                     Matter of Law. ............................................................................17

              3.     The Expanded "Medicare Fraud" Allegations Are Not in the
                     Complaint and, Even if Accepted as True, Higher Hospital
                     Reimbursement Would Have Benefitted, Not Harmed, Both
                     Consumers and CareFusion. ......................................................17

              4.     CareFusion's "Monopoly as a Whole" Argument Merely Tries to
                     Obscure the Failure to Plead the Required Elements and a Cognizable
                     Injury for a Patent-Acquisition Claim........................................19

IV.    CONCLUSION ..........................................................................................20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs. v. Teva Pharm.*,
   432 F. Supp. 2d 408 (D.Del. 2006) ............................................................... 18

*Abbyy Software House, Inc. v. Nuance Commc'ns, Inc.*,
   2008 U.S. Dist. LEXIS 90308 (N.D. Cal. Nov. 6, 2008) ...................... 15, 19

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
   141 F.3d 947 (9th Cir. 1998) .................................................................. 11, 21

*Alien Tech. Corp. v. Intermec, Inc.*,
   No. 06-51, 2007 U.S. Dist. LEXIS 2851 (D.N.D. Jan. 4, 2007) ................... 12

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1997) .................................................................... 23

*American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*,
   190 F.3d 1051 (9th Cir. 1999) .................................................................... 19

*Arcade, Inc. v. Minn. Mining & Mfg. Co.*,
   No. 88-141, 1991 WL 185155 (E.D. Tenn. Jul. 2, 1991) ............................... 8

*Ashcroft v. Iqbal*,
   129 S. Ct. 1937 (2009) ......................................................................... 15, 23

*Assoc. Gen. Contractors v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983) .................................................................................... 1

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ...................................... 2, 11, 14, 15, 17, 19, 21, 23, 24, 25

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*,
   49 F. Supp. 2d 750 (D.N.J. 1999) ................................................................. 8

*Black and Decker, Inc. v. Hoover Serv. Ctr.*,
   765 F. Supp. 1129 (D. Conn. 1991) ............................................................. 18

*Brandt Consol., Inc. v. Agrimar Corp.*,
   801 F. Supp. 164 (C.D. Ill. 1992) ................................................................. 8

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) .................................................................................... 22

*Brunswick Corp. v. Riegel Textile Corp.*,
   752 F.2d 261 (7th Cir. 1984) ...................................................................... 11

*Burbank Aeronautical Corp. v. Aeronautical Develop. Corp., Ltd.*,
   No. 89-6244, 1990 WL 261395 (C.D. Cal. May 23, 1990) ............................ 8

*C.R. Bard, Inc. v. M3 Sys., Inc.*,

ii

157 F.3d 1340 (Fed. Cir. 1998) .................................................................................. 5

*Calif. Motor Transp. Co. v. Trucking Unlimited,*
    404 U.S. 508 (1972) ................................................................................................. 5

*City of Anaheim v. So. Cal. Edison Co.,*
    955 F.2d 1373 (9th Cir. 1992) ......................................................................... 22, 23

*CVD, Inc. v. Raytheon Co.,*
    769 F.2d 842 (1st Cir. 1985) ................................................................................. 8

*Dr. Reddy's Labs., Ltd. v. aaiPharma, Inc.,*
    No. 01-10102, 2002 U.S. Dist. LEXIS 17287 (S.D.N.Y. Sept. 13, 2002) ...................... 12

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961) ............................................................................................. 5

*Edmunds Holding Co. v. Autobytel Inc.,*
    598 F. Supp. 2d 606 (D. Del. 2009) ..................................................................... 12

*ErinMedia, LLC v. Nielsen Media Research, Inc.,*
    401 F. Supp. 2d 1262 (M.D. Fla. 2005) ................................................................ 15

*Finnsugar Bioproducts, Inc. v. Monitor Sugar Co.,*
    No. 00-10381, 2002 WL 31758644 (E.D. Mich. Sept. 30, 2001) ............................... 8

*Glaxo Wellcome, Inc. v. Pharadyne Corp.,*
    No. 96-455, 1996 WL 432290 (D. Md. Jul. 23, 1996) ............................................ 12

*Grid Sys. Corp. v. Texas Instruments Inc.,*
    771 F. Supp. 1033 (N.D. Cal. 1991) ..................................................................... 8

*Handgards, Inc. v. Ethicon, Inc.,*
    601 F.2d 986 (1979) .............................. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 14, 18, 23, 24

*Handgards, Inc. v. Ethicon, Inc.,*
    743 F.2d 1282 (9th Cir. 1984) ........................................................................... 6, 9

*Image Tech. Servs. v. Eastman Kodak Co.,*
    125 F.3d 1195 (9th Cir. 1997) .............................................................................. 23

*In re Netflix Antitrust Litig.,*
    506 F. Supp. 2d 308 (N.D. Cal. 2007) .................................................................. 13

*Kaiser v. Abbott Laboratories,*
    552 F.3d 1033 (9th Cir. 2009) ............................................................................... 7

*Kaspar Wire Works, Inc. v. K-Jack Eng'g Co., Inc.,*
    Nos. 95-1095, 95-1115, 1995 WL 662674 (5th Cir. Nov. 9, 1995) ........................... 16

*Kobe, Inc. v. Dempsey Pump Co.*
    198 F.2d 416 (10th Cir. 1952) ............................................................................. 18

*Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League,*
    791 F.2d 1356 (9th Cir. 1986) .............................................................................. 23

iii

*Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ................................................................................................ 16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ...................................................................................................... 20, 23

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................................................ 11

*Medi-Temp, LLC v. CVS Pharmacy, Inc.*,
    CV 05-3241-PCT-JAT, 2006 U.S. Dist. LEXIS 51331 (D. Az. Jul. 20, 2006) ............................... 9

*Momento, Inc. v. Seccion Amarilla USA*,
    2009 U.S. Dist. LEXIS 85295 (N.D. Cal. Sept. 17, 2009) .................................................... 15

*Morton Grove Pharm., Inc. v. Par Pharm. Cos.*,
    No. 04-7007, 2006 U.S. Dist. LEXIS 13779 (N.D. Ill. Mar. 28, 2006) ........................................ 9

*Nobelpharma AB v. Implant Innovations, Inc.*,
    141 F.3d 1059 (Fed. Cir. 1998) .............................................................................................. 9

*Oetiker v. Jurid Werke GmbH*,
    671 F.2d 596 (D.C. Cir. 1982) ............................................................................................... 5

*Picante, Inc. v. Jimenez Food Prods.*,
    No. 81-625, 1982 WL 1891 (W.D. Tex. Aug. 15, 1982) ........................................................ 14

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................................ 5, 6, 7, 18

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ............................................................................................... 22

*SanDisk Corp. v. STMicroelectronics, Inc.*,
    480 F.3d 1372 (Fed. Cir. 2007) ........................................................................................... 13

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2nd Cir. 1981) ......................................................................... 2, 15, 16, 17

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ................................................................................................ 5

*Stewart-Warner Corp. v. Staley,*,
    42 F. Supp. 140 (W.D. Pa. 1941) ......................................................................................... 18

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965) .............................................................................................................. 5

*United States v. Brown Univ. in Providence in State of R.I.*,
    5 F.3d 658 (3rd Cir. 1993) ................................................................................................... 22

*United States v. Parker-Rust-Proof Co.*,
    61 F. Supp. 805 (E.D. Mich. 1945) ...................................................................................... 18

*Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*,

iv

375 F.3d 1341 (Fed. Cir. 2004) ........................................................................ 4, 9

*USS-POSCO Indus. v. Contra Costa County Bldg. & Constr. Trades Council*,
    31 F.3d 800 (9th Cir. 1994) ........................................................................ 7

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965) ........................................... 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 23, 24

*Walter Kiddie Portable Equip., Inc. v. Universal Sec'y Instruments, Inc.*,
    669 F. Supp. 2d 895 (N.D. Ill. 2009) ........................................................ 8

*Western Concrete Structures Co., Inc. v. Mitsuit & Co., Inc.*,
    760 F.2d 1013 (9th Cir. 1985) .................................................................. 23

**Other Authorities**

ABA's Model Jury Instructions in Civil Antitrust Cases (2005) ................................. 8, 13

# I.  <u>OVERVIEW</u>

Any antitrust cause of action, including the two at issue here, must allege conduct that both violates antitrust law and causes antitrust injury (*i.e.*, of a type that the antitrust laws were intended to prevent) proximately caused by such conduct.  *See Assoc. Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).  Actionable conduct must cause cognizable injury; cognizable injury must flow from actionable conduct.  At both ends, the Complaint fails the test.  CareFusion hopes to cover this fatal defect with a voluminous hodgepodge of alleged conduct and illusory injury.  The requisite nexus, however, is not in the porridge.

In arguing that CareFusion has been harmed, the Opposition continues to rely on two allegations from the Complaint: (1) that the launch of CareFusion's kyphoplasty product was delayed two years because of Defendants' threatened enforcement of two foundational patents, the '404 and '888 (the "Delayed Entry" theory); and (2) that even after those patents expired and CareFusion launched its kyphoplasty products, Defendants' other patents continue to "threaten[] to . . . cast a cloud over" CareFusion's product.  (*See* CareFusion's Complaint, Doc. #1 ("Compl.") ¶ 159 (the "Threatened Cloud" theory).)

The first allegation, even under CareFusion's newly announced legal theory, remains lacking in required elements pled.  (*See* Part II.)  Chiding Defendants for supposedly misreading the Rorschach blot of the Complaint's far-flung allegations, CareFusion now disowns a *Walker Process* claim and asserts that the Delayed Entry theory is instead based on the Ninth Circuit decision in *Handgards*.  But the Complaint fails to plead the fundamental element of a *Handgards* "sham litigation" claim, namely that CareFusion was the victim of a patent infringement lawsuit.  This element is ***required*** by *Handgards*, by the Supreme Court cases governing this claim, and by more recent Ninth Circuit decisions (which CareFusion failed to cite).  (*See* Part II.A.)  Moreover, even if a threat alone were sufficient under *Handgards* (as it would be under *Walker Process*, which is why Defendants originally surmised this was the basis for the Delayed Entry claim), the Opposition fails to overcome the Opening Brief's showing that the alleged "threats," such as a feature story in the *Sonoma Press Democrat* or a boilerplate footnote in a 10-K, do not suffice even for a *Walker Process* claim.  (*See* Part II.B.)

Having failed to properly plead the claim that would permit a suit for the alleged Delayed Entry, CareFusion is left with its second allegation of injury, that other acts by Defendants "threaten[] to . . . cast a cloud" over its present business.  (*See* Compl. ¶ 159.)  But the Threatened Cloud claim remains defective in the two dimensions required for cognizable "antitrust injury":  (1) a properly pled allegation of an antitrust violation; and (2) resulting injury to CareFusion.

First, in asserting that patent acquisitions were unlawful, the Complaint fails to allege the elements required by the leading case, *SCM v. Xerox*, cited in CareFusion's brief.  (*See* Part III.A.)  Instead, the Complaint cuts-and-pastes the identical conclusory description for each of a string of alleged acquisitions.  Such rote recitations violate the "plaintiff's obligation to provide . . . more than labels and conclusions, and a formulaic recitation," to survive dismissal.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Second, the Complaint fails to link these "violations" to cognizable injury to CareFusion. Alleging that patents "threaten a cloud" does not satisfy the Supreme Court's standing criteria of concreteness and particularity.  (*See* Part III.B.1.)  Nor is alleging that Medtronic discontinued parts of its own product portfolio sufficient to plead cognizable injury because, as the Supreme Court has noted, competitors stand to benefit from reduced competition.  (*See* Part III.B.2.)  Finally, the newly-padded "Medicare fraud" theory is not pled in the Complaint and, even as recited in the Opposition, would have only increased CareFusion sales as well as consumer welfare and choice, and hence is likewise not cognizable as "antitrust injury" as a matter of law.  (*See* Part III.B.3.)[1]

---

[1]     The rest of the Opposition is empty rhetoric.  An example is CareFusion's protest about "misrepresentations" in the moving papers that Kyphon's founders were true innovators who did not mislead the Patent Office.  (Opp. at 5 n.5.)  Defendants' "representations" came from CareFusion's own Complaint Exhibit G.  (*See* Mot. Part II.D & E.)  And the "sworn testimony" appended to the Opposition simply does not support the inferences about kyphoplasty art that CareFusion is stretching them to establish.  (*See* Opp. at 5, 7.)  In any event, this point is now moot, since the issue of "but-for" causation of Patent Office decisionmaking has been taken off the table by the Opposition's disavowal of a claim under *Walker Process*.  CareFusion also derides other aspects of Defendants' factual introduction as "self-serving."  (Opp. at 7 n.7.)  Again, these facts were "served" up by CareFusion, in the Complaint or its many exhibits.  More importantly, the arguments on which this motion depends do not require the Court to rely on any matter outside the Complaint.

## II. DELAYED ENTRY INTO THE KYPHOPLASTY MARKET DOES NOT GIVE RISE TO A "SHAM LITIGATION" CLAIM UNDER *HANDGARDS* BECAUSE CAREFUSION WAS NEVER SUED FOR INFRINGING THE '404 AND '888 PATENTS.

The Opposition protests that the Delayed Entry theory of injury is not premised on the Supreme Court's decision in *Walker Process*, but rather on the Ninth Circuit's decision in *Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 992 (1979).  (*See* CareFusion's Opposition to Medtronic's Motion to Dismiss Antitrust Claims (Counts I and II), Doc. # 45 ("Opp.").)  Under *Walker Process*, the "conduct" element of a monopolization claim consists of enforcement of a patent which is procured by fraud on the Patent Office.  (*See* Opp. at 18.)  Under *Handgards*, the patent need not be procured by fraud, but its enforcement must nevertheless involve "bad faith," for example, where the suing party knows that the patent is invalid for a reason other than fraud.[2]  *See* 601 F.2d at 992-93 ("infringement actions initiated and conducted in bad faith . . . may constitute an attempt to monopolize violative of Section 2 of the antitrust law").

### A. *Handgards*, and More Recent Supreme Court and Ninth Circuit Authority, Require that the Plaintiff Be the Target of Actual Patent Infringement Lawsuits, Not Generalized "Threats."

CareFusion objects that the opening papers analyzing *Walker Process* elements are barking up the wrong tree.  But in jumping to the *Handgards* tree, CareFusion clings to a *Walker Process* nut, namely the ability to base its claim on a "threat," rather than actual litigation.  Under *Walker Process*, with its higher standard of intent (fraud on the Patent Office procuring the patent), a plaintiff may base a claim on *threatened* enforcement.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1362 (Fed. Cir. 2004), *overruled on other grounds*, 546 U.S. 394

---

[2]  The Opposition asserts, "Tellingly, Medtronic does not dispute that it knew that the '404 and '888 patents were both invalid and unenforceable."  (Opp. at 21.)  This is wrong.  Medtronic said at the outset of its moving papers that it vigorously disputed all of CareFusion's allegations of wrongdoing, but was limiting its challenge under Rule 12(b)(6) to selected pleading deficiencies that were dispositive.  (*See* Mot. at 2.)  The Opposition boils over with the assertion that "the only inference that can be drawn from Medtronic's multiple filed pleadings [defending against Kyphon's infringement suits] is that Medtronic knew that the '404 and '888 patents were invalid and unenforceable."  (*See* Opp. at 20.)  But CareFusion does not explain why Medtronic would then, after trying to fight those patents, resign itself to paying $4 billion for them.  (*See* Opp. at 11 (price paid to acquire Kyphon).)  This illogic at the core of CareFusion's allegations need not be resolved in this motion, which contests solely the failure to allege necessary elements of enforcement and injury.

(letters threatening patent litigation are sufficient enforcement to establish a *Walker Process* claim).

In a *Handgards* case, with a lower threshold of intent, the "bad faith" conduct must include a

lawsuit. *See Handgards*, 601 F.2d at 996 (holding that the rule it devised "is fashioned in response

to the unique characteristics of proceedings in which the alleged violation of the antitrust law

consists solely of one or more **infringement actions** initiated in bad faith") (emphasis added). Thus,

CareFusion is trying to graft the more lenient intent element from *Handgards* onto the more lenient

*Walker Process* "threat" standard. If permitted, such a mix-and-match claim would render moot the

*Walker Process* cause of action defined by the Supreme Court. *See Walker Process Equip., Inc. v.*

*Food Mach. & Chem. Corp.*, 382 U.S. 172, 179 (1965) (claim defined by the Court arises if "the

relevant patent is shown to have been procured by knowing and willful fraud practiced by the

defendant on the Patent Office," but a "cause of action would not be made out if the plaintiff

. . . showed no more than invalidity of the patent . . . .") (Harlan, J., concurring).

   As the District of Columbia Circuit held in applying *Handgards*, without an actual lawsuit

there cannot be a *Handgards* claim. *See Oetiker v. Jurid Werke GmbH*, 671 F.2d 596, 601-02

(D.C. Cir. 1982) (no antitrust claim because "Jurid initiated no litigation, in bad faith or good

. . . [and] Jurid's letters to VW cannot provide a basis for an antitrust action") (citing *Handgards*).

   The Supreme Court, Federal Circuit[3] and Ninth Circuit apply the same predicate. The very

origin of the *Handgards* claim is a line of Supreme Court precedent limiting antitrust liability for

constitutionally protected "petitioning," including litigation.[4] The most recent Supreme Court

---

[3]    *See C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1368-69 (Fed. Cir. 1998)
(distinguishing between *Walker Process* claims and those involving "sham" litigation).

[4]    The First Amendment guarantees "the right of the people . . . to petition the Government for
a redress of grievances." In recognition of this fundamental right, the Supreme Court held in two
seminal cases, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127
(1961) and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), that those who
petition any department of the government for redress are immune from antitrust liability regardless
of any anti-competitive purpose—the so-called *Noerr-Pennington* doctrine of immunity. *See Sosa v.*
*DIRECTV, Inc.*, 437 F.3d 923, 929-930 (9th Cir. 2006). The Supreme Court has extended the right
to petition the government to include the right to sue in state and federal courts. *See California*
*Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510-511 (1972). These cases make a
narrow exception for "sham litigation," which in the case of an antitrust challenge to a patent-
infringement suit, requires proof that the litigation was both objectively baseless and subjectively
brought for a bad motive. *See Prof'l Real Estate Investors, Inc.*, 508 U.S. at 56-61 (explaining that
sham litigation analysis has both an "objectively baseless" and "subjective" component).

decision defining what CareFusion calls the *Handgards* claim is *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993).  CareFusion repeatedly quotes *Professional Real Estate Investors* in sentences asserting that a *Handgards* claim may be based on "threatened enforcement" of a patent.  (*See* Opp. at 19, 27, 28.)  In each case, CareFusion's sentence begins the quotation after the word "threatened."  That is no accident:  the cited page of *Professional Real Estate Investors* does not discuss "threats," and instead uses words like "lawsuit," "litigation" and other terms presupposing actual litigation a dozen times.  *See* 508 U.S. at 60; *compare* Opp. at 19, 27, 28 (inaccurately citing page 60 of *Professional Real Estate Investors* as supporting a cause of action based on "threats").

   *Handgards* itself involved an actual patent-infringement lawsuit, not threats.  *See* 601 F.2d at 990-91, 996.  The Ninth Circuit formulated the cause of action on the express premise that the plaintiff would be the victim of actual litigation.[5]  The policy cited by the Court for its decision was the competitive harm that could result from the cost of defending against litigation,[6] a policy that would not apply to threats, especially where, as here, it is the antitrust plaintiff who proceeds to bring on those costs by initiating a lawsuit.  The test for "bad faith" dictated by the Court also requires actual litigation: using objective hindsight to "provide the means whereby the bad faith infringement action can be identified post hoc. . . ."[7]

   After remand, the *Handgards* case came back up to the Ninth Circuit five years later, and the Court in *Handgards II* again formulated the "sham litigation" cause of action as entailing an actual

---

*Handgards* is one of the earlier Ninth Circuit decisions developing this doctrine.

[5]   601 F.2d at 993 ("infringement actions initiated and conducted in bad faith . . . may constitute an attempt to monopolize violative of Section 2 of the antitrust law"); *id.* at 996 (holding that the rule it devised "is fashioned in response to the unique characteristics of proceedings in which the alleged violation of the antitrust law consists solely of one or more **infringement actions** initiated in bad faith") (emphasis added).

[6]   *Id.* at 993 n.12 ("Subjecting a potential rival or actual rival to . . . (the burden of defending an infringement suit) may weaken him or even dissuade him from beginning or continuing the rivalry with the monopolist-patentee and perhaps without regard to the merits of the infringement claim" *(ellipses and parentheses in original).)*

[7]   *Id.* at 993.

---

5

lawsuit.  *See Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1284 (9th Cir. 1984) ("*Handgards II*") ("In [*Handgards I*] we established . . . a standard for . . . antitrust liability resulting from the prosecution of a patent suit in bad faith."); *id.* at 1294-95 ("We believe that *Handgards I* established a standard" including a "requirement of bad faith litigation").

Subsequent Ninth Circuit cases, following the lead of the Supreme Court in *Professional Real Estate Investors,* have further cemented the requirement that "*Handgards*" or "sham litigation" claims involve actual litigation.  In *USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council* ("*POSCO*"), the Ninth Circuit analyzed Supreme Court precedent as establishing two kinds of claims for "sham litigation":  one involving single lawsuits, whose "objective merit" could be evaluated *post hoc*, 31 F.3d 800, 810-811 (9th Cir. 1994), and the other involving multiple lawsuits, whose objective merit could be evaluated by counting wins and losses. *Id.*  Obviously this methodology for assessing "bad faith" presupposes actual lawsuits, as does the Court's reiteration of the policy of avoiding bad faith imposition of the "crushing burden" of litigation costs.  *Id.*

*POSCO* was followed by the Ninth Circuit last year in *Kaiser v. Abbott Laboratories*, another case involving actual lawsuits.  552 F.3d 1033, 1044, 1046-47 (affirming summary judgment for patent holder where it won seven out of seventeen suits, but in the losing cases had a plausible argument).

CareFusion's Opposition cites neither of these controlling Ninth Circuit cases.  Instead, in asserting that its claim may be based on threats, CareFusion relies on non-binding cases that either do not involve patents, or else extend the sham litigation exception to a narrow circumstance not present here:  pre-lawsuit demands made directly to the plaintiff, threatening a lawsuit explicitly, coercing an immediate settlement.  In CareFusion's only Circuit Court of Appeal decision, *CVD, Inc. v. Raytheon Co.*, the defendants met with plaintiffs in person and threatened litigation unless plaintiffs entered into a pre-lawsuit settlement agreement, which plaintiffs thereafter did under duress.  *See Raytheon Co.*, 769 F.2d 842, 847-54 (1st Cir. 1985).  No such pre-lawsuit demands for settlement or one-on-one threats of litigation have been alleged here.

Similarly, the district court cases cited by CareFusion likewise involve direct threats of litigation either resulting in pre-lawsuit settlements or actual litigation that plaintiffs then contended amounted to bad faith enforcement of defendants' patent rights.[8]  All the other cases cited by CareFusion are district court cases that do not control in this court and either concern *Walker Process* claims[9] or do not even purport to apply (or even cite) *Handgards*.[10]  All the cases cited on the page in the Opposition for "outlining elements" of a "bad faith patent enforcement" (*Handgards*) involve actual lawsuits.[11]

In summary, the Supreme Court in *Walker Process* struck a balance between a patent-holder's constitutional right to enforce its patent and the policies of antitrust.  By requiring antitrust plaintiffs to meet the high bar of alleging (and then proving) fraud on the Patent Office, the Court created a category of claims for which it suffices to allege enforcement "threats" without actual litigation.  *See Unitherm Food Sys.*, 375 F.3d 1341 at 1362 (Fed. Cir. 2004), *overruled on other grounds* (where plaintiff establishes patents were procured by fraud on the Patent Office, letters threatening patent litigation are sufficient enforcement to establish a *Walker Process* claim).

---

[8]    *See Grid Sys. Corp. v. Texas Instruments Inc.*, 771 F. Supp. 1033, 1036 (N.D. Cal. 1991) (direct threats of litigation resulting in pre-lawsuit settlement); *see Arcade, Inc. v. Minnesota Mining & Mfg. Co.*, No. 88-141, 1991 WL 185155, 1991 U.S. Dist. LEXIS 19768 (E.D. Tenn. Jul. 2, 1991) (threatening letters sent to plaintiffs' customers specifically identifying patents being infringed followed by actual infringement lawsuit).

[9]    S*ee Burbank Aeronautical Corp. v. Aeronautical Develop. Corp., Ltd.*, No. 89-6244,1990 WL 261395, at *5, 1990 U.S. Dist. LEXIS 15028 at *13-15 (C.D. Cal. May 23, 1990) (claim based on *Walker Process*, not *Handgards*, and concerned threatening letters sent directly to the plaintiff).

[10]   S*ee Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750 (D.N.J. 1999) (no reference to *Handgards*); *Finnsugar Bioproducts, Inc. v. Monitor Sugar Co.*, No. 00-10381, 2002 WL 31758644 (E.D. Mich. Jun. 10, 2002) (same); *Brandt Consol., Inc. v. Agrimar Corp.*, 801 F. Supp. 164 (C.D. Ill. 1992), *overruled on other grounds* (same).

[11]   For example, *Walter Kiddie Portable Equipment* specifically defined a *Handgards* claim as bad faith litigation without mentioning threats.  *See Walter Kiddie Portable Equip., Inc. v. Universal Sec'y Instruments, Inc.*, 669 F. Supp. 2d 895, 898-99 (N.D. Ill. 2009) (*Handgards* "allows for a suit under Section 2 of the Sherman Act if the patent holder brought its infringement suit in bad faith").  Similarly, the court in *Medi-Temp, LLC* defined a *Handgards* claim as "infringement actions initiated in bad faith . . . .", and did not mention threats.  *Medi-Temp, LLC v. CVS Pharmacy, Inc.*, CV 05-3241-PCT-JAT, 2006 U.S. Dist. LEXIS 51331, at *12-13 (D. Az. Jul. 20, 2006) (quoting *Handgards*).  The other two cases cited on page 21 of the Opposition (*Nobelpharma* and *Morton*) likewise involve *Handgards*-type claims arising out of actual litigation.

*Handgards* recognized this careful balancing, and made clear that it was formulating a different claim, a "sham litigation" exception to *Noerr-Pennington* antitrust immunity specifically related to the bad faith enforcement of a patent with actual lawsuits.  *See Handgards*, 601 F.2d at 994-96; *Handgards II*, 743 F.2d at 1294.  Because a *Handgards* claim does not require the high bar of alleging and proving fraud, but rather mere knowledge of a patent's invalidity, it allows an antitrust claim to go forward only if the patent holder has actually attempted to enforce the knowingly invalid patent through bad faith litigation.  *See id.*  Threats are not enough.  *See id.*[12] Indeed, CareFusion's reformulation of *Handgards* effectively vitiates the Supreme Court's decision in *Walker Process*: no longer would allegations of fraud on the Patent Office be required in order for mere threats of patent enforcement to be actionable under the antitrust laws.

B.   **Having Abandoned One of the Complaint's Three "Threats," CareFusion Defends the Remaining Two Under an Inapplicable Standard and Mixes in "Threats" Made After the '404 and '888 Patents Expired.**

CareFusion alleges that it delayed the launch of its kyphoplasty product for two years, until the '404 and '888 patents expired in February 2009, because of Defendants' patent-enforcement "threats."  (*See* Compl. ¶¶ 102 & 103; Opp. at 13.)  There were no threats.

In addition to "threats" being an inadequate basis for a claim under *Handgards* (*see* Part II.A *supra*), the items proffered by the Complaint as "threats," when viewed outside CareFusion's filter of ellipses and characterizations, cannot as a matter of law be actionable, even under the jurisprudence of *Walker Process*.  The Opposition does not even attempt to defend the "threatening" character of the feature article in the Sonoma County *Press Democrat* (discussing local companies involved in IP litigation, one of which happened to be Medtronic as a defendant in a case involving its vascular products division).  (*See* Compl. ¶¶ 86-95 (calling Compl. Ex. W a "threat."); Medtronic's Motion to Dismiss Antitrust Claims (Counts I and II), Doc. # 36 ("Mot."), at 15 (discussing Ex. W).)

---

[12]   The ABA Model Antitrust Jury Instructions reflect this analysis of *Walker Process* and *Handgards*, by specifically including the fact that a *Handgards* claim requires an actual lawsuit, not just "threats."  *See* Model Jury Instructions in Civil Antitrust Cases (ABA 2005 edition) at D-63 to D-71 (*hereinafter* "Antitrust Jury Instructions").

8

The second "threat" is a 10-K appendix warning of risks to earnings predictability resulting from IP litigation.  (*See* Compl. ¶¶ 86-95 & Ex. X.)  The third "threat" is a CEO's teleconference with investment analysts which is so far from threatening litigation over the '404 and '888 patents that the Complaint had to chop it up, throw away the middle part, and join the head to the feet to try to concoct a "threat."  (*See* Mot. at 16-17 (discussing Compl. ¶ 92, & Ex. Y.).)

The moving papers described these documents in more detail (*see* Mot. at 16-17), and challenged CareFusion to claim that its kyphoplasty developers even read these statements, let alone recoiled from launching a product in fear of them (*see id*. at 15-17).  The Opposition ignores the invitation.

Little wonder.  None of these statements mentions the '404 or '888 patents.  (*Id.*)  None mentions any specific patent (the CEO analyst telecon mentions only IP referred to as "Michelson patents").  (*Id.*)  None mentions CareFusion.  (*Id.*)  No case cited to the Court supports a cause of action alleging such "threats" for the enforcement element of a *Walker Process* claim, much less a claim under *Handgards*.  Calling these statements "threats" of any kind, let alone "threats" regarding the '404 and '888 patents, fails the Supreme Court's *Twombly* test of plausibility.[13]

CareFusion responds that a public statement of generalized intent to defend a company's entire IP portfolio suffices as a *Handgards* "threatened enforcement."  But it concedes that no case so holds.  (*See* Opp. at 24 n.22.)  So, CareFusion instead reaches for cases (including Medtronic pleadings from such cases) addressing the issue of when a patent-holder's statements create

---

[13]    The Opposition escalates CareFusion's claim that the invalidity of these patents was manifest from the public record of infringement litigation that preceded or coincided with CareFusion's supposed decision to delay.  However, as Judge Posner stated in *Brunswick Corp. v. Riegel Textile Corp.*, "a patent known to the trade to be invalid will not discourage competitors from making the patented product or using the patented process, and so will not confer monopoly power. . . ."  752 F.2d 261, 265 (7th Cir. 1984); *see also Twombly*, 550 U.S. at 557 (plausibility required in antitrust pleading); *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) (an antitrust claim cannot proceed if the antitrust theory does not "make economic sense").  The likely explanation is that CareFusion knew that the '404 and '888 patents were in fact valid.  Indeed, while CareFusion objects that an Article III court did not make a final, contested ruling on their validity, the District Court's judgment in the Kyphon/Disc-O-Tech litigation finding the '888 and '404 patents valid, while based on the parties' settlement, came after the Court had adopted the Special Master's denial of Disc-O-Tech's summary judgment motion asserting invalidity of the '888 and '404 patents based on "anticipation and/or obviousness."

sufficient apprehension to confer standing to sue for declaratory judgment.  (*See id*. at 24-26.)

These cases offer no lifeline.  First, CareFusion's alleged "threats" do not even meet this imported standard.  The Supreme Court's test for declaratory judgment ripeness was re-defined in *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 (2007).  Under *MedImmune,* declaratory judgment standing arises only if the patent-holder's statements are directed "overtly and specifically toward the declaratory judgment plaintiff (or, at the very least, a class of alleged infringers to which plaintiff belonged) . . . ."  *See, e.g., Edmunds Holding Co. v. Autobytel Inc.*, 598 F. Supp. 2d 606, 610 (D. Del. 2009) ("Autobytel's suits against sales leads companies and stated general intent to enforce its rights, without more, are not sufficient to show the existence of a real controversy between Autobytel and Edmunds.").  None of the Complaint's alleged "threats" meet this standard.  (*See* Mot. at 15-17 (unabridged version of statements at issue).)[14]

Second, the very notion of defining "threats" based on the threshold for declaratory-judgment standing comes from the caselaw of claims under *Walker Process*, a theory which CareFusion now disavows.  (*See* Opp. at 1 ("CareFusion did not even plead a *Walker Process* claim").)  Moreover, even under the standards of that theory, the alleged "threats" are not actionable.  (*See* Mot. at 14-17

---

[14]   The Opposition reaches outside the Ninth Circuit to cite unreported cases supposedly on point, but they all involve statements which either (1) specifically mention the plaintiff or product (or medical procedure) by name, or (2) are coupled with significant litigation history between the parties.  (*See* Opp. at 26 (citing *Glaxo Wellcome, Inc. v. Pharadyne Corp.*, No. 96-455,1996 WL 432290, at *4, 1996 U.S. Dist. LEXIS 10959 (D. Md. Jul. 23, 1996) (finding declaratory judgment standing where (1) Glaxo had publicly stated its policy of enforcing the patent covering the chemical formulation being used by Pharadyne in manufacturing its competing generic drug, and where (2) Glaxo had previously sued, and was currently bringing patent infringement actions against, other generic drug manufacturers alleging suit over the specific patent at issue and was currently suing Pharadyne over two other patents.); *Alien Tech. Corp. v.  Intermec, Inc.*, No. 06-51, 2007 U.S. Dist. LEXIS 2851, at *3-5, 10-12 (D.N.D. Jan. 4, 2007) (finding declaratory judgment standing from defendant's CEO's statements to stock analysts that preparations were underway to bring infringement suits against unlicensed competitors and specifically singling out plaintiff as a possible defendant); *Dr. Reddy's Labs., Ltd. v. aaiPharma, Inc.*, No. 01-10102, 2002 U.S. Dist. LEXIS 17287, at *24-25 (S.D.N.Y. Sept. 13, 2002) (finding declaratory judgment standing where defendant made statements threatening enforcement of its patents covering the drug omeprazole and where defendant had sued plaintiff three previous times alleging patent infringement regarding related drugs)).)  The prior Medtronic pleading submitted with the Opposition also refers to prior *repeated* litigation against Medtronic and statements by the defendant which specifically reference the medical procedure at issue.  (*See* Opp. Ex. 2.)  By contrast, here there is no litigation history between the parties, and the three threats alleged with respect to Kyphon's '404 and '888 patents do not mention any specific patent, any alleged infringer or category of infringers, and do not even mention the subject of kyphoplasty in connection with patent litigation.  (*See* Mot. at 15-17.)

10

(full discussion of inadequacy of Complaint's allegation of "enforcement" element of *Walker Process* claim).)  For example, in *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 317 (N.D. Cal. 2007), the alleged threats were found to be insufficient because they were not directed against "certain identified ongoing or planned . . . accused activity."  *Id.* (quoting *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1381 (Fed. Cir. 2007)).  CareFusion's alleged "threats" also lack such specific focus.

The Opposition dismisses this authority as "not a *Handgards* case."  (*See* Opp. at 26 n.23.) Of course, the Opposition admits elsewhere that it found no *Handgards* case recognizing a "threat" based on the declaratory judgment standard.  (*See id.* 24 n.22.)  In other words, CareFusion is once again impermissibly trying to clone a *"Handgards"* claim with a *Walker Process* "threat" element, without even complying with the *Walker Process* authority defining that "threat" element.

In apparent recognition that its three "threats" are neither plausible nor legally cognizable, CareFusion now throws in some additional statements by Medtronic's CEO which sound more specific to kyphoplasty and CareFusion, and indeed they are.  (*See* Opp. at 25.)  But the Opposition slips these into the "Delayed Entry" discussion without mentioning that these statements were made after the '404 and '888 patents had expired, and after CareFusion had ended its delay.  (*Compare* Compl. ¶ 103 (the '404 and '888 patents expired on February 9, 2009); *with* Opp. at 25 (citing Compl. Ex. Z and JJ, post-dating February 9, 2009).)  In other words, they are not threats regarding the '404 and '888 patents, which by CareFusion's own allegation, were the basis for its decision to delay entry.  (*See* Compl. ¶ 102; Opp. at 13.)  Thus, these post-expiration statements cannot support a *Handgards* claim based on "enforcement" of the '404 and '888 patents.[15]

---

[15]     How far CareFusion is willing to reach is also demonstrated by its argument that Medtronic's decision to record assignments of the '404 and '888 patents with the Patent Office after acquiring Kyphon constitutes actionable "threats."  (*See* Opp. at 23.)  CareFusion relies on an unpublished decision from the Western District of Texas which involved not merely re-registration of an admittedly-invalid trademark, but actual litigation.  *See Picante, Inc. v. Jimenez Food Prods.*, No. 81-625, 1982 WL 1891 (W.D. Tex. Aug. 15, 1982).

11

### III.   CAREFUSION STILL FAILS TO ALLEGE AN ANTITRUST VIOLATION INVOLVING PATENT ACQUISITIONS OR AN ANTITRUST INJURY RESULTING FROM THE ACQUIRED PATENTS.

In addition to alleging that the '404 and '888 patents caused CareFusion's Delayed Entry, the Complaint alleges that later-acquired patents now "threaten to cast a cloud" over CareFusion's new product.  (*See* Compl. ¶¶ 36-47, 61-65, 81-85 (string of acquisitions); ¶¶ 159 & 170 ("Threatened Cloud" injury).)  The Complaint alleges that acquisition of these patents violated antitrust law.  (*Id.*)  However, neither the boilerplate pleading of antitrust violations nor the pleading of CareFusion's alleged "Threatened Cloud" injury is sufficient to state a proper claim and avoid dismissal.

### A.   Patent Acquisitions Are Pled Using Cut-and-Paste Boilerplate Flouting the Supreme Court's Standard of Specificity in Antitrust Pleading and Omitting Elements Prescribed in CareFusion's Own Case Authority.

The Supreme Court in *Bell Atlantic v. Twombly* held that courts should no longer accept antitrust allegations that are "formulaic recitation[s]" of bare legal conclusions lacking "specificity." 550 U.S. at 555-58.  The Complaint's claim regarding Defendants' patent acquisitions cannot survive that directive.

The allegations are, literally, formulaic.  They follow a formula.  A series of seven acquisitions is described by naming a seller, averring that Kyphon acquired its patents, and then repeating the identical bare legal conclusion that the acquisition violated antitrust law.  (*See* Compl. ¶¶ 37-39; 40-42; 43-45; 46-47; 61-65 (Complaint's patent-acquisition claims); Mot. at 6-7, 20-21 (describing formulaic, conclusory style).)

CareFusion does not dispute that its patent-acquisition allegations are limited to this formulaic boilerplate.  It simply says that such allegations suffice.  (*See* Opp. at 30.)  As for *Twombly*, CareFusion off-handedly dismisses the Supreme Court's ruling as distinguishable (Opp. at 16, n.13),[16] and points to other cases that purportedly endorse the Complaint's approach (*id.* at 32).

Actually, none of the cases cited in the Opposition endorses the adequacy of CareFusion's

---

[16]   CareFusion is so anxious to avoid *Twombly* that it makes contradictory contentions.  On the one hand, the Opposition says that there is no "special pleading rule" in antitrust cases.  (Opp. at 32.) But then CareFusion tries to confine the pleading rules of *Twombly* to only Sherman Act Section 1 cases.  (*See* Opp. at 16 n.13.)  The bottom line is that the Supreme Court has held that *Twombly*'s pleading standards apply to "all civil actions."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1953 (2009).

pleading as meeting post-*Twombly* standards.[17]  On the contrary, CareFusion's own case, *SCM v. Xerox*, established the foundation for the present-day elements of a patent-acquisition monopolization (or attempted monopolization)[18] claim, none of which are pled in the Complaint: (1) acquirer's pre-existing market power; (2) increase in market power caused by the acquisition; and (3) market-power increase exceeding what would be inherent in the patent standing alone.  *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1203, 1208 (2d Cir. 1981);[19] ABA's Model Jury Instructions in Civil Antitrust Cases (2005) at D-22 (acquirer's pre-existing market power), D-23 (second and third elements).[20]

The Complaint alleges none of these elements.  (*See* Compl. ¶¶ 36-47, 61-65, 81-85.)  For example, with respect to Medtronic's acquisition of Kyphon, the Complaint does not allege that

[17]    CareFusion cites three cases for the proposition that threadbare conclusory allegations merely listing acquisitions are enough to state an antitrust claim.  None of these cases is controlling or even persuasive.  *ErinMedia, LLC v. Nielsen Media Research, Inc.*, 401 F. Supp. 2d 1262 (M.D. Fla. 2005), was decided before the Supreme Court's decision in *Twombly*.  The other two are unpublished district court opinions that do not support CareFusion's position.  In *Abbyy Software*, the district court dismissed plaintiff's antitrust claim for lack of standing and antitrust injury, and hence its discussion of the patent-acquisition allegations was dictum, with only a partial discussion of required elements and not applying *Twombly* (which the court cited elsewhere) to those particular allegations.  *Abbyy Software House, Inc. v. Nuance Commc'ns, Inc.*, 2008 U.S. Dist. LEXIS 90308, *11-15 (N.D. Cal. Nov. 6, 2008).  *Momento, Inc. v. Seccion Amarilla USA* involved a predatory pricing scheme, not patent acquisition, and the complaint contained detailed allegations regarding specific advertisements, price lists, and secret discounts that were more specific than the conclusory allegations of wrongdoing that CareFusion puts forward in its Complaint.  2009 U.S. Dist. LEXIS 85295, *14-23 (N.D. Cal. Sept. 17, 2009).

[18]    Attempted monopolization claims based on patent acquisition have the same patent-specific elements as those of monopolization.  *See* Antitrust Jury Instructions, *infra*, at D-24.

[19]    "In scrutinizing **acquisitions of patents** under § 2 of the Sherman Act, the focus should be upon the **market power that will be conferred by the patent** in relation to the **market position then occupied by the acquiring party**.  We agree with Professors Areeda and Turner that whether limitations should be imposed on the patent rights of an acquiring party should be dictated by the **extent of the power already possessed by that party** in the relevant market into which the products embodying the patented art enter." 645 F.2d at 1203, 1208 (emphasis added).  *SCM v. Xerox* remains the leading authority on patent-acquisition Section 2 claims.  *See* Antitrust Jury Instructions at D-24 to D-25.

[20]    "The theory is that **unless the acquisition increases the market power of the acquiring party over that power implicit in the patent grant, the acquisition does not restrain trade** and should be permitted.  In other words, it is not unlawful to purchase a pre-existing monopoly that existed by virtue of a patent holder's patent rights, but it could be unlawful to create a monopoly by combining two patent holders' patent rights and thereby create market power where it did not exist previously." *Id.* at D-24 (emphasis added).

Medtronic had market power prior to the acquisition.  *Compare* Compl. ¶¶ 77-80 (Medtronic

acquisition of Kyphon) *with SCM v. Xerox*, 645 F.2d at 1208 (antitrust limitations on patent

acquisitions "should be dictated by the extent of the power already possessed by" the acquirer) and

Antitrust Jury Instructions at D-24 ("it is not unlawful to purchase a pre-existing monopoly that

existed by virtue of a patent-holder's patent rights" absent prior market power in the acquirer); *see*

*also Kaspar Wire Works, Inc. v. K-Jack Eng'g Co., Inc*., Nos. 95-1095, 95-1115, 1995 WL 662674,

at *4 (Fed. Cir. Nov. 9, 1995) (holding that Section 2 plaintiff must show that defendant had

dominant monopoly power before acquisition of the patents); *cf. Lucas Auto. Eng'g v.*

*Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232-33 (9th Cir. 1998) (competitor suffers no antitrust

injury from defendant's acquisition of exclusive rights to a brand of vintage tires resulting in market

shares of 74% – 90%, because plaintiff would have been excluded from the same percentage of the

market had the rights been acquired by a small business).

      With respect to Kyphon's prior patent acquisitions, the Complaint does not identify the

particular coverage of any patent, let alone allege how it excluded CareFusion or otherwise

conferred market power.  Other than listing the names of sellers, and parroting the boilerplate legal

conclusions, the Complaint says nothing at all about the patents.  This information is not unavailable,

especially to CareFusion.  Patents are, after all, public documents.  What they cover, what they

exclude others from doing, is not hidden from view.  And CareFusion admits that it has been a

player in this "market," scrutinizing Defendants' patents, since 2006.  (*See* Compl. ¶¶ 97-105.)  Its

failure to specify the alleged exclusive aspects of these patents is the kind of strategic gamesmanship

that is no longer permitted after *Twombly.  See* 550 U.S. at 554-58, 566 (antitrust complaint must

allege more than facts which could possibly constitute unlawful conduct, and "neutral" facts coupled

with "naked" conclusory assertions do not suffice; courts should "insist upon some specificity in

pleading" facts which make plaintiff's characterization not just possible, but plausible).

      The only patents (other than the expired '404 and '888) which are discussed with any

specificity are the four in the declaratory judgment counts:  the '043, '734, '110 and '054.  The

Opposition does not dispute the contention in the moving papers that judicially-noticeable records

show these patented inventions to have been internally developed, rather than acquired, by Kyphon. (*See* Mot. at 21.)  Nor does the Opposition respond to the moving papers' contention, based on CareFusion's own *SCM v. Xerox*, that monopoly claims cannot be based on non-acquired patents. (*See id.* (*citing SCM v. Xerox*, 645 F.2d at 1207 (nothing that "ordinarily there is no limitation on a company's freedom to generate its own patents"))).

Finally, having failed to allege any of the basic elements of a patent-acquisition monopolization claim, CareFusion cannot state a claim under *Kobe, Inc. v. Dempsey Pump Co.*, where the defendant additionally (1) acquired every patent related to the market, (2) pursuant to a patent-pooling contract which said that its purpose was to "build up and maintain . . . patent monopoly," (3) obtained covenants not to compete from those from whom it purchased the patents, (4) filed infringement lawsuits without investigating their merits, (5) publicized the lawsuits throughout the industry, (6) threatened suit against anyone dealing with the plaintiff, and (7) caused a complete boycott of the plaintiff.  *See* 198 F.2d 416, 420, 423-25 (10th Cir. 1952).  The 9th Circuit in *Handgards* noted these attributes of *Kobe* in distinguishing it as a separate category of antitrust claim from "sham litigation."  601 F.2d at 994, 999.  Moreover, because *Kobe* was decided 45 years before the Supreme Court raised the standards for infringement-lawsuit monopoly cases in *Professional Real Estate Investors*, its continued validity has been questioned by cases such as that cited by CareFusion.  *See Abbott Labs. v. Teva Pharm.*, 432 F. Supp. 2d 408, 429-30 (D. Del. 2006).[21]

---

[21]     CareFusion cites other "*Kobe*" cases from the pre-*Professional Real Estate Investors* era (one 55 years old), which likewise require the proper allegation of a patent-acquisition claim or some other stand-alone monopolization scheme.  For example, *United States v. Parker-Rust-Proof Co.*, *Black and Decker, Inc. v. Hoover Service Center* and *Stewart-Warner Corp.* require (1) that a defendant have dominant market power at the time of acquisition, and (2) that the acquired patents enhance that market power by eliminating substantial competition or constitute the majority of all unexpired patents covering the market.  *See United States v. Parker-Rust-Proof Co.*, 61 F. Supp. 805, 807, 812 (E.D. Mich. 1945) (defendant had a "substantial" presence in the market place at the time of the acquisition and the acquired company offered "substantial" competition to acquiring defendant); *Black and Decker, Inc. v. Hoover Serv. Ctr.*, 765 F. Supp. 1129, 1139-40 (D. Conn. 1991)(defendant held a pre-acquisition market share of 78%–87% and license acquired covered 12% of the relevant market); *Stewart-Warner Corp. v. Staley*, 42 F. Supp. 140, 143 (W.D. Pa. 1941) (defendant allegedly created monopoly by acquiring "many hundreds of patents . . . constituting the preponderant majority of all unexpired patents in that field.").  CareFusion's allegations fail these standards because, with respect to Kyphon's patent acquisitions, there is no allegation of facts about the coverage or market impact of any acquired patent; and with respect to Medtronic's acquisition of

15

**B.** **The Complaint Fails as a Matter of Law to Allege Antitrust Injury.**

The element of "antitrust injury" requires alleging an injury of the type which the antitrust laws were intended to prevent, linked causally to an antitrust violation. *See American Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999). CareFusion's second theory of injury, the "Threatened Cloud" allegedly caused by Defendant's non-expired patents, fails this test. First, the underlying claim of patent-acquisition monopolization is pled using impermissible boilerplate and lacking elements prescribed by the leading case cited by CareFusion. (*See* Part III.A *supra*.) Second, as will be shown here, no causally linked injury is properly pled. After the moving papers demonstrated the failure to allege cognizable injury from acquisitions, the Opposition seized on an irrelevant smear about Medicare reimbursement from the Complaint and tried to blow it up into an antitrust-injury rescue balloon. The balloon pops on the twin thorns of Supreme Court caselaw and CareFusion's own pleading. (*See* Part III.A.3 *infra*.) But first, a look at where things stand on more basic antitrust injury issues.[22]

**1.** ***Lujan* Applies, and "Threatened Clouds" Are Not "Concrete" or "Imminent."**

The moving papers explained that the element of antitrust injury is an extension of the universal requirement of Article III standing. (*See* Mot. at 18-19.) The Opposition does not dispute the accuracy of the quotation of the Complaint's allegation of injury from Defendant's patent acquisitions. (*See* Mot. at 18.)[23] Nor does CareFusion try to explain how "threaten[ing] to cast a

Kyphon, there is no allegation that Medtronic had market power in the kyphoplasty market, let alone "dominant market power," at the time it acquired Kyphon.

[22] The Opposition asserts that "the existence of antitrust injury is not typically resolved through motions to dismiss," citing a Third Circuit case decided prior to *Twombly*. (*See* Opp. at 34.) But antitrust injury is not typically alleged with such brazen vagueness in contravention of Supreme Court precedent. CareFusion's own *Abbyy Software* decision from the Northern District of California dismissed an antitrust case for lack of antitrust injury. *See Abbyy Software House, Inc. v. Nuance Commc'ns, Inc.*, 2008 U.S. Dist. LEXIS 90308, *5-16 (N.D. Cal. Nov. 6, 2008).

[23] *See* Compl. ¶¶ 159, 170 ("Defendants' violation of the Sherman Antitrust Act also threatens to continue to harm CareFusion's ability to compete in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, for example, by using illegally acquired third party patent rights to threaten litigation against CareFusion and cast a cloud over its Ava*max*™ balloon kyphoplasty products. (*See, e.g.,* Compl. Ex. HH, Feb. 10, 2010 JP Morgan Report at 2 (stating that "Kyphon reps will likely use the litigation overhang . . . as [a] selling point[] against AVAmax.").)").

16

cloud" can meet the Supreme Court's standing criteria of concreteness and imminence set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). The Opposition does not dispute that there is no allegation about how or why any particular patent threatens to cast a cloud, let alone actually casts one. Instead, the Opposition merely dismisses *Lujan* as a "wildlife" case. (*See* Opp. at 40.) No authority for this assertion is given, and none exists. On this basis alone, the "Threatened Cloud" half of the antitrust claims should be dismissed.

### 2. Elimination of Competitors' Products Cannot Injure CareFusion as a Matter of Law.

The moving papers reviewed in detail the saga of alleged acquisitions. (*See* Mot. at 6-9.) The Opposition does not respond to the proposition that Supreme Court precedent precludes a claim of "antitrust injury" when a defendant's acquisition removes a third party's product or technology from the market, since a competitor plaintiff would benefit from the resulting lessened competition. (*See* Mot. at 8 n.5.) These allegations therefore fail for lack of a corresponding antitrust injury (in addition to their failure to allege the elements of a substantive violation (*see* Part III.A *supra*)).

### 3. The Expanded "Medicare Fraud" Allegations Are Not in the Complaint and, Even if Accepted as True, Higher Hospital Reimbursement Would Have Benefitted, Not Harmed, Both Consumers and CareFusion.

While the Complaint deals exclusively with alleged harm to CareFusion's entry into kyphoplasty, the Opposition asserts for the first time that "Defendants' illegal Medicare pricing scheme" caused CareFusion to lose sales of cement used in *vertebroplasty*. (*See* Opp. at 29, 37.) Even were CareFusion's "Medicare fraud" allegations true,[24] they fail to rescue the antitrust claims.

First, and dispositively, the new allegations of how "Medicare fraud" injured CareFusion are not in the Complaint. The Opposition cites paragraphs from the Complaint to give the appearance that its "injury" has been pled (*see* Opp. at 9-10, 37), but examination of the cited paragraphs shows

---

[24] Defendants have consistently denied these allegations. Medicare reimbursement regulations are exceedingly complex, and to this day, CareFusion's own website tells hospitals and doctors that the Medicare-reimbursement parameters for vertebroplasty and kyphoplasty are indeterminate. CareFusion also acknowledges that the patient population for kyphoplasty is predominantly elderly (*see* Compl. Ex. G at 2-3), and precautionary overnight hospitalization was recommended in studies published by respected orthopedic surgeons.

that the newly-minted "fact"[25] of lost sales of vertebroplasty cement is not pled.  (*Compare* Opp. at 9-10 ("This illegal pricing scheme misappropriated millions of dollars from Medicare, allowed Defendants to sell their kyphoplasty products at artificially high prices and wrongly diverted business away from alternate VCF treatments, namely the less-expensive option of vertebroplasty.") (*citing* Compl. ¶ 52); *with* Compl. ¶ 52 ("On information and belief, Kyphon's pricing and marketing scheme, which was facilitated by its monopoly power, defrauded the United States government of millions of dollars."); *see also* Opp. at 37 (once again citing paragraphs in Complaint that do not support the assertion in the brief).)

Assuming that a hypothetical rule of procedure did allow CareFusion to graft onto a complaint new theories and allegations through an opposition to a motion to dismiss, the *faux* "complaint" would still fail.  In launching a new theory of lost sales in the vertebroplasty market, the Opposition does not explain why allegedly corrupt hospitals would not profit-maximize by getting Medicare to reimburse for overnight stays for vertebroplasty (which the Opposition asserts is a virtually indistinguishable procedure (*see* Opp. at 4-5, 8)), while saving money by buying more (rather than less) vertebroplasty products (which are alleged to be much cheaper (*see* Opp. at 29)). *See Twombly*, 550 U.S. at 555-58 (must plead sufficient specific facts to make plaintiff's inferences more than possible, but rather plausible); *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1998) ("Antitrust claims must make economic sense.").  Indeed, the policies of *Twombly* are especially applicable where, as here, a litigant is clearly trying to game the system through pleading flip-flops, and vaguely-pled theories which are facially economically implausible.[26]

---

[25]     Again, the evidence would show that the Medicare complaint against Kyphon and the Sisters of Charity Hospital was filed in 2006.  CareFusion did not start selling vertebroplasty cement until 2006.  (*See* Opp. at 5.)  So the idea that this "years long" "Medicare fraud" injured CareFusion is far-fetched.  While the first of these facts is not pled in the Complaint, it illustrates the necessity of the type of specificity the Supreme Court now requires in pleadings, so that plaintiffs cannot hide behind vague, conclusory pleading to evade dismissal of claims that are contradicted by facts already known to the parties.  *See Twombly*, 550 U.S. at 558 ("[A] district court must retain the power to insist on some specificity in pleading before allowing a potentially massive factual controversy to proceed.") (*citation and internal quotation marks omitted*).

[26]     For the reason just discussed, CareFusion fails to explain how the "scheme," if it had existed, would have hurt patients, since it allegedly enabled hospitals to offer alternative treatments,

18

4. **CareFusion's "Monopoly as a Whole" Argument Merely Tries to Obscure the Failure to Plead the Required Elements and a Cognizable Injury for a Patent-Acquisition Claim.**

CareFusion's "monopoly as a whole" theory is based on the claim that "Medtronic ignores" the "injury pled by CareFusion." (*See* Opp. at 38.)  On the contrary, the entire structure of this motion is built around the Complaint's allegations of injury.  But injury is not actionable unless it is causally tied to an antitrust violation.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977) (finding that antitrust injury must "flow[] from that which makes defendants' acts unlawful." ).  Parsing the "monopoly as a whole" argument in the Opposition, most of the allegedly "ignored" injuries are actually part of CareFusion's theory of Delayed Entry (*see* Opp. at 38-40), which is of course discussed extensively in this motion.  So Defendants are indeed looking at alleged injuries "as a whole," grouping them just as Plaintiffs did, under the holistic theory that the moving papers summarized as the Delayed Entry claim.  And that alleged injury was caused exclusively (by CareFusion's own allegation) by the '404 and '888 patents.  (*See* Compl. ¶ 102; Opp. at 13.)  As Part II showed, Defendants' alleged conduct with respect to these patents is not actionable as a matter of law and, therefore, CareFusion's claims of injury not causally tied to an antitrust violation involving those patents.[27]

---

increasing consumer choice, a prime policy goal of antitrust law.  *See United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 675 (3d Cir. 1993) ("Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a pro-competitive benefit."). Thus, another criterion of antitrust standing—injury to consumers rather than to competitors—would be absent here even if CareFusion had "pled" this "Medicare fraud" theory.  *See Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("reduction of competition does not invoke the Sherman Act until it harms consumer welfare.")

[27]     CareFusion's citation to *City of Anaheim v. Southern California Edison* (*see* Opp. at 38) underscores the wisdom of constraining antitrust attacks on patents, as expressed in cases like *Walker Process* and *Handgards* (*see* Part II.A *supra*): "courts should tread carefully" in accepting antitrust claims involving an area "where much monopoly is legal." 955 F.2d 1373, 1378 (9th Cir. 1992).  Patent law is such an area.  Most of the other cases cited by CareFusion in this section do not even apply "monopoly as a whole" theory; none discusses such a doctrine in the aftermath of the pleading specificity requirements of *Twombly* and *Iqbal*; and none applies such a theory to pleading akin to what is in (and what is lacking from) this Complaint.  *See Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1200-01 (9th Cir. 1997) (lost profits resulted from defendant's refusal to supply necessary equipment for plaintiffs' businesses); *Amarel v. Connell*, 102 F.3d 1494, 1508-09 (9th Cir. 1997) (lost profits resulted from defendants' price-fixing scheme, which drove every competitor out of business except two); *Western Concrete Structures Co., Inc. v. Mitsuit & Co., Inc.*, 760 F.2d 1013, 1015 (9th Cir. 1985) (plaintiff was driven from the market as a direct result of defendants' illegal price-fixing); *Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League*,

19

Further, the '404 and '888 patents have expired, and the Defendants' remaining patents are not blamed for the Delayed Entry.  (*See* Compl. ¶¶ 102-111.)  Therefore, nothing about the acquisition of those other patents is made unlawful under the antitrust laws by some "monopoly as a whole" theory, because a claim about a "monopoly as a whole" does not substitute for the required—but here missing—elements of patent-acquisition antitrust claims.  (*See* Part III.A *supra*.)  Likewise, nothing about the *injury* alleged from the present patents is made less "cloudy," or is changed from a mere "threat" to being imminent, by waving a rhetorical arm at a supposed "overall combined effect."  (*See* Opp. at 38.)  Indeed, CareFusion's own CEO dismisses any such "threat" in the first place.  (*See* Compl. Ex. AA at 7.)  *Lujan*'s standards of concreteness and imminence to show some actionable injury are therefore not met, and CareFusion's ridiculous suggestion that such standards are only for wildlife cases does not advance the analysis of how "threatening to cast a cloud" meets these standards.

## IV.   <u>CONCLUSION</u>

There is a fundamental problem at the very core of this case: monopolization is about excluding competition (*see* Mot. at 1), and CareFusion by its own admission has not been excluded.  Indeed, CareFusion now claims a reputation in the marketplace for improved safety and efficacy.  (*See* Opp. at 8, 13-15.)  (The source cited is actually statements to stock analysts by CareFusion's CEO.  (*Id.* (citing Compl. Ex. AA).).)  But antitrust law is not a tool for a head-to-head competitor to secure a competitive advantage in the marketplace.  And that is precisely the use to which CareFusion's monopolization claims are put; in the name of antitrust law, CareFusion, a head-to-head competitor with Medtronic, seeks to wipe out Medtronic's entire kyphoplasty patent portfolio, and the $4 billion investment that it represents.  (*See* Compl. at 36 (Prayer for Relief demanding that Defendants "be ordered to immediately disclaim and dedicate to the public each and every patent they own" related to kyphoplasty).)

---

791 F.2d 1356, 1364 (9th Cir. 1986) (plaintiff football team was prohibited by the NFL from entering and operating in the Los Angeles market).  In stark contrast to the facts in those cases, CareFusion's "lost profits" are grounded on a few generalized "threats," and CareFusion has entered the kyphoplasty market and launched its AVAmax product after Medtronic's patents expired.

A vibrant competitor in the market place, CareFusion cannot claim exclusion.  Instead, relying on *Handgards* (presumably because it knows it cannot do so under *Walker Process*), CareFusion claims that it was delayed by a couple of years out of fear that the '404 and '808 patents (patents with less than a two-year life span at the time Medtronic settled Kyphon's infringement allegations) would be enforced by Medtronic if CareFusion chose to enter into the market before the patents expired.  But *Handgards* requires an actual lawsuit, not just threats.  CareFusion has not been sued, even not in response to the preemptive strike that it decided to launch.  And review of the three publications from the period of the '404 and '888 patents shows that CareFusion was never even threatened.

Trying to further shore up its case for competitive injury, CareFusion claims that an undefined cloud of Medtronic patents casts some inchoate shadow upon unspecified attributes of its products.  If the Supreme Court's directive in *Twombly* means anything, it means that these flimsy allegations simply do not suffice.  Remarkably, the Complaint does not identify a single acquired patent and explain what it is and does, or how that somehow adversely affects anything CareFusion does or would like to do.

A cleverly told "story" rich in hyperbole and atmospherics (*e.g.*, allegations of "Medicare fraud" that, even were they true, would have only benefited, not harmed, CareFusion) does not do, despite CareFusion's plea that the Court accept the story today and leave to tomorrow the pesky question of requisite antitrust claim elements.  CareFusion's scatter-shot, vague, and internally-inconsistent allegations are the poster child of the problem addressed (and redressed) by the Supreme Court in *Twombly*.  A long line of Supreme Court authority requires that a viable antitrust claim allege actionable antitrust conduct that proximately causes cognizable antitrust injury.  If such a nexus existed, CareFusion had the duty under *Twombly* to plead it with specificity sufficient to justify imposing on this Court and Medtronic the substantial burdens of major antitrust litigation.  *See* 550 U.S. at 557-59 (stricter scrutiny is required at the pleading stage because a case's "deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court) (quotation marks and citations omitted)).  CareFusion's Complaint falls far

short of articulating, through particularized allegations, a viable antitrust claim.  It should be dismissed.

DATED:  August 18, 2010                    Respectfully submitted,

                                           */s/ Martin R. Boles*
                                           Jeffrey S. Davidson (S.B.N. 143633)
                                           jeffrey.davidson@kirkland.com
                                           Luke L. Dauchot (S.B.N. 229829)
                                           luke.dauchot@kirkland.com
                                           Martin R. Boles (S.B.N. 124159)
                                           martin.boles@kirkland.com
                                           R. C. Harlan (S.B.N. 234279)
                                           rc.harlan@kirkland.com
                                           KIRKLAND & ELLIS LLP
                                           333 South Hope Street
                                           Los Angeles, CA  90071
                                           Telephone:    (213) 680-8400
                                           Facsimile:    (213) 680-8500

                                           Attorneys for Defendants
                                           MEDTRONIC INC.,
                                           MEDTRONIC SPINE LLC,
                                           and KYPHON SARL

22