UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | | |
|---|---|---|
| CAREFUSION CORPORATION AND CAREFUSION 2200, CORPORATION, | ) ) ) | Case No.: 10-CV-01111-LHK |
| Plaintiffs, | ) ) | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS WITH LEAVE TO AMEND |
| v. | ) ) | |
| MEDTRONIC, INC., MEDTRONIC SPINE LLC, D/B/A KYPHON INC., AND KYPHON SARL, | ) ) ) | (re: docket #50) |
| Defendants. | ) ) ) | |

Plaintiffs CareFusion Corporation and CareFusion 2200 (collectively "CareFusion" or "Plaintiffs") bring suit against Defendants seeking damages and injunctive relief for antitrust violations and declaratory judgment of non-infringement and/or invalidity of certain patents. Defendants are Medtronic, Inc., Medtronic Spine LLC (d/b/a Kyphon Inc.), and Kyphon Sarl (collectively "Defendants"). Although Plaintiffs' Complaint includes both antitrust and patent claims, presently before the Court is Defendants' motion to dismiss only as to the antitrust counts in Plaintiffs' Complaint. Specifically, Defendants move to dismiss Count One (monopolization) and Count Two (attempted monopolization) for failure to state a claim under Federal Rule of Civil Proceudre 12(b)(6). The Court held a hearing on this matter on October 21, 2010. For the reasons discussed below, Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND.

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

# I. BACKGROUND

For purposes of ruling on Defendants' motion to dismiss, the Court accepts as true well-pled allegations in Plaintiffs' Complaint and construes material facts in the light most favorable to Plaintiffs. *Marceau v. Blackfeet Housing Authority*, 540 F.3d 916, 919 (9th Cir. 2008). Accordingly, unless otherwise noted, the following background draws heavily from the allegations in Plaintiffs' Complaint.

## A. Vertebral Compression Fracture Products and Kyphon's Founding

Vertebroplasty is a minimally invasive vertebral compression fracture ("VCF") treatment procedure, involving supplying bone cement or bone paste into the affected vertebral body to treat fractures and/or osteoporosis. Compl. ¶ 24. Kyphoplasty is another type of VCF treatment procedure, which involves creating a void in the vertebral body by the insertion and inflation of a balloon, and then inserting bone cement or bone paste into the void. *Id*. at ¶ 25. Kyphoplasty was developed by Doctors Mark Reiley and Arie Scholten in the late 1980's and early 1990's. Reiley and Scholten filed an initial patent application relating to kyphoplasty on February 9, 1989, and ultimately received United States Patent No. 4,969,888 (the "888 patent") on November 13, 1990. *Id*. at ¶27. Reiley and Scholten filed for a continuation-in-part patent on August 15, 1990, and were issued United States Patent No. 5,108,404 (the "404 patent") on November 13, 1990. *Id*. at ¶ 28. In 1994, Kyphon was founded by Reiley and Scholten, who then assigned the '888 and '404 patents to Kyphon on August 7, 1996. *Id*. ¶¶ 30-31. The '888 and '404 patents expired on February 9, 2009.

## B. Kyphon's Acquisitions, Pricing, and Enforcement of Patent Rights

Since its founding in 1994, Kyphon has acquired additional patents and patent rights related to minimally invasive VCF treatment products, including exclusive licenses to various patents and acquisition of a German company ("Sanatis GmbH") that was formerly a competitor. *Id*. at ¶¶ 36-48. Plaintiffs further allege that, since Kyphon's founding, Kyphon used its monopoly power to "artificially raise the prices on their kyphoplasty products." *Id*. at ¶ 49. Specifically, Plaintiffs point to a May 22, 2008 press release by the United States Department of Justice (DOJ) announcing a $75 million settlement between Medtronic Spine LLC (Kyphon's corporate

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

1    successor) to settle allegations of a seven-year marketing scheme that resulted in fraudulent

2    Medicare claims in relation to Kyphon's kyphoplasty procedure. *See* Exh. K to Compl. According

3    to the DOJ press release, Kyphon's marketing practices were aimed at persuading hospitals to use

4    kyphoplasty treatment, which could be billed to Medicare at a higher inpatient (e.g., overnight)

5    rate, rather than on a less-costly outpatient basis appropriate for kyphoplasty treatment. *Id*.

6    Finally, Plaintiffs allege that Kyphon filed a lawsuit against a competitor, Disc-O-Tech Medical

7    Technologies, Ltd., which ultimately settled and resulted in Kyphon's acquisition of Disc-O-Tech's

8    intellectual property. Compl. ¶¶ 55-61. On October 5, 2007, the Federal Trade Commission (FTC)

9    filed a complaint against Kyphon's acquisition of Disc-O-Tech, but allowed the merger to proceed

10   after Kyphon (which was then being acquired by Medtronic) agreed to the divestiture of a line of

11   Disc-O-Tech products. *See* Exh. L, FTC Complaint and Exh. M., FTC Decision to Compl.

12   According to Plaintiffs, Kyphon (and eventually Medtronic) never marketed or sold one of the

13   Disc-O-Tech product lines (the "SKy Bone Expander") after the acquisition of Disc-O-Tech, even

14   though the FTC did not require the divestiture of that particular line of products. Compl. ¶¶ 64-65.

15         **C. Medtronic's Acquisition of Kyphon**

16         On November 23, 2005, Kyphon, along with Dr. Harvinder S. Sandhu (who had granted

17   Kyphon exclusive license to VCF technology he developed), filed a trade secrets lawsuit against

18   several Medtronic subsidiaries, alleging that the Medtronic subsidiaries stole trade secrets and filed

19   patent applications without naming Dr. Sandhu as inventor. *Id*. at ¶ 66. On April 26, 2006,

20   Kyphon amended its complaint to add allegations of patent infringement of the '888 patent and the

21   '404 patent. *Id*. at ¶ 69. During this litigation, Medtronic, through its subsidiaries, alleged that

22   Kyphon's patents (namely the '888 patent and the '404 patent) were invalid and that the patents

23   were unenforceable due to inequitable conduct. *Id*. at ¶¶ 71-73. Medtronic asserted in its defense

24   that the "applicants" (i.e., Drs. Reiley and Scholten) intentionally misrepresented to the USPTO

25   that the only known treatment for VCF was bed rest and aspirin, when in actuality the applicants

26   were aware that vertebroplasty had been used in the prior art. *Id*. at ¶¶ 74-76. Before a final ruling

27   was issued in the litigation, Medtronic acquired Kyphon for approximately $4 billion. *See* Compl.,

28   Exh. R (July 27, 2007 Press Release announcing merger) and Exh. S (November 2, 2007 Press

3

**United States District Court**
For the Northern District of California

1     Release announcing finalization of acquisition).  After the acquisition of Kyphon, on information

2     and belief, Plaintiffs allege that Defendants maintain approximately 85% of the minimally invasive

3     VCF treatment market, and 97% of the kyphoplasty market.  *Id.* at ¶ 150.  Plaintiffs allege that the

4     investment community recognized that Medtronic would have been a competitor to Kyphon, and

5     that, after acquiring Kyphon, Medtronic stopped marketing its line of vertebroplasty and

6     kyphoplasty products.  *Id.* at ¶¶ 78-80.  In addition, Plaintiffs allege that Medtronic continued to

7     acquire patents in the VCF treatment market, made "public threats" to enforce their patent rights

8     "they knew to be invalid," and failed to disclaim or dedicate to the public the acquired patents

9     "they knew to be invalid and/or unenforceable."  *Id.* at ¶¶ 81-90.

10          **D. CareFusion's Development and Defendants' Alleged Response**

11          Since 2001, CareFusion has sold bone cement delivery systems, and has expanded its sales

12    to the vertebroplasty market.  *Id.* at ¶¶ 97-100.  Although interested in expanding its position into

13    the minimally invasive VCF treatment product market and the kyphoplasty market, and in light of

14    Defendants' history of "threatening competitors with the '888 and '404 patents," CareFusion

15    "made a business decision to wait until the '888 patent and '404 patent expired before launching its

16    balloon kyphoplasty product."  *Id.* at ¶ 102.  In January 2009, CareFusion applied for FDA

17    approval of a kyphoplasty product, and received FDA approval in July 2009.  CareFusion alleges

18    that its FDA application was strategically timed so that approval would occur after the expiration

19    of the '888 and '404 patents.  *Id.* at ¶¶ 103-108.  In April 2010, CareFusion announced the

20    imminent product launch of its "Avamax" balloon kyphoplasty products.  *Id.* at ¶ 111.  In response,

21    according to CareFusion, Defendants made numerous "threatening statements directed toward

22    CareFusion."  *Id.* at ¶ 112.  For example, CareFusion cites earnings conference calls, industry

23    reports, and news articles in which Defendants announce their intent to "vigorously defend [their]

24    intellectual property rights" and in which third party analysts suggest they would not be surprised if

25    Medtronic "came out aggressively" against competitors, including CareFusion, via litigation.  *Id.* at

26    ¶¶ 112-140.  CareFusion alleges that Defendants "did nothing to discourage or retract these

27    statements."  *Id.*

28

4

1    CareFusion filed its Complaint on March 15, 2010 alleging antitrust violations and seeking

2    declaratory judgment of non-infringement or invalidity as to non-expired patents owned by

3    Defendants.  This case was originally assigned to the Honorable Vaughn R. Walker, and was

4    reassigned to this Court on August 2, 2010.

### II. LEGAL STANDARDS

6        A motion to dismiss for failure to state a claim under Rule 12(b)(6) tests the legal

7    sufficiency of a complaint.  To withstand a motion to dismiss, a plaintiff must "plead enough facts

8    to state a claim that is plausible on its face."  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).

9    "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is

10   'plausible' in light of basic economic principles."  *Coalition for ICANN Transparency, Inc. v.*

11   *VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) (citing *Twombly*, 550 U.S. at 556).  All

12   allegations of material fact shall be taken as true and interpreted in a manner most favorable to the

13   non-moving party.  *Simon v. Hartford Life and Accident Ins. Co.*, 546 F.3d 661, 664 (9th Cir.

14   2008).  Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient

15   facts alleged under a cognizable legal theory.  *Balistreri v Pacifica Police Dep't*, 901 F.2d 696, 699

16   (9th Cir 1990).  Leave to amend should be granted unless it is clear that the complaint's

17   deficiencies cannot be cured by amendment.  *Lucas v. Dep't of Corrections*, 66 F.3d 245, 248 (9th

18   Cir. 1995).  If amendment would be futile, a dismissal may be ordered with prejudice.  *Dumas v.*

19   *Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

### III. DISCUSSION

21       Plaintiffs plead antitrust claims of monopolization and attempted monopolization under the

22   Sherman Act, 15 U.S.C. § 2 *et seq*.  Defendants have moved to dismiss the antitrust claims for

23   failure to state a claim.  Specifically, Defendants argue that Plaintiffs have not adequately pled that

24   Defendants' actions (e.g., acquisition of patents and competitors, threatening enforcement of

25   allegedly invalid patents, and Medicare fraud) constitute "anticompetitive conduct" or that the

26   alleged harms to Plaintiffs (e.g., delayed entry into market for two years, lost sales and market

27

28

5

share, and threat of future litigation) constitute the requisite "antitrust injury."[1]  Although the two claims overlap, the Court will analyze separately each of Plaintiffs' antitrust claims.

### A. Monopolization under Section Two of the Sherman Act

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize . . . trade or commerce among the several States."  15 U.S.C. § 2.  To succeed in establishing a claim of monopolization under Section Two, a plaintiff must adequately plead that: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury."  *Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 950 (9th Cir. 1996).

### 1. Whether Defendants possess monopoly power in the relevant market?

According to Plaintiffs, the relevant market is the "minimally invasive vertebral compression fracture [VCF] treatment product market, which includes, but is not limited to, kyphoplasty (by balloon or otherwise) and vertebroplasty."  Compl. ¶ 18.  Alternatively, Plaintiffs allege that the relevant market is the "kyphoplasty product market."  *Id*. at ¶ 19.

Plaintiffs allege that after Medtronic's acquisition of Kyphon in July 2007 (merger agreement) and November 2007 (completed merger), Defendants possess 85% of the market share in the VCF treatment product market, and 97% of the market in the kyphoplasty product market.  *Id*. at ¶ 150.  Plaintiffs, however, do not make any allegations as to the market share of Kyphon before the latter's merger with Medtronic.  For purposes of ruling on this motion to dismiss, Defendants do not contest Plaintiffs' allegations as to the relevant market and monopoly power, and Plaintiffs' allegations are not implausible on their face.  Accordingly, Plaintiffs have adequately pled monopoly power in the relevant market and satisfied the first element of a Section 2 claim.[2]  *See, e.g., Cost Mgmt. Servs., Inc.*, 99 F.3d at 950-51 ("Where an [inference of market

---

[1] Defendants also point out that some of the arguments in CareFusion's Opposition rely on allegations that are not in the Complaint.  CareFusion should specify all alleged anticompetitive conduct on the part of Defendants and all alleged antitrust injury to CareFusion in any amended complaint.

[2] Although Plaintiffs' allegations of monopoly power are uncontested and sufficient for purposes of this Order, the Court notes that Plaintiffs' allegations would have to be substantially more detailed in order to survive later stages of litigation.  *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1439 (9th Cir. 1995) ("A mere showing of substantial or even dominant market

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

power based on market share] is not implausible on its face, an allegation of a specific market share is sufficient, as a matter of pleading, to withstand a motion for dismissal.").

### 2. Willful Acquisition or Maintenance of Monopoly Power (Anticompetitive Conduct) and 3. Causal Antitrust Injury

The second element of a monopolization claim, willful acquisition or maintenance of monopoly power, requires a showing that defendant engaged in "anticompetitive conduct," or in other words, that defendant's acts amount to "exclusionary or predatory conduct," not power "gained from growth or development as a consequence of a superior product, business acumen, or historic accident." *See Image Tech. Servs. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997). This element is necessary to distinguish between legitimate competition and conduct that interferes with competition. *See SmileCare Dental Group v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 784 n.6 ("The Courts have repeatedly observed that 'the antitrust laws protect competition, not competitors.'") (internal citation omitted).

But anticompetitive conduct alone does not establish a monopolization claim; rather, the plaintiff must connect that anticompetitive conduct to a corresponding antitrust injury in order to establish "antitrust standing." *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). The Ninth Circuit has established a four-part definition of antitrust injury: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999). In practice, then, a plaintiff must show how defendant's anticompetitive conduct harms both competition and plaintiff.

Here, CareFusion allege three types of anticompetitive conduct: 1) bad faith patent enforcement (a "*Handgards*" claim"); 2) an illegal Medicare fraud marketing and pricing scheme; and 3) illegal acquisition of patents, licenses, and competitor companies to dominate the market. CareFusion also alleges two types of injury: 1) delayed entry into the market based on Defendants'

---

share alone cannot establish market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price."). Plaintiffs' Complaint makes few allegations about the state of the market *before* Medtronic's acquisition of Kyphon in late 2007.

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

anticompetitive conduct; and 2) potential threat of litigation regarding CareFusion's products in the kyphoplasty market.[3]  As to the market and competition overall, CareFusion argues that Defendants' conduct (especially in regard to acquisitions of patents and companies) has prevented competitors from entering the market.

### a) Plaintiffs' *Handgards* Claim

Plaintiffs argue that Defendants threatened to enforce the '404 and '888 patents with full knowledge that these patents were invalid or unenforceable because Medtronic itself said so in its defense to litigation initiated by Kyphon.  Such a claim is often referred to as a *Handgards* claim, or "sham litigation."  *See Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986 (9th Cir. 1979) ("Handgards I") (prosecution of patent enforcement actions in bad faith may violate antitrust laws); *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d (1282 (9th Cir. 1984) ("Handgards II") (requiring clear and convincing evidence to show baseless litigation or bad faith).  A *Handgards* claim is an exception to the *Noerr-Pennington* doctrine, which, in general provides that petitioning the government, including litigating in court, is immune from antitrust liability.  *See Rickards v. Canine Eye Registr. Found.*, 783 F.2d 1329, 1334 (9th Cir. 1986) ("The *Noerr-Pennington* immunity is not, however, absolute.  Immunity is not afforded to those who resort to sham or unfounded litigation solely for anticompetitive purposes.").  There is a fatal flaw in Plaintiffs' argument.  Even if Defendants believed the '404 and '888 patents were invalid, Defendants did not actually bring suit, or make direct threats that they would bring suit, against Plaintiffs for patent infringement, thus it makes no sense to speak of "sham litigation" or "bad faith prosecution."  *See, e.g.*, *Kaiser Foundation Health Plan, Inc. v. Abbott Laboratories, Inc.*, 552 F.3d 1033, 1046 (9th Cir. 2009) (discussing whether seventeen infringement suits amount to "sham litigation").

Plaintiffs allege that Defendants' statements regarding "defending its intellectual property rights" and "enforcing its intellectual property portfolio" against a "growing number of competitors" amount to "public threats" of enforcement and a valid *Handgards* claim.  Plaintiffs

---

[3] CareFusion's Opposition notes a potential third type of injury, arguing that it has been injured by Defendants' "monopoly as a whole." *See* Pls.' Opp'n at 38-40.  CareFusion's Complaint, however, does not identify this type of injury or connect the alleged "monopoly as a whole" injury to any specific anticompetitive conduct.

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

**United States District Court**
For the Northern District of California

1   argue that "threatened enforcement, as opposed to actual enforcement, is all that is required to

2   establish liability." Pls.' Opp'n at 21. The Court does not find Plaintiffs' argument persuasive.

3   *Handgards* itself involved actual litigation, and later precedent has generally affirmed the litigation

4   requirement -- in fact, some decisions refer to a *Handgards* claim as "sham litigation." *See*

5   *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993)

6   (an enforcement threat is in bad faith when the threat is "objectively baseless in the sense that no

7   reasonable *litigant* could realistically expect success on the merits") (emphasis added).

8          Plaintiffs do cite cases that do not involve litigation, but those cases are generally out-of-

9   Circuit, pre-*Twombly*, and distinguishable. For example, two cases on which Plaintiffs heavily rely

10  involved direct threats of litigation in order to exact licensing agreements. *See, e.g.*, *CVD, Inc. v.*

11  *Raytheon Co.*, 769 F.2d 842, 851 (1st Cir. 1985) (although defendant did not actually initiate

12  litigation, allowing *Handgards* claim when evidence showed defendant made direct threats to

13  plaintiff to exact a licensing agreement); *see also Grid Systems Corp. v. Texas Instruments, Inc.*,

14  771 F. Supp. 1033, 1041 (N.D. Cal. 1991) (refusing to strike *Handgards* allegations from

15  plaintiff's complaint where defendant sent plaintiff letter asserting infringement and demanded that

16  plaintiff enter into a license agreement). Here, again, CareFusion's only allegations are that

17  Defendants made public statements about protecting and enforcing their intellectual property

18  rights. CareFusion has not alleged that Defendants made direct threats of litigation against them or

19  exacted a license agreement in exchange for not bringing suit. Thus, Defendants' conduct does not

20  rise to the level of bad faith patent enforcement. *See, e.g.*, *In re Netflix Antitrust Litig.*, 506 F.

21  Supp. 2d 308, 317-18 (N.D. Cal. 2007) (finding that plaintiffs failed to plead a sufficient level of

22  bad faith patent enforcement where defendant directed no action against plaintiffs).

23         Moreover, it is not clear how Defendants' public statements regarding defending its

24  intellectual property have caused any injury to CareFusion. In regards to a *Handgards* claim,

25  antitrust injury ordinarily consists of "costs incurred in the defense of a suit filed in violation of the

26  antitrust laws." *Rickards*, 783 F.2d at 1334-36. CareFusion entered the kyphoplasty market with

27  its "AVAmax" product as of April 2010. *See* Compl. ¶¶ 110-112. But here, CareFusion is not

28  defending itself in a suit, but rather is the party initiating the litigation.

9

**United States District Court**
For the Northern District of California

1    Accordingly, Plaintiff's *Handgards* claim, as currently pled, is insufficient to establish

2    either anticompetitive conduct or antitrust injury.

3                    **b) Medicare Fraud Allegations and Defendants' Settlement with DOJ**

4    Plaintiffs also allege that, "in or about 2000," Defendants (e.g., Kyphon before its

5    acquisition by Medtronic) engaged in a "years-long" scheme to market their kyphoplasty products

6    by convincing certain hospitals that they could bill Medicare at a higher overnight rate, even

7    though, according to Plaintiffs, kyphoplasty does not require overnight care.  *See* Pl.'s Opp'n at 29.

8    Although Defendants ultimately settled these allegations for $75 million with DOJ (not the FTC, as

9    Plaintiff erroneously states in paragraph 54 of its Complaint), Plaintiffs argue that Defendants'

10   "marketing and pricing scheme" allowed them to artificially raise prices for kyphoplasty products

11   and improperly diverted sales away from less-costly VCF treatment (e.g., vertebroplasty).

12   Defendants spend little time disputing whether these allegations are sufficient to constitute

13   "anticompetitive conduct," but instead challenge whether and how CareFusion could be injured

14   even if the Medicare allegations are true.  Plaintiff is generally correct that deceptive practices

15   (e.g., illegal marketing) may constitute "anticompetitive conduct."  *See Hunt-Wesson Foods, Inc. v.*

16   *Ragu Foods, Inc.*, 627 F.2d 919, 923 (9th Cir. 1980).  But it is not clear from Plaintiffs' Complaint

17   how Defendants' Medicare "marketing and pricing scheme," even if true, amounts to the type of

18   "exclusionary or predatory conduct" that is sufficient to establish anticompetitive conduct.

19   Moreover, as Defendants persuasively argue, CareFusion does not explain how

20   Defendants' "illegal Medicare pricing scheme" caused CareFusion any injury.  *See Atl. Richfield*

21   *Co.*, 495 U.S. at 334 (antitrust injury must flow from that which makes the anticompetitive conduct

22   unlawful, not from separate unlawful activity).  Defendants did not charge a lower price for their

23   kyphoplasty products or restrict their sale of products.  CareFusion's Opposition (at 9-10), though

24   not its Complaint (¶ 52), argues that it lost sales in the vertrebroplasty cement market.  Yet,

25   CareFusion did not start selling vertebroplasty cement until 2006, many years into Defendants'

26   alleged scheme.  Even more telling, CareFusion makes no allegations as to how the Medicare

27   pricing scheme actually harmed competition overall -- on CareFusion's own allegations, the true

28   harm was to the federal government's Medicare program, not to consumers or competitors.

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

Accordingly, Plaintiffs' current allegations regarding Defendants' Medicare marketing and pricing scheme are insufficient to establish either anticompetitive conduct or antitrust injury.

### c) Acquisition of Patents, Licenses, and Competitor Companies

Although the claims here involve Section 2 of the Sherman Act, a related antitrust statute, Section 7 of the Clayton Act, prohibits as unlawful an acquisition with the effect of "lessen[ing] competition" or tend[ing] to create a monopoly.  15 U.S.C. § 18.  With respect to claims of patent-based monopolization, "where a patent has been lawfully acquired, subsequent conduct permissible under the patent laws cannot trigger any liability under the antitrust laws."  *See Image Technical Services*, 125 F.3d at 1216 (citing *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981).  The transfer of a valid patent "has no antitrust significance," but merely shifts a lawful monopoly to different hands."  *See Brunswick Corp. v. Riegel Textile Corp.,* 752 F.2d 261, 266 (7th Cir. 1984) (holding that no harm to competition resulted when one rival applicant obtained a valid patent monopoly rather than another because the patent monopoly would exist either way); *see also Columbia River People's Utility Dist. v. Portland General Elec. Co.,* 217 F.3d 1187, 1190-91 (9th Cir. 2000) (citing *Brunswick* favorably on this point and holding that determining which party would be a state-approved monopolist for an electrical plant had no antitrust significance because the monopoly would exist either way).

Plaintiffs' third and final set of allegations as to anticompetitive conduct relate to Defendants' history of acquiring or licensing patents in the kyphoplasty field, threatening and bringing litigation over allegedly invalid patents, and taking over competitor companies. Specifically, Plaintiffs point to Defendants' conduct during the Kyphon-Medtronic litigation and eventual merger in late 2007 as evidence of anticompetitive conduct.  According to Plaintiffs, after Kyphon sued Medtronic for patent infringement in November 2005, Medtronic, in five separate pleadings, asserted that the '888 and '404 patents were invalid as a matter of law and were unenforceable due to inequitable conduct (e.g., Drs. Reiley and Scholten had "specific knowledge" of prior art, vertebroplasty, yet did not disclose that prior art in their application for the kyhoplasty-related patents).  *See* Pls.' Opp'n at 11.  In the midst of the litigation, Medtronic acquired Kyphon, and then recorded assignments of Kyphon's patents.  Finally, after acquiring Kyphon, Medtronic

11

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

1    stopped marketing certain products, continued to acquire patents in the VCF treatment market, and

2    made "public threats" to enforce patent rights "they knew to be invalid." *Id*. at 12.

3        Although some of Plaintiffs' allegations regarding patent and corporate acquisitions are

4    more detailed than others, the Court finds that most of Plaintiffs' allegations, taken as a whole, are

5    insufficient to establish anticompetitive conduct and corresponding antitrust injury. *See City of*

6    *Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (the ultimate determination of

7    an antitrust violation rests on the "overall combined effect" of the alleged acts).  Most of Plaintiffs'

8    allegations of "illegal acquisition" relate to Defendants' conduct pre-merger, in other words, to the

9    conduct of Kyphon before it was acquired by Medtronic.  The Complaint, however, includes no

10   allegations as to Kyphon's market power before acquisition by Medtronic, no allegations that the

11   acquisitions increased Kyphon's market power, and no allegations that Kyphon's acquisitions

12   harmed competition. *See SCM Corp.*, 645 F.2d at 1208 ("In scrutinizing acquisitions of patents

13   under § 2 of the Sherman Act, the focus should be upon the market power that will be conferred by

14   the patent in relation to the market position then occupied by the acquiring party.").

15       There is a similar deficiency regarding Medtronic's $4 billion acquisition of Kyphon.  As

16   currently pled, Plaintiffs' allegations are insufficient to establish that the merger led to a greater

17   power to exclude competitors than that already inherent in Kyphon's pre-merger position in the

18   market. *Id*. at 1208 ("whether limitations should be imposed on the patent rights of an acquiring

19   party should be dictated by the extent of the power already possessed by that party in the relevant

20   market").  Plaintiffs' Complaint includes no allegations as to the state of the relevant markets, and

21   specifically no allegations as to Medtronic's position in those markets, before Medtronic's

22   acquisition of Kyphon.  If Kyphon, by virtue of its unexpired patents, was by far the dominant

23   player in the kyphoplasty market, then Medtronic's acquisition would apparently have no antitrust

24   significance since the monopoly would just be shifting from Kyphon to Medtronic. *See Columbia*

25   *River*, 217 F.3d at 1190 (shift of monopoly from one company to another does not "create

26   monopoly power" in violation of antitrust laws).

27       Although it is not the focus of their Complaint or Opposition, Plaintiffs do allege that after

28   Medtronic's acquisition of Kyphon, "Medtronic stopped marketing its vertebroplasty and

                                                12

1    kyphoplasty products, namely its ACRUATE™ and ARCUATE™ XP Products." *See* Compl. ¶

2    79. Taking these allegations as true, the Court agrees that Defendants' removal of product lines

3    after merger may constitute anticompetitive conduct. *See Movie 1 & 2 v. United Artists*

4    *Communications, Inc.*, 909 F.2d 1245 (9th Cir. 1990) (acquisition of competitor with unlawful

5    objective, i.e., in order to prevent competitive bids for a project, is one piece of circumstantial

6    evidence supporting inference of anticompetitive conduct). Defendants counter that Plaintiffs'

7    Complaint "fails to allege facts negating lawful motivations for this decision, such as

8    considerations of comparative efficacy or safety." *See* Defs.' Mot. to Dismiss at 8. Plaintiffs do

9    bear the burden of proving lack of legitimate business justifications in regard to a Section 2 claim,

10   but whether "valid business decisions" motivated Defendants' conduct is a question of fact

11   inappropriate for review at the pleading stage. *See High Technology Careers v. San Jose Mercury*

12   *News*, 996 F.2d 987, 990 (9th Cir. 1993).

13        Even if some of Plaintiffs' allegations suggest potentially unlawful (i.e., anticompetitive)

14   conduct, the Court is not persuaded that Plaintiffs have suffered any corresponding "antitrust

15   injury." CareFusion alleges it was ready to enter the minimally invasive VCF treatment market

16   and the kyphoplasty market in 2006, but delayed its entry based on a "business decision to wait

17   until the '888 and '404 patents expired" in February 2009. *See* Compl. ¶ 102. As a result,

18   CareFusion alleges that it has been prevented from "capturing the share" of those markets it would

19   have had otherwise obtained but for Defendants' conduct and that Defendants' prior litigation

20   history continues to "threaten" CareFusion's position in the relevant markets. *Id*. at ¶¶ 158-59.

21   These allegations are insufficient to establish antitrust injury.

22        CareFusion did not enter the kyphoplasty market until April 2010, leaving its allegations of

23   harm highly speculative and indirect. *See Am. Ad. Mgmt.*, 190 F.3d at 1057-60 (antitrust injury

24   requires plaintiff to have suffered injury in the relevant market that is direct and not speculative).

25   CareFusion argues that Defendants should have known the '888 and '404 patents were invalid and

26   unenforceable as of the 2005-2006 litigation between Kyphon and Medtronic, but CareFusion does

27   not explain why it did not enter the market when, on its own allegations, it was ready to do so "for

28   at least two (2) years" prior to the expiration of the patents in February 2009. *See* Compl. ¶ 158.

United States District Court
For the Northern District of California

1  CareFusion, in its Opposition, asks the Court to consider "lost sales" from its delayed entry, but

2  allegations as to lost sales or diverted sales are not in its Complaint.  Even if those allegations were

3  in the Complaint, it is not clear to the Court how CareFusion can plausibly allege lost sales from

4  Defendants' acquisition of patents and other companies at a time when CareFusion was not in the

5  market.  Moreover, CareFusion fails to allege *unlawful* conduct that caused injury to CareFusion

6  and to the market overall -- on the face of its Complaint, CareFusion timed its entrance into the

7  kyphoplasty market based on the expiration of the '888 and '404 patents.  *See Atl. Richfield Co.*,

8  495 U.S. at 334 (injury will only qualify as "antitrust injury" if it is tied to an "anticompetitive

9  practice" under scrutiny); *see also Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611

10  F.3d 495, 502-03 (9th Cir. 2010) (to state injury to competition, plaintiff must allege conduct that

11  "actually causes injury to competition, beyond the impact on the claimant") (internal citation

12  omitted).

13       In sum, CareFusion has failed to sufficiently allege that any of the conduct it has identified

14  establishes both anticompetitive conduct on the part of Defendants *and* antitrust injury to

15  CareFusion and to competition in the relevant markets.

16       **B. Attempted Monopolization under Section 2 of Sherman Act**

17       To succeed in establishing a claim of attempted monopolization under Section 2 of the

18  Sherman Act, a plaintiff must show: "(1) specific intent to control prices or destroy competition;

19  (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous

20  probability of success; and (4) causal antitrust injury."  *Cost Management*, 99 F.3d at 951.  The

21  Court's analysis above as to why Plaintiffs' allegations as to anticompetitive conduct and causal

22  antitrust injury are lacking applies equally to the attempted monopolization claim.  Accordingly,

23  the remaining elements of an attempted monopolization claim only require a brief discussion.

24       The dangerous probability of success element is similar to the market power element in a

25  monopolization claim, the latter of which Defendants have not contested for purposes of this

26  motion to dismiss.  Once a plaintiff has adequately established market power, as CareFusion has

27  done for purposes of this motion, the only remaining issues for an attempted monopolization claim

28

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND

United States District Court
For the Northern District of California

are intentional anticompetitive conduct and resulting antitrust injury. *See SmileCare Dental Group*, 88 F.3d at 783.

Antitrust laws do not prohibit vigorous competition on the merits, even if that competition results in harm to one or more competitors. Thus, courts cannot infer intent to monopolize from ambiguous or vague statements, but may infer the requisite intent from anticompetitive conduct. *See Rutman Wine Co. v. E.&J. Gallo* Winery, 829 F.2d 729, 735 (9th Cir. 1987) ("The allegation of specific intent . . . to bring about harm to competition is conclusory in the absence of anticompetitive conduct from which such specific intent may be inferred."). CareFusion has alleged that Defendants acted "with the intention of maintaining and/or further increasing their monopoly power" and "acted with the specific intent to acquire a monopoly." *See* Compl. ¶¶ 153, 157, 164. However, these allegations of specific intent are not connected to sufficient allegations of anticompetitive conduct. Having found the allegations of anticompetitive conduct deficient, the Court will not infer specific intent based only on CareFusion's conclusory allegations.

## IV. CONCLUSION

Accordingly, the Court GRANTS Defendants' motion to dismiss Count I (monopolization) and Count II (attempted monopolization) of Plaintiffs' Complaint with leave to amend. Plaintiffs shall file an amended complaint, if any, within thirty (30) calendar days of this Order. Failure to file a timely amended complaint may result in dismissal of Plaintiffs' claims with prejudice.

**IT IS SO ORDERED.**


Dated: November 1, 2010

_Lucy H. Koh_
LUCY H. KOH
United States District Judge

Case No.: 10-CV-01111-LHK
ORDER GRANTING DEFENDANTS' MOTION TO DISMISS ANTITRUST CLAIMS WITH LEAVE TO AMEND