1  Claude M. Stern (SBN: 96737)
   claudestern@quinnemanuel.com
2  Thomas R. Watson (SBN: 227264)
   tomwatson@quinnemanuel.com
3  QUINN EMANUEL URQUHART & SULLIVAN, LLP
4  555 Twin Dolphin Dr., 5th Floor
   Redwood Shores, California 94065
5  Telephone: (650) 801-5000
   Facsimile: (650) 801-5100
6
7  Timothy J. Malloy *(admitted pro hac vice)*
   tmalloy@mcandrews-ip.com
8  James R. Nuttall *(admitted pro hac vice)*
   jnuttall@mcandrews-ip.com
9  Christopher M. Scharff *(admitted pro hac vice)*
   csharff@mcandrews-ip.com
10 Stephanie F. Samz *(admitted pro hac vice)*
   ssamz@mcandrews-ip.com
11 McANDREWS, HELD & MALLOY LTD.
12 500 West Madison Street, Suite 3400
   Chicago, Illinois 60661
13 Telephone: (312) 775-8000
   Facsimile: (312) 775-8100
14
15 Attorneys for Plaintiffs
   CareFusion Corporation and
16 CareFusion 2200, Inc.

17

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

| | |
|---|---|
| CAREFUSION CORPORATION and CAREFUSION 2200, INC., | Case No. 10-CV-01111-LHK (PVT) |
| Plaintiffs, | **FIRST AMENDED AND SUPPLEMENTAL COMPLAINT FOR ANTITRUST AND LANHAM ACT VIOLATIONS AND A DECLARATORY JUDGMENT FOR PATENT INVALIDITY AND NONINFRINGEMENT** |
| v. | |
| MEDTRONIC, INC., MEDTRONIC SPINE LLC d/b/a KYPHON INC., and KYPHON SARL | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiffs CareFusion Corporation and CareFusion 2200, Inc. (collectively "CareFusion") bring this Complaint against Defendants Medtronic, Inc., Medtronic Spine LLC, and Kyphon SARL (collectively "Defendants") seeking relief for Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct in violation of the antitrust laws of the United States, 15 U.S.C. §§ 1 et. seq., and the false advertising laws of the United States, 15 U.S.C. § 1051 et. seq. CareFusion also seeks a declaration that the claims of United States Patent No. 6,235,043 entitled "Inflatable Device For Use In Surgical Protocol Relating To Fixation Of Bone" ("the '043 patent"), United States Patent No. 6,241,734 entitled "Systems And Methods For Placing Materials Into Bone" ("the '734 patent"), United States Patent No. 6,248,110 entitled "Systems And Methods For Treating Fractured Or Diseased Bone Using Expandable Bodies" ("the '110 patent"), and United States Patent No. 6,613,054 entitled "Systems And Methods For Placing Materials Into Bone" ("the '054 patent") are invalid and/or not infringed by CareFusion. The '043, '734, '110, and '054 patents are attached hereto as Exhibits A – D, respectfully. CareFusion alleges as follows:

1.     CareFusion has been the victim of a scheme by the Defendants to keep competitors out of the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. For example, Defendants have engaged in an illegal scheme of monopolization and/or attempt to monopolize that includes at least the following: (1) a years-long illegal Medicare marketing scheme; (2) acquisition and stockpiling of assets from third parties; (3) acquiring knowingly invalid and unenforceable patents and asserting or threatening to assert these invalid and unenforceable patents against others; and (4) widespread dissemination of false and misleading statements about CareFusion's kyphoplasty products. Through these illegal acts, Defendants have eliminated competition and obtained and/or maintained approximately 85% or more market share in the minimally invasive vertebral compression fracture treatment product market and approximately 97% or more market share in the alternative kyphoplasty product market. Defendants have engaged in predatory conduct to eliminate CareFusion and others as viable competitors. In doing so, Defendants have violated the antitrust laws of the United States. CareFusion brings this action for relief from the harm that Defendants' illegal scheme has caused.

2.      Through their illegal conduct, namely their widespread dissemination of false and misleading statements about CareFusion's kyphoplasty products, Defendants also have violated the false advertising laws of the United States.   Defendants' campaign of disseminating numerous demonstrably false and misleading statements regarding CareFusion's kyphoplasty products have caused CareFusion to lose prospective customers and have caused CareFusion to expend significant resources in an attempt to correct the pervasive misconceptions caused by Defendants' dissemination of these numerous false and misleading statements.   CareFusion, therefore, also brings this action under the federal false advertising laws for relief from the harm that Defendants' campaign of widespread dissemination of false and misleading statements regarding CareFusion's kyphoplasty products has caused.

3.      Defendants have also threatened to enforce their kyphoplasty patents against CareFusion's recently-launched kyphoplasty products.   The same day that CareFusion announced its intent to launch a kyphoplasty line of products, analysts who cover the medical device industry, including Defendants', wrote to CareFusion and identified among others, the '043, '734, '110 and '054 patents, as threats to CareFusion's product launch.   On information and belief, Defendants' provided this information to the analysts.   Moreover, less than a month after CareFusion announced that it would be launching a line of kyphoplasty products, Defendant Medtronic, Inc.'s Chairman and Chief Executive Officer held an earnings conference call during which he repeatedly asserted that Defendants would assert their kyphoplasty intellectual property against any competitor, including against the "potential new US competitor."   On information and belief, the "potential new US competitor" he was referring to was CareFusion.   Numerous analysts reported, both before and after Defendants' earnings conference all, that Defendants would enforce their kyphoplasty patents against CareFusion.   CareFusion, therefore, also brings this action for a declaratory judgment that one or more claims of the '043, '734, '110 and '054 patents are invalid and that CareFusion's kyphoplasty products do not infringe any valid claim of those patents.

## THE PARTIES

4.      CareFusion Corporation is a corporation organized under the laws of the State of Delaware and has a principal place of business at 3750 Torrey View Court, San Diego, California.

5.     CareFusion 2200, Inc. is a corporation organized under the laws of the State of Delaware and has a principal place of business at 1430 Waukegan Road, McGaw Park, Illinois.

6.     On information and belief, Medtronic, Inc. ("Medtronic") is a corporation organized under the laws of the State of Minnesota and has a principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota.

7.     On information and belief, Medtronic Spine LLC ("Medtronic Spine"), a subsidiary of Medtronic, is a corporation organized under the laws of the State of Delaware and has a principal place of business at 1221 Crossman Avenue, Sunnyvale, California.

8.     On information and belief, Medtronic Spine is currently doing business as Kyphon Inc. ("Kyphon").

9.     On information and belief, Kyphon SARL, a subsidiary of Medtronic, is a Swiss corporation with its principal place of business at Rue de Puits-Godet 12/12A, 2000, Neuchatel, Switzerland.

## JURISDICTION AND VENUE

10.     This is a complaint for injunctive relief and damages based on the antitrust laws of the United States, Title 15 of the United States Code §§ 1 et. seq., the patent laws and declaratory judgment laws of the United States, Title 35 of the United States Code §§ 1 et. seq. and Title 28 of the United States Code §§ 2201 and 2202, and the false advertising laws of the United States, Title 15 of the United States Code §§ 1051 et seq.

11.     This Court has jurisdiction over the subject matter of this action under 15 U.S.C. §§ 4, 15, 26, and 1121 and 28 U.S.C. §§ 1331, 1337, 1338(a), 2201, and 2202.

12.     On information and belief, this Court has personal jurisdiction, general and specific, over the Defendants because they have sufficient minimum contacts to establish personal jurisdiction in this district.  Although it is believed that the extent of Defendants' contacts in this district are extensive, the extent of Defendants' contacts in this district will be established after a reasonable opportunity for discovery.

13.     On information and belief, Defendants have systematic and continuous contacts in this judicial district.

14.     On information and belief, Defendants regularly transact business within this judicial district.

15.     On information and belief, Defendants regularly sell products in this judicial district. Defendants derive substantial revenues from sales in this district.

16.     Venue is proper in this district under 15 U.S.C. §§ 15(a), 22, and 26 and 28 U.S.C. §§ 1391(b) and (c).

## INTRADISTRICT ASSIGNMENT

17.     Pursuant to Civil L.R. 3-2(c), this action may be assigned on a district-wide basis.

## TRADE AND COMMERCE

18.     Defendants are engaged in activity affecting interstate commerce including substantial sales of minimally invasive vertebral compression fracture treatment products in the United States.

19.     Defendants' predatory actions that give rise to the antitrust claims asserted herein have an intended and substantial effect within the United States, including harming CareFusion's ability to compete in interstate commerce related to minimally invasive vertebral compression fracture treatment products.

## THE RELEVANT PRODUCT MARKETS

20.     A relevant product market is the minimally invasive vertebral compression fracture treatment product market, which includes, but is not limited to, kyphoplasty (by balloon or otherwise) and vertebroplasty.

21.     Alternatively, a relevant product market is the kyphoplasty product market.

22.     The relevant geographic market is the United States.

23.     The relevant time period for the relevant product markets is 1998 to the present.

24.     On information and belief, Defendants' anticompetitive, predatory, exclusionary and/or inequitable conduct that gave rise to their monopoly and/or attempted monopoly occurred between 2000 through the present day.

25.     Entry into the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market is extremely difficult, expensive, and time-consuming because of, among other things, extensive regulatory approval time, the high cost of

developing and producing a minimally invasive vertebral compression fracture treatment product, physician unwillingness to switch product manufacturers, physician preferences toward devices with long clinical track records, and Kyphon's/Medtronic's perceived market leadership in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  (Ex. E, "U.S. Spinal Surgery Market" at 2-10 (explaining that "domination by large medical device manufacturers," like Medtronic, "restricts the growth of emerging companies….These larger companies have the resources to concentrate on research and development, guide their products through various developmental phases and conduct large-scale clinical trials.  These factors which dictate the success of these companies prove to be a constraint for emerging companies.").)

26.     Because of Defendants' (including Defendants' predecessor) aggressive enforcement and threatened enforcement of the extensive portfolio of patents they allegedly own/owned, including enforcement or threatened enforcement of United States Patent No. 4,969,888 ("the '888 patent"; attached hereto as Exhibit F) and United States Patent No. 5,108,404 ("the '404 patent"; attached hereto as Exhibit G),  both of which relate to the basic kyphoplasty procedure, prior to the February 2009 expiration of the '888 and '404 patents, Defendants' patents also constituted a significant barrier to the entry into the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.

27.     Defendants' organized and widespread advertising, marketing and/or promotional campaign to disseminate false and misleading statements regarding CareFusion's competitive kyphoplasty products has created yet another significant barrier to entry into the minimally invasive vertebral compression facture treatment product market and/or the alternative kyphoplasty product market.

## DEFENDANTS' MONOPOLY POWER

28.     Kyphon began limited sales of its kyphoplasty products in 1999.  By spring of 2000, Kyphon had initiated a full commercial release of its kyphoplasty products.

29.     In 2000, the market share in terms of revenues was split approximately evenly between revenues generated by vertebroplasty and revenues generated by kyphoplasty (i.e., Kyphon).

30.     By at least 2007 and continuing to the present day, Defendants' market share in terms of revenues grew from approximately 50% to over 85% in the minimally invasive vertebral compression fracture treatment product market.

31.     Defendants' market share in the alternative kyphoplasty product market has always been at least about 97%.

32.     Defendants have grown their monopoly from approximately $6 million in 2000 to approximately over $500 million in 2009.

33.     For example, for the period 2000 through 2006, each year Kyphon achieved substantial revenue growth.  Specifically, on information and belief, from 2002 to 2003 Kyphon's revenues grew over 71%.  From 2003 to 2004, Kyphon's revenues grew over 62%.  From 2004 to 2005, Kyphon's revenues grew over 43%, and from 2005 to 2006, Kyphon's revenues grew over 33%.  (Ex. H, Global Data, "Kyphoplasty: Driving Growth in the Vertebral Compression Fracture Treatment Market in the US," Mar. 2009 at 9.)

34.     Kyphon's repeated significant growth was a result of Defendants' scheme to eliminate competition and increase and/or maintain its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty market.

## FACTUAL BACKGROUND

35.     Vertebroplasty is a minimally invasive vertebral compression fracture treatment procedure.  Specifically, it is a surgical procedure developed at least in France in 1984 for the treatment of vertebral compression fractures, which are commonly caused by osteoporosis.  Vertebroplasty involves supplying bone cement, bone paste or related flowable material into the affected vertebral body or bodies.  The bone cement, bone paste, or related flowable material hardens after it has been supplied to the vertebral body or bodies.

36.     Kyphoplasty is another type of minimally invasive vertebral compression fracture treatment procedure.  Kyphoplasty is a surgical procedure that, according to Kyphon, was developed in the late 1980s and early 1990s by Dr. Mark Reiley ("Reiley") and Arie Scholten ("Scholten").  Kyphoplasty is identical to vertebroplasty except for the addition of one step.  In kyphoplasty, before supplying bone cement, bone paste, or related flowable material to the affected vertebral body or

bodies, a void is created in the affected vertebral body or bodies. The void is most commonly created by the insertion and inflation of a balloon within the affected vertebral body or bodies, but can be created by other devices such as cutting tools or non-balloon expandable devices. Bone cement, bone paste, or related flowable material is then injected into the void created by, for example, a balloon. The bone cement, bone paste, or related flowable material hardens after it has been supplied to the vertebral body or bodies.

37.    Both vertebroplasty and kyphoplasty can be used to treat vertebral compression fractures.

38.    On information and belief, Reiley and Scholten developed the kyphoplasty procedure by copying balloon catheters used in coronary angioplasty procedures and by building upon the vertebroplasty procedures developed before kyphoplasty. (Ex. I, David Cassak, "Kyphon: A Trial Balloon Succeeds In Spine," *In Vivo*, July 1, 2002, at 4; Ex. J, "Tapping Into New Treatment Firm Aims To Sell Heart Equipment For Spinal Use," Chicago Tribune, Sept. 25, 1999, at Business p. 1; Ex. K, Medtronic Amended Answer to Amended Complaint, Civ. Action No. 05-2863 (W.D. Tenn.) at Counterclaim ¶¶ 67-77.)

39.    Reiley and Scholten filed their initial patent application relating to kyphoplasty on February 9, 1989. That application, entitled "Surgical Protocol For Fixation Of Osteoporotic Bone Using Inflatable Device," ultimately issued on November 13, 1990 as the '888 patent. (Ex. F at Cover.)

40.    On August 15, 1990, Reiley and Scholten filed a continuation-in-part patent application to the patent application that issued as the '888 patent. This continuation-in-part patent application, entitled "Surgical Protocol For Fixation Of Bone Using Inflatable Device," issued on April 28, 1992 as the '404 patent. (Ex. G at Cover.)

41.    According to Kyphon, the '888 and '404 patents contain broad claims covering the basic kyphoplasty procedure, including kyphoplasty performed with a balloon and kyphoplasty performed with non-balloon instruments to create a void or voids in vertebral bodies.

42.    In 1994, Kyphon was founded by, among others, Reiley and Scholten.

43.     On August 7, 1996, Reiley and Scholten assigned the '888 and '404 patents to Kyphon.

44.     The '888 and '404 patents expired on February 9, 2009.

45.     Since the filing of the patent applications leading to the '888 and '404 patents, Kyphon has continued to seek and obtain numerous patents for minor, trivial, and/or obvious modifications to its kyphoplasty procedures and/or the equipment used during a kyphoplasty procedure.

46.     Subsequently, Kyphon obtained approximately fifty (50) or more patents directed to kyphoplasty procedures and equipment.

47.     On May 1, 2006, in furtherance of Defendants' scheme to eliminate competition in the minimally invasive vertebral compression fracture treatment product market or in the alternative kyphoplasty product market, Kyphon issued a press release asserting that at least one of these additional patents "extends our patent coverage for key aspects of the fundamental method of performing kyphoplasty" and "significantly bolsters our exiting portfolio and reflects both our continuing commitment to technological innovation and our constant efforts to aggressively pursue patent protection in our core markets in both the U.S. and abroad." (Ex. L, Kyphon May 1, 2006 Press Release at 1.)

## I.     Defendants' Anticompetitive Illegal Medicare Marketing Scheme

48.     On information and belief, since Kyphon's founding, Defendants have sought to create and maintain a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by engaging in an anticompetitive and illegal Medicare marketing scheme in order to entice hospitals and doctors to use Defendants' kyphoplasty products.

49.     In or about 2000 or 2001 and continuing on information and belief to approximately May 2008, Kyphon embarked on a years-long marketing scheme that defrauded Medicare while simultaneously increasing and/or maintaining its market share in the minimally invasive vertebral compression fracture treatment product market and maintaining its near 100% market share in the alternative kyphoplasty product market. (*See* Ex. M, Department of Justice May 22, 2008 Press Release.)

50. CareFusion was competing in the minimally invasive vertebral compression fracture treatment product market during this time frame by, for example, selling vertebroplasty products.

51. To break into the minimally invasive vertebral compression fracture treatment product market, Kyphon needed to convince hospitals and doctors to purchase and use it products at a price point of approximately $4,000.

52. On information and belief, hospitals often refuse to approve the use of new products and/or procedures, such as Kyphon's kyphoplasty products, if the hospital will lose money by allowing its doctors to perform the medical procedure. (*See* Ex. N, Compl. in Civil Action No. 05-6568 (W.D.N.Y.) at ¶ 54 ("The hospital credentialing committee, in order to approve the procedure, investigates the procedure, makes sure it is FDA approved and explores reimbursement for the procedure. If it appears that it is a procedure that will cost the hospital money, many times they will not approve the procedure.").)

53. Many hospitals and doctors complained that Kyphon's product was priced too highly and that they would lose money by performing kyphoplasty. (Ex. O, July 28, 2003 Lazard Report at 3 (noting "vehement resistance to KypHX device's selling price."); Ex. P, Jan. 28, 2003 Lazard Report at 6 (noting that Kyphon's product "was widely viewed as much too expensive"); *id*. at 14 (documenting numerous customer complaints about Kyphon's high prices); Ex. N, Compl. in Civil Action No. 05-6568 (W.D.N.Y.) at ¶¶ 50, 54 & 74; Ex. I, "Kyphon: A Trial Balloon Succeeds In Spine" at 10 (noting that some feel Kyphon's product is "over-priced").)

54. In particular, kyphoplasty typically only requires an "out-patient" procedure. However, in for example 2006, the Medicare reimbursement for out-patient kyphoplasty was only approximately $2,600. Accordingly, the typical $2,600 reimbursement to the hospital for kyphoplasty would not cover the approximately $4,000 price of Kyphon's product.

55. In comparison, vertebroplasty products (such as CareFusion's vertebroplasty products) are much less expensive. For example, the typical price of a vertebroplasty product has been between approximately on average $300-700 since 2000. The 2006 reimbursement rate for vertebroplasty procedures was approximately $1,425. This $1,425 out-patient reimbursement rate was more than sufficient to cover the cost of vertebroplasty products. Doctors and hospitals, therefore, initially

1   preferred to buy vertebroplasty products rather than Defendants' kyphoplasty products. (Ex. P,   Jan.

2   28, 2003 Lazard Report at 19 (stating that 82% of surgeons preferred vertebroplasty over

3   kyphoplasty; "there was no difference in the ease-of-use, nor in the patient's outcome; thus, they

4   favored vertebroplasty because it is far less expensive.")

5       56.     Defendants, however, realized that hospitals and doctors would be willing to buy

6   Kyphon's kyphoplasty product if they could obtain a higher reimbursement from Medicare.  With a

7   higher reimbursement, the hospitals and doctors could then afford to adopt Kyphon's kyphoplasty

8   product.   Defendants realized that they could market a higher reimbursement by falsely and

9   unnecessarily marketing kyphoplasty as an "in-patient" procedure (i.e., a procedure requiring an

10  overnight hospital stay) rather than marketing it correctly as an "out-patient" procedure.   The

11  difference between the reimbursement rates for "in-patient" versus "out-patient" procedures is

12  significant.  For example, in 2006, if kyphoplasty was performed on an in-patient basis, the hospital

13  received approximately $10,000 from Medicare, resulting in a much higher profit margin to the

14  hospitals or doctors.

15      57.     More than one doctor noted during Kyphon's years-long illegal Medicare marketing

16  scheme that Kyphon's suggested use of Medicare reimbursement codes was improper.  (Ex. P, Jan.

17  28, 2003 Lazard Report at 14 (noting doctor comment that "the coding used for billing is not

18  legitimate" and explaining that "[w]e believe this orthopedic spine surgeon's commentary implied the

19  *reimbursement policy* for the device, not the device itself, is illegitimate.  His impression was that the

20  Medicare billing codes he was being told to use were intended for other procedures (such as more

21  involved spinal surgery), and should not be used for the relatively simply [sic] kyphoplasty

22  procedure."); Ex. N, Compl. in Civil Action No. 05-6568 at ¶¶ 61-62.)

23      58.     Kyphon's illegal Medicare marketing scheme was so widespread that many thought

24  that kyphoplasty was supposed to be performed only on an in-patient basis.  (*Id*. at ¶¶ 40, 50, 54-56 &

25  60; Ex. Q, Oct. 29, 2003 Thomas Weisel Partners Report at 5 ("Kyphoplasty patients are usually

26  admitted to the hospital for at least one day."); Ex. R, Sept. 23, 2003 Thomas Weisel Partners Report

27  at 12 (same); Ex. E, U.S. Spinal Surgery Market at 4-5 ("Kyphoplasty is often performed in an

28

inpatient setting . . ."); Ex. I, "Kyphon: A Trial Balloon Succeeds In Spine" at 8 (Kyphon CEO promoting kyphoplasty as "typically accompanied by an overnight stay in the hospital").)

59.     Kyphon chose to initiate and continue this illegal Medicare marketing scheme in order to increase and/or maintain its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty market rather than lower the price of its kyphoplasty product.  (*See, e.g.*, Ex. N, Compl. in Civil Action No. 05-6568 at ¶¶ 50 & 74.)

60.     Kyphon's illegal Medicare marketing scheme facilitated Kyphon's acquisition of a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Specifically, had Kyphon not initiated its illegal Medicare marketing scheme, hospitals and doctors would not have purchased Kyphon's products because Medicare would not have provided the hospitals and doctors with a reimbursement that would cover the price of the Kyphon's kyphoplasty product.  But for Kyphon's illegal Medicare marketing scheme, Defendants would not have gained and maintained their monopoly.

61.     The illegal Medicare marketing scheme facilitated the growth and maintenance of Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market from less than 50% of the market share in 2000 to over at least 85% of the market share in 2007.

62.     On information and belief, Kyphon continued its illegal Medicare marketing scheme until at least May 2008 when Defendants settled a lawsuit, which alleged that Kyphon's illegal Medicare marketing scheme had defrauded the United States government of millions of dollars, for $75 million with the United States Justice Department.

63.     Kyphon's illegal Medicare marketing scheme directly harmed competition, including CareFusion, from 2000 or 2001 through 2008 and beyond.  CareFusion in particular has sold a competing vertebroplasty delivery system since about 2006.  Because of Kyphon's illegal Medicare marketing scheme, on information and belief, numerous hospitals and doctors chose to purchase Defendants' kyphoplasty products instead of competing vertebroplasty products (including specifically CareFusion's vertebroplasty products) in order to increase their reimbursement rates from Medicare, and in turn their overall profits.  Because hospitals and doctors could increase their

Medicare reimbursements, and thus their profits, by engaging in Kyphon's illegal Medicare marketing scheme, competitors, like CareFusion lost sales of their vertebroplasty products because vertebroplasty products generated less Medicare reimbursements, and in turn less profits, for the hospitals and doctors.  Hospitals and doctors using vertebroplasty products, sold by for example CareFusion, could not receive the same profit margin as those using Kyphon's kyphoplasty products unless the competitors, like CareFusion, also engaged in Kyphon's illegal Medicare marketing scheme (e.g., unless competitors, like CareFusion, illegally encouraged the hospitals and doctors to unnecessarily keep patients receiving vertebroplasty overnight in order to generate the significantly higher inpatient Medicare reimbursements).

64.     Kyphon's illegal Medicare marketing scheme has also had a continuing and lingering harmful effect on competition since 2008 through the present.  For example, Kyphon's illegal Medicare marketing scheme continues to harm competition, including CareFusion, by forcing competitors to charge lower prices for kyphoplasty products.  CareFusion has sold a kyphoplasty product since about April 2010.  On information and belief, because of Kyphon's years-long illegal Medicare marketing scheme, numerous hospitals and doctors still expect to maintain substantially the same profit margin per procedure as they received under Kyphon's past illegal Medicare marketing scheme.  Competitors, like CareFusion, have therefore had to adjust the prices of their newly-launched kyphoplasty products downward in order to meet inflated hospital and doctor expectations created by Kyphon's illegal Medicare marketing scheme.  CareFusion, therefore, makes less profit on its kyphoplasty products than it would have made if Defendants had not engaged in their illegal Medicare marketing scheme.  In addition, Kyphon's illegal Medicare marketing scheme continues to harm competition because it existed for so many years that doctors and hospitals became entrenched with using Defendants' kyphoplasty products, and it has enabled Defendants to grow a larger sales force and develop a larger clinical history.  Further, on information and belief, some doctors may continue to be misled by Kyphon's prior false statements in support of its illegal Medicare marketing scheme, and may continue to unnecessarily perform kyphoplasty as an in-patient procedure.  Also, because it is easier to sell CareFusion's kyphoplasty products to customers who already use its

vertebroplasty products, CareFusion's lost vertebroplasty contracts due to Kyphon's illegal Medicare scheme have inhibited and decreased CareFusion's sales of kyphoplasty products.

65.    Kyphon's illegal Medicare marketing scheme also defrauded the United States government and consumers of millions of dollars.

66.    As a result of Kyphon's illegal Medicare marketing scheme, Kyphon settled with the United States Department of Justice for $75 million.  The fine was ultimately paid by Medtronic Spine, Kyphon's corporate successor.  (*See generally* Ex. M.)

## II.    Defendants' Anticompetitive Acquisitions And Repeated Non-Use Of Assets, Including Patent Rights, Related To Minimally Invasive Vertebral Compression Fracture Treatment Products

67.    Since Kyphon's founding, Defendants have actively sought to acquire assets, including additional patents, related to minimally invasive vertebral compression fracture treatment products, including kyphoplasty, from third parties as part of a scheme to eliminate and/or reduce competition and increase and/or maintain their market share in that market and in the alternative kyphoplasty product market.  This scheme included Kyphon's repeated acquisition of third party assets without, on information and belief, any intention of developing or otherwise utilizing the acquired assets.

68.    For example, in August 2002, Kyphon paid approximately at least $12.25 million for an exclusive license to approximately at least 23 patents naming Dr. Peter M. Bonutti as the inventor.

69.    The licensed Dr. Bonutti patents included at least: 5,163,949; 5,197,971; 5,295,994; 5,331,975; 5,345,927; 5,514,153; 5,667,520; 5,601,590; 5,685,826; 5,707,390; 5,716,325; 5,827,318; 5,860,997; 5,888,196; 5,954,739; 6,017,305; 6,042,596; 6,102,928; 6,171,236; 6,171,299; 6,187,023; 6,277,136; and 6,358,266.

70.    The Dr. Bonutti patents relate to the use of balloon technology in soft tissue in numerous areas of the body, including the soft tissue around the spine.  (*See, e.g.,* Ex. R, Sept. 25, 2003 Thomas Weisel Partners Report at 10; Ex. P, Jan.28, 2003 Lazard Report at 22-23; Ex. S, Aug. 22, 2002 Business Wire Article.)

71.    Kyphon's acquisition of rights in the Dr. Bonutti patents was part of Defendants' scheme to eliminate competition and increase and/or maintain its market share in the minimally

invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, and had the effect of eliminating and/or diminishing competition in those markets by eliminating a potential competitive threat from those markets.

72.     Specifically, Kyphon executives admitted that they acquired rights in the Dr. Bonutti patents in part to prevent a potential competitor from acquiring them and using those patent rights to launch a competitive product:

> The main reason, in our view, that Kyphon paid $12.3 million for rights to 23 patents that do not cover its current product line has more to do with staving off a competitive threat than it does with covering a future Kyphon product.  If a large orthopedic device company were to seek to create and sell a product to compete with the KyphX system for treating spinal fractures, one way it could get around Kyphon's balloons-in-bone patent portfolio would be to stage an off-label competitive attack.  The competitor could launch a balloon-expansion product for use in *non-bone tissue* around the spine, with the goal that surgeons would buy the device to use it off-label – for spine bones. The competitive company could then disavow any knowledge that surgeons were using the device in this way, thereby claiming innocence to patent infringement. There is precedent for this kind of off-label competitive attack being used to circumvent what would otherwise be a strong IP portfolio, and it isn't very difficult to imagine Johnson & Johnson or Stryker or Tyco launching a balloon product in exactly this way.  <u>Kyphon management admits part of its motivation for the purchase of the license to the 23 Bonutti patents was to prevent this.</u>

(Ex. P, Jan. 28, 2003 Lazard Report at 22-23 (emphasis added).)

73.     On information and belief, Kyphon never marketed or sold technology utilizing the Dr. Bonutti patent rights.

74.     Kyphon's acquisition of the rights to the Dr. Bonutti patents prevented any competitor, such as CareFusion or any other competitor, from acquiring these rights and developing and launching a competitive product based on those patents.  On information and belief, a competitive product based on the Dr. Bonutti patent rights would have decreased or eliminated Defendants' monopoly in minimally invasive vertebral compression fracture treatment product market and/or the alternative kyphoplasty market.  CareFusion was specifically injured by the cumulative effect of all of Defendants' acquisitions because it would have made greater sales of its vertebroplasty products and its recently-released kyphoplasty products in a non-monopolistic market.  (*See infra* at ¶¶ 93-94.) Competition as a whole was also decreased by preventing a competitive Bonutti product from

1  entering the market, and consumers were denied greater product choice in the minimally invasive

2  vertebral compression fracture treatment product and kyphoplasty markets.

3     75.    In February 2003, Kyphon acquired the German company Sanatis GmbH for

4  approximately at least $3.2 million.

5     76.    This acquisition included the transfer of at least four pending patent applications to

6  Kyphon.  At least one those patent applications subsequently issued as a patent, namely United States

7  Patent No. 6,692,563.

8     77.    The assets acquired from Sanatis related at least in part to bone cement for use in the

9  spine.

10     78.    Kyphon's acquisition of Sanatis, including Sanatis' patent rights, was part of

11  Defendants' scheme to eliminate competition and increase and/or maintain its market share in the

12  minimally invasive vertebral compression fracture treatment product market and in the alternative

13  kyphoplasty product market, and had the effect of eliminating and/or diminishing competition in

14  those markets by eliminating a competitor from those markets.  CareFusion was specifically injured

15  by the cumulative effect of all of Defendants' acquisitions, because it would have made greater sales

16  of its vertebroplasty products and its recently-released kyphoplasty products in a non-monopolistic

17  market.  (*See infra* at ¶¶ 93-94.)

18     79.    On information and belief, by at least 2002 Kyphon had acquired all or at least

19  substantially all of the existing patents rights directed towards balloon technology (1) in the bone and

20  (2) in and around the spine, except for one or more patents owed by Dr. J. Lee Berger:



| Exhibit 12: | Who has IP rights to use the balloon tissue-expander devices, and for what | | | |
|---|---|---|---|---|
| Entity | Spine bones (vertebrae) | Other bones (arms near the wrists, hip bones) | Soft tissue in and around the spine | Soft tissue elsewhere in the body |
| Kyphon | | | | |
| Tyco (TYC – $XX.XX, NR) | | | | |
| The Bonutti Research Institute | | | | |
| Lee Berger | | | | |

Key: ▓▓▓ = This is what Kyphon purchased for $12.3 million in August 2002

*Source: Kyphon, The U.S. Patent & Trademark Office, Lazard Frères & Co. LLC Research*

(Ex. P, Jan. 28, 2003 Lazard Report at 23.)

80.    In April 2005, Kyphon paid approximately at least $1 million for an exclusive license to patents owned by Dr. J. Lee Berger.

81.    These patents included at least: 5,423,850; 5,480,400; 5,545,136; 5,658,310; and 6,706,069.

82.    Dr. Berger's patent rights acquired by Kyphon relate to at least the use of balloons in bones other than the spine.

83.    Kyphon's acquisition of these patent rights from Dr. Berger was part of Defendants' scheme to eliminate competition and increase and/or maintain its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, and had the effect of eliminating and/or diminishing competition in those markets by eliminating a potential competitive threat from those markets.

84.    Specifically, as with the Dr. Bonutti patent rights, on information and belief, Dr. Berger's patent rights were acquired in order to prevent any potential competitor from acquiring those patent rights and developing and launching a competitive product.  (*Cf.* Ex. P, Jan. 28, 2003 Lazard at 22-23.)  More specifically, on information and belief, Kyphon acquired Dr. Berger's patent rights in order to prevent any potential competitor from developing and launching a balloon-expansion product for use in a bone other than the spine, with the goal that surgeons would buy the device to use it off-label in the spine.  (*Cf. id.*).

85.    On information and belief, Kyphon never marketed or sold technology utilizing Dr. Berger's patent rights directed towards, for example, balloon technology for fixation of bone fractures outside the spine.

86.    Kyphon's acquisition of the rights to Dr. Berger's patents prevented a competitor from acquiring those patents and developing and launching a competitive product to Kyphon's kyphoplasty products.  On information and belief, if a competitor, such as CareFusion, had been able to utilize the Berger patent technology, that competitor would have decreased or eliminated Defendants' monopoly in minimally invasive vertebral compression fracture treatment product market and/or the alternative kyphoplasty market.  CareFusion was specifically injured by the

cumulative effect of all of Defendants' acquisitions, because it would have made greater sales of its vertebroplasty products and its recently-released kyphoplasty products in a non-monopolistic market. (*See infra* at ¶¶ 93-94.)   Competition as a whole was also decreased by preventing a competitive Berger product from entering the market, and consumers were denied greater product choice in the minimally invasive vertebral compression fracture treatment product market and kyphoplasty market.

87.      In November 2005, Kyphon obtained an exclusive license to technology developed by Dr. Harvinder S. Sandhu.

88.      These rights related to kyphoplasty technology using an expandable directional bone tamp to treat vertebral compression fractures.  (Ex. T, Kyphon Compl. at ¶ 17.)

89.      Kyphon's acquisition of these intellectual property rights from Dr. Sandhu was part of Defendants' scheme to eliminate competition and increase and/or maintain its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, and had the effect of eliminating and/or diminishing competition in those markets by preventing a competitive product from entering those markets.

90.      Specifically, on information and belief, Kyphon acquired rights to Dr. Sandhu's technology in order to prevent a competitor, specifically Medtronic, from utilizing Dr. Sandhu's technology in order to launch a competitive product.  (*See generally* Ex. T, Kyphon Compl.)

91.      On information and belief, Kyphon never marketed or sold technology utilizing Dr. Sandhu's expandable directional bone tamp technology for treating vertebral compression fractures.

92.      Kyphon's acquisition of the rights to Dr. Sandhu's technology prevented a competitor from acquiring rights to that technology and launching a competing product.  For example, if a competitor, such as Medtronic, had been able to utilize the Sandhu technology, that competitor would have decreased or eliminated Defendants' monopoly in minimally invasive vertebral compression fracture treatment product market and/or the alternative kyphoplasty market.   CareFusion was specifically injured by the cumulative effect of all of Defendants' acquisitions, because it would have made greater sales of its vertebroplasty products and its recently-released kyphoplasty products in a non-monopolistic market.  (*See infra* at ¶¶ 93-94.)   Competition as a whole was also decreased by preventing a competitive Sandhu product from entering the market, and consumers were denied

greater product choice in minimally invasive vertebral compression fracture product and kyphoplasty markets.

93. Kyphon's repeated acquisitions of assets, including patent rights, without, on information and belief, any intention of utilizing the acquired assets has as a whole harmed competition by preventing any other potential competitor, such as CareFusion, from acquiring those assets and launching a competing kyphoplasty product.

94. Kyphon's repeated acquisition of assets, including patent rights, without, on information and belief, any intention of utilizing the acquired assets has harmed competition, and specifically CareFusion, additionally because it had a synergistic effect of entrenching Defendants' kyphoplasty products in the market and facilitated Defendants' illegal monopoly position.  This in turn has made it more difficult for competitors, like CareFusion, to compete in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Defendants' monopoly has provided them with an unfair competitive advantage because, among other reasons, doctors and hospitals are reluctant to switch manufacturers, are more prone to use a proven product from a larger manufacturer, are more prone to use a product with a widely published clinical record, and are more prone to use a product that other doctors or physician's recommend.

95. In 2006, Kyphon again announced the acquisition of another competitor from the market, namely Disc-O-Tech Medical Technologies, Ltd. ("Disc-O-Tech"), an Israeli company that had developed, among other things, a kyphoplasty product, namely the SKy Bone Expander.

96. Because Disc-O-Tech was a foreign company, on information and belief, Disc-O-Tech was looking for a partner in the United States to facilitate the sales of its products, including the SKy Bone Expander in the United States.

97. In or around approximately 2003 or 2004, CareFusion met with Disc-O-Tech to review Disc-O-Tech's technology, including the SKy Bone Expander, and to discuss a possible relationship between the two companies.

98. Shortly after CareFusion met with Disc-O-Tech, Disc-O-Tech was sued by Kyphon. (*See infra* Section III.A.)

99.     That lawsuit ultimately resulted in Kyphon's acquisition of Disc-O-Tech. Specifically, on December 20, 2006, as part of Defendants' anticompetitive scheme, Kyphon acquired the assets and intellectual property of Disc-O-Tech.  Kyphon's acquisition of Disc-O-Tech's assets and intellectual property furthered Defendants' scheme to eliminate and/or diminish competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

100.    On October 5, 2007, the Federal Trade Commission filed a complaint against Kyphon's acquisition of Disc-O-Tech.  (*See* Ex. U, Federal Trade Commission Complaint.)

101.    Ultimately, the Federal Trade Commission required Kyphon (which was then being acquired by Medtronic) to divest Disc-O-Tech's Confidence line of products relating to bone cement injection, but allowed Kyphon to keep, among other things, Disc-O-Tech's SKy Bone Expander product line.  (*See* Ex. V, Federal Trade Commission Decision.)

102.    On information and belief, Defendants removed the SKy Bone Expander from the market in the United States.

103.    CareFusion was aware of Defendants' acquisition of and subsequent decision to remove Disc-O-Tech's SKy Bone Expander from the market in the United States.

104.    Disc-O-Tech's SKy Bone Expander was viewed by analysts as a competitive threat should Disc-O-Tech be able to competitively price its product and/or form an alliance with a United States company with an existing sales and marketing force.  (Ex. W, Mar. 15, 2004 ThinkEquity Partners Report at 3.)

105.    Had Defendants not acquired Disc-O-Tech, on information and belief, Disc-O-Tech could have captured significant market share in both markets.

106.    Accordingly, Defendants' acquisition of Disc-O-Tech had the effect of ensuring that there was only one competitive kyphoplasty product being sold in the United States.

107.    Defendants' acquisition of Disc-O-Tech and eliminating the SKy Bone Expander product from the market, therefore, also had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by

1    preventing a competitive product from entering those markets, by eliminating a competitor from
2    those markets, and further adding to their scheme of enforcing and threatening to enforce their
3    patents, including invalid and unenforceable patents.

4         108.    For example, as discussed *supra*, before Disc-O-Tech was acquired by Defendants,
5    CareFusion met with Disc-O-Tech to review Disc-O-Tech's technology and to discuss a potential
6    business relationship with Disc-O-Tech.

7         109.    Defendants' acquisition of Disc-O-Tech prevented a competitor, such as CareFusion,
8    from acquiring or otherwise establishing a business relationship with Disc-O-Tech and in turn selling
9    competitive kyphoplasty products such as the SKy Bone Expander in the United States.

10        110.    This anticompetitive acquisition, followed by the decision to remove the acquired
11   competitive product from the market has also harmed competition, and specifically CareFusion,
12   additionally because it has helped to entrench Defendants' kyphoplasty products in the market and
13   facilitated Defendants' illegal monopoly position.  This in turn has made it more difficult for
14   competitors, like CareFusion, to compete in the minimally invasive vertebral compression fracture
15   treatment product market and in the alternative kyphoplasty product market.

16        111.    Additionally, this anticompetitive acquisition, followed by the decision to remove the
17   acquired competitive product from the market has harmed competition by preventing competitive
18   products from entering the market.

19        112.    On information and belief, Defendants' acquisition of Disc-O-Tech eliminated the
20   potential for imminent significant competition in the minimally invasive vertebral compression
21   fracture treatment product market and in the alternative kyphoplasty product market in furtherance of
22   Defendants' scheme to eliminate competition and increase and/or maintain its market share in those
23   markets.

24        113.    Finally, in 2007, after being sued by Kyphon for, among other things, patent
25   infringement, Medtronic acquired Kyphon for approximately $4 billion.  (Exs. X and Y, Medtronic
26   July 27, 2007 and Nov. 2, 2007 Press Releases.)  This acquisition provided Medtronic with Kyphon's
27   monopoly in the minimally invasive vertebral compression fracture treatment product market and/or
28   the alternative kyphoplasty market, and also transferred Kyphon's assets, sales-force, and goodwill,

as well as Kyphon's dozens of kyphoplasty patents.   This announced acquisition occurred approximately only three months after Medtronic, through its subsidiaries, had expressly asserted that Kyphon's basic patents, namely the '888 and '404 patents, had been procured through inequitable conduct and were unenforceable and invalid.

114.   Prior to Medtronic's acquisition of Kyphon, the investment community recognized that Medtronic would have been a strong competitor to Kyphon in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. (Ex. Z, "Why Kyphon Faces Intensifying Competition," Aug. 12, 2004; Ex. AA, "Kyphon shares tumble on downgrade," June 1, 2006.)

115.   Had Medtronic preceded to market its competitive kyphoplasty products, instead of acquiring Kyphon and removing its product from the market, on information and belief, because Medtronic's kyphoplasty product was recognized as a strong competitive threat and because of Medtronic's substantial marketing and sales resources, Medtronic would have captured a substantial portion of the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.

116.   On information and belief, after acquiring Kyphon, Medtronic stopped marketing its vertebroplasty and kyphoplasty products, namely its ARCUATE™ and ARCUATE™ XP products, thus eliminating yet another competitive line of products.

117.   Accordingly, Medtronic's acquisition of Kyphon had the effect of again ensuring that there was only one competitive kyphoplasty product being sold in the United States.

118.   On information and belief, Medtronic's acquisition of Kyphon also had the effect of increasing Defendants' market power in the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.  Specifically, on information and belief, Medtronic's acquisition of Kyphon increased Defendants' market power by combining Kyphon's monopoly market share with Medtronic's extensive resources, including Medtronic's large sales force and general presence and recognition in the medical field.

119.   On information and belief, Medtronic's acquisition of Kyphon therefore had the effect of eliminating the potential for imminent significant competition in the minimally invasive vertebral

compression fracture treatment product market and in the alternative kyphoplasty product market in furtherance of Defendants' scheme to eliminate competition in those markets.

120. This additional anticompetitive acquisition, followed by Defendants' decision to remove the acquired competitive products from the market has harmed competition by preventing competitive products from entering the market.

121. This additional anticompetitive acquisition, followed by Defendants' decision to remove the acquired competitive products from the market has harmed competition, and specifically CareFusion, additionally because it has helped to entrench Defendants' kyphoplasty products in the market and facilitated Defendants' illegal monopoly position. This in turn has made it more difficult for competitors, like CareFusion, to compete in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

122. After acquiring Kyphon, Defendants continued Kyphon's scheme of acquiring patents and other assets from third parties in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market in furtherance of Defendants' scheme to eliminate competition in those markets.

123. For example, on November 17, 2008 Medtronic announced that it had acquired the assets and intellectual property of Pabban Development, Inc. (Ex. BB, Medtronic Nov. 17, 2008 Press Release at 1.)

124. On information and belief, the intellectual property acquired included at least United States Patent Application Publication No. 20050180806.

125. Medtronic stated in its press release that it intends to use the bone cement delivery system it acquired from Pabban with its kyphoplasty products. (*Id.*)

126. On information and belief, Medtronic's acquisition of Pabban, including Pabban's intellectual property, was part of the Defendants' scheme and had the effect of eliminating and/or diminishing competition and increasing and/or maintaining its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market because it eliminated a potential competitor from those markets.

127.    The full extent of the Defendants' scheme and illegal activities in furtherance of their scheme for eliminating competition and increasing and/or maintaining their market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market will be established after a reasonable opportunity for discovery.

### III.    Defendants' Enforcement of Knowingly Invalid And Unenforceable Patent Rights

#### A.    Kyphon's History and Reputation of Enforcing The Kyphoplasty Patents

128.    Since its founding, to keep its dominant position in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, Defendants have actively sought to prevent competitors from entering those markets by repeatedly enforcing and threatening enforcement of its patent rights against those competitors.  This conduct existed when Kyphon was an independent company, and created a reputation in the industry that the patents would be vigorously enforced.  But this conduct also continued, in contravention of the antitrust laws, after Defendants became unquestionably aware that the core kyphoplasty patents were invalid.

129.    Specifically, on April 2, 2004, Kyphon filed a lawsuit against Disc-O-Tech Medical Technologies, Ltd. and Disc Orthopaedic Technologies Inc. (collectively "Disc-O-Tech") alleging infringement of the '888, '404, '043, and '110 patents (and later the '734 and '054 patents).  (*See Kyphon Inc. v. Disc-O-Tech Med. Techs., Ltd., et al.*, Civil Action No. 04-204-JJF (D. Del.).)

130.    Just days later, on April 5, 2004, Kyphon also filed a complaint against Disc-O-Tech with the International Trade Commission alleging infringement of those same patents.  (*See In re Certain Med. Devices Used to Compact Inner Bone Tissue and Prods. Containing Same*, Investigation No. 377-TA-507.)

131.    Specifically, Kyphon alleged that Disc-O-Tech's SKy Bone Expander – a non-balloon product used to treat vertebral compression fractures by creating a void in the vertebral body prior to cement injection – infringed the above-referenced patents.

132.    Because of CareFusion's history with Disc-O-Tech and its interest in the minimally invasive vertebral compression fracture treatment product market and alternative kyphoplasty market, CareFusion was aware of this litigation between Kyphon and Disc-O-Tech.

133.    Kyphon and Disc-O-Tech ultimately settled their lawsuits.  As part of the settlement, Kyphon required Disc-O-Tech to sign a consent decree that the asserted patents were valid, despite Disc-O-Tech's assertions that the patents were invalid.  The Court never ruled on the merits as to whether Kyphon's patents were invalid.

134.    Subsequently, on November 23, 2005, Kyphon, along with Dr. Sandhu, filed another lawsuit, this time against several Medtronic entities, *i.e.*, Medtronic's subsidiaries, who were getting ready to launch a competing kyphoplasty product.  Kyphon and Dr. Sandhu alleged, *inter alia*, that Medtronic's subsidiaries stole Dr. Sandhu's trade secrets relating to the treatment of vertebral compression fractures and, in violation of the patent laws, filed patent applications relating to Dr. Sandhu's trade secrets without naming Dr. Sandhu as an inventor.  (*See Sandhu and Kyphon Inc. v. Medtronic Sofamor Danek, Inc., et al.*, Civil Action No. 05-2863 (W.D. Tenn.).)

135.    On information and belief, the patent rights Kyphon alleged that Medtronic obtained embodying Dr. Sandhu's devices for the treatment of vertebral compression fractures include at least U.S. Patent No. 6,676,665.

136.    On information and belief, Kyphon also alleged that Medtronic violated the patent laws by filing at least two additional applications embodying Dr. Sandhu's devices for the treatment of vertebral compression fractures, namely U.S. Patent Application Serial No. 10/756,970 and U.S. Patent Application Serial No. 10/778,650 (now issued as United States Patent No. 7,641,664).

137.    On April 26, 2006, Kyphon and Dr. Sandhu amended their complaint against Medtronic's subsidiaries to add allegations of infringement of the '888 patent, the '404 patent, the '043 patent, United States Patent No. 6,440,138, and United States Patent No. 6,863,672.  (*See Sandhu and Kyphon, Inc. v. Medtronic Sofamor Danek, Inc., et al.*, Civil Action No. 05-2863 (W.D. Tenn).)

138.    CareFusion was aware of this litigation between Kyphon and Medtronic.

139.    During its litigation with Kyphon, Medtronic, through its subsidiaries, repeatedly admitted and alleged that the patents asserted by Kyphon were invalid.

140.    For example, on August 3, 2006, Medtronic, through its subsidiaries, answered Kyphon's Amended Complaint and stated the following:

**Twenty-Second Defense**

**(Invalidity of Kyphon's Patents)**

The Kyphon patents asserted against Medtronic, namely the '888, '404, '043, '138, and '672 patents are invalid because they fail to satisfy the requirements of 35 U.S.C. § 101, et seq., including, without limitation, sections 101, 102, 103, and 112.

(Ex. CC, Medtronic Answer to Amended Complaint at 18.)

141.    On April 12, 2007, Medtronic, through its subsidiaries, filed an Amended Answer to the Amended Complaint and again twice stated that the patents asserted by Kyphon were invalid:

**Twenty-Second Defense**

**(Invalidity of Kyphon's Patents)**

The Kyphon patents asserted against Medtronic, namely the '888, '404, '043, '138, and '672 patents are invalid because they fail to satisfy the requirements of 35 U.S.C. § 101, et seq., including, without limitation, sections 101, 102, 103, and 112.

84.    The claims of Kyphon's '888, '404, '138, '672, and '043 patents are invalid for failure to comply with one or more provisions of the Patent Laws of the United States, Title 35, United States Code, §§ 101 et seq., including without limitation Sections 101, 102, 103 and/or 112.

(Ex. K, Medtronic Amended Answer to Amended Complaint at 20 and 37.)

142.    In its April 12, 2007 Amended Answer to the Amended Complaint, Medtronic, through its subsidiaries, also included detailed allegations regarding its belief that the '888 and '404 patents were unenforceable due to inequitable conduct.  (*See id*. at ¶¶ 67-77.)

143.    In particular, Medtronic, through its subsidiaries, alleged and admitted that though the applicants were aware that vertebroplasty had been used in the prior art to treat vertebral compression fractures, the applicants intentionally misrepresented to the United States Patent and Trademark Office that the only known treatment for vertebral compression fractures was bed rest and aspirin:

**Seventh Counterclaim by MSD Inc., MSD USA, and SDGI**

**(Declaratory Judgment of Unenforceability Due to Inequitable Conduct)**

67.    MSD Inc., MSD USA, and SDGI reassert and incorporate by reference the allegations set forth in paragraphs 1-66 as though fully set forth herein.

68.     This Counterclaim is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 et seq.

69.     Kyphon filed suit against Medtronic and alleged in its Complaint that MSD Inc., MSD USA, and SDGI infringe United States Patent Nos. 4,969,888 ("the '888 patent"), 5,108,404 ("the '404 patent"), 6,235,043 ("the '043 patent"), 6,440,138 ("the '138 patent") and 6,863,672 ("the '672 patent").  MSD Inc., MSD USA, and SDGI now seek a declaration of unenforceability due to inequitable conduct as to the '888, '404, and '138 patents, and any applications or patents related thereto.

### United States Patent Application Serial No. 07/308,724 (the "'724 application")

70.     The '724 application was filed on February 9, 1989. The '724 application was pending at the United States Patent and Trademark Office (the "PTO") until its issuance, as the '888 patent, on November 13, 1990. The named inventors on the '724 application are Arie Scholten and Mark A. Reiley, and the prosecuting attorneys were the law firm of Townsend and Townsend. During the entirety of the time that the '724 application was pending before the PTO, all those substantively involved with the prosecution of the '724 application had a duty to disclose to the PTO information material to the patentability of one or more claims of the application.

71.     In the background section of the '724 application, the applicants stated that the only methods of treatment for vertebral compression fractures were bed rest and aspirin:

> Osteoporotic vertebral body compression fractures are currently treated with bed rest, analgesics, and intravenous hydration during the first week after onset of the problem. These steps are followed by the prescription of a soft or firm spinal corset, depending upon the physician's preference. In most cases, the corset is not worn because the patient suffers much discomfort and oftentimes greater discomfort than that due to the fracture of the vertebral body. The fracture pain lasts from two to eight months. In many cases, patients with osteoporotic vertebral body collapse fractures require about one week in an acute care hospital and two to three weeks in an extended care facility until they are able to move about independently and with only moderate pain. Current treatment does not substantially alter the conditions of the vertebral body.

*See* Prosecution History for the '724 Application filed on February 9, 1989 at Pg. 1, line 23 – Pg. 2, line 4. The applicants made this representation to the PTO despite having specific knowledge of other, more advanced medical procedures for the treatment of vertebral compression fractures.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

72.     Specifically, the applicants were aware, prior to filing the '724 application that a medical procedure known as vertebroplasty was being performed as a method of treatment of vertebral fractures. Vertebroplasty is a percutaneous procedure for fixation of vertebral fractures by the introduction of a bone filler, such as bone cement, by use of a needle. This procedure reads on elements of one or more of the claims of the '724 application.

73.     One or more of the inventors, and/or others substantively involved with the filing and prosecution of the '724 application, failed to disclose the inventors' knowledge of vertebroplasty to the PTO for consideration in the '724 patent application. Moreover, the inventors and/or others substantively involved with the filing and prosecution of the '724 application intentionally misrepresented the state of the prior art to the PTO. Vertebroplasty is material prior art to the claims of the '724 patent. In doing the aforesaid acts, one or more of the inventors, and/or others substantively involved with the filing and prosecution of the '724 application, violated the duty of disclosure and duty of candor, and did so with the intent to deceive the PTO as evidenced by the fact that those with a duty to disclose knew of the existence of this highly material art, yet failed to disclose it to the PTO and intentionally misrepresented the state of the art. This misrepresentation and failure to disclose material art renders the claims of the '888 patent, and all patents and patent applications related to the '724 application, unenforceable.

### United States Patent Application Serial No. 07/567,862 (the "'862 application")

74.     The '862 application was filed on August 15, 1990. The '862 application was pending at the PTO until its issuance, as the '404 patent, on April 28, 1992. The named inventors on the '862 application are Arie Scholten and Mark A. Reiley, and the prosecuting attorneys were the law firm of Townsend and Townsend. During the entirety of the time that the '862 application was pending before the PTO, all those substantively involved with the prosecution of the '862 application had a duty to disclose to the PTO information material to the patentability of one or more claims of the application.

75.     In the background section of the '862 application, the applicants stated that the only methods of treatment for vertebral compression fractures were bed rest and aspirin:

> Osteoporotic vertebral body compression fractures are currently treated with bed rest, analgesics, and intravenous hydration during the first week after onset of the problem. These steps are followed by the prescription of a soft or firm spinal corset, depending upon the physician's preference. In most cases, the corset is not worn because the patient suffers much discomfort and oftentimes greater discomfort than that due to the fracture of the vertebral body. The fracture pain lasts from two to eight months. In many cases, patients with osteoporotic vertebral body collapse fractures require about one week in an acute care hospital and two to three weeks in an extended care facility until they are able to move about independently and with only moderate pain. Current treatment does not substantially alter the conditions of the vertebral body.

*See* Prosecution History for the '862 Application filed on August 15, 1990, at Pg. 1, line 29 – Pg. 2, line 9. The applicants made this representation to the PTO despite having specific knowledge of other, more advanced medical procedures for the treatment of vertebral compression fractures.

76.     Specifically, the applicants were aware, prior to filing the '862 application that a medical procedure known as vertebroplasty was being performed as a method of treatment of vertebral fractures. Vertebroplasty is a procedure fixing vertebral fractures by the introduction of a bone filler such as bone cement. The procedure reads on elements of one or more of the claims in the '862 application.

77.     One or more of the inventors, and/or others substantively involved with the filing and prosecution of the '862 application failed to disclose the inventors' knowledge of vertebroplasty to the PTO for consideration in the '862 patent application. Moreover, the inventors and/or others substantively involved with the filing and prosecution of the '862 application intentionally misrepresented the state of the prior art to the PTO. In doing the aforesaid acts, one or more of the inventors, and/or others substantively involved with the filing and prosecution of the '862 application violated the duty of disclosure and duty of candor, and did so with the intent to deceive the PTO as evidenced by the fact that those with a duty to disclose knew of the existence of this highly material art, yet failed to disclose it to the PTO and intentionally misrepresented the state of the art. This misrepresentation and failure to disclose material art renders the claims of the '404 patent, and all patents and patent applications related to the '862 application, unenforceable.

144.    In addition to its answer and counterclaims alleging the invalidity and unenforceability of at least the '888 and '404 patents, on October 17, 2006, Medtronic, through its subsidiaries, also filed summary judgment motions asserting that certain claims of the '404 patent were invalid under 35 U.S.C. §§ 102 and 112.  (*See* Exs. DD and EE, Medtronic's Oct. 17, 2006 Motions For Summary Judgment.)

145.    On October 28, 2006, Medtronic, through its subsidiaries, filed yet another summary judgment motion again asserting that certain claims of the '404 patent were invalid under at least 35 U.S.C. § 102 in light of an additional prior art reference.  (*See* Ex. FF, Medtronic's Oct. 28, 2006 Motion For Summary Judgment.)

146.    Before the district court in the above-referenced litigation could issue a final ruling on the merits of Medtronic's invalidity and unenforceability claims, Medtronic acquired Kyphon for approximately $4 billion.  (*See supra* ¶ 113.)

**B.    Defendants Continued To Threaten Competition With Core Kyphoplasty Patents Even After Knowing They Were Invalid And Unenforceable**

147.    After acquiring Kyphon's patents, including patents that they knew to be invalid and/or unenforceable, Defendants embarked on multiple public threats to enforce their patent rights.

148.    For example, on July 2, 2006, Medtronic publicly stated that "Medtronic will go to court if necessary to enforce its patents."  (Ex. GG, Steve Hart, "Patent Protection: High-Tech Companies Battle To Defend Trade Secrets Key To Their Financial Success," Press Democrat, July 2, 2006.)

149.    On information and belief, Defendants' patent enforcement policy was publicized and well-known to any potential or current competitor.

150.    Specifically, CareFusion was aware of both Kyphon's previous aggressive litigation in the kyphoplasty space as well as Defendants' general aggressive patent enforcement policies.

151.    Despite Defendants' well-known policy of patent enforcement and Kyphon's well-known policy of enforcing its patents in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, after acquiring from Kyphon patent rights they knew to be invalid and/or unenforceable, Defendants failed to seek reexamination of, disclaim and/or dedicate to the public the acquired patents that they knew to be

invalid and unenforceable.   Specifically, though Medtronic, through its subsidiaries, repeatedly asserted during its prior litigation with Kyphon that, among others, the patents that covered the basic kyphoplasty procedure – namely, the '888 and '404 patents – were both invalid and unenforceable, Defendants never disclaimed or dedicated these patents to the public.

152.    Instead, as part of their anticompetitive, predatory, exclusionary, and/or inequitable scheme, Defendants continued to issue statements touting their robust patent enforcement policy.

153.    For example, in its Form 10-K Annual Report for the fiscal year ending on April 25, 2008, Medtronic publicly stated that Medtronic "rel[ies] on a combination of patents, trade secrets and nondisclosure and non-competition agreements to protect our proprietary intellectual property, and will continue to do so."  Medtronic also stated that Medtronic "intend[s] to defend against any threats to our intellectual property."  (Ex. HH, Medtronic Annual Report filed with the SEC at 34.)

154.    On May 20, 2008, in an Earnings Conference Call, Medtronic again reiterated its patent enforcement policy and specifically tied that patent enforcement policy to the intellectual property it acquired from Kyphon, e.g., kyphoplasty patents, including the '888 and '404 patents. Specifically, Medtronic stated that "Kyphon and Biologics helped to partially offset continued competitive pressures on our [Medtronic] core spinal products in the United States.  We remain committed to our strategy of raising the bar of competition….We also remain committed to enforcing our portfolio of intellectual property."  (Ex. II, Medtronic May 2008 Earnings Call at 3.)

155.    In addition to these public statements threatening enforcement of its patent rights, Defendants also took specific affirmative steps to protect their interest in patents that they had obtained from third parties, including the invalid and/or unenforceable patent rights they acquired from Kyphon.

156.    For example, as part of its $4 billion purchase of Kyphon, Medtronic Spine accepted assignments to third party patents, including patents they knew to be invalid and/or unenforceable (e.g., the '888 and '404 patents).  Medtronic Spine then took affirmative steps to ensure its ability to fully enforce these patents against competitors in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by recording its

assignments to the '888 and '404 patents, among others, with the United States Patent and Trademark Office on May 9, 2008.

157.   On June 9, 2008, Defendants took further affirmative steps to ensure that they could enforce these patents against competitors in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by recording with the United States Patent and Trademark Office assignments from Medtronic Spine of the '888 and '404 patents, among others, to Medtronic's subsidiary Kyphon SARL.

158.   Moreover, Defendants took further affirmative steps to enforce their patent rights by directly threatening CareFusion.

159.   In 2008, CareFusion was working with another company, Advanced Polymers Inc. ("API"), to produce a kyphoplasty balloon product for CareFusion.

160.   In July 2008, CareFusion employees met in person with API.

161.   During this July 2008 meeting, API informed CareFusion that Medtronic threatened that the kyphoplasty balloon device would allegedly infringe at least one kyphoplasty patent that Medtronic acquired from Kyphon.

162.   Defendants' policy of enforcing its patent rights (including patents acquired from third parties), Defendants' aggressive litigation history and Defendants' direct infringement threat to CareFusion's balloon kyphoplasty product supplier combined with Defendants' refusal to disclaim, dedicate to the public, or seek reexamination on patents they acquired yet knew to be invalid and/or unenforceable were part of the Defendants' anticompetitive, predatory, exclusionary, and/or inequitable scheme and had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by preventing others from entering those markets.

163.   For example, because of Defendants' litigious history, especially surrounding the '888 and '404 patents, and Defendants' threatened enforcement of its patent rights, CareFusion delayed the launch of its balloon kyphoplasty products until the '888 and '404 patents expired in 2009.  Had Defendants' disclaimed or dedicated to the public patent rights which it knew to be invalid and/or

unenforceable, CareFusion would have been able to launch its competitive kyphoplasty product at an earlier date.

### C.   CareFusion's Delayed Entry Into Kyphoplasty Due To Defendants' Threats

164.   Since approximately 2001-2002, CareFusion, or its predecessors, has sold bone cement delivery systems.

165.   Since approximately 2003-2004, CareFusion, or its predecessors, has sold bone cement.

166.   Since approximately 2005-2006, CareFusion, or its predecessors, has sold bone cement for vertebroplasty.

167.   Since approximately 2006-2007, CareFusion, or its predecessors, has sold bone cement delivery systems for vertebroplasty.

168.   In about 2008, CareFusion also was interested in expanding its position in the minimally invasive vertebral compression fracture treatment product market and/or entering the alternative kyphoplasty product market by developing a balloon kyphoplasty product.

169.   For example, in 2008 CareFusion worked with API to produce a kyphoplasty balloon product.  (*See supra* at ¶¶ 159-161.)

170.   CareFusion had an experienced sales force in the minimally invasive vertebral compression fracture treatment product market, marketing and regulatory personnel, and manufacturing capabilities several years before the expiration of the '888 and '404 patents, which made a potential balloon kyphoplasty product a natural good fit for CareFusion's business. CareFusion also had an existing bone cement product and bone cement delivery system that it was prepared to sell in conjunction with a potential balloon to enable CareFusion's products to be used for kyphoplasty procedures.

171.   In view of Defendants threats to enforce their kyphoplasty patents and threats to CareFusion's balloon kyphoplasty product supplier, Defendants' history of enforcing those patents, and their aggressive litigation patent enforcement policy, CareFusion was faced with the decision of either waiting to release a balloon kyphoplasty product (and losing sales it would have made during that lost time) or risking a patent infringement lawsuit brought by Defendants (and spending

1   potentially millions of dollars in defending against such a lawsuit, regardless of its lack of merit

2   and/or the invalidity of the subject patents).  Each of these decisions would have caused CareFusion

3   economic loss.  CareFusion therefore made a business decision to wait until after the '888 and '404

4   patents expired in February 2009 before launching its balloon kyphoplasty product.

5       172.   CareFusion was ready to enter the kyphoplasty market and would have entered that

6   market before the expiration of the '888 and '404 patents if Defendants had not threatened

7   enforcement of those patents and/or if Defendants had disclaimed or dedicated to the public those

8   patents.

9       173.   The '888 and '404 patents expired on February 9, 2009.

10      174.   On January 28, 2009, CareFusion applied for FDA approval of its 8 gauge Inflatable

11  Bone Tamp device for use in kyphoplasty.

12      175.   CareFusion initial's January 28, 2009 FDA application was strategically timed so that

13  CareFusion would receive FDA approval for its 8 gauge Inflatable Bone Tamp device after the '888

14  and '404 patents had expired.

15      176.   After the '888 and '404 patents expired, on July 1, 2009, CareFusion received FDA

16  approval for its 8 gauge Inflatable Bone Tamp device for use in kyphoplasty.

17      177.   After the '888 and '404 patents expired, CareFusion applied for FDA approval of its

18  10 gauge Inflatable Bone Tamp device for use in kyphoplasty.

19      178.   On February 23, 2010, CareFusion received FDA approval for its 10 gauge Inflatable

20  Bone Tamp device for use in kyphoplasty.

21      179.   Because Medtronic knew that the '888 and '404 patents were invalid and/or

22  unenforceable, CareFusion should not have had to wait until the expiration of those patents to launch

23  its kyphoplasty products.

24      180.   On March 13-18, 2010, the Society of Interventional Radiology hosted the 35th Annual

25  Scientific meeting in Tampa, Florida.   CareFusion's AVA*max*[TM] balloon kyphoplasty products were

26  marketed, displayed and/or demonstrated at the meeting.

27

28

181.    As of the date of the original Complaint and continuing to the present day, CareFusion has manufactured, at its facilities in the United States, the AVA*max*^TM balloon kyphoplasty products in preparation for both its launch and continual sales of those products.

182.    By at least April 2010, CareFusion initiated a limited release of AVA*max*^TM balloon kyphoplasty products.

183.    CareFusion announced a full market release of its AVA*max*^TM balloon kyphoplasty products on August 26, 2010.

### IV.    After CareFusion Announces The Release Of Its Kyphoplasty Products, Defendants Threatened Litigation On Other Kyphoplasty Patents

184.    After CareFusion received FDA approval for its 8 gauge balloon kyphoplasty product and/or after it announced its intention to launch a balloon kyphoplasty line of products in or around April 2010, Defendants issued numerous threatening statements directed towards CareFusion as part of Defendants' scheme to eliminate competitors, including specifically CareFusion, in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

185.    On August 25, 2009, Medtronic held an Earnings Conference Call.  During that conference call, Medtronic's Chairman & CEO, Bill Hawkins, announced that "Medtronic has and will vigorously defend its intellectual property rights in all of our markets, **including balloon kyphoplasty**."  (Ex. JJ, Medtronic Aug. 25, 2009, Earnings Conference Call at 3 (emphasis added).)

186.    On information and belief, these rights include, among others, patents obtained from third parties, including rights acquired by Defendants upon Medtronic's acquisition of Kyphon.

187.    On information and belief, as part of Defendants' scheme to eliminate competition and increase and/or maintain its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, Defendants anticipated and intended that CareFusion and others would become aware of the threatening statements made by Medtronic CEO Bill Hawkins.

188.    On February 9, 2010, CareFusion held an earnings conference call.  During that conference call, CareFusion's Chairman & Chief Executive Officer, David Schlotterbeck, announced that CareFusion planned to expand its minimally invasive vertebral compression fracture treatment

product line by launching a line of balloon kyphoplasty products in April 2010.  (Ex. KK, CareFusion Feb. 9, 2010 Earnings Conference Call at 7.)

189.    That same day, in light of CareFusion's announcement, David Lewis and Ryan Bachman, analysts for Morgan Stanley who cover the medical device industry including Defendants, contacted CareFusion.  (*See* Ex. LL at Feb. 9, 2010 email from Bachman to Borkowski.)

190.    On information and belief, the communication from the Morgan Stanley analysts relied on information provided at least in part by Defendants as part of Defendants' scheme to eliminate CareFusion as a competitor in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

191.    After contacting CareFusion, the Morgan Stanley analysts sent an electronic mail message to CareFusion and specifically identified six patents, namely the '888, '404, '043, '734, '110 and '054 patents, as threats to CareFusion's then imminent product launch.  (*See id.*)

192.    On information and belief, Defendants anticipated and intended that CareFusion and others would become aware of the threatening statements made by Defendants to the analyst community, including the Morgan Stanley analysts, and were made as part of the Defendants' scheme to eliminate CareFusion as a competitor in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

193.    Several analyst reports were also published in light of CareFusion's product launch announcement.

194.    For example, on February 9, 2010, William Blair & Co. published a report, attached hereto as Exhibit MM, entitled "CareFusion Corporation: Raising Estimates Off Strong Fiscal Second Quarter; See Further Upside."

195.    Among other things, that report stated that "[c]oncerns related to Medtronic's…intellectual property (acquired with Kyphon) will remain a hot-button issue, but management is focusing on the main patent that expires this month, and suggesting that its product does not infringe the company's other patents.  We cannot judge that statement at this point, but would not be surprised if Medtronic came out aggressively against the numerous players targeting

this market, so the potential for some litigation expense is relatively high, in our view." (Ex. MM at 3.) On information and belief, Defendants did nothing to discourage or retract these statements.

196.    On February 10, 2010, several more analyst reports and news articles were also published in light of CareFusion's product launch announcement.

197.    For example, on February 10, 2010, the Dow Jones Newswires published an article, attached hereto as Exhibit NN, entitled "CareFusion to Challenge Medtronic in Spine-Repair Market."

198.    On information and belief, the article published by Dow Jones Newswires relied on information provided in pertinent part by Defendants as part of their scheme to eliminate CareFusion as a competitor in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

199.    Among other things, the Dow Jones Newswires article stated that "Medtronic…noted in a statement Wednesday that it is the 'only company with a commercially available product in the U.S. for this procedure [balloon kyphoplasty] and the only company with level-one evidence to support the technology." (Ex. NN.) The Dow Jones Newswires article further stated that "the company [Medtronic] said it 'has and will vigorously defend its intellectual property rights in all of our markets, **including Balloon Kyphoplasty**.'" (*Id.* (emphasis added).)

200.    On information and belief, Defendants anticipated and intended that CareFusion and others would become aware of the threatening statements made by Defendants to the Dow Jones Newswire and were made as part of the Defendants' scheme to eliminate CareFusion as a competitor in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty market.

201.    Also on February 10, 2010, J.P. Morgan published an alert, attached hereto as Exhibit OO, entitled "CareFusion Wants In; New Competitor in Kyphoplasty."

202.    Among other things, the alert stated that:

- **"On Tuesday's call, CareFusion appeared unfazed by potential hurdles on the IP front.** Recall that Kyphon defended its intellectual property aggressively prior to its acquisition by Medtronic, securing a preliminary

1  injunction against Disc-O-Tech in 2005 that led to the withdrawal of Disc-O-

2  Tech's Sky Bone Expander from the US market."

3  •  "**We expect Medtronic to initiate legal action once CareFusion moves**

4  **definitely to launch its product domestically.**"

5  (Ex. OO at 1 (emphasis in original).)  On information and belief, Defendants did nothing to

6  discourage or retract these statements.

7  203.  Also on February 10, 2010, Deutsche Bank published an alert, attached hereto as

8  Exhibit PP, entitled "A shot across Kyphon's bow."

9  204.  Among other things, the alert stated that "[w]e believe that MDT's [Medtronic] IP

10  surrounding this technology is strong with multiple patents and, given the importance of this product,

11  would expect a vigorous defend of its IP."  (Ex. PP.)  On information and belief, Medtronic did

12  nothing to discourage or retract these statements.

13  205.  On February 10, 2010, Deutsch Bank also published a report, attached hereto as

14  Exhibit QQ, entitled "CareFusion Corporation: Solid quarter but valuation remains lofty."

15  206.  Among other things, that report stated that "[w]e anticipate a significant patent

16  disagreement with MDT [Medtronic], as CFN [CareFusion] indicated on the call that it believes the

17  main patents have expired, and MDT will likely contend differently."  (Ex. QQ at 2.)  On information

18  and belief, Defendants did nothing to discourage or retract these statements.

19  207.  J.P. Morgan also published a report on February 10, 2010, attached hereto as Exhibit

20  RR, entitled "CareFusion: Solid Sales, Soft Gross Margin in F2Q'10."

21  208.  Among other things, that report stated that "[o]nce CFN [CareFusion] nears official

22  launch, we anticipate legal action from Medtronic, and Kyphon reps will likely use the litigation

23  overhang, along with the lack of published clinical data, as selling points against AVAmax."  (Ex.

24  RR at 2.)  On information and belief, Defendants did nothing to discourage or retract these

25  statements.

26  209.  On February 15, 2010, the Gray Sheet published an article, attached hereto as Exhibit

27  SS, indicating that J.P. Morgan Analyst Michael Weinstein "expects Medtronic to initiate legal action

28

[against CareFusion] closer to U.S. launch [*i.e.*, April 2010]."  On information and belief, Defendants did nothing to discourage or retract these statements.

210.    On February 23, 2010, Medtronic held another earnings conference call.  During that conference call Medtronic's Chairman & CEO, Bill Hawkins, announced that "[f]inally, on Kyphon. Work continues.  In regard to a recent announcement of a potential new US competitor, we are very confident in our current family of BKP [balloon kyphoplasty] intellectual property and the protection it gives our innovative products.  We will vigorously defend it against any competitive product that infringes on our technology."  (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 4.)

211.    On information and belief, the "potential new US competitor" referenced by Medtronic CEO Bill Hawkins was CareFusion.

212.    During that same earnings conference call, in response to an analyst's question regarding possible litigation against new competitors in the minimally invasive vertebral compression fracture treatment product market or in the alternative kyphoplasty product market, Medtronic CEO Bill Hawkins reiterated that "we first of all are very confident in the strength of our IP and as I said, we will vigorously defend and assert our IP against any of those that we have reason to believe are infringing our intellectual property.  We have a number of patents which protect that space that we really have, if you will, brought to market and developed."  (*Id*. at 15.)

213.    On information and belief, the "competitors" that the analyst and Medtronic CEO Bill Hawkins were referring to included CareFusion.

214.    On information and belief, as part of Defendants' scheme to eliminate CareFusion as a competitor in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, Defendants anticipated and intended that CareFusion and others would become aware of the threatening statements made by Medtronic CEO Bill Hawkins.

215.    In fact, others did become aware of Medtronic CEO Bill Hawkins threatening statements and interpreted them as a threat of legal action against CareFusion.

216.    For example, on February 24, 2010 (the day after Medtronic CEO Bill Hawkins made his public threatening statements), Credit Suisse published a report, attached hereto as Exhibit UU, entitled "Time to Take MDT Out of the Penalty Box."

217.    Among other things, the report stated that "[i]n regards to the entrance of CareFusion into the kyphoplasty market, Medtronic is confident in its intellectual property and indicated it will 'vigorously' defend against any competitor products that infringe on its patents.  (CareFusion, expect to be 'served'.)."  (Ex. UU at 6.)  On information and belief, Defendants did nothing to discourage or retract these statements.

218.    Also, on March 1, 2010, the Gray Sheet published an article, attached hereto as Exhibit VV, entitled "Medtronic Spine Sales Down In Fiscal Q3, But Firm Expects A Rebound In 2011," also interpreting Medtronic CEO Bill Hawkins' February 23, 2010 public threatening statements as threat of legal action.

219.    Among other things, the Gray Sheet article stated that "Hawkins suggested Medtronic will consider legal action to keep the new device off the market.  'We are very confident in our current family of [balloon kyphoplasty] intellectual property,' he said.  'We will vigorously defend it against any competitor product that infringes our technology."  (Ex. VV at 1.)

## V.    Defendants Attacked CareFusion's Product Launch With A Widespread False and Misleading Marketing, Advertising and/or Promotional Campaign

220.    After CareFusion launched its kyphoplasty products, Defendants' began a widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements in interstate commerce regarding CareFusion's kyphoplasty products as part of Defendants' scheme to eliminate competitors, and specifically CareFusion, and to increase and/or maintain its monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

221.    As part of its marketing, advertising and/or promotional campaign, since at least July 2010 and continuing to the present day Defendants' sales representatives have disseminated to CareFusion's prospective kyphoplasty customers numerous false and misleading statements regarding CareFusion's kyphoplasty products.

222.    These false and misleading statements have been made by Defendants' sales representatives to numerous hospitals and doctors across the country through, on information and belief, email distribution, phone calls, in-person solicitations, and other materials and means.

223.    On information and belief, the use of email distribution, phone calls, in-person solicitations by sales representatives, and other materials and means are typical ways in which minimally invasive vertebral compression fracture treatment products are advertised or promoted to consumers, namely to hospitals and doctors.

224.    These false and misleading statements, which have been disseminated to numerous prospective customers include at least the following:

A.    Defendants' sales representatives have disseminated false and misleading statements regarding the failure rate of the balloons used in CareFusion's kyphoplasty products. Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons have a failure rate of 50%. This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products. In CareFusion's premarket release, CareFusion's balloons had a rupture rate of approximately 1.4% not 50%. Moreover, the rupture rate of CareFusion's balloons is significantly lower than reported rupture rates of Defendants' balloons which, on information and belief, have a rupture rate of over 6% (i.e., over four times the rupture rate of CareFusion's kyphoplasty balloons). (Ex. WW, "Balloon-Related Complications and Technical Failures in Kyphoplasty for Vertebral Fractures" at 175-76.)

B.    Defendants' sales representatives have disseminated other false and misleading statements regarding the balloons used in CareFusion's kyphoplasty products. Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons usually will rupture if the pressure exceeds 200 psi. This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products. CareFusion's balloons are designed to be used and are used at pressures of up to 400 psi.

C.    Defendants' sales representatives have also disseminated false and misleading statements regarding the approved use of CareFusion's kyphoplasty products. Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's kyphoplasty products were approved by the FDA to only be used in a unipedicular manner, not

a bipedicular manner like Defendants' products. This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products. The FDA has stated that it is the physician's responsibility to determine the surgical approach to be used with CareFusion's kyphoplasty products. As such, the FDA approved CareFusion's kyphoplasty products for use in the reduction and fixation of fractures in cancellous bone in the spine for kyphoplasty. This approved indication for use is substantially identical to the approved indication of use Defendants received from the FDA for their kyphoplasty products which they advertise can be used in a bipedicular manner. Accordingly, the physician, not the FDA, determines if the reduction and fixation is done in unipedicular or bipedicular manner.

D. Defendants' sales representatives have disseminated other false and misleading statements regarding the use of CareFusion's kyphoplasty products. Specifically, Defendants' sales representatives have informed prospective customers that doctors cannot use CareFusion's kyphoplasty products in a bipedicular manner because doing so will result in patent infringement. This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products. Title 35 Section 287(c) provides immunity to patent infringement for "a medical practitioner's performance, of a medical activity that constitutes an infringement under section 271 (a) or (b)...."

225. On information and belief, the false and misleading statements disseminated by Defendants are part of an organized and widespread marketing, advertising and/or promotional campaign aimed at, among other things, eliminating CareFusion as a competitor in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

226. On information and belief, these numerous false and misleading statements are being made by Defendants' sales representatives, many of whom have for years cultivated relationships with the hospitals and doctors who have received Defendants' false and misleading statements. Consequently, on information and belief, these hospitals and doctors inherently trust Defendants'

1  sales representatives, and thus inherently believe the false and misleading statements disseminated by

2  Defendants' sales representatives.

3       227.   Information regarding, for example, the rupture rates of CareFusion's balloons, the

4  pressure CareFusion's balloons are capable of withstanding, the approved use of CareFusion's

5  kyphoplasty products and alleged liability for patent infringement if CareFusion's kyphoplasty

6  products are used in a certain manner, are material to a customer's decision to purchase CareFusion's

7  kyphoplasty products.  Specifically, certain hospitals and doctors have cited Defendants' false and

8  misleading statements as reasons for not purchasing CareFusion's kyphoplasty products.

9       228.   Defendants' widespread dissemination of the false and misleading statements

10  regarding CareFusion's kyphoplasty products has and will continue to negatively impact

11  CareFusion's ability to make sales of its kyphoplasty products.

12       229.   For example, Defendants' widespread dissemination of false and misleading

13  statements regarding CareFusion's kyphoplasty products has and will continue to cause CareFusion

14  to lose prospective customers, sales, and profits.

15       230.   Defendants' widespread dissemination of false and misleading statements regarding

16  CareFusion's kyphoplasty products also has and will continue to cause CareFusion to spend

17  significant time and resources correcting the misperceptions Defendants' false and misleading

18  statements are creating and will continue to create in the marketplace.

19       231.   Defendants' widespread dissemination of false and misleading statements regarding

20  CareFusion's kyphoplasty products also has and will continue to harm competition as a whole in the

21  minimally invasive vertebral compression fracture treatment market and/or the alternative

22  kyphoplasty market.  Defendants' actions have reduced consumer choice in the market by reducing

23  the availability of CareFusion's competing product and have maintained Defendants' monopoly

24  advantage in the market.

25       232.   Defendants' widespread dissemination of false and misleading statements regarding

26  CareFusion's kyphoplasty produces also has and will continue to increase and/or maintain the

27  Defendants monopoly in the minimally invasive vertebral compression fracture treatment product

28  market and the alternative kyphoplasty market.

## COUNT I
## MONOPOLIZATION UNDER 15 U.S.C. § 2: ILLEGAL MEDICARE MARKETING SCHEME

233.    CareFusion incorporates by reference the allegations in paragraphs 1 – 232 above, as if fully alleged herein.

234.    Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have acquired and maintained a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

235.    Defendants possess monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  On information and belief, Defendants obtained and continue to maintain approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market.    And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the alternative kyphoplasty product market.  The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

236.    Defendants have willfully acquired and maintained their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the multiple acts of anticompetitive, predatory, exclusionary, and/or inequitable conduct as outlined above.

237.    Specifically, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct includes but it is not limited to Kyphon's illegal Medicare marketing scheme.

238.    In or about 2000 or 2001 and continuing on information and belief to approximately May 2008, in order to break into the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market, Kyphon embarked on a years-long illegal marketing scheme in which Kyphon convinced certain hospitals and doctors to purchase and use its kyphoplasty products by inducing those hospitals and doctors to unnecessarily and improperly keep kyphoplasty patients in the hospital overnight in order to get doctors and/or hospitals to use kyphoplasty instead of vertebroplasty because it would drastically increase the reimbursement received by the hospitals and/or doctors from Medicare.

239.    For example, in order to at least break-even on the performance of a kyphoplasty procedure, the Medicare reimbursement had to at least cover the approximately $4,000 price of Kyphon's kyphoplasty product.

240.    The outpatient Medicare reimbursement rate to hospital, the entity usually purchasing the products used in surgical procedures, for an outpatient procedure in 2006 was only approximately less than $2,600.  If a patient is kept overnight, however, the reimbursement to the hospital increased in 2006 to approximately $10,000.

241.    Accordingly, to entice certain hospitals and doctors to use its kyphoplasty products instead of vertebroplasty products, including CareFusion's vertebroplasty products, Kyphon convinced those hospitals and doctors to unnecessarily and improperly keep patients receiving the kyphoplasty procedure overnight, even though kyphoplasty is typically done on an outpatient basis, so that the hospital and doctors could receive higher reimbursement payments from Medicare, and in turn increase their profit margins.

242.    On information and belief, Kyphon's illegal Medicare marketing scheme defrauded the United States government and consumers of millions of dollars.

243.    On information and belief, Kyphon's illegal Medicare marketing scheme facilitated Kyphon's acquisition of a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Specifically, had Kyphon not carried out its illegal Medicare marketing scheme, hospitals and doctors would not have purchased Kyphon's products because Medicare would not have provided the hospitals and doctors with a reimbursement that would cover the price of the Kyphon's kyphoplasty product.  Instead hospitals and doctors would have purchased vertebroplasty products, including CareFusion's vertebroplasty products.

244.    On information and belief, as outlined above, Defendants' illegal Medicare marketing scheme facilitated the growth and maintenance of Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market from less than 50% of the market share in 2000 to over at least 85% of the market share in 2007.

245.   On information and belief, Kyphon's illegal Medicare marketing scheme also facilitated Defendants' maintaining a monopoly in the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.   Specifically, Kyphon's years-long illegal Medicare marketing scheme incentivized hospitals and doctors to continue purchasing Kyphon's kyphoplasty products because doing so increased their profit margins.

246.   Accordingly, on information and belief, Kyphon's illegal Medicare marketing scheme has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

247.   Defendants' actions, including Kyphon's illegal Medicare marketing scheme, had no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

248.   Because market entry conditions are so high, Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market will continue for years even though Defendants have allegedly ceased the illegal Medicare marketing scheme.

249.   On information and belief, Defendants have engaged in this anticompetitive, predatory, exclusionary, and/or inequitable conduct with the intention of maintaining and/or further increasing their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

250.   Kyphon's illegal Medicare marketing scheme has harmed consumers because it has defrauded the United States government and consumers of millions of dollars, and decreased consumer choice between vertebroplasty products (including CareFusion's vertebroplasty products) and Defendants' kyphoplasty products.

251.   Kyphon's illegal Medicare marketing scheme will also continue to harm consumers because Kyphon's illegal Medicare marketing scheme has led to Defendants' charging and continuing to charge artificially-high prices for its kyphoplasty products.

252.   CareFusion was competing in the minimally invasive vertebral compression fracture treatment product market while Kyphon's illegal Medicare marketing scheme was on-going by, for example, selling vertebroplasty products.  CareFusion has sold a vertebroplasty delivery system since about 2006.  On information and belief, Kyphon's illegal Medicare marketing scheme continued until at least May 2008, when Defendants settled allegations of Medicare fraud with the Justice Department.

253.   Kyphon's illegal Medicare marketing scheme directly harmed competition from about 2000 or 2001 until at least May 2008, and in particular harmed CareFusion from about 2006 to at least May 2008 in the sales of vertebroplasty products.  Because of Kyphon's illegal Medicare marketing scheme, on information and belief, numerous hospitals and doctors chose to purchase Defendants' kyphoplasty products instead of competing vertebroplasty products (including specifically CareFusion's vertebroplasty products) in order to increase their reimbursement rates from Medicare, and in turn their overall profits.  Because hospitals and doctors could increase their Medicare reimbursements, and thus their profits, by engaging in Kyphon's illegal Medicare marketing scheme, competitors, like CareFusion lost sales of their vertebroplasty products because vertebroplasty products generated less Medicare reimbursements, and in turn less profits, for the hospitals and doctors.  Hospitals and doctors using vertebroplasty products, sold by for example CareFusion, could not receive the same profit margin as those using Kyphon's kyphoplasty products unless the competitors, like CareFusion, also engaged in Kyphon's illegal Medicare marketing scheme (e.g., unless competitors, like CareFusion, illegally encouraged the hospitals and doctors to unnecessarily keep patients receiving vertebroplasty overnight in order to generate the significantly higher inpatient Medicare reimbursements).

254.   Kyphon's illegal Medicare marketing scheme has also had a continuing and lingering harmful effect on competition since 2008 through the present.  For example, Kyphon's illegal Medicare marketing scheme continues to harm competition, including CareFusion, by forcing competitors to charge lower prices for kyphoplasty products.  CareFusion has sold a kyphoplasty product since about April 2010.  On information and belief, because of Kyphon's years-long illegal Medicare marketing scheme, numerous hospitals and doctors still expect to maintain substantially the

same profit margin per procedure as they received under Kyphon's past illegal Medicare marketing scheme. Competitors, like CareFusion, have therefore had to adjust the prices of their newly-launched kyphoplasty products downward in order to meet inflated hospital and doctor expectations created by Kyphon's illegal Medicare marketing scheme. CareFusion, therefore, makes less profit on its kyphoplasty products than it would have made if Defendants had not engaged in their illegal Medicare marketing scheme. In addition, Kyphon's illegal Medicare marketing scheme continues to harm competition because it existed for so many years that doctors and hospitals became entrenched with using Defendants' kyphoplasty products, and it has enabled Defendants to grow a larger sales force and develop a larger clinical history. Further, on information and belief, some doctors may continue to be misled by Kyphon's prior false statements in support of its illegal Medicare marketing scheme, and may continue to unnecessarily perform kyphoplasty as an in-patient procedure. Also, because it is easier to sell CareFusion's kyphoplasty products to customers who already use its vertebroplasty products, CareFusion's lost vertebroplasty contracts due to Kyphon's illegal Medicare marketing scheme have inhibited and decreased CareFusion's sales of kyphoplasty products.

255. The harm suffered by CareFusion is the direct and intended result of Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically, Kyphon's illegal Medicare marketing scheme.

## COUNT II
### ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2:
### ILLEGAL MEDICARE MARKETING SCHEME

256. CareFusion incorporates by reference the allegations in paragraphs 1 – 255 above, as if fully alleged herein.

257. Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have and are attempting to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

258. On information and belief, Defendants obtained and continue to maintain market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. For example, on information and belief, Defendants obtained and continue to maintain approximately an 85% or more market share in the minimally

invasive vertebral compression fracture treatment product market.   And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the alternative kyphoplasty product market.   The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

259.   On information and belief, Defendants have acted with the specific intent to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the anticompetitive, predatory, exclusionary, and/or inequitable conduct outlined above.

260.   Specifically, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct includes but it is not limited to Kyphon's illegal Medicare marketing scheme.

261.   In or about 2000 or 2001 and continuing on information and belief to approximately May 2008, in order to break into the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market, Kyphon embarked on a years-long illegal marketing scheme in which Kyphon convinced certain hospitals and doctors to purchase and use its kyphoplasty products by inducing those hospitals and doctors to unnecessarily and improperly keep kyphoplasty patients in the hospital overnight in order to get doctors and/or hospitals to use kyphoplasty instead of vertebroplasty because it would drastically increase the reimbursement received by the hospitals and/or doctors from Medicare.

262.   For example, in order to at least break-even on the performance of a kyphoplasty procedure, the Medicare reimbursement had to at least cover the approximately $4,000 price of Kyphon's kyphoplasty product.

263.   The outpatient Medicare reimbursement rate to hospital, the entity usually purchasing the products used in surgical procedures, for an outpatient procedure in 2006 was only approximately less than $2,600.  If a patient is kept overnight, however, the reimbursement to the hospital increased in 2006 to approximately $10,000.

264.   Accordingly, to entice certain hospitals and doctors to use its kyphoplasty products instead of vertebroplasty products, including CareFusion's vertebroplasty products, Kyphon convinced those hospitals and doctors to unnecessarily and improperly keep patients receiving the

kyphoplasty procedure overnight, even though kyphoplasty is typically done on an outpatient basis, so that the hospital and doctors could receive higher reimbursement payments from Medicare, and in turn increase their profit margins.

265.   On information and belief, Kyphon's illegal Medicare marketing scheme defrauded the United States government of millions of dollars.

266.   On information and belief, Kyphon's illegal Medicare marketing scheme facilitated Kyphon's attempt to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Specifically, had Kyphon not carried out its illegal Medicare marketing scheme, hospitals and doctors would not have purchased Kyphon's products because Medicare would not have provided the hospitals and doctors with a reimbursement that would cover the price of the Kyphon's kyphoplasty product.  Instead hospitals and doctors would have purchased vertebroplasty products, including CareFusion's vertebroplasty products.

267.   On information and belief, as outlined above, Defendants' illegal Medicare marketing scheme facilitated the growth and maintenance of Defendants' market power in the minimally invasive vertebral compression fracture treatment product market from less than 50% of the market share in 2000 to over at least 85% of the market share in 2007.

268.   On information and belief, Kyphon's illegal Medicare marketing scheme also facilitated Defendants' maintaining market power in the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.  Specifically, Kyphon's years-long illegal Medicare marketing scheme incentivized hospitals and doctors to continue purchasing Kyphon's kyphoplasty products because doing so increased their profit margins.

269.   Accordingly, on information and belief, Kyphon's illegal Medicare marketing scheme has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

270.    Defendants' actions, including Kyphon's illegal Medicare marketing scheme, had no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

271.    Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, including, Kyphon's illegal Medicare marketing scheme, gives rise to the dangerous probability that Defendants will succeed in their attempt to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

272.    Specifically, though Defendants have allegedly ceased their illegal Medicare marketing scheme, the illegal Medicare marketing scheme allowed Kyphon to entrench their kyphoplasty products in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Because market entry conditions are so high, Defendants' entrenchment of their products in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market will prevent and/or limit the ability of competitors to enter the aforementioned markets.

273.    Kyphon's illegal Medicare marketing scheme has harmed consumers because it has defrauded the United States government and consumers of millions of dollars.

274.    Kyphon's illegal Medicare marketing scheme will also continue to harm consumers because Kyphon's illegal Medicare marketing scheme has led to Defendants' charging and continuing to charge artificially-high prices for its kyphoplasty products.

275.    CareFusion was competing in the minimally invasive vertebral compression fracture treatment product market while Kyphon's illegal Medicare marketing scheme was on-going by, for example, selling vertebroplasty products.  CareFusion has sold vertebroplasty delivery systems since about 2006.  On information and belief, Defendants' illegal Medicare marketing scheme continued until on information and belief at least May 2008, when Defendants settled allegations of Medicare fraud with the Justice Department.

276.    Kyphon's illegal Medicare marketing scheme directly harmed competition from about 2000 or 2001 until at least May 2008, and in particular harmed CareFusion from about 2006 to at least May 2008.  Because of Kyphon's illegal Medicare marketing scheme, on information and belief,

numerous hospitals and doctors chose to purchase Defendants' kyphoplasty products instead of competing vertebroplasty products (including specifically CareFusion's vertebroplasty products) in order to increase their reimbursement rates from Medicare, and in turn their overall profits.  Because hospitals and doctors could increase their Medicare reimbursements, and thus their profits, by engaging in Kyphon's illegal Medicare marketing scheme, competitors like CareFusion lost sales of their vertebroplasty products because vertebroplasty products generated less Medicare reimbursements, and in turn less profits, for the hospitals and doctors.  Hospitals and doctors using vertebroplasty products, sold by for example CareFusion, could not receive the same profit margin as those using Kyphon's kyphoplasty products unless the competitors, like CareFusion, also engaged in Kyphon's illegal Medicare marketing scheme (e.g., unless competitors, like CareFusion, illegally encouraged the hospitals and doctors to unnecessarily keep patients receiving vertebroplasty overnight in order to generate the significantly higher inpatient Medicare reimbursements).

277.  Kyphon's illegal Medicare marketing scheme has also had a continuing and lingering harmful effect on competition since 2008 through the present.  For example, Kyphon's illegal Medicare marketing scheme continues to harm competition, including CareFusion, by forcing competitors to charge lower prices for kyphoplasty products.  CareFusion has sold a kyphoplasty product since about April 2010.  On information and belief, because of Kyphon's years-long illegal Medicare marketing scheme, numerous hospitals and doctors still expect to maintain substantially the same profit margin per procedure as they received under Kyphon's past illegal Medicare marketing scheme.  Competitors, like CareFusion, have therefore had to adjust the prices of their newly-launched kyphoplasty products downward in order to meet inflated hospital and doctor expectations created by Kyphon's illegal Medicare marketing scheme.  CareFusion, therefore, makes less profit on its kyphoplasty products than it would have made if Defendants had not engaged in their illegal Medicare marketing scheme.  In addition, Kyphon's illegal Medicare marketing scheme continues to harm competition because it existed for so many years that doctors and hospitals became entrenched with using Defendants' kyphoplasty products, and it has enabled Defendants to grow a larger sales force and develop a larger clinical history.  Further, on information and belief, some doctors may

continue to be misled by Kyphon's prior false statements in support of its illegal Medicare marketing scheme, and may continue to unnecessarily perform kyphoplasty as an in-patient procedure.

278.    The harm suffered by CareFusion is the direct and intended result of Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically, Kyphon's illegal Medicare marketing scheme.

### COUNT III
### MONOPOLIZATION UNDER 15 U.S.C. § 2: FALSE AND DECEPTIVE ADVERTISING

279.    CareFusion incorporates by reference the allegations in paragraphs 1 – 278 above, as if fully alleged herein.

280.    Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have acquired and maintained a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

281.    Defendants possess monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  On information and belief, Defendants obtained and continue to maintain approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market.    And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the alternative kyphoplasty product market.  The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

282.    Defendants have willfully acquired and maintained their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the multiple acts of anticompetitive, predatory, exclusionary, and/or inequitable conduct as outlined above.

283.    Specifically, since at least July 2010, shortly after CareFusion announced the launch of its kyphoplasty products, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct has included but it is not limited to Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products.

284.   Defendants' marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has been continuous and on-going since shortly after CareFusion's announced launch of its kyphoplasty products in April 2010 and is continuing to the present day.

285.   Defendants' widespread marketing, advertising and/or promotional campaign of disseminating false and misleading statements regarding CareFusion's kyphoplasty products has been conducted as part of Defendants' scheme to eliminate competitors, and specifically CareFusion, and to increase and/or maintain its monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.   Specifically, Defendants' marketing, advertising and/or promotional campaign of disseminating false and misleading statements regarding CareFusion's kyphoplasty products has prevented CareFusion from making sales of its kyphoplasty products, which in turn has increased Defendants' kyphoplasty product sales and has allowed Defendants to maintain their monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty market.

286.   These false and misleading statements, which have been disseminated to numerous prospective kyphoplasty customers across the country include at least the following:

A.   Defendants' sales representatives have disseminated false and misleading statements regarding the failure rate of the balloons used in CareFusion's kyphoplasty products.   Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons have a failure rate of 50%.  This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.   In CareFusion's premarket release, CareFusion's balloons had a rupture rate of approximately 1.4% not 50%.  Moreover, the rupture rate of CareFusion's balloons is significantly lower than reported rupture rates of Defendants' balloons which, on information and belief, have a rupture rate of over 6% (i.e., more than 4 times greater than the rupture rate of CareFusion's balloons).  (Ex. WW, "Balloon-Related Complications and Technical Failures in Kyphoplasty for Vertebral Fractures" at 175-76.)

1      B.      Defendants' sales representatives have disseminated other false and misleading

2 statements regarding the balloons used in CareFusion's kyphoplasty products. Specifically,

3 Defendants' sales representatives have informed prospective customers that CareFusion's

4 balloons usually will rupture if the pressure exceeds 200 psi. This statement is a false and

5 misleading factual description and/or representation of the nature, characteristics and qualities

6 of CareFusion's kyphoplasty products. CareFusion's balloons are designed to be used and are

7 used at pressures of up to 400 psi.

8      C.      Defendants' sales representatives have also disseminated false and misleading

9 statements regarding the approved use of CareFusion's kyphoplasty products. Specifically,

10 Defendants' sales representatives have informed prospective customers that CareFusion's

11 kyphoplasty products were approved by the FDA to only be used in a unipedicular manner,

12 not a bipedicular manner like Defendants' products. This statement is a false and misleading

13 factual description and/or representation of the nature, characteristics and qualities of

14 CareFusion's kyphoplasty products. The FDA has stated that it is the physician's

15 responsibility to determine the surgical approach to be used with CareFusion's kyphoplasty

16 products. As such, the FDA approved CareFusion's kyphoplasty products for use in the

17 reduction and fixation of fractures in cancellous bone in the spine for kyphoplasty. This

18 approved indication for use is substantially identical to the approved indication of use

19 Defendants' received from the FDA for their kyphoplasty products which they advertise can

20 be used in a bipedicular manner. Accordingly, the physician, not the FDA, determines if the

21 reduction and fixation is done in unipedicular or bipedicular manner.

22      D.      Defendants' sales representatives have disseminated other false and misleading

23 statements regarding the use of CareFusion's kyphoplasty products. Specifically, Defendants'

24 sales representatives have informed prospective customers that doctors cannot use

25 CareFusion's kyphoplasty products in a bipedicular manner because doing so will result in

26 patent infringement. This statement is a false and misleading factual description and/or

27 representation of the nature, characteristics and qualities of CareFusion's kyphoplasty

28 products. Title 35 Section 287(c) provides immunity to patent infringement for "a medical

1  practitioner's performance, of a medical activity that constitutes an infringement under

2  section 271 (a) or (b) . . . ."

3       287.    Information regarding, for example, the rupture rates of CareFusion's balloons, the

4  pressure CareFusion's balloons are capable of withstanding, the approved use of CareFusion's

5  kyphoplasty products and alleged liability for patent infringement if CareFusion's kyphoplasty

6  products are used in a certain manner, are material to a customer's decision to purchase CareFusion's

7  kyphoplasty products.   Specifically, certain hospitals and doctors have cited Defendants' false

8  statements as reasons for not purchasing CareFusion's kyphoplasty products.

9       288.   On information and belief, Defendants' false and misleading statements are being

10  made to consumers who do not have independent knowledge of CareFusion's kyphoplasty products.

11       289.    Moreover, on information and belief, these numerous false and misleading statements

12  are being made by Defendants' sales representatives, many of whom have for years cultivated

13  relationships with the hospitals and doctors who have received Defendants' false and misleading

14  statements. Consequently, on information and belief, hospitals and doctors inherently trust

15  Defendants' sales representatives, and thus inherently believe the false and misleading statements

16  disseminated by Defendants' sales representatives.   Additionally, certain hospitals and doctors have

17  relied on Defendants' false statements in deciding not to purchase CareFusion's kyphoplasty

18  products.

19       290.    Defendants' widespread dissemination of false and misleading statements is not

20  readily susceptible to neutralization or other offset because: (1) on information and belief, many of

21  Defendants' false statements are made outside the presence of CareFusion; and (2) Defendants' sales

22  representatives, who, on information and belief, are responsible for the dissemination of the

23  aforementioned false and misleading statements, have for years cultivated relationships with the

24  hospitals and doctors who have received Defendants' false and misleading statements and as such

25  those hospitals and doctors inherently trust Defendants' sales representative and thus inherently

26  believe the false and misleading statements disseminated by Defendants' sales representatives.

27       291.    On information and belief, as outlined above, Defendants' widespread marketing,

28  advertising and/or promotional campaign aimed at disseminating numerous false and misleading

statements regarding CareFusion's kyphoplasty products has facilitated the growth and/or maintenance of Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

292.   Moreover, on information and belief, Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.   Specifically, since CareFusion's full commercial launch of its kyphoplasty products, Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market has remained largely unchanged, e.g., because CareFusion has captured less than 5% of the kyphoplasty product market since its full commercial product launch Defendants continue to enjoy a monopolistic market share in both the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

293.   Defendants' actions, including, Defendants' marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products, have no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

294.   On information and belief, Defendants have engaged in this anticompetitive, predatory, exclusionary, and/or inequitable conduct with the intention of maintaining and/or further increasing their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

295.   Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has had a significant and enduring effect on competition at least because:

A.   Defendants' false and misleading statements regarding CareFusion's kyphoplasty products have prevented CareFusion from becoming a competitive threat to Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Specifically, months after CareFusion initiated the full commercial release of its products, Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market remains largely unchanged.  Defendants' actions have thus ensured that hospitals, doctors and patients have less product choices in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

B.   Defendants' false and misleading statements regarding CareFusion's kyphoplasty products, and resulting continued monopoly, has maintained high barriers to entry for other potential competitors.  Specifically, because Defendants continue to have a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, Defendants have a greater ability than other competitors to obtain long-term contracts with customers, doctor endorsements, and clinical and scientific support for their products, which results in less competition and decreased consumer choice in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty market.

296.   Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has harmed and will continue to harm competition, including CareFusion, because hospitals and doctors have decided to purchase or continue to purchase Defendants' kyphoplasty products instead of CareFusion's kyphoplasty products as a direct result of Defendants' false and misleading statements.

297.   But for Defendants' campaign to disseminate false and misleading statements regarding CareFusion's kyphoplasty products, CareFusion could have captured a significant market share in the minimally invasive vertebral compression fracture treatment product market or in the alternative kyphoplasty product market.

298.   The harm suffered by CareFusion is the direct and intended result of Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically, Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products.

**COUNT IV**
**ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2:**
**FALSE AND DECEPTIVE ADVERTISING**

299.   CareFusion incorporates by reference the allegations in paragraphs 1 – 298 above, as if fully alleged herein.

300.   Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have and are attempting to acquire and maintain a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

301.   On information and belief, Defendants obtained and continue to maintain market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.   For example, on information and belief, Defendants obtained and continued to maintain approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market.    And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the alternative kyphoplasty product market.   The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

302.   On information and belief, Defendants have acted with the specific intent to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the multiple acts of anticompetitive, predatory, exclusionary, and/or inequitable conduct as outlined above.

303.   Specifically, since at least July 2010, shortly after CareFusion announced the launch of its kyphoplasty products, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct has included but it is not limited to Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products.

304.     Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has been continuous and on-going since shortly after CareFusion's announced launch of its kyphoplasty products in April 2010 and is continuing to the present day.

305.     Defendants' widespread marketing, advertising and/or promotional campaign of disseminating false and misleading statements regarding CareFusion's kyphoplasty products has been conducted as part of Defendants' scheme to eliminate competitors, and specifically CareFusion, and to increase and/or maintain its market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.   Specifically, Defendants' marketing, advertising and/or promotional campaign of disseminating false and misleading statements regarding CareFusion's kyphoplasty products has prevented CareFusion from making sales of its kyphoplasty products, which in turn has increased Defendants' kyphoplasty product sales and has allowed Defendants to maintain their market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

306.     These false and misleading statements, which have been disseminated to numerous prospective customers across the country include at least the following:

A.     Defendants' sales representatives have disseminated false and misleading statements regarding the failure rate of the balloons used in CareFusion's kyphoplasty products.   Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons have a failure rate of 50%.   This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.   In CareFusion's premarket release, CareFusion's balloons had a rupture rate of approximately 1.4% not 50%.   Moreover, the rupture rate of CareFusion's balloons is significantly lower than reported rupture rates of Defendants' balloons which, on information and belief, are over 6%.   (Ex. WW, "Balloon-Related Complications and Technical Failures in Kyphoplasty for Vertebral Fractures" at 175-76.)

B.      Defendants' sales representatives have disseminated other false and misleading statements regarding the balloons used in CareFusion's kyphoplasty products.   Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons usually will rupture if the pressure exceeds 200 psi.  This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.  CareFusion's balloons are designed to be used and are used at pressures of up to 400 psi.

C.      Defendants' sales representatives have also disseminated false and misleading statements regarding the approved use of CareFusion's kyphoplasty products.   Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's kyphoplasty products were approved by the FDA to only be used in a unipedicular manner, not a bipedicular manner like Defendants' products.  This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.  The FDA has stated that it is the physician's responsibility to determine the surgical approach to be used with CareFusion's kyphoplasty products.  As such, the FDA approved CareFusion's kyphoplasty products for use in the reduction and fixation of fractures in cancellous bone in the spine for kyphoplasty.  This approved indication for use is substantially identical to the approved indication of use Defendants received from the FDA for their kyphoplasty products which they advertise can be used in a bipedicular manner.   Accordingly, the physician, not the FDA, determines if the reduction and fixation is done in unipedicular or bipedicular manner.

D.      Defendants' sales representatives have disseminated other false and misleading statements regarding the use of CareFusion's kyphoplasty products.  Specifically, Defendants' sales representatives have informed prospective customers that doctors cannot use CareFusion's kyphoplasty products in a bipedicular manner because doing so will result in patent infringement. This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.  Title 35 Section 287(c) provides immunity to patent infringement for "a medical practitioner's performance, of a medical activity that constitutes an infringement under section 271 (a) or (b) . . . ."

307.     Information regarding, for example, the rupture rates of CareFusion's balloons, the pressure CareFusion's balloons are capable of withstanding, the approved use of CareFusion's kyphoplasty products and alleged liability for patent infringement if CareFusion's kyphoplasty products are used in a certain manner, are material to a customer's decision to purchase CareFusion's kyphoplasty products.   Specifically, certain hospitals and doctors have cited Defendants' false statements as reasons for not purchasing CareFusion's kyphoplasty products.

308.     On information and belief, Defendants' false and misleading statements are being made to consumers who do not have independent knowledge of CareFusion's kyphoplasty products.

309.     Moreover, on information and belief, these numerous false and misleading statements are being made by Defendants' sales representatives, many of whom have for years cultivated relationships with the hospitals and doctors who have received Defendants' false and misleading statements. Consequently, on information and belief, hospitals and doctors inherently trust Defendants' sales representatives, and thus inherently believe the false and misleading statements disseminated by Defendants' sales representatives.   Additionally, certain hospitals and doctors have relied on Defendants' false statements in deciding not to purchase CareFusion's kyphoplasty products.

310.     Defendants' widespread dissemination of false and misleading statements is not readily susceptible to neutralization or other offset because: (1) on information and belief, many of Defendants' false statements are made outside of CareFusion's presence; and (2) Defendants' sales representatives, who, on information and belief, are responsible for the dissemination of the aforementioned false and misleading statements, have for years cultivated relationships with the hospitals and doctors who have received Defendants' false and misleading statements and as such those hospitals and doctors inherently trust Defendants' sales representative and thus inherently believe the false and misleading statements disseminated by Defendants' sales representatives.

311.     On information and belief, as outlined above, Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has facilitated the growth and/or

maintenance of Defendants' market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

312.    Moreover, on information and belief, Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.   Specifically, since CareFusion's full commercial launch of its kyphoplasty products, Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market has remained largely unchanged, e.g., because CareFusion has captured less than 5% of the kyphoplasty product market since its full commercial product launch Defendants continue to enjoy a market power in both the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

313.    Defendants' actions, including, Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products, have no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

314.    Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products gives rise to a dangerous probability that Defendants will succeed in their attempt to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

315.    Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has had a significant and enduring effect on competition at least because:

A.     Defendants' false and misleading statements regarding CareFusion's kyphoplasty products have prevented CareFusion from becoming a competitive threat in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  Specifically, months after CareFusion initiated the full commercial release of its products, Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market remains largely unchanged.  Defendants' actions have thus ensured that hospitals, doctors and patients have less product choices in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

B.     Defendants' false and misleading statements regarding CareFusion's kyphoplasty products have maintained high barriers to entry for other potential competitors.  Specifically, because Defendants continue to have market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty market, Defendants have a greater ability than other competitors to obtain long-term contracts with customers, doctor endorsements, and clinical and scientific support for their products, which results in less competition and decreased consumer choice in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

316.     Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products has harmed and will continue to harm competition, including CareFusion, because hospitals and doctors have decided to purchase or continue to purchase Defendants' kyphoplasty products instead of CareFusion's kyphoplasty products as a direct result of Defendants' false and misleading statements.

317.     But for Defendants' campaign to disseminate false and misleading statements regarding CareFusion's kyphoplasty products, CareFusion could have captured a significant market share in the minimally invasive vertebral compression fracture treatment product market or in the alternative kyphoplasty product market.

318.   The harm suffered by CareFusion is the direct and intended result of Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically, Defendants' widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements regarding CareFusion's kyphoplasty products.

**COUNT V**
**MONOPOLIZATION UNDER 15 U.S.C. § 2: *HANDGARDS***

319.   CareFusion incorporates by reference the allegations in paragraphs 1 – 318 above, as if fully alleged herein.

320.   Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have acquired and maintained a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

321.   Defendants possess monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  On information and belief, Defendants obtained and continue to maintain approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market.    And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the alternative kyphoplasty product market.  The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

322.   Defendants have willfully acquired and maintained their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the multiple acts of anticompetitive, predatory, exclusionary, and/or inequitable conduct as outlined above.

323.   Specifically, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct includes but it is not limited to (1) Defendants' acquisition of patent rights from Kyphon, including the '888 and '404 patents, that Defendants knew to be invalid and unenforceable followed by (2) the failure to disclaim or dedicate those invalid and/or unenforceable patents to the public after acquiring them and/or (3) the use, e.g., threatened enforcement, of those invalid and/or unenforceable patents to keep competitors, including CareFusion, out of the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.

324.    On November 23, 2005, Kyphon, along with third party Dr. Sandhu, filed a lawsuit against several Medtronic entities, e.g., Medtronic's subsidiaries.  The complaint in that lawsuit was eventually amended, on April 26, 2006, to include counts accusing the Medtronic subsidiaries of infringing, among others, the '888 and '404 patents.

325.    During the course of the litigation between Kyphon and the Medtronic subsidiaries, Medtronic, through its subsidiaries, repeatedly admitted and alleged in multiple court-filed pleadings that the '888 and '404 patents were both invalid and unenforceable.

326.    For example, Medtronic, through its subsidiaries, provided detailed allegations in the amended answer to the amended complaint regarding why the '888 and '404 patents were unenforceable.  Specifically, Medtronic, through it subsidiaries, alleged and admitted that though the applicants were aware that vertebroplasty had been used in the prior art to treat vertebral compression factures, the applicants intentionally misrepresented to the United States Patent and Trademark Office that the only known treatment for vertebral compression fractures was bed rest and aspirin.  (*See* Ex. K, Medtronic Amended Answer to Amended Complaint at ¶¶ 67-77.)

327.    Additionally, Medtronic, through its subsidiaries, alleged that the '888 and '404 patents were invalid.  (Ex. CC, Medtronic Answer to Amended Complaint at 18; Ex. K, Medtronic Amended Answer to Amended Complaint at 20 & 37.)  Medtronic, through its subsidiaries, also filed multiple motions for summary judgment arguing that certain claims of the '404 patent were invalid under at least 35 U.S.C. §§ 102 and 112.  (Exs. DD-FF.)

328.    Before the district court could issue a final ruling on the merits of Medtronic's invalidity and unenforceability claims, Medtronic acquired Kyphon for approximately $ 4 billion.  This announced acquisition occurred only months after Medtronic, through its subsidiaries, had expressly asserted that Kyphon's basic patents, namely the '888 and '404 patents, were invalid and had been procured through inequitable conduct and were thus also unenforceable.

329.    After acquiring Kyphon's patents, including patents that they knew to be invalid and/or unenforceable, Defendants embarked on multiple public and private threats to enforce their patent rights.

330.    For example, on July 2, 2006, Medtronic publicly stated that "Medtronic will go to court if necessary to enforce its patents."  (Ex. GG, Steve Hart, "Patent Protection: High-Tech Companies Battle To Defend Trade Secrets Key To Their Financial Success," Press Democrat, July 2, 2006.)

331.    On information and belief, Defendants' patent enforcement policy was publicized and well-known to any potential or current competitor.  Specifically, CareFusion was aware of both Kyphon's previous aggressive litigations against the only known entrants into the kyphoplasty space as well as Defendants' general aggressive patent enforcement policies.

332.    Despite Defendants' well-known policy of patent enforcement and Kyphon's well-known policy of enforcing its patents in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, after acquiring from Kyphon patent rights they knew to be invalid and/or unenforceable, Defendants failed to seek reexamination of, disclaim and/or dedicate to the public the acquired patents that they knew to be invalid and unenforceable.  Specifically, though Medtronic, through its subsidiaries, repeatedly asserted during its prior litigation with Kyphon that, among others, the patents that covered the basic kyphoplasty procedure – namely, the '888 and '404 patents – were both invalid and unenforceable, Defendants never disclaimed or dedicated these patents to the public.

333.    Instead, as part of their anticompetitive, predatory, exclusionary, and/or inequitable scheme, Defendants continued to threaten enforcement of their intellectual property, including the kyphoplasty patents.

334.    For example, in its Form 10-K Annual Report for the fiscal year ending on April 25, 2008, Medtronic publicly stated that Medtronic "rel[ies] on a combination of patents, trade secrets and nondisclosure and non-competition agreements to protect our proprietary intellectual property, and will continue to do so."  Medtronic also stated that Medtronic "intend[s] to defend against any threats to our intellectual property."  (Ex. HH Medtronic April 25, 2008 Annual Report filed with the SEC at 34.)

335.    On May 20, 2008, in an Earnings Conference Call, Medtronic again reiterated its patent enforcement policy and specifically tied that patent enforcement policy to the intellectual

property it acquired from Kyphon, e.g., kyphoplasty patents, including the '888 and '404 patents. Specifically, Medtronic stated that "Kyphon and Biologics helped to partially offset continued competitive pressures on our [Medtronic] core spinal products in the United States.  We remain committed to our strategy of raising the bar of competition….We also remain committed to enforcing our portfolio of intellectual property."  (Ex. II, Medtronic May 2008 Earnings Call at 3.)

336.    In addition to these public statements threatening enforcement of its patent rights, Defendants also took specific affirmative steps to protect their interest in patents that they had obtained from third parties, including the invalid and/or unenforceable patent rights they acquired from Kyphon.

337.    For example, as part of its $4 billion purchase of Kyphon, Medtronic Spine accepted assignments to third party patents, including patents they knew to be invalid and/or unenforceable (e.g., the '888 and '404 patents).  Medtronic Spine then took affirmative steps to ensure its ability to fully enforce these patents against competitors in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by recording its assignments to the '888 and '404 patents, among others, with the United States Patent and Trademark Office on May 9, 2008.

338.    On June 9, 2008, Defendants took further affirmative steps to ensure that they could enforce these patents against competitors in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by recording with the United States Patent and Trademark Office assignments from Medtronic Spine of the '888 and '404 patents, among others, to Medtronic's subsidiary Kyphon SARL.

339.    Moreover, Defendants took further affirmative steps to enforce their patent rights by directly threatening CareFusion.

340.    In 2008, CareFusion was working with another company, API, to produce a kyphoplasty balloon product for CareFusion.

341.    In July 2008, CareFusion employees met in person with API.

342.   During this July 2008 meeting, API informed CareFusion that Medtronic threatened that the kyphoplasty balloon device would allegedly infringe at least one kyphoplasty patent that Medtronic acquired from Kyphon.

343.   On information and belief, Defendants' use of patent rights that they knew to be invalid and/or enforceable facilitated the maintenance of Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

344.   Accordingly, on information and belief, Defendants' use of patent rights that they knew to be invalid and/or unenforceable has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining its market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by preventing competitors, such as CareFusion from entering those markets.

345.   Defendants' actions, including Defendants' use of patent rights that they knew to be invalid and/or unenforceable, had no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

346.   Because market entry conditions are so high in the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market, Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market will continue for years even though the patents covering the basic kyphoplasty procedure, namely the '888 and '404 patents, have expired.

347.   On information and belief, Defendants have engaged in this anticompetitive, predatory, exclusionary, and/or inequitable conduct with the intention of maintaining and/or further increasing their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

348.   In view of Defendants' threats to enforce their kyphoplasty patents and threats to CareFusion's balloon kyphoplasty product supplier, Defendants' history of enforcing those patents, and their aggressive litigation patent enforcement policies, CareFusion was faced with the decision of

either waiting to release a balloon kyphoplasty product (and losing sales it would have made during that lost time) or risking a patent infringement lawsuit brought by Defendants (and spending potentially millions of dollars in defending against such a lawsuit, regardless of its lack of merit and/or the invalidity of the subject patents). Each of these decisions would have caused CareFusion economic loss. CareFusion therefore made a business decision to wait until after the '888 and '404 patents expired in February 2009 before launching its balloon kyphoplasty product.

349.    This delay in market entry has in turn prevented CareFusion from timely capturing the share of the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market it would have been able to capture but for Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct.

350.    The harm suffered by CareFusion is the direct and intended result of Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically (1) Defendants' threatened enforcement of patent rights it knew to be invalid and/or unenforceable and/or (2) Defendants' refusal to disclaim, dedicate to the public, or seek reexamination of patents Defendants acquired yet knew to be invalid and/or unenforceable.

## COUNT VI
## ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C § 2: *HANDGARDS*

351.    CareFusion incorporates by reference the allegations in paragraphs 1 – 350 above, as if fully alleged herein.

352.    Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have and are attempting to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

353.    On information and belief, Defendants obtained and continue to maintain market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. For example, on information and belief, Defendants obtained and continue to maintain approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market. And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the

alternative kyphoplasty product market.  The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

354.    On information and belief, Defendants have acted with the specific intent to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the multiple acts of anticompetitive, predatory, exclusionary, and/or inequitable conduct as outlined above.

355.    Specifically, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct includes but it is not limited to (1) Defendants' acquisition of patent rights from Kyphon, including the '888 and '404 patents, that Defendants knew to be invalid and unenforceable followed by (2) the failure to disclaim or dedicate those invalid and/or unenforceable patents to the public after acquiring them and/or (3) the use, e.g., threatened enforcement, of those invalid and/or unenforceable patents to keep competitors, including CareFusion out of the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.

356.    On November 23, 2005, Kyphon, along with third party Dr. Sandhu, filed a lawsuit against several Medtronic entities, e.g., Medtronic's subsidiaries.  The complaint in that lawsuit was eventually amended, on April 26, 2006, to include counts accusing the Medtronic subsidiaries of infringing, among others, the '888 and '404 patents.

357.    During the course of the litigation between Kyphon and the Medtronic subsidiaries, Medtronic, through its subsidiaries, repeatedly admitted and alleged in multiple court-filed pleadings that the '888 and '404 patents were both invalid and unenforceable.

358.    For example, Medtronic, through its subsidiaries, provided detailed allegations in the amended answer to the amended complaint regarding why the '888 and '404 patents were unenforceable.  Specifically, Medtronic, through it subsidiaries, alleged and admitted that though the applicants were aware that vertebroplasty had been used in the prior art to treat vertebral compression factures, the applicants intentionally misrepresented to the United States Patent and Trademark Office that the only known treatment for vertebral compression fractures was bed rest and aspirin.  (*See* Ex. K, Medtronic Amended Answer to Amended Complaint at ¶¶ 67-77.)

359.    Additionally, Medtronic, through its subsidiaries, alleged that the '888 and '404 patents were invalid.  (Ex. CC, Medtronic Answer to Amended Complaint at 18; Ex. K, Medtronic Amended Answer to Amended Complaint at 20 & 37.)  Medtronic, through its subsidiaries, also filed multiple motions for summary judgment arguing that certain claims of the '404 patent were invalid under at least 35 U.S.C. §§ 102 and 112.  (Exs. DD-FF.)

360.    Before the district court could issue a final ruling on the merits of Medtronic's invalidity and unenforceability claims, Medtronic acquired Kyphon for approximately $ 4 billion. This announced acquisition occurred only months after Medtronic, through its subsidiaries, had expressly asserted that Kyphon's basic patents, namely the '888 and '404 patents, were invalid and had been procured through inequitable conduct and were thus also unenforceable.

361.    After acquiring Kyphon's patents, including patents that they knew to be invalid and/or unenforceable, Defendants embarked on multiple public and private threats to enforce their patent rights.

362.    For example, on July 2, 2006, Medtronic publicly stated that "Medtronic will go to court if necessary to enforce its patents."  (Ex. GG, Steve Hart, "Patent Protection: High-Tech Companies Battle To Defend Trade Secrets Key To Their Financial Success," Press Democrat, July 2, 2006.)

363.    On information and belief, Defendants' patent enforcement policy was publicized and well-known to any potential or current competitor.  Specifically, CareFusion was aware of both Kyphon's previous aggressive litigation against the only known entrants into the kyphoplasty space as well as Defendants' general aggressive patent enforcement policies.

364.    Despite Defendants' well-known policy of patent enforcement and Kyphon's well-known policy of enforcing its patents in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, after acquiring from Kyphon patent rights they knew to be invalid and/or unenforceable, Defendants failed to seek reexamination of, disclaim and/or dedicate to the public the acquired patents that they knew to be invalid and unenforceable.  Specifically, though Medtronic, through its subsidiaries, repeatedly asserted during its prior litigation with Kyphon that, among others, the patents that covered the basic

kyphoplasty procedure – namely, the '888 and '404 patents – were both invalid and unenforceable, Defendants never disclaimed or dedicated these patents to the public.

365.    Instead, as part of their anticompetitive, predatory, exclusionary, and/or inequitable scheme, Defendants continued to threaten enforcement of their intellectual property, including the kyphoplasty patents.

366.    For example, in its Form 10-K Annual Report for the fiscal year ending on April 25, 2008, Medtronic publicly stated that Medtronic "rel[ies] on a combination of patents, trade secrets and nondisclosure and non-competition agreements to protect our proprietary intellectual property, and will continue to do so."  Medtronic also stated that Medtronic "intend[s] to defend against any threats to our intellectual property."  (Ex. HH, Medtronic April 25, 2008 Annual Report filed with the SEC at 34.)

367.    On May 20, 2008, in an Earnings Conference Call, Medtronic again reiterated its patent enforcement policy and specifically tied that patent enforcement policy to the intellectual property it acquired from Kyphon, e.g., kyphoplasty patents, including the '888 and '404 patents. Specifically, Medtronic stated that "Kyphon and Biologics helped to partially offset continued competitive pressures on our [Medtronic] core spinal products in the United States.  We remain committed to our strategy of raising the bar of competition….We also remain committed to enforcing our portfolio of intellectual property."  (Ex. II, Medtronic May 2008 Earnings Call at 3.)

368.    In addition to these public statements threatening enforcement of its patent rights, Defendants also took specific affirmative steps to protect their interest in patents that they had obtained from third parties, including the invalid and/or unenforceable patent rights they acquired from Kyphon.

369.    For example, as part of its $4 billion purchase of Kyphon, Medtronic Spine accepted assignments to third party patents, including patents they knew to be invalid and/or unenforceable (e.g., the '888 and '404 patents).  Medtronic Spine then took affirmative steps to ensure its ability to fully enforce these patents against competitors in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market by recording its

1   assignments to the '888 and '404 patents, among others, with the United States Patent and Trademark

2   Office on May 9, 2008.

3         370.   On June 9, 2008, Defendants took further affirmative steps to ensure that they could

4   enforce these patents against competitors in the minimally invasive vertebral compression fracture

5   treatment product market and in the alternative kyphoplasty product market by recording with the

6   United States Patent and Trademark Office assignments from Medtronic Spine of the '888 and '404

7   patents, among others, to Medtronic's subsidiary Kyphon SARL.

8         371.   Moreover, Defendants took further affirmative steps to enforce their patent rights by

9   directly threatening CareFusion.

10         372.   In 2008, CareFusion was working with another company, API, to produce a

11   kyphoplasty balloon product for CareFusion.

12         373.   In July 2008, CareFusion employees met in person with API.

13         374.   During this July 2008 meeting, API informed CareFusion that Medtronic threatened

14   that the kyphoplasty balloon device would allegedly infringe at least one kyphoplasty patent that

15   Medtronic acquired from Kyphon.

16         375.   On information and belief, Defendants' use of patent rights that they knew to be

17   invalid and/or enforceable facilitated the maintenance of Defendants' market power in the minimally

18   invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty

19   product market.

20         376.   Accordingly, on information and belief, Defendants' use of patent rights that they

21   knew to be invalid and/or unenforceable has had the effect of eliminating and/or diminishing

22   competition and increasing and/or maintaining its market share in the minimally invasive vertebral

23   compression fracture treatment product market and in the alternative kyphoplasty product market by

24   preventing competitors, such as CareFusion from entering those markets.

25         377.   Defendants' actions, including Defendants' use of patent rights that they knew to be

26   invalid and/or unenforceable, had no legitimate business justification except to destroy competition in

27   the minimally invasive vertebral compression fracture treatment product market and in the alternative

28   kyphoplasty product market.

378.    Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, including, but not limited to the illegal use of patent rights that Defendants knew to be invalid and/or unenforceable gives rise to a dangerous probability that Defendants will succeed in their attempt to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

379.    In view of Defendants' threats to enforce their kyphoplasty patents and threats to CareFusion's balloon kyphoplasty product supplier, Defendants' history of enforcing those patents, and their aggressive litigation patent enforcement policies, CareFusion was faced with the decision of either waiting to release a balloon kyphoplasty product (and losing sales it would have made during that lost time) or risking a patent infringement lawsuit brought by Defendants (and spending potentially millions of dollars in defending against such a lawsuit, regardless of its lack of merit and/or the invalidity of the subject patents).  Each of these decisions would have caused CareFusion economic loss.  CareFusion therefore made a business decision to wait until after the '888 and '404 patents expired in February 2009 before launching its balloon kyphoplasty product.

380.    This delay in market entry has in turn prevented CareFusion from timely capturing the share of the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market it would have been able to capture but for Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct.

381.    The harm suffered by CareFusion is the direct and intended result of Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically (1) Defendants' threatened enforcement of patent rights it knew to be invalid and/or unenforceable and/or (2) Defendants' refusal to disclaim, dedicate to the public, or seek reexamination of patents Defendants acquired yet knew to be invalid and/or unenforceable.

## COUNT VII
## MONOPOLIZATION UNDER 15 U.S.C. § 2:
## IMPROPER GROWTH AND MONOPOLY MAINTENANCE THROUGH ACQUISITIONS

382.    CareFusion incorporates by reference the allegations in paragraphs 1 – 381 above, as if fully alleged herein.

383.    Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have acquired and maintained a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

384.    Defendants possess monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.  On information and belief, Defendants obtained and continue to maintain approximately an 85% or more market share in the minimally invasive vertebral compression fracture treatment product market.    And, on information and belief, Defendants obtained and continue to maintain approximately a 97% or more market share in the alternative kyphoplasty product market.  The full extent of Defendants' market power will be established after a reasonable opportunity for discovery.

385.    Defendants have willfully acquired and maintained their monopoly power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market through the multiple acts of anticompetitive, predatory, exclusionary, and/or inequitable conduct as outlined above.

386.    Specifically, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct includes but it is not limited to Defendants' multiple anticompetitive acquisitions of third party assets related to minimally invasive vertebral compression fracture treatment products without, on information and belief, any intention of actually developing or otherwise utilizing those acquired assets.   Rather, on information and belief, Defendants acquired those third party assets, which included potentially competitive technology and products, in order to eliminate competition from the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.

387.    As outlined above, in furtherance of their scheme to eliminate and/or reduce competition and increase and/or maintain their market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, the Defendants acquired at least the following assets:

A.    Rights to at least 23 Dr. Bonutti patents, which related at least in part to use of balloon technology in soft tissue, including soft tissue surrounding the spine;

B.    The German company Sanatis, whose assets related at least in part to bone cement for use in the spine;

C.    Rights to at least 5 Dr. Berger patents, which related at least in part to the use of balloons in bones other than the spine;

D.    Rights to minimally invasive vertebral compression fracture treatment products developed by Dr. Harvinder S. Sandhu; and

E.    The Disc-O-Tech companies, whose assets included the SKy Bone expander – a potentially competitive kyphoplasty product.

388.    In furtherance of their scheme to eliminate and/or reduce competition and increase and/or maintain their market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, Defendants' anticompetitive acquisition of assets related to vertebral compression fracture treatment products was repeatedly followed by Defendants' failure to market products utilizing the acquired third party assets and/or removal of the acquired products from the market.

389.    For example, on information and belief, after acquiring rights to the Dr. Bonutti patents, Kyphon never marketed or sold products utilizing the disclosed technology, namely the use of balloons in soft tissue.  Rather, on information and belief, Kyphon acquired rights to those patents to prevent another competitor from acquiring rights to those patents and launching a competitive kyphoplasty product.

390.    Likewise, after acquiring right to the Dr. Berger patents, Kyphon never marketed or sold products utilizing the disclosed technology, namely the use of balloons in bones other than the spine.  Rather, on information and belief, Kyphon acquired rights to those patents to prevent another competitor from acquiring rights to those patents and launching a competitive kyphoplasty product.

391.    Moreover, after acquiring rights to minimally invasive vertebral compression fracture treatment product technology developed by Dr. Sandhu, Kyphon never marketed or sold products utilizing the disclosed technology.  Rather, on information and belief, Kyphon acquired rights to this technology in other to prevent another competitor, such as Medtronic, from acquiring those rights and launching a competitive kyphoplasty product.

392.   Likewise, after acquiring Disc-O-Tech, Kyphon removed the SKy Bone Expander from the market in order to eliminate a potential competitive threat from the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.

393.   On information and belief, each of these acquisitions followed by the non-use or market removal of the acquired technology allowed Kyphon to remove a potentially competitive threat from the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.  The serial removal of each potentially competitive threat from the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market, on information and belief, allowed Kyphon to increase and/or maintain its monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

394.   Defendants' scheme to eliminate and/or reduce competition and increase and/or maintain their market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market continued when Medtronic acquired Kyphon.

395.   Prior to Medtronic's acquisition of Kyphon, the investment community recognized that Medtronic would have been a strong competitor to Kyphon in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

396.   For example, had Medtronic preceded to market its competitive kyphoplasty products, instead of acquiring Kyphon and removing its product from the market, on information and belief, because Medtronic's kyphoplasty product was recognized as a strong competitive threat and because of Medtronic's substantial marketing and sales resources, Medtronic would have acquired a substantial portion of the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.  Two large competitors would have sold kyphoplasty products rather than just one.

397.   After acquiring Kyphon, Medtronic removed its competitive products, namely its ARCUATE$^{TM}$ and ARCUATE$^{TM}$ XP, products from the relevant markets, thus eliminating yet another competitive line of products from those markets.

398.    Moreover, Medtronic's acquisition of Kyphon also had the effect of increasing Defendants' market power in the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.   Specifically, on information and belief, Medtronic's acquisition of Kyphon increased Defendants' market power by combining Kyphon's monopoly market share with Medtronic's extensive resources, including Medtronic's large sales force and general presence and recognition in the medical field.

399.    As outlined above, Defendants' multiple anticompetitive acquisitions facilitated the growth and/or maintenance of Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. Specifically, Defendants' acquisition history removed multiple competitive threats from the aforementioned markets, thus preserving their monopoly in the aforementioned market(s).   But for Defendants' acquisitions, each of the acquired and eliminated companies, technologies, or patents would have individually and/or collectively grown into a competitive threat that would have eliminated Defendants' monopoly and resulted in multiple competitors providing multiple kyphoplasty products.   Accordingly, Defendants' anticompetitive acquisition scheme has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

400.    Defendants' actions, including Defendants' multiple acquisitions of third party assets related to minimally invasive vertebral compression fracture treatment products without an intention of utilizing those third party assets, had no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

401.    Because market entry conditions are so high, Defendants' monopoly in the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market will continue for years.

402.    Defendants have engaged in this anticompetitive, predatory, exclusionary, and/or inequitable conduct with the intention of maintaining and/or further increasing their monopoly power

in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

403. Defendants' acquisition of multiple third party assets without the intention of marketing products that utilized those assets has harmed consumers by allowing Defendants' to remove competitive threats from the relevant market(s) and thus charge artificially high prices for its kyphoplasty products.

404. Defendants' acquisition of multiple third party assets without the intention of marketing products that utilized those assets, also has harmed and will continue to harm competition, including CareFusion because Defendants' anticompetitive acquisition scheme has helped to entrench Defendants' kyphoplasty products in the market and thus has facilitated Defendants' illegal monopoly position. This in turn has made it more difficult for competitors, like CareFusion, to compete in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. Competition as a whole was also decreased by preventing competitive products from entering the market, and consumers were denied greater product choice in minimally invasive vertebral compression fracture treatment product market and kyphoplasty market. CareFusion was specifically injured by the cumulative effect of all of Defendants' acquisitions, because it would have made greater sales of its vertebroplasty product and its recently-released kyphoplasty product in a non-monopolistic market. Defendants have an unfair advantage in the market as a monopolist, because doctors and hospitals are more willing to purchase from a monopolist with a larger sales force, more established clinical history, perceived market leadership, more widely used product (i.e., doctors are more willing to use the product their colleagues use), and greater ability to offer favorable long-term contracts.

405. For example, prior to Defendants' acquisition of Disc-O-Tech, CareFusion had met with Disc-O-Tech to review Disc-O-Tech's technology, including the SKy Bone Expander, and to discuss a potential partnership between the two companies. Defendants' acquisition of Disc-O-Tech, among other companies and third party assets, prevented a competitor, such as CareFusion, from acquiring or otherwise establishing a business relationship with Disc-O-Tech. This is turn prevented

1    a competitor, such as CareFusion, from selling Disc-O-Tech's competitive SKy Bone Expander

2    kyphoplasty product in the United States.

3        406.    Defendants' illegal acquisition of third party assets also continues to harm

4    CareFusion's ability to compete in the minimally invasive vertebral compression fracture treatment

5    product market and in the alternative kyphoplasty product market, for example, by using illegal

6    acquired third party patent rights to threaten litigation against CareFusion relating to its Ava*max*™

7    balloon kyphoplasty products. (*See, e.g.,* Ex. RR, Feb. 10, 2010 JP Morgan Report at 2 (stating that

8    "Kyphon reps will likely use the litigation overhang…as [a] selling point[] against AVAmax.").)

9        407.    The harm suffered by CareFusion is the direct and intended result of Defendants'

10   anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically, Defendants'

11   anticompetitive acquisition scheme.

**COUNT VIII**
**ATTEMPTED MONOPOLIZATION UNDER 15 U.S.C. § 2:**
**IMPROPER GROWTH AND MONOPOLY MAINTENANCE THROUGH ACQUISITIONS**

12

13

14       408.    CareFusion incorporates by reference the allegations in paragraphs 1 – 407 above, as

15   if fully alleged herein.

16       409.    Defendants, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, have and are

17   attempting to acquire and/or maintain a monopoly in the minimally invasive vertebral compression

18   fracture treatment product market and in the alternative kyphoplasty product market.

19       410.    Defendants obtained and continue to maintain market power in the minimally invasive

20   vertebral compression fracture treatment product market and in the alternative kyphoplasty market.

21   For example, Defendants obtained and continue to maintain approximately an 85% or more market

22   share in the minimally invasive vertebral compression fracture treatment product market.    And, on

23   information and belief, Defendants obtained and continue to maintain approximately a 97% or more

24   market share in the alternative kyphoplasty product market.  The full extent of Defendants' market

25   power will be established after a reasonable opportunity for discovery.

26       411.    Defendants have acted with the specific intent to acquire a monopoly in the minimally

27   invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty

28

product market through the anticompetitive, predatory, exclusionary, and/or inequitable conduct outlined above.

412.    Specifically, Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct includes but it is not limited to Defendants' multiple anticompetitive acquisitions of third party assets related to minimally invasive vertebral compression fracture treatment products without any intention of actually developing or otherwise utilizing those acquired assets.  Rather Defendants acquired those third party assets, which included potentially competitive technology and products, in order to eliminate competition from the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.

413.    As outlined above, in furtherance of their scheme to eliminate and/or reduce competition and increase and/or maintain their market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, the Defendants acquired at least the following assets:

A.    Rights to at least 23 Dr. Bonutti patents, which related at least in part to use of balloon technology in soft tissue, including soft tissue surrounding the spine;

B.    The German company Sanatis, whose assets related at least in part to bone cement for use in the spine;

C.    Rights to at least 5 Dr. Berger patents, which related at least in part to the use of balloons in bones other than the spine;

D.    Rights to minimally invasive vertebral compression fracture treatment products developed by Dr. Harvinder S. Sandhu; and

E.    The Disc-O-Tech companies, whose assets included the SKy Bone expander – a potentially competitive kyphoplasty product.

414.    In furtherance of their scheme to eliminate and/or reduce competition and increase and/or maintain their market share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market, Defendants' anticompetitive acquisition of assets related to vertebral compression fracture treatment products was repeatedly

followed by Defendants' failure to market products utilizing the acquired third party assets and/or removal of the acquired products from the market.

415.   For example, after acquiring rights to the Dr. Bonutti patents, Kyphon never marketed or sold products utilizing the disclosed technology, namely the use of balloons in soft tissue.  Rather, on information and belief, Kyphon acquired rights to those patents to prevent another competitor from acquiring rights to those patents and launching a competitive kyphoplasty product.

416.   Likewise, after acquiring right to the Dr. Berger patents, Kyphon never marketed or sold products utilizing the disclosed technology, namely the use of balloons in bones other than the spine.  Rather, on information and belief, Kyphon acquired rights to those patents to prevent another competitor from acquiring rights to those patents and launching a competitive kyphoplasty product.

417.   Moreover, after acquiring rights to minimally invasive vertebral compression fracture treatment product technology developed by Dr. Sandhu, Kyphon never marketed or sold products utilizing the disclosed technology.  Rather, on information and belief, Kyphon acquired rights to this technology in other to prevent another competitor, such as Medtronic, from acquiring those rights and launching a competitive kyphoplasty product.

418.   Likewise, after acquiring Disc-O-Tech, Kyphon removed the SKy Bone Expander from the market in order to eliminate a potential competitive threat from the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.

419.   Each of these acquisitions followed by the non-use or market removal of the acquired technology allowed Kyphon to remove a potentially competitive threat from the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market.  The serial removal of each potentially competitive threat from the minimally invasive vertebral compression fracture treatment product market and the alternative kyphoplasty product market, on information and belief, allowed Kyphon to increase and/or maintain its market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

420.   Defendants' scheme to eliminate and/or reduce competition and increase and/or maintain their market share in the minimally invasive vertebral compression fracture treatment

product market and in the alternative kyphoplasty product market continued when Medtronic acquired Kyphon.

421.   Prior to Medtronic's acquisition of Kyphon, the investment community recognized that Medtronic would have been a strong competitor to Kyphon in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

422.   For example, had Medtronic preceded to market its competitive kyphoplasty products, instead of acquiring Kyphon and removing its product from the market, on information and belief, because Medtronic's kyphoplasty product was recognized as a strong competitive threat and because of Medtronic's substantial marketing and sales resources, Medtronic would have acquired a substantial portion of the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.   Two large competitors would have sold kyphoplasty products rather than just one.

423.   After acquiring Kyphon, Medtronic removed its competitive products, namely its ARCUATE$^{TM}$ and ARCUATE$^{TM}$ XP products, from the relevant markets thus eliminating yet another competitive line of products from those markets.

424.   Moreover, Medtronic's acquisition of Kyphon also had the effect of increasing Defendants' market power in the kyphoplasty and minimally invasive vertebral compression fracture treatment product markets.   Specifically, on information and belief, Medtronic's acquisition of Kyphon increased Defendants' market power by combining Kyphon's market power with Medtronic's extensive resources, including Medtronic's large sales force and general presence and recognition in the medical field.

425.   As outlined above, Defendants' multiple anticompetitive acquisitions facilitated the growth and/or maintenance of Defendants' market power in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. Specifically, Defendants' acquisition history removed multiple competitive threats from the aforementioned markets, thus preserving their market power in the aforementioned market(s).

426.   Accordingly, Defendants' anticompetitive acquisition scheme has had the effect of eliminating and/or diminishing competition and increasing and/or maintaining Defendants' market

share in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

427. Defendants' actions, including Defendants' multiple acquisitions of third party assets related to minimally invasive vertebral compression fracture treatment products without an intention of utilizing those third party assets, had no legitimate business justification except to destroy competition in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

428. Defendants' anticompetitive, predatory, exclusionary, and/or inequitable conduct, including the acquisition of third party assets related to minimally invasive vertebral compression fracture treatment products without the intention of utilizing those assets gives rise to the dangerous probability that Defendants will succeed in their attempt to acquire a monopoly in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market.

429. Defendants' acquisition of multiple third party assets without the intention of marketing products that utilized those assets has harmed consumers by allowing Defendants' to remove competitive threats from the relevant market(s) and thus charge artificially high prices for its kyphoplasty products.

430. Defendants' acquisition of multiple third party assets without the intention of marketing products that utilized those assets, also has harmed and will continue to harm competition, including CareFusion because Defendants' anticompetitive acquisition scheme has helped to entrench Defendants' kyphoplasty products in the market and thus has facilitated Defendants' market power. This in turn has made it more difficult for competitors, like CareFusion, to compete in the minimally invasive vertebral compression fracture treatment product market and in the alternative kyphoplasty product market. Competition as a whole was also decreased by preventing competitive products from entering the market, and consumers were denied greater product choice in minimally invasive vertebral compression fracture treatment product market and kyphoplasty market. CareFusion was specifically injured by the cumulative effect of all of Defendants' acquisitions, because it would have made greater sales of its vertebroplasty product and its recently-released kyphoplasty product in a

1   market without an attempted monopolist.  Defendants have an unfair advantage in the market as an

2   attempted monopolist, because doctors and hospitals are more willing to purchase from a monopolist

3   with a larger sales force, more established clinical history, perceived market leadership, more widely

4   used product (i.e., doctors are more willing to use the product their colleagues use), and greater

5   ability to offer favorable long-term contracts.

6       431.   For example, prior to Defendants' acquisition of Disc-O-Tech, CareFusion had met

7   with Disc-O-Tech to review Disc-O-Tech's technology, including the SKy Bone Expander, and to

8   discuss a potential partnership between the two companies.  Defendants' acquisition of Disc-O-Tech,

9   among other companies and third party assets, prevented a competitor, such as CareFusion, from

10  acquiring or otherwise establishing a business relationship with Disc-O-Tech.  This is turn prevented

11  a competitor, such as CareFusion, from selling Disc-O-Tech's competitive SKy Bone Expander

12  kyphoplasty product in the United States.

13      432.   Defendants' acquisition of multiple third party assets without the intention of

14  marketing products that utilized those assets, also has harmed and will continue to harm competition,

15  including CareFusion because Defendants' anticompetitive acquisition scheme has helped to entrench

16  Defendants' kyphoplasty products in the market and thus has facilitated Defendants' illegal market

17  position.  This in turn has made it more difficult for competitors, like CareFusion, to compete in the

18  minimally invasive vertebral compression fracture treatment product market and in the alternative

19  kyphoplasty product market.

20      433.   Defendants' illegal acquisition of third party assets also threatens to continue to harm

21  CareFusion's ability to compete in the minimally invasive vertebral compression fracture treatment

22  product market and in the alternative kyphoplasty product market, for example, by using illegal

23  acquired third party patent rights to threaten litigation against CareFusion relating to its Ava*max*<sup>TM</sup>

24  balloon kyphoplasty products.  (*See, e.g.,* Ex. RR, Feb. 10, 2010 JP Morgan Report at 2 (stating that

25  "Kyphon reps will likely use the litigation overhang…as [a] selling point[] against AVAmax.").)

26      434.   The harm suffered by CareFusion is the direct and intended result of Defendants'

27  anticompetitive, predatory, exclusionary, and/or inequitable conduct, and specifically, Defendants'

28  anticompetitive acquisition scheme.

## COUNT IX
## FALSE ADVERTISING UNDER 15 U.S.C. § 1125(a)

435. CareFusion incorporates by reference the allegations of paragraphs 1 – 434 above, as if fully alleged herein.

436. CareFusion and Defendants are both selling competing balloon kyphoplasty products.

437. Both CareFusion and Defendants use sales representatives to advertise and promote their balloon kyphoplasty products to consumers, namely hospitals and doctors. On information and belief, typical means through which sales representative advertise and promote minimally invasive vertebral compression fracture treatment products, including balloon kyphoplasty products, is through the use of email distribution, phone calls, in-person solicitations and other materials and means.

438. Beginning in at least July 2010, shortly after CareFusion announced the launch of its balloon kyphoplasty products, Defendants' began a widespread marketing, advertising and/or promotional campaign aimed at disseminating numerous false and misleading statements in interstate commerce to CareFusion's prospective kyphoplasty customers regarding CareFusion's kyphoplasty products.

439. On information and belief, Defendants' widespread marketing, advertising and/or promotional campaign is on-going and continuous.

440. These false and misleading statements have been made by Defendants' sales representatives to numerous hospitals and doctors across the country through, on information and belief, email distribution, phone calls, in-person solicitations and other materials and means.

441. These false and misleading statements, which have been disseminated to numerous prospective customers include at least the following:

A. Defendants' sales representatives have disseminated false and misleading statements regarding the failure rate of the balloons used in CareFusion's kyphoplasty products. Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons have a failure rate of 50%. This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products. In CareFusion's premarket release, CareFusion's balloons had a rupture rate of approximately 1.4% not

50%.  Moreover, the rupture rate of CareFusion's balloons is significantly lower than reported rupture rates of Defendants' balloons which, on information and belief, are over 6%.  (Ex. WW, "Balloon-Related Complications and Technical Failures in Kyphoplasty for Vertebral Fractures" at 175-76.)

B.      Defendants' sales representatives have disseminated other false and misleading statements regarding the balloons used in CareFusion's kyphoplasty products.  Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's balloons usually will rupture if the pressure exceeds 200 psi.  This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.  CareFusion's balloons are designed to be used and are used at pressures of up to 400 psi.

C.      Defendants' sales representatives have also disseminated false and misleading statements regarding the approved use of CareFusion's kyphoplasty products.  Specifically, Defendants' sales representatives have informed prospective customers that CareFusion's kyphoplasty products were approved by the FDA to only be used in a unipedicular manner, not a bipedicular manner like Defendants' products.  This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products.  The FDA has stated that it is the physician's responsibility to determine the surgical approach to be used with CareFusion's kyphoplasty products.  As such, the FDA approved CareFusion's kyphoplasty products for use in the reduction and fixation of fractures in cancellous bone in the spine for kyphoplasty.  This approved indication for use is substantially identical to the approved indication of use Defendants received from the FDA for their kyphoplasty products which they advertise can be used in a bipedicular manner.  Accordingly, the physician, not the FDA, determines if the reduction and fixation is done in unipedicular or bipedicular manner.

D.      Defendants' sales representatives have disseminated other false and misleading statements regarding the use of CareFusion's kyphoplasty products.  Specifically, Defendants' sales representatives have informed prospective customers that doctors cannot use CareFusion's kyphoplasty products in a bipedicular manner because doing so will result in patent infringement.

This statement is a false and misleading factual description and/or representation of the nature, characteristics and qualities of CareFusion's kyphoplasty products. Title 35 Section 287(c) provides immunity to patent infringement for "a medical practitioner's performance, of a medical activity that constitutes an infringement under section 271 (a) or (b) . . . ."

442.    These numerous false and misleading statements are being made by Defendants' sales representatives, many of whom have for years cultivated relationships with the hospitals and doctors who have received Defendants' false and misleading statements. Consequently, on information and belief, hospitals and doctors inherently trust Defendants' sales representatives, and thus inherently believe the false and misleading statements disseminated by Defendants' sales representatives.

443.    Information regarding, for example, the rupture rates of CareFusion's balloons, the pressure CareFusion's balloons are capable of withstanding, the approved use of CareFusion's kyphoplasty products and alleged liability for patent infringement if CareFusion's kyphoplasty products are used in a certain manner, are material to a customer's decision to purchase CareFusion's kyphoplasty products.  Specifically, certain hospitals and doctors have cited Defendants' false statements as reasons for not purchasing CareFusion's kyphoplasty products.

444.    Defendants' dissemination of the false and misleading statements regarding CareFusion's kyphoplasty products has and will continue to cause CareFusion to lose prospective customers,  has and will continue to negatively impact CareFusion's ability to make sales of its kyphoplasty products, and has and will continue to cause CareFusion to spend significant time and resources correcting the misperceptions Defendants' false and misleading statements are creating and will continue to create in the marketplace.

445.    Defendants' dissemination of the false and misleading statements regarding CareFusion's kyphoplasty products has and will continue to cause damage to CareFusion's business reputation and goodwill and have been conducted, on information and belief, knowingly and willfully by Defendants.

446.    Defendants' dissemination of the false and misleading statements regarding CareFusion's kyphoplasty products further has and will continue to irreparably harm CareFusion unless enjoined by the Court.

# COUNT X
## DECLARATORY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY OF U.S. PATENT NO. 6,235,043

447. CareFusion incorporates by reference the allegations of paragraphs 1 – 446 above, as if fully alleged herein.

448. Kyphon SARL, which on information and belief is a subsidiary of Medtronic, is the current recorded assignee of the '043 patent.

449. Since CareFusion's announcement of its AVA*max*™ balloon kyphoplasty product launch, the analyst community has repeatedly stated that a lawsuit from Defendants was forthcoming. (*See generally supra* ¶¶ 184-219.)

450. For example, on February 9, 2010, just hours after CareFusion announced the imminent launch of AVA*max*™ balloon kyphoplasty product, Morgan Stanley analysts sent an electronic message to CareFusion identifying the '043 patent as a threat to CareFusion's imminent product launch. (*See* Ex. LL, Bachman email to Borkowski.)

451. On information and belief, the Morgan Stanley analysts have covered the medical device industry for years, have and continue to work closely with Defendants, and received information regarding the '043 patent from Defendants.

452. Since CareFusion's announcement of its AVA*max*™ balloon kyphoplasty product launch, Defendants, through their Chairman & CEO, have also directly and publicly stated that it will "vigorously defend and assert our IP" related to balloon kyphoplasty. (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 15; *see also id*. at 4.)

453. Specifically, mere days after CareFusion's product launch announcement, Medtronic Chairman & CEO held an earnings conference call. In that call, Medtronic Chairman & CEO specifically referenced the "recent announcement of a potential new US competitor" and unequivocally stated that Medtronic would "vigorously defend it [its intellectual property] against any competitor product that infringes on our technology." (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 4; *see also id*. at 15.)

454. On information and belief, the "potential new US competitor" referenced by Medtronic's Chairman and CEO was CareFusion.

455.    Defendants' actions, combined with the totality of the circumstances, including but not limited to Defendants' litigation history, have therefore created a substantial controversy between Defendants and CareFusion regarding the alleged infringement of the '043 patent by CareFusion's AVA*max*™ balloon kyphoplasty products.[1]

456.    On information and belief, one or more claims of the '043 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

457.    CareFusion's AVA*max*™ balloon kyphoplasty products do not infringe any valid claim of the '043 patent.

458.    An actual and justiciable controversy exists between Defendants and CareFusion regarding invalidity and non-infringement of the '043 patent.

**COUNT XI**
**DECLARATORY JUDGMENT OF NONINFRINGEMENT**
**AND INVALIDITY OF U.S. PATENT NO. 6,241,734**

459.    CareFusion incorporates by reference the allegations of paragraphs 1 – 458 above, as if fully alleged herein.

460.    Kyphon SARL, which on information and belief is a subsidiary of Medtronic, is the current recorded assignee of the '734 patent.

461.    Since CareFusion's announcement of its AVA*max*™ balloon kyphoplasty product launch, the analyst community has repeatedly stated that a lawsuit from Defendants was forthcoming. (*See generally supra* ¶¶ 184-219.)

462.    For example, on February 9, 2010, just hours after CareFusion announced the imminent launch of AVA*max*™ balloon kyphoplasty product, Morgan Stanley analysts sent an

---

[1] *See, e.g., Alien Tech. Corp. v. Intermec, Inc.*, No. 06-51, 2007 U.S. Dist. LEXIS 2851, at *3-5, 10-12 (D.N.D. Jan. 4, 2007) (finding an actual case or controversy existed in light of threatening statements made during an earnings conference call and defendants' prior litigation regarding the patents at issue); *Dr. Reddy's Labs., LTD v. AaiPharma, Inc.*, No. 01-10102, 2002 U.S. Dist. LEXIS 17287, at *8-24 (S.D.N.Y. Sept. 19, 2002) (holding that threatening statements made to entire industry in two separate Wall Street Journal articles sufficient to establish declaratory judgment jurisdiction).

1    electronic message to CareFusion identifying the '734 patent as a threat to CareFusion's imminent

2    product launch. (*See* Ex. LL, Bachman email to Borkowski.)

3         463.    On information and belief, the Morgan Stanley analysts have covered the medical

4    device industry for years, have and continue to work closely with Defendants, and received

5    information regarding the '734 patent from Defendants.

6         464.    Since CareFusion's announcement of its AVA*max*[TM] balloon kyphoplasty product

7    launch, Defendants, through their Chairman & CEO, have also directly and publicly stated that it will

8    "vigorously defend and assert our IP" related to balloon kyphoplasty. (Ex. TT, Medtronic Feb. 23,

9    2010 Earnings Conference Call at 15; *see also id*. at 4.)

10        465.    Specifically, mere days after CareFusion's product announcement, Medtronic

11    Chairman & CEO held an earnings conference call. In that call, Medtronic Chairman & CEO

12    specifically referenced the "recent announcement of a potential new US competitor" and

13    unequivocally stated that Medtronic would "vigorously defend it [its intellectual property] against

14    any competitor product that infringes on our technology." (Ex. TT, Medtronic Feb. 23, 2010

15    Earnings Conference Call at 4; *see also id*. at 15.)

16        466.    On information and belief, the "potential new US competitor" referenced by

17    Medtronic's Chairman and CEO was CareFusion.

18        467.    Defendants' actions, combined with the totality of the circumstances, including but not

19    limited to Defendants' litigation history, have therefore created a substantial controversy between

20    Defendants and CareFusion regarding the alleged infringement of the '734 patent by CareFusion's

21    AVA*max*[TM] balloon kyphoplasty products. (*See supra* ¶ 453 n.1.)

22        468.    On information and belief, one or more claims of the '734 patent are invalid for failure

23    to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and

24    112.

25        469.    CareFusion's AVA*max*[TM] balloon kyphoplasty products do not infringe any valid

26    claim of the '734 patent.

27        470.    An actual and justiciable controversy exists between Defendants and CareFusion

28    regarding invalidity and non-infringement of the '734 patent.

## COUNT XII
## DECLARATORY JUDGMENT OF NONINFRINGEMENT
## AND INVALIDITY OF U.S. PATENT NO. 6,248,110

471.    CareFusion incorporates by reference the allegations of paragraphs 1 – 470 above, as if fully alleged herein.

472.    Medtronic Spine is the current recorded assignee of the '110 patent.

473.    Since CareFusion's announcement of its AVA*max*™ balloon kyphoplasty product launch, the analyst community has repeatedly stated that a lawsuit from Defendants was forthcoming. (*See supra* ¶¶ 184-219.)

474.    For example, on February 9, 2010, just hours after CareFusion announced the imminent launch of AVA*max*™ balloon kyphoplasty product, Morgan Stanley analysts sent an electronic message to CareFusion identifying the '110 patent as a threat to CareFusion's imminent product launch.  (*See* Ex. LL, Bachman email to Borkowski.)

475.    On information and belief, the Morgan Stanley analysts have covered the medical device industry for years, have and continue to work closely with Defendants, and received information regarding the '110 patent from Defendants.

476.    Since CareFusion's announcement of its AVA*max*™ balloon kyphoplasty product launch, Defendants, through their Chairman & CEO, have also directly and publicly stated that it will "vigorously defend and assert our IP" related to balloon kyphoplasty.  (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 15; *see also id*. at 4.)

477.    Specifically, mere days after CareFusion's product announcement, Medtronic Chairman & CEO held an earnings conference call.  In that call, Medtronic Chairman & CEO specifically referenced the "recent announcement of a potential new US competitor" and unequivocally stated that Medtronic would "vigorously defend it [its intellectual property] against any competitor product that infringes on our technology."  (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 4; *see also id*. at 15.)

478.    On information and belief, the "potential new US competitor" referenced by Medtronic's Chairman and CEO was CareFusion.

479.   Defendants' actions, combined with the totality of the circumstances, including but not limited to Defendants' litigation history, have therefore created a substantial controversy between Defendants and CareFusion regarding the alleged infringement of the '110 patent by CareFusion's AVA*max*™ balloon kyphoplasty products. (*See supra* ¶ 453 n.1.)

480.   On information and belief, one or more claims of the '110 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

481.   CareFusion's AVA*max*™ balloon kyphoplasty products do not infringe any valid claim of the '110 patent.

482.   An actual and justiciable controversy exists between Defendants and CareFusion regarding invalidity and non-infringement of the '110 patent.

## COUNT XIII
## DECLARATORY JUDGMENT OF NONINFRINGEMENT
## AND INVALIDITY OF U.S. PATENT NO. 6,613,054

483.   CareFusion incorporates by reference the allegations of paragraphs 1 – 482 above, as if fully alleged herein.

484.   Kyphon SARL, which on information and belief is a subsidiary of Medtronic, is the current recorded assignee of the '054 patent.

485.   Since CareFusion's announcement of its AVA*max*™ balloon kyphoplasty product launch, the analyst community has repeatedly stated that a lawsuit from Defendants was forthcoming. (*See supra* ¶¶ 184-219.)

486.   For example, on February 9, 2010, just hours after CareFusion announced the imminent launch of AVA*max*™ balloon kyphoplasty product, Morgan Stanley analysts sent an electronic message to CareFusion identifying the '054 patent as a threat to CareFusion's imminent product launch. (*See* Ex. LL, Bachman email to Borkowski.)

487.   On information and belief, the Morgan Stanley analysts have covered the medical device industry for years, have and continue to work closely with Defendants, and received information regarding the '054 patent from Defendants.

488.   Since CareFusion's announcement of its AVA*max*<sup>TM</sup> balloon kyphoplasty product launch, Defendants, through their Chairman & CEO, have also directly and publicly stated that it will "vigorously defend and assert our IP" related to balloon kyphoplasty.  (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 15; *see also id.* at 4.)

489.   Specifically, mere days after CareFusion's product announcement, Medtronic Chairman & CEO held an earnings conference call.  In that call, Medtronic Chairman & CEO specifically referenced the "recent announcement of a potential new US competitor" and unequivocally stated that Medtronic would "vigorously defend it [its intellectual property] against any competitor product that infringes on our technology."  (Ex. TT, Medtronic Feb. 23, 2010 Earnings Conference Call at 4; *see also id.* at 15.)

490.   On information and belief, the "potential new US competitor" referenced by Medtronic's Chairman and CEO was CareFusion.

491.   Defendants' actions, combined with the totality of the circumstances, including but not limited to Defendants' litigation history, have therefore created a substantial controversy between Defendants and CareFusion regarding the alleged infringement of the '054 patent by CareFusion's AVA*max*<sup>TM</sup> balloon kyphoplasty products.  (*See supra* ¶ 453 n.1.)

492.   On information and belief, one or more claims of the '054 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

493.   CareFusion's AVA*max*<sup>TM</sup> balloon kyphoplasty products do not infringe any valid claim of the '054 patent.

494.   An actual and justiciable controversy exists between Defendants and CareFusion regarding invalidity and non-infringement of the '054 patent.

## **PRAYER FOR RELIEF**

WHEREFORE, CareFusion respectfully requests entry of judgment in its favor and the following relief, including:

A.      That judgment be entered in favor of CareFusion and against Defendants on all counts;

1    B.  That Defendants account for damages sustained by CareFusion as a result of

2 Defendants' violations of the antitrust laws;

3    C.  That the damages resulting from Defendants' violations of the antitrust laws be trebled

4 as required by 15 U.S.C. § 15(a);

5    D.  That Defendants, and all related entities, be permanently enjoined from threatening

6 CareFusion with patents it knows to be either invalid or unenforceable;

7    E.  That Defendants, and all related entities, be ordered to immediately disclaim and

8 dedicate to the public each and every patent they own, or have exclusive rights in, that relates in

9 whole or in part to minimally invasive vertebral compression fracture treatment products, to the

10 public and to so inform the United States Patent and Trademark Office;

11    F.  That Defendants, and all related entities, be enjoined from enforcing each and every

12 patent they own, or have exclusive rights in, that relates in whole or in part to minimally invasive

13 vertebral compression fracture treatment products, for a minimum of ten (10) years from the date of

14 the Order;

15    G.  That all potential or actual competitors of Defendants in the minimally invasive

16 vertebral compression fracture treatment product market be given a zero sum paid up license under

17 each and every patent now owned or controlled by Defendants that relates to said market;

18    H.  That CareFusion be awarded its costs and reasonable attorney fees associated with its

19 antitrust counts as required by 15 U.S.C. § 15(a);

20    I.  That Defendants, all related entities of Defendants and any of their officers, directors,

21 agents, servants, employees, successors, assigns, and attorneys, as well as all of those in active

22 concert or participation with Defendants be preliminarily and permanently enjoined from making any

23 false or misleading description of fact or false or misleading representation of fact regarding

24 CareFusion's kyphoplasty products, including but not limited to false and misleading statements

25 regarding balloon rupture, FDA approval and alleged patent infringement;

26    J.  That Defendants be ordered to pay restitution to CareFusion including all profits lost

27 by CareFusion as a result of Defendants false and misleading advertising and/or promotion, all profits

28 received by Defendants from sales or revenues of any kind made as a result of Defendants' false and

misleading advertising and/or promotion, and all sums expended by CareFusion in an attempt to correct Defendants' false and misleading advertising and/or promotion;

K.     That the damages resulting from Defendants' false and misleading advertising and/or promotion be trebled pursuant to 15 U.S.C. § 1117;

L.     That CareFusion be awarded its costs and reasonable attorney fees associated with its false advertising count as required by 15 U.S.C. § 1117;

M.     That Defendants be order to disseminate corrective advertising at Defendants' expense regarding at least the following: that CareFusion's balloon kyphoplasty products rupture only approximately 1.4% of the time; that CareFusion's balloon kyphoplasty products can withstand pressures of at least 400 psi; that CareFusion's balloon kyphoplasty products are approved by the FDA for the reduction and fixation of fractures in cancellous bone in the spine and that it is for the physician to decide if the reduction and fixation is done in a unipedicular or bipedicular manner; and that a physician cannot infringe Defendants' patents through performance of a bipedicular kyphoplasty procedure;

N.     That Defendants be ordered to recall all false advertising distributed and requiring Defendants to issue notices (written or otherwise) to that effect to all current sales representatives of Defendants;

O.     That one or more claims of the '043 patent be declared invalid;

P.     That one or more claims of the '734 patent be declared invalid;

Q.     That one or more claims of the '110 patent be declared invalid;

R.     That one or more claims of the '054 patent be declared invalid;

S.     That CareFusion be declared to not be liable for any infringement, contributory infringement, or for inducing the infringement of any valid claim of the '043 patent;

T.      That CareFusion be declared to not be liable for any infringement, contributory infringement, or for inducing the infringement of any valid claim of the '734 patent;

U.     That CareFusion be declared to not be liable for any infringement, contributory infringement, or for inducing the infringement of any valid claim of the '110 patent;

1    V.    That CareFusion be declared to not be liable for any infringement, contributory

2    infringement, or for inducing the infringement of any valid claim of the '054 patent;

3    W.    That this case be declared "exceptional" and that CareFusion be awarded its expenses,

4    costs, and attorneys' fees pursuant to 35 U.S.C. § 285;

5    X.    That CareFusion be awarded its costs, attorneys' fees, and expenses incurred in this

6    action pursuant to applicable state and federal laws;

7    Y.    That CareFusion be awarded prejudgment interest on any award made; and

8    Z.    That the Court grant CareFusion such other and further relief as the Court may deem

9    just and proper.

10

11                                                Respectfully submitted,

12

13

14    Dated:  December 16, 2010                   /s/ James R. Nuttall

15                                                Claude M. Stern
                                                  QUINN EMANUEL URQUHART
16                                                 & SULLIVAN, LLP
                                                  555 Twin Dolphin Dr., 5th Floor
17                                                Redwood Shores, California 94065
                                                  Telephone: (650) 801-5000
18                                                Facsimile: (650) 801-5100

19                                                Timothy J. Malloy
                                                  James R. Nuttall
20                                                Christopher M. Scharff
                                                  Stephanie F. Samz
21                                                McANDREWS, HELD & MALLOY LTD.
                                                  500 West Madison Street, Suite 3400
22                                                Chicago, Illinois 60661
                                                  Telephone: (312) 775-8000
23                                                Facsimile: (312) 775-8100

24                                                **Attorneys for Plaintiffs**
                                                  **CareFusion Corporation and**
25                                                **CareFusion 2200, Inc.**

26

27

28

## JURY DEMAND

CareFusion demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated:  December 16, 2010

/s/ James R. Nuttall
Claude M. Stern
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Timothy J. Malloy
James R. Nuttall
Christopher M. Scharff
Stephanie F. Samz
McANDREWS, HELD & MALLOY LTD.
500 West Madison Street, Suite 3400
Chicago, Illinois 60661
Telephone: (312) 775-8000
Facsimile: (312) 775-8100

**Attorneys for Plaintiffs
CareFusion Corporation and
CareFusion 2200, Inc.**

1

**<u>CERTIFICATE OF SERVICE</u>**

2
       The undersigned certifies that a true and correct copy of the above and foregoing document

3
has been served on December 16, 2010 to all counsel of record who are deemed to have consented to

4
electronic service via the Court's CM/ECF service per Civil Local Rule 5.4.  Any other counsel of

5
record will be served by electronic mail, facsimile and/or overnight delivery.

6

7
Dated:   December 16, 2010

8

9

10
                   By:  _/s/ James R. Nuttall_____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28