Jeffrey S. Davidson (S.B.N. 143633)
jeff.davidson@kirkland.com
Luke L. Dauchot (S.B.N. 229829)
luke.dauchot@kirkland.com
Martin R. Boles (S.B.N. 124159)
martin.boles@kirkland.com
Sharre S. Lotfollahi (S.B.N. 258913)
sharre.lotfollahi@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, CA  90071
Telephone:     (213) 680-8400
Facsimile:     (213) 680-8500

Attorneys for Defendants
MEDTRONIC INC.,
MEDTRONIC SPINE LLC,
and KYPHON SARL

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| CAREFUSION CORPORATION and CAREFUSION 2200, CORPORATION<br><br>Plaintiffs,<br><br>v.<br><br>MEDTRONIC, INC., MEDTRONIC SPINE LLC d/b/a KYPHON INC., and KYPHON SARL<br><br>Defendants. | **CASE NO. CV10-01111 LHK (PSG)**<br><br>**NOTICE OF MOTION, MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COUNTS I THROUGH IX OF THE FIRST AMENDED AND SUPPLEMENTAL COMPLAINT**<br><br>Hearing Date:  March 17, 2011<br>Time:            1:30 p.m.<br>Judge:           Hon. Lucy H. Koh<br>Location:       Courtroom 4, 5th Floor<br>                      280 South First Street<br>                      San Jose, California |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on March 17, 2011, at 1:30 p.m., pursuant to the Court's November 23, 2010 Order (Dkt. 62), before the Honorable Lucy H. Koh, Judge of the United States District Court for the Northern District of California, 280 South First Street, San Jose, California, in Courtroom 4, 5th Floor, Defendants Medtronic, Inc., Medtronic Spine LLC (incorrectly named as Medtronic Spine LLC d/b/a Kyphon Inc.), and Kyphon SARL will move, and hereby do move, this Court to dismiss Counts I, III, V, and VII (Monopolization), Counts II, IV, VI, and VIII (Attempted Monopolization), and Count IX (Lanham Act) of Plaintiffs CareFusion Corp. and CareFusion 2200, Inc.'s First Amended and Supplemental Complaint for Antitrust Violations and Lanham Act Violations and a Declaratory Judgment for Patent Invalidity and Noninfringement ("Amended Complaint") for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Motion will be based on this Notice of Motion, Motion, and Memorandum of Points and Authorities in Support, any Reply memorandum, the files and records of this action, and any additional evidence and argument that may be elicited at the hearing of this Motion.

The Court action sought by this motion is dismissal of Counts I, II, III, IV, V, VI, VII, VIII and IX of the Amended Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES

## TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES TO BE DECIDED..........................................................................1

STATEMENT OF RELEVANT FACTS...................................................................................1

ARGUMENT..............................................................................................................................2

I.      THE ANTITRUST CLAIMS (COUNTS I-VIII) SHOULD BE DISMISSED..............2

      A.    Monopoly Power Is Not Properly or Plausibly Pled for Any Claim. ......................2

      B.    "Predatory Conduct" and "Antitrust Standing" Are Not Properly Pled. .................5

          1.    "Medicare Fraud" (Counts I & II) ................................................................5

              a.    Injury-in-fact to CareFusion is not alleged plausibly. ....................6

              b.    Competition increased, according to CareFusion's own allegations. ......................................................................................7

              c.    CareFusion's alleged injury does not "flow from that which would make the conduct unlawful" under the antitrust laws..........9

              d.    CareFusion is not the proper party to sue for the alleged Medicare fraud. ................................................................................9

          2.    "False and Deceptive Advertising" (Counts III & IV) .............................11

          3.    "*Handgards*" Sham Litigation Claims (Counts V & VI)..........................14

              a.    Litigation by Defendants against CareFusion is not pled. .............14

              b.    Antitrust injury is still lacking. ....................................................16

               c.    New allegations establish as a matter of law that assertion of the '404 and '888 patents would not have been "objectively baseless."...................................................................................16

          4.    Patent Acquisitions (Counts VII & VIII)..................................................17

               a.    The statute of limitations precludes claims based on the Bonutti, Sanatis, Berger, and Sandhu acquisitions. .......................17

              b.    Antitrust injury is not properly alleged with respect to any of the acquisitions................................................................................18

              c.    Individually the alleged acquisitions are not plausibly pled as furthering a monopoly.................................................................22

II.     THE LANHAM ACT CLAIM (COUNT IX) SHOULD BE DISMISSED.................24

CONCLUSION ........................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abcor Corp. v. AM Int'l, Inc.,*
916 F.2d 924 (4th Cir. 1990) ......................................................................................... 13

*Alberta Gas Chem., Ltd. v. E.I. Du Pont de Nemours & Co.,*
826 F.2d 1235 (3d Cir. 1987) ......................................................................... 9, 11, 18, 24

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co.,*
190 F.3d 1051 (9th Cir. 1999) ......................................................................................... 6

*Am. Int'l Adjustment Co. v. Galvin,*
86 F.3d 1455 (7th Cir. 1996) ........................................................................................... 9

*Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.,*
108 F.3d 1147 (9th Cir. 1997) .............................................................................. 11, 12, 13

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
459 U.S. 519 (1983) ...................................................................................................... 10

*Atl. Richfield Co. v. USA Petroleum Co.,*
495 U.S. 328 (1990) ........................................................................................................ 8

*Bell Atlantic Corp.  v. Twombly,*
550 U.S. 544 (2007) ................................................................................................ passim

*Boulware v. State of Nev.,*
960 F.2d 793 (9th Cir. 1992) ......................................................................................... 17

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993) ........................................................................................................ 8

*Brunswick v. Pueblo Bowl-o-Mat,*
429 U.S. 477 (1977) .................................................................................................... 9, 22

*Cargill, Inc. v. Monfort of Colo.,*
479 U.S. 104 (1986) .................................................................................................... 7, 9

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.,*
611 F.3d 495 (9th Cir. 2010) ....................................................................................... 6, 7

*CollegeNet, Inc. v. Xap Corp.,*
2004 WL 2303506, at *2 (D. Or. Oct. 12, 2004) ..................................................... 24, 25

*Columbia R. People's Util. Dist. v. Portland Gen. Elec. Co.,*
217 F.3d 1187 (9th Cir. 2000) ....................................................................................... 24

*Datagate, Inc. v. Hewlett-Packard Co.,*
941 F.2d 864 (9th Cir. 1991) ................................................................................. 1, 2, 18

*Ecodisc Tech. AG v. DVD Format/Logo Licensing Corp.,*

711 F. Supp. 2d 1074 (C.D. Cal. 2010) ............................................................ 24, 25

*F.T.C. v. Tenet Health Care Corp.*,
186 F.3d 1045 (8th Cir. 1999) ............................................................................ 5

*FilmTec Corp. v. Hydranautics*,
67 F.3d 931 (1995) ............................................................................................. 17

*In re Netflix Antitrust Litig.*,
506 F. Supp. 2d 308 (N.D. Cal. 2007) .............................................................. 15

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996) ............................................................................... 4

*In re Travel Agent Com'n Antitrust Litigation*,
583 F.3d 896 (6th Cir. 2009) ............................................................................... 4

*J. Allen Ramey, M.D., Inc. v. Pacific Found. for Med. Care*,
999 F. Supp. 1355 (SD Cal. 1998) .................................................................... 11

*Kinderstart.com, LLC v. Google, Inc.*,
2007 WL 831806 (N.D. Cal. Mar. 16, 2007) .................................................... 13

*Lucas v. Bechtel Corp.*,
800 F.2d 839 (9th Cir. 1986) ............................................................................. 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...................................................................................... 9, 18

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
309 F. Supp. 2d 1156 (N.D. Cal. 2004) ............................................................ 23

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
701 F. Supp. 2d 568 (S.D.N.Y. 2010) ............................................................... 17

*Oahu Gas Serv., Inc. v.  Pac. Res., Inc.*,
838 F.2d 360 (9th Cir. 1988) ............................................................................... 4

*Pestube Sys., Inc. v. Hometeam Pest Defense, LLC*,
2006 WL 1441014 (D. Ariz. May 24, 2006) ..................................................... 24

*Pool Water Prods. v. Olin Corp.*,
258 F.3d 1024 (9th Cir. 2001) .............................................................. 7, 8, 19, 20

*POURfect Prods. v. KitchenAid*,
2010 WL 1769413 (D. Ariz. May 3, 2010) ....................................................... 13

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993) ...................................................................................... 16, 17

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
890 F.2d 139 (9th Cir. 1988) ............................................................................. 10

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) ...................................................................... 3, 5, 8

iii

D\textsc{efendants'} M\textsc{otion to} D\textsc{ismiss} C\textsc{ounts} I T\textsc{hrough} IX          CASE NO: CV10-01111 LHK (PSG)

*Rickards v. Canine Eye Registration Found.*,
    783 F.2d 1329 (9th Cir. 1986) .................................................................................... 16

*Sacramento Valley, Chapter of the Nat'l. Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers*,
    888 F.2d 604 (9th Cir. 1989) ...................................................................................... 10

*Sanderson v. Culligan International Company,*
    415 F.3d 620 (2005) .................................................................................................... 13

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
    401 F.3d 123 (3rd Cir. 2005) ...................................................................................... 13

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981) ...................................................................................... 23

*Segal Co. v. Amazon.com*,
    280 F. Supp. 2d 1229 (W.D. Wash. 2003) ................................................................. 25

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) ...................................................................................... 3

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ...................................................................................... 5

*Tate v. Pac. Gas & Elec. Co.*,
    230 F. Supp. 2d 1072 (N.D. Cal. 2002) ......................................................... 11, 12, 13

*Total Coverage, Inc. v. Cendant Settlement Servs. Group, Inc.*,
    2007 WL 1982136 (9th Cir. July 3, 2007) .................................................................. 9

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
    709 F. Supp. 2d 821 (C.D. Cal. 2010) ...................................................................... 12

*UGG Holdings, Inc. v. Severn*,
    No. 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) ........................................................ 5

*United States v. Brown Univ. in Providence in State of R.I.*,
    5 F.3d 658 (3d Cir. 1993) ............................................................................................ 8

*United States v. Caronia*,
    576 F. Supp. 2d 385 (E.D.N.Y. 2008) ....................................................................... 23

*United States v. Syufy Enters.*,
    903 F.2d 659 (9th Cir. 1990) ............................................................................. 3, 4, 19

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .................................................................................... 24

*Von Koenig v. Snapple Beverage Corp.*,
    2011 WL 43577 (E.D. Cal., Jan. 6, 2011) ................................................................. 25

*W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*,
    65 F. Supp. 2d 1052 (N.D. Cal. 1998) ........................................................................ 5

**Statutes**

15 U.S.C. § 15b (1976) ................................................................................................ 17

**Other Authorities**

3 P. Areeda, *Antitrust Law*, ¶ 737b (1978) ................................................................ 11

5 Wright and Miller, *Federal Practice and Procedure* § 1285 (3d ed. 2004) .................................... 9

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 10

Fed. R. Civ. P. 9(b) ............................................................................................ 24, 25

### STATEMENT OF ISSUES TO BE DECIDED

The elements for a claim of "monopolization" are (1) "monopoly power," namely the power to exclude competition and raise prices; (2) predatory conduct to achieve that monopoly power; and (3) "antitrust standing," a multi-part analysis combining traditional standing doctrines with other requirements peculiar to antitrust law, including causal "antitrust injury."  *See Datagate, Inc. v. Hewlett-Packard Co.*, 941 F.2d 864, 868 (9th Cir. 1991).

This Court dismissed the original Complaint because it failed to adequately allege the latter two elements.  (*See* Dkt. 60 (Order) at 9–10, 13–14.)  The Amended Complaint, in a painfully transparent effort to respond by substituting sheer length for substance, adds so many new, alternating and contradictory allegations that the "monopoly power" element is now also negated. This element being a requirement for each of the "monopolization" claims (and "dangerous probability of acquiring monopoly power" being required for each claim of attempted monopoly), the self-destruction of that element is fatal to all eight of the antitrust claims.  *See infra* Part I.A.

A second independent reason for dismissing each antitrust claim is the continued failure to adequately allege the elements of "predatory conduct" and "antitrust standing."  *See infra* Part I.B. One or both of these elements is lacking or contradicted in each of the eight antitrust causes of action.  *See infra* Parts I.B.1 (Counts I & II re "Medicare Fraud"), I.B.2 (Counts III & IV re "False Advertising"), I.B.3 (Counts V & VI re *"Handgards"* (Sham Litigation), I.B.4 (Counts VII & VIII re acquisitions).

A third independent reason for dismissing each of these claims is the failure to comply with the Supreme Court's requirement in *Bell Atlantic v. Twombly* that antitrust claims be pled with **plausibility**.  Like a player in the game of *Twister*, CareFusion reaches so far, with so many theories, and with so many entangling contradictions, that stories fall over from the weight of their own implausibility.  *See infra* Parts I.B.1–4.

### STATEMENT OF RELEVANT FACTS

The following facts are from allegations in CareFusion's Complaint, Amended Complaint, or the attached exhibits.  Defendants assume their truth for purposes of this motion only.

This case involves treatment of "vertebral compression fractures," or "VCF," a condition

caused by progressive osteoporosis, primarily in elderly patients.  Traditional treatment of VCF includes braces, pain medication, bed rest, physical therapy, and open-spine surgery.  (*See* Dkt. 63 (1st Am. & Supplemental Compl. ("FAC")) Ex. I at 4, 10; *id.* Ex. R at 16–17).  Surgery was formerly ruled out for many patients of advanced age.  (*See id.* Ex. I at 4, 9, 10.)

Defendant Kyphon was founded by a technician and two doctors who invented a "minimally invasive" surgical treatment of VCF called "kyphoplasty."  (*See id.* Ex. I at 3–5.)  The treatment involves inserting a tiny tube into the vertebrae, inserting an uninflated balloon through the tube, then inflating the balloon inside the vertebrae to restore its original shape, followed by injecting cement to make the restoration permanent.  The United States Patent and Trademark Office awarded Kyphon's founders two foundational patents covering the kyphoplasty procedure—the '404 and '888 patents.  (*Id.* ¶¶ 39–41.)  They expired in February 2009.  (*Id.* ¶ 44.)  CareFusion thereupon announced that it would introduce a competing kyphoplasty product.  (*See id.* ¶¶ 163, 171, 173–176.)

The original Complaint alleged that CareFusion delayed its product launch by two years because of "threats" by Defendants to sue for infringement of the '404 and '888 patents.  (*See* Dkt. 1 ¶¶ 102, 158, 169.)  The newly-launched product was also supposedly "threaten[ed]" by a "cloud" resulting from other, non-expired patents acquired by Defendants allegedly in violation of the Sherman Act.  (*See id.* ¶¶ 159, 170.)

Plaintiff CareFusion sells products for another VCF treatment called "vertebroplasty," which entails injection of cement into the collapsed vertebrae, but without prior inflation of a balloon to create a cavity and restore vertebral shape.  (*See* FAC ¶¶ 35–36, 50; *id.* Ex. I at 18.)

Because the Amended Complaint contains several alternative story lines, factual allegations pertinent to each will be discussed separately with respect to particular causes of action.

## ARGUMENT

## I.     THE ANTITRUST CLAIMS (COUNTS I-VIII) SHOULD BE DISMISSED.

### A.     Monopoly Power Is Not Properly or Plausibly Pled for Any Claim.

The threshold element of a claim for monopolization is "monopoly power."  *Datagate*, 941 F.2d at 868.  Monopoly power is the power to exclude competitors or restrict output in order to raise

prices. *See United States v. Syufy Enters.*, 903 F.2d 659, 664 (9th Cir. 1990); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995).

In the original motion to dismiss, Defendants noted at the outset that this case was "hollow at the core" because the Complaint showed that new competition was entering the market boldly, not being excluded. (*See* Dkt. 36 (Mot. to Dismiss) at 1.) The Amended Complaint reinforces the allegations negating monopoly power. Gone are the allegations that Defendants' unexpired patents erected a barrier to new competition. (*See* Dkt. 1 (Compl.) ¶ 170 (alleging that Defendants' acquired patents "cast a cloud" over CareFusion's new product).) In its place is a new story of a market that is wide open, where individual inventors and doctors can adapt a variety of technologies outside the confines of vertebral patents to enable any competitor to "decrease[] or eliminate[] Defendants' monopoly." (*See e.g.*, FAC ¶¶ 70, 74 (alleging patents for non-vertebral "soft tissue" could be used to eliminate Defendants' monopoly); *id.* ¶¶ 82, 86 (alleging patents related to "the use of balloons in bones other than the spine" could have "decreased or eliminated Defendants' monopoly)"; *id.* ¶ 399 (alleging each of the acquired technologies "would have eliminated Defendants' monopoly").)

Far from being excluded, *see Syufy Enters.*, 903 F.2d at 671 n.21 (no monopolization under Section 2 absent power to exclude competition), "multiple competitors" are entering. (*See* FAC Ex. TT at 17.)[1] Among them are formidable giants like Johnson & Johnson (*id.* Ex. HH at 14) and, of course, the 4-billion-dollar-strong CareFusion (*see id.* Ex. MM at 2–3). As this Court has noted, the entry of competitors into the market suggests absence of market power. (*See* Dkt. 60 (Order) at 6–7 n.2 ("A mere showing of substantial or even dominant market share alone cannot establish market power sufficient to carry out a predatory scheme. The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price" (quoting *Rebel Oil*, 51 F.3d at 1439)).) The influx of new competition is summarized in a chart that CareFusion withheld from the excerpts of an industry report appended to the Amended Complaint as Exhibit E: "Competitors" include "10+" companies

---

[1]  Courts, when considering a motion to dismiss, "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296–97 (9th Cir. 1998).

and the "trend" is "increasing." (*See* Beffa Decl. Ex. A at 50.)[2]

Furthermore, the prices of the new products are lower, not higher. (*See* FAC ¶ 64.)  And customers are getting more "favorable" terms in long-term contracts.  (*See id.* ¶¶ 404, 430.)  *See Syufy Enters.*, 903 F.2d at 664 (monopoly power is the power to raise prices).

Any of these facts negate the existence of "monopoly power" (or the equivalent element for a claim of attempted monopoly, a "dangerous probability" of achieving it).  *See id.* 903 F.2d at 671 n.21.  Taken together, they render the element of monopoly power impossible, not just implausible. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 554–58, 566–67 (2007) (courts should "insist upon some specificity in pleading" facts that make plaintiff's characterization not just possible, but plausible).

Nor can the monopoly power element continue to be supported by alleged market shares.  In antitrust law, market shares can in some circumstances be used as a proxy for monopoly power, on the theory that a competitor who controls a high enough market share can unilaterally increase prices by restricting output.  *See Oahu Gas Serv., Inc. v.  Pac. Res., Inc.*, 838 F.2d 360, 366 (9th Cir. 1988).  But market shares are insufficient where the facts show "defendant's inability to control prices or exclude competitors."  *Id.*

Moreover, exhibits attached to the Amended Complaint show that CareFusion's allegation of market share relies on implausible market definitions.[3]  Because of "skepticism" from doctors, many VCF patients are prescribed treatments other than vertebroplasty and kyphoplasty.  (*See* FAC Ex. E at 4–5; *see also id.* Ex. R at 16 (listing alternatives); *id.* Ex. P at 11 ("skeptical" whether "gatekeeper" doctors can be convinced to refer patients for kyphoplasty rather than alternative treatment plan involving pain medication).)  Since those other treatments are considered substitutes for vertebroplasty and kyphoplasty by the doctor decision-maker, they should be included in the

---

[2]   This document can be considered on this motion.  *See In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).

[3]   *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 909 (6th Cir. 2009) (dismissing complaint where exhibit contained facts suggesting a more plausible, lawful explanation for defendants' conduct in light of plaintiffs' vague allegations, in keeping with Supreme Court mandate in *Twombly* to avoid costly discovery obligations where allegations are implausible).

denominator for assessing market share.[4]  CareFusion fails to allege (let alone allege with plausibility) that non-surgical treatments for vertebral compression fractures (such as bed rest or medication) do not compete with vertebroplasty or kyphoplasty for doctor and hospital adoption. *See Rebel Oil Co.*, 51 F.3d at 1434.  Once the improper market definition is disregarded, CareFusion has not alleged that Defendants have ever had a significant share of the overall vertebral compression fracture treatment market.  Indeed, pages from a market report that CareFusion omitted from Exhibit E say that kyphoplasty accounted for only 1% of trauma-related VCF treatments.  (*See* Beffa Decl. Ex. A at 50.)  That means that CareFusion's vertebroplasty sales, or other treatments aside from Defendants' products, were used for treatments provided to those patients.  *See Rebel Oil Co.*, 51 F.3d at 1438 ("[A] market share of 30 percent is presumptively insufficient to establish the power to control price."); *F.T.C. v. Tenet Health Care Corp.*, 186 F.3d 1045, 1052 n.10 (8th Cir. 1999) ("Market shares of less than 60% are generally not sufficient to create an inference of monopoly power.").

### B.     "Predatory Conduct" and "Antitrust Standing" Are Not Properly Pled.

#### 1.     "Medicare Fraud" (Counts I & II)

CareFusion alleges that Kyphon induced hospitals to perform kyphoplasty as an inpatient, rather than outpatient, procedure to obtain a higher Medicare reimbursement rate.  (*See* FAC Counts I–II.)  CareFusion argues that it thereby lost sales of vertebroplasty.  (*Id.* ¶¶ 253, 276.)  Defendants dispute the premise that their marketing practices were wrongful, and indeed CareFusion has submitted evidence that inpatient treatment is widespread even for vertebroplasty—which Defendants have never marketed.  (*See* FAC Ex. E at 4–5.)

Even taken at face value, however, these counts fail to meet three criteria for "antitrust

---

[4]     *See W. Parcel Exp. v. United Parcel Serv. of Am., Inc.*, 65 F. Supp. 2d 1052, 1058 (N.D. Cal. 1998) ("A relevant market is generally defined as a pool of services that are reasonably interchangeable and are therefore economic substitutes for one another."); *UGG Holdings, Inc. v. Severn*, No. 2004 WL 5458426, at *3 (C.D. Cal. Oct. 1, 2004) ("Where a plaintiff fails to define his proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in his favor, the relevant market is legally insufficient and a motion to dismiss may be granted." (citing *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001))).

injury":  (a) constitutional "injury in fact" to CareFusion; (b) injury to competition "of the type the antitrust laws were intended to prevent;" and (c) that CareFusion's injury "flows from that which makes the conduct unlawful" under the antitrust laws.  (*See* Dkt. 60 (Order) at 7, 9–10 (dismissing claims for lack of antitrust injury and quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1055 (9th Cir. 1999)).)  All three criteria must be met, or the claim should be dismissed.  (*Id.*)  The claim must also satisfy an additional criterion for "antitrust standing," namely (d) that CareFusion be the best plaintiff to redress the alleged fraud.

### a.      Injury-in-fact to CareFusion is not alleged plausibly.

CareFusion has not plausibly alleged that inpatient reimbursement of kyphoplasty caused it to suffer injury.  The very context of this suit—filed 10 years after the "fraud" supposedly began, and two years after the settlement was announced—suggests that this grievance is contrived.  Courts properly regard "antitrust" claims brought by competitors with suspicion, lest a body of law enacted to protect consumers be usurped by sellers to thwart a competitor.  *See infra* note 9 and accompanying text.

CareFusion's story does not meet the Supreme Court's requirement, from *Bell Atlantic v. Twombly*, that antitrust pleadings be plausible.  *See Twombly* 550 U.S. at 554–58.  For example, CareFusion alleges that inducement of inpatient treatment was fraudulent because kyphoplasty is done on an outpatient basis "typically."  (*See* FAC ¶ 54.)  But kyphoplasty did not exist in the marketplace prior to when Defendant Kyphon began marketing it.  CareFusion alleges that Kyphon began the scheme to defraud Medicare "[i]n or about 2000 or 2001"—the same time that Kyphon initiated "a full commercial release of its kyphoplasty products."  (*Id.* ¶¶ 28, 49.)  So the premise that Kyphon subverted what was done "typically" is not plausible—or even possible.

Nor does CareFusion's theory that inpatient procedures caused lower sales of vertebroplasty make economic sense.  "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles."  (*See* Dkt. 60 (Order) at 5 (quoting *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010)).)  The premise of CareFusion's claim is that hospitals defrauded Medicare by performing kyphoplasty on an inpatient basis for a higher reimbursement rate.  (FAC ¶ 56.)  But vertebroplasty

could also be submitted for reimbursement at the higher inpatient rate.  (*See id*. ¶¶ 253, 276.)  And vertebroplasty products were much cheaper for hospitals to purchase (*see id.* ¶ 55), so the allegedly-corrupt hospitals would have maximized profits by buying more, not less, vertebroplasty.  *See VeriSign, Inc.*, 611 F.3d at 501 (dismissing antitrust claim that does not make economic sense).[5]

Likewise, CareFusion's theories of lost sales of kyphoplasty do not make economic sense.  CareFusion did not even begin selling kyphoplasty products until two years after the Medicare case was settled.  (*Compare* FAC ¶ 62 (Kyphon settled with the federal government in May 2008), *with id.* ¶ 182 (explaining that CareFusion initiated a limited launch of its kyphoplasty product in April 2010).)  CareFusion tries to explain this contradiction by claiming that the effects of the alleged Medicare scheme will "continue for years" because hospitals became addicted to higher profit margins.  (*Id.* ¶ 248.)  But that would drive them to buy CareFusion's cheaper kyphoplasty or vertebroplasty products, not Defendants' expensive ones.  (*See id.* ¶ 64; Ex. KK at 10 (CareFusion's CEO explaining that "we're going to be very aggressive when it comes to pricing" their kyphoplasty product); Ex. NN (article re earnings conference call) at 2 (discussing "CareFusion's plan to use lower prices to drive product adoption").)

### b. Competition increased, according to CareFusion's own allegations.

A second requirement of "antitrust injury" is that there be harm, not just to the plaintiff, but to competition, the preservation of which is the goal of antitrust law.  Lost business in itself is not an antitrust injury.  *Pool Water Prods. v. Olin Corp.*, 258 F.3d 1024, 1036 (9th Cir. 2001) ("Shifting [the plaintiff's] sales to [the defendant] and other competitors in the market does not directly affect consumers and therefore does not result in antitrust injury." (citing *Cargill, Inc. v. Monfort of Colo.*, 479 U.S. 104, 116 (1986))).  CareFusion must therefore allege that its "loss flows from an *anticompetitive* aspect or effect of the defendant's behavior since it is inimical to the antitrust laws to

---

[5]  Outside of this Court, CareFusion's CEO has disclaimed the notion that kyphoplasty sales competed with vertebroplasty sales.  When challenged by a stock analyst as to whether CareFusion's launch of new kyphoplasty products might cannibalize vertebroplasty sales, the CEO said that the two products are bought by distinct physician groups.  (*See* Nov. 2, 2010 Thomson-Reuters Earnings Conference Call, available at Thomson-Reuters website.)  While not cognizable on this motion, CareFusion's doubletalk illustrates the salutary benefits of the Supreme Court's *Twombly* directive that pleadings be held to heightened scrutiny for specificity and plausibility.

award damages for losses stemming from acts that do not hurt competition." *Rebel Oil*, 51 F.3d at 1433 (emphasis added). Moreover, "private [antitrust] plaintiffs can be compensated only for injuries that the antitrust laws were intended to prevent. It is not enough to show that one's injury was caused by illegal behavior." *Olin Corp.*, 258 F.3d at 1034.

The Amended Complaint shows that inpatient performance of kyphoplasty benefitted rather than harmed competition. CareFusion admits that kyphoplasty would not have been introduced into the market as an alternative treatment without inpatient reimbursement: "[H]ad Kyphon not initiated its illegal Medicare marketing scheme, hospitals and doctors would not have purchased Kyphon's products because Medicare would not have provided the hospitals and doctors with a reimbursement that would cover the price of the Kyphon's [sic] kyphoplasty product[.]" (FAC ¶¶ 60, 243, 266.)[6] As CareFusion's own exhibit admits, Defendants' kyphoplasty product responded to "an unmet medical need . . . [that] won over a select number of surgeon champions[.]" (*See id.* Ex. P at 7.) Entry of a new product alternative benefits consumers, and any profits that CareFusion would have made but for the entrance of such new competition are therefore not an "antitrust injury." "Enhancement of consumer choice is a traditional objective of the antitrust laws and has also been acknowledged as a procompetitive benefit." *See United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 675 (3d Cir. 1993).

CareFusion also alleges that the hospitals' alleged addiction to higher profit margins as a result of the alleged Medicare fraud has now led to lower kyphoplasty prices and profit margins. (*See id.* ¶ 64.) But lowered prices do not satisfy the "antitrust injury" requirement of harm to competition. On the contrary, "[l]ow prices benefit consumers regardless of how they are set, and so long as they are above predatory levels, they do not threaten competition." *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223–24 (1993) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990). Elsewhere, CareFusion alleges that Defendants' prices have supposedly remained "artificially high." (FAC ¶¶ 251, 274.) But the Amended complaint does not plausibly reconcile this allegation with the allegation that the Medicare scheme

---

[6]   (*See also* FAC ¶¶ 56 (inpatient reimbursement permitted "adoption" of new product), 238, 261 (enabled new products to "break into the [relevant] market").)

provoked hospitals to demand lower prices.  (*See id.*)  This court need not accept contradictory allegations.[7]  Moreover, CareFusion, as a competitor, presumptively benefits from a rival's higher prices, and therefore lacks standing to challenge them under the antitrust laws.[8]

   **c.** **CareFusion's alleged injury does not "flow from that which would make the conduct unlawful" under the antitrust laws.**

   The "antitrust injury" standard also requires that CareFusion's alleged harm "flow from that which makes the conduct unlawful" under the antitrust laws.  In establishing this test in *Brunswick v. Pueblo Bowl-o-Mat*, the Supreme Court reasoned that there is no "antitrust injury" if the same alleged harm to plaintiff would have resulted from lawful competition.  429 U.S. 477, 487–89 (1977).  Here, injury allegedly suffered by CareFusion would have resulted from entry into the marketplace of the new kyphoplasty product sold at a lower price for outpatient procedures; the Amended Complaint alleges no specific facts to the contrary.  *See Twombly*, 550 U.S. at 554–58, 566–67 (plaintiff's interference does not cross the threshold from "possible" to "plausible" if lawful behavior could explain outcome).  CareFusion's harm therefore does not "reflect the anticompetitive effect . . . of the violation[.]"  *See Alberta Gas*, 826 F.2d at 1240–41.

   **d.** **CareFusion is not the proper party to sue for the alleged Medicare fraud.**

   Establishing "antitrust injury" is not enough.  The doctrine of "antitrust standing" requires dismissal if CareFusion is not the "proper plaintiff."  *Cargill, Inc.*, 479 U.S. at 111 n.6.  The Supreme Court identified five factors to determine whether a plaintiff is the proper party to bring an antitrust lawsuit:  (1) the nature of the injury alleged and whether plaintiff was a participant in the relevant market; (2) the directness of the alleged injury; (3) the speculative nature of the alleged

---

[7] *Total Coverage, Inc. v. Cendant Settlement Servs. Group, Inc.*, 2007 WL 1982136, at *2 (9th Cir. July 3, 2007) ("[A] pleader may assert contradictory statements of fact only when legitimately in doubt about the facts in question." (citing *Am. Int'l Adjustment Co. v. Galvin*, 86 F.3d 1455, 1461 (7th Cir. 1996))); *see* 5 Wright and Miller, *Federal Practice and Procedure* § 1285 (3d ed. 2004).

[8] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986) (rejecting claim that plaintiffs could recover based on defendants charging "higher than competitive prices" because such conduct "could not injure respondents: as petitioners' competitors, respondents stand to gain" from higher prices); *see also Alberta Gas*, 826 F.2d at 1242 (competitors cannot sue for antitrust violations "that have the effect of either raising market price or limiting output" because they would benefit from these changes (quoting *Matsushita*)).

9

harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535–45 (1983). These factors can form a basis for dismissal under Rule 12(b)(6). *Sacramento Valley, Chapter of the Nat'l. Elec. Contractors Ass'n v. Int'l Bhd. of Elec. Workers*, 888 F.2d 604, 606–09 (9th Cir. 1989).

As discussed above, the nature of the alleged injury does not permit CareFusion to proceed on its Medicare fraud theory because CareFusion has suffered no antitrust injury. *See supra* Parts I.B.1.a–c. Likewise, none of the other *Associated General* factors support CareFusion's standing. In particular, if the Medicare fraud allegation were true, the party directly harmed by, and undisputedly motivated to redress, the alleged scheme would have been the federal government. As the Supreme Court explained, the "existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement diminishes the justification for allowing a more remote party such as the [claimant] to perform the office of a private attorney general. Denying the [claimant] a remedy on the basis of its allegations in this case is not likely to leave a significant antitrust violation undetected or unremedied." *Associated General*, 459 U.S. at 542.

That is the situation here. As this Court noted in its Order dismissing CareFusion's original Complaint, the "victim" of the Defendants' supposed Medicare scheme would have been the federal government and its Medicare program, not competitors like CareFusion. (*See* Dkt. 60 (Order) at 10.) The federal government obtained a $75-million settlement from Kyphon well before this antitrust action was brought. (*See* FAC ¶ 66.) CareFusion's lawsuit two years later based on the same misconduct is duplicative and legally improper. *See R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*, 890 F.2d 139, 148 (9th Cir. 1988) ("[I]f Dick Geothermal's claims were true, PG & E suffered the more obvious antitrust injury and is an excellent position to vindicate its own and the public's interest."); *Lucas v. Bechtel Corp.*, 800 F.2d 839, 845–46 (9th Cir. 1986) (plaintiff lacked standing to bring antitrust action because a more direct victim of the alleged anticompetitive activity was present).

Not one of the *Associated General* factors supports CareFusion's standing as the proper

plaintiff.  Courts regard with suspicion a competitor's "antitrust" lawsuit against a fellow competitor, since such a plaintiff is inherently motivated by personal gain, rather than vindicating the interest of consumers.[9]

### 2.   "False and Deceptive Advertising" (Counts III & IV)

The Amended Complaint asserts a new theory of "predatory conduct":  that Defendants' salespeople disparaged CareFusion's products.  (*See* FAC ¶¶ 220–32.)

As might be expected, courts have been extremely reluctant to accept such allegations as a proper foundation for antitrust claims.  The Ninth Circuit has gone so far as to say that "such claims should be presumptively ignored."  *Am. Prof'l Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (quoting 3 P. Areeda, *Antitrust Law*, ¶ 737b).  "[C]ompetition and competing information" are essential components of the "marketplace of ideas."  *See Tate v. Pac. Gas & Elec. Co.*, 230 F. Supp. 2d 1072, 1080 (N.D. Cal. 2002).  "It is all too easy for losers in the rough-and-tumble of commerce to accuse competitors of spreading false information."  *Id.*  Even when a competitor's advertising is false, courts strongly presume that the issue does not justify the importation of antitrust law.  *Harcourt Brace*, 108 F.3d at 1151 (effects of false advertising on competition are presumed to be "de minimis" and the "harmful effects [of disparagement] are ordinarily not significant enough to warrant recognition under § 2 of the Sherman Act").

To overcome this presumption, a plaintiff must plausibly allege that the Defendants' "representations were [1] clearly false, [2] clearly material, [3] clearly likely to induce reasonable reliance, [4] made to buyers without knowledge of the subject matter, [5] continued for prolonged

---

[9]   *See Alberta Gas*, 826 F.2d at 1239 ("Courts have carefully scrutinized enforcement efforts by competitors because their interests are not necessarily congruent with the consumer's stake in competition. . . . Conduct that harms competitors may benefit consumers—a result the antitrust laws were not intended to penalize. 'When the plaintiff is a poor champion of consumers, a court must be especially careful not to grant relief that may undercut the proper functions of antitrust.'"); *see also  J. Allen Ramey, M.D., Inc. v. Pac. Found. for Med. Care,* 999 F. Supp. 1355, 1360–61 (S.D. Cal. 1998) ("'Because a competitor opposes efficient, aggressive, and legitimate competition by his rivals, he has an incentive to . . . use an antitrust suit to delay their operations or induce them to moderate their competition.  For that reason, the courts should be skeptical of a plaintiff's claims that his rivals have violated the antitrust laws and caused . . . antitrust injury[.]'" (alterations in original)).

periods, and [6] not readily susceptible of neutralization or other offset by rivals.  [The plaintiff] must satisfy all six elements to overcome [this] de minimis presumption." *Id.* at 1152 (internal quotation marks omitted).  CareFusion must also show that the disparagement had [7] a "significant and enduring adverse impact" on competition.  *See id.*; *see also TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 821, 832 (C.D. Cal. 2010).

While Defendants deny making any false statements, even the allegations in the Amended Complaint and the attached exhibits show that CareFusion has failed to adequately allege at least three of these required elements.

<u>Buyers without knowledge of the subject matter</u>.  CareFusion alleges that the decisionmakers who purchase kyphoplasty products are "hospitals and doctors."  (*See* FAC ¶¶ 223, 226, 290; *id.* Ex. O at 3.)  These are customers who are "sufficiently sophisticated so as not to be fooled easily by [the defendant's alleged] misinformation."  *See Tate*, 230 F. Supp. 2d at 1074–76, 1080 (dismissing claims because defendant's criticisms of plaintiff's natural-gas-motor technology were directed toward owners of commercial or municipal vehicle fleets).  CareFusion has not pled that doctors and hospitals could "be fooled easily" with the type of specificity that *Twombly* requires for an antitrust pleading to be considered plausible.  *See Twombly*, 550 U.S. at 554–58.

<u>Enduring impact on competition</u>.  CareFusion has failed to allege any impact on competition, let alone an "enduring" one.  Its allegations regarding impact on competition are, once again, cursory boilerplate.  (*See id.* ¶¶ 295, 315 (alleging that effects have been "significant and enduring," but providing no detail).)  The reader gets the impression that the Amended Complaint tries to take an isolated report from the field and magnify it into "systematic marketing campaign."  To plead this claim, CareFusion must make an inference of enduring conduct more than "possible"; it must allege facts with sufficient specificity to make its inferences plausible. *Twombly*, 550 U.S. at 554–58, 566–67.  Although CareFusion has described Defendants' efforts as "widespread," the allegation lacks the specificity—such as an estimate of the number or percentage of doctors and hospitals that received the allegedly false statements or the number of sales representatives involved—that would plausibly suggest that the alleged misconduct was a "systematic" advertising campaign as opposed to isolated conduct that does not implicate the antitrust laws.  *Id.*; *see Abcor Corp. v. AM Int'l, Inc.*,

916 F.2d 924, 930 (4th Cir. 1990) (isolated incidents of employees spreading lies and misinformation about the competitor-plaintiff did not "constitute enough evidence to support a finding of attempted monopolization").

<u>Susceptibility to neutralization by competitor</u>.  The Amended Complaint does not plausibly plead that CareFusion lacks the ability to neutralize the alleged disparagement; indeed, the allegations suggest the opposite.  CareFusion lauds its "experienced sales force" (FAC ¶ 170) and has touted to market analysts its "investment" in specialized salespeople who "are well schooled and already have relationships with these customers [radiologists and spinal surgeons]."  (*See id.* Ex. KK at 14–15.)  CareFusion offers no plausible facts explaining why this sales force is incapable of informing doctors and hospitals about the efficacy of CareFusion's product, which it claims outperforms Defendants'.  (*See id.* ¶¶ 170, 286.A.)  CareFusion instead acknowledges that it has disseminated information to combat Medtronic's alleged "false" advertising and continues to do so. (*See id.* ¶ 230.)[10]

The failure to plead an inability to neutralize, like the improper pleading of each of the other *Harcourt Brace* elements, requires dismissal.  But it also ties back to the initial discussion of the strong policy behind this caselaw:  seldom is the "rough-and-tumble" of competing sales pitches a justification for enmeshing a court in the immensity of an antitrust lawsuit.[11]  CareFusion's scanty boilerplate allegations do not delineate the extraordinary circumstances for making an exception to

---

[10]  *See POURfect Prods. v. KitchenAid*, 2010 WL 1769413, at *5 (D. Ariz. May 3, 2010) (applying the *Harcourt Brace* factors and dismissing product disparagement claim because, among other things, "POURfect has not stated in its Complaint why it would be unable to communicate statements about its product quality to KitchenAid retailers"); *Tate*, 230 F. Supp. 2d at 1080 (dismissing complaint because, among other things, "[p]laintiffs were capable of defending their product and winning over customers based on the merits"); *Kinderstart.com, LLC v. Google, Inc.*, 2007 WL 831806, at * 8–10 (N.D. Cal. Mar. 16, 2007) (dismissing complaint alleging that Google filed misleading statements with the SEC about the objectivity of search results because plaintiff had failed to adequately plead that Google deprived it of the ability to neutralize the allegedly-false statements).

[11]  *See, e.g.*, *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 622–23 (7th Cir. 2005) (market competition is "designed to take sales away from one's rivals," and false statements about a rival's goods merely "set the stage for competition in a different venue:  the advertising market"); *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 125–28 (3rd Cir. 2005) (manufacturer failed to show that it was excluded from competing on the merits by the defendant's alleged advertising of a "fire hazard"; plaintiff's better response "would seem to be an increase in the losing party's sales efforts on future bids, not an antitrust suit").

this rule.

There is a likely reason for this failure of pleading: the allegations are not true.  Outside of this Court, CareFusion has repeatedly touted its ability to flip doctors into supporting its product, bragging to investors that 90% of the sampled physicians said they would recommend CareFusion's product to their peers.  (See actual page excerpts from this presentation in Part I.B.4, at page 21 below.)  This presentation was made in December 2010, the same month in which CareFusion filed this Amended Complaint alleging an inability to undo Defendants' "false advertising."  Of course, this presentation is not part of the record on this motion, but once again, CareFusion's "say anything" doubletalk underscores the importance of the specificity required to meet the *Twombly* standard of plausibility, and why the Supreme Court regards the gatekeeping function of pleading motions as so important for protecting defendants from the coercive burden of antitrust discovery unless a plaintiff can come forward with more than hide-the-ball boilerplate.

### 3.   "*Handgards*" Sham Litigation Claims (Counts V & VI)

In November, the Court dismissed CareFusion's sham litigation—or *Handgards*—claim, based on the absence of any lawsuit by Defendants, the absence of "threats" against Plaintiffs, and failure to plead antitrust injury.  (*See* Dkt. 60 (Order) at 8–10.)  These failures reappear in the Amended Complaint, which re-alleges the *Handgards* claims with only two additional allegations of fact.  One of these new facts—Defendant Kyphon's success in obtaining a preliminary injunction based on the challenged patents—negates the "objective baselessness" element for sham litigation.

#### a.   Litigation by Defendants against CareFusion is not pled.

In dismissing the original Complaint, this Court held that a *Handgards* claim for "sham litigation" requires, as the label suggests, litigation.  The Court said that the lack of a lawsuit by Defendants against CareFusion was a "fatal flaw" to this claim.  (*See id.* at 8; *id.* at 9 ("*Handgards* itself involved actual litigation, and later precedent has generally affirmed the litigation requirement[.]").)  The Amended Complaint still lacks this required allegation, and so on this basis alone the claim should be dismissed.

In its dismissal Order, the Court discussed (without adopting) cases from a handful of out-of-circuit and lower courts that have entertained a sham litigation claim premised on mere threats.  But

the Court noted that even in those cases, the threats were direct and imposed actual monetary cost (e.g., a coerced licensing agreement).  The Court therefore rejected CareFusion's alleged 'threats' as insufficient even under this standard.  (*Id.* at 9 (citing *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d 308, 317–18 (N.D. Cal. 2007) for the proposition that no liability is to be had where "defendant directed no action against plaintiffs").)

CareFusion has nevertheless re-pled the same "threats" in its Amended Complaint.  It again points to a feature story in the *Sonoma County Press Democrat* (*compare* FAC ¶ 330, *with* Dkt. 1 (Compl.) ¶ 87), a routine standard appendix in Medtronic's April 2008 Form 10-K (similar to the one in CareFusion's own public reports and not mentioning CareFusion or kyphoplasty) (*compare* FAC ¶ 334, *with* Dkt. 1 (Compl.) ¶ 91), and a May 2008 "Earnings Conference Call" heavily cut and pasted to look more "threatening" (*compare* FAC ¶ 335, *with* Dkt. 1 (Compl.) ¶ 92).  The manifestly un-"threatening" nature of these documents was thoroughly analyzed in Defendants' initial motion. (*See* Dkt. 36 (Mot. to Dismiss) at 15–17.)  These allegations entail no threat directed at CareFusion, fail to point to any statement even identifying the '404 or '888 patents, and fail to assert that CareFusion was thereby coerced into a settlement or other monetary injury.  In other words, they fail to meet the standard even of CareFusion's non-binding authority—as the Court noted in its Order of dismissal.  (*See* Dkt. 60 (Order) at 9.)  The remaining "threats" were demonstrated in the original dismissal motion to relate to patents other than the expired '404 and '888 patents; CareFusion has not even attempted to allege the elements of a *Handgards* claim with respect to these post-404/888-expiration "threats."  (*See* Dkt. 36 (Mot. to Dismiss) at 10-11; *see also* Dkt. 51 (Reply) at 11.)

The only new "threat" alleged in the Amended Complaint is the allegation that CareFusion met in July 2008 with a company called API, which allegedly told CareFusion that Medtronic "threaten[ed]" that an API kyphoplasty product would infringe an unspecified Medtronic patent. (FAC ¶ 342.)  Like the other alleged "threats," this one was not directed at CareFusion.  It therefore cannot be the basis for a sham litigation claim, even under CareFusion's out-of-circuit caselaw.  (*See* Dkt. 60 (Order) at 9 (citing *In re Netflix Antitrust Litig.*, 506 F. Supp. 2d at 317–18).)  And once again there is no allegation that this new "threat" was based on the '404 or '888 patents—as opposed to one of Medtronic's other patents.  Moreover, the element of injury is getting less plausible as the

---

15

story evolves.  Originally CareFusion told the Court that the '404 and '888 patents caused CareFusion to delay its kyphoplasty launch "for at least two (2) years."  (Dkt. 1 (Compl.) ¶ 158.)  The products were announced in January 2009.  So if the "two-year delay" story was true, the "threats" conveyed in the July 2008 API meeting did not matter, because CareFusion was already cowed into inaction.  But if the "two-year delay" theory is now out the window, and CareFusion was truly shocked to learn about the "threats" in July 2008, then again the notion of "injury" is not plausible:  the '404 and '888 patents were going to expire in just seven months (*see* FAC ¶ 26) and in the meantime CareFusion—far from standing down—was busy completing its product to the point where it applied for FDA approval in January 2009 (*see* FAC ¶ 174).

### b.   Antitrust injury is still lacking.

In dismissing CareFusion's sham litigation claim, the Court also found the allegations lacking because, for such a claim, the relevant "antitrust injury ordinarily consists of 'costs incurred in the defense of a suit filed in violation of the antitrust laws.'"  (Dkt. 60 (Order) at 9 (quoting *Rickards v. Canine Eye Registration Found.*, 783 F.2d 1329, 1334–36 (9th Cir. 1986)).)  As it did in the original Complaint, CareFusion does not allege that it incurred any costs as a result of litigation brought by Defendants on the '404 or '888 patents.  For this independent reason, CareFusion's sham litigation claim should be dismissed.

### c.   New allegations establish as a matter of law that assertion of the '404 and '888 patents would not have been "objectively baseless."

In order to establish a sham litigation claim, CareFusion must plead and prove that Defendants' litigation was objectively baseless.  *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 51, 60–61 (1993).  New allegations negate the possibility of pleading this element.  The Amended Complaint acknowledges that Kyphon obtained a preliminary injunction against Disc-O-Tech based on the '404 and '888 patents.  (FAC ¶ 202.)  (Kyphon also obtained a preliminary injunction based on these patents against Medtronic, as would be seen from portions of the litigation record that CareFusion has chosen not to excerpt and disclose to this Court.)  Courts have held that "[a] winning lawsuit is by definition a reasonable effort at petitioning for redress and therefore not a sham."  *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 60 n.5.

Preliminary success in litigation may also establish objective reasonableness.  *See Boulware v. State of Nev.*, 960 F.2d 793, 798 (9th Cir. 1992).  Courts can and do decide that preliminary success precludes a finding of objective baselessness.  *See, e.g.*, *FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 938–39 (Fed. Cir. 1995).  The "issuance of injunctive relief . . .  which required th[e] court to find a likelihood of success on the merits . . . is fatal to Plaintiffs' claim that the . . . [a]ction was objectively baseless."  *See Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 602 (S.D.N.Y. 2010) (citing *Boulware*, 960 F.2d at 798).[12]

### 4.  Patent Acquisitions (Counts VII & VIII)

CareFusion alleges that Medtronic and its predecessor Kyphon violated the antitrust laws through various acquisitions.  Most of the acquisitions took place prior to the time period prescribed by the statute of limitations.  None of the acquisitions is plausibly linked to cognizable antitrust injury.  Moreover, individual examination of each acquisition shows that none is plausibly alleged to have furthered a monopoly.

### a.  The statute of limitations precludes claims based on the Bonutti, Sanatis, Berger, and Sandhu acquisitions.

Most of CareFusion's allegations of improper acquisition are time-barred.  For antitrust cases, the statute of limitations is four years. 15 U.S.C. § 15b (1976).  The original Complaint was filed on March 15, 2010.  (Dkt. 1.)  Thus, allegations about any acquisition dating from before March 2006 presumptively cannot be the basis for liability.

Kyphon's acquisition of patent rights from Bonutti, Berger, and Sandhu, and its acquisition of Sanatis, all occurred before March 2006.  Kyphon's acquisition of the Bonutti patents occurred in 2002 (FAC ¶ 68); the acquisition of Sanatis occurred in 2003 (*id.* ¶ 75); and the acquisitions of the Berger and Sandhu patents occurred in 2005 (*id.* ¶¶ 80, 87).

Subsequent acquisitions within the limitations period cannot form the basis of a "continuing conspiracy" theory of tolling, because CareFusion's claims based on those later mergers are invalid

---

[12]  *Mosdos* notes the Ninth Circuit in 1992 suggested that "a finding of 'success on the merits' is not necessarily dispositive of the sham inquiry[.]"  *Mosdos*, 701 F. Supp. 2d at 602.  In 1993, the Supreme Court clarified that success on the merits does end the inquiry.  *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 60–61.

as a matter of law.  *See* Parts I.B.4.c *infra*.

### b.   Antitrust injury is not properly alleged with respect to any of the acquisitions.

The original Complaint alleged that Defendants' patents excluded CareFusion's kyphoplasty products from the market:  the '404 and '888 patents allegedly delayed product launch until February 2009 (*see* Dkt. 1 (Compl.) ¶¶ 102–03), and newer patents "threaten[ed]" to "cast a cloud" over the nascent product (*see id*. ¶¶ 159, 170).  The Amended Complaint turns these allegations on their head.  Thus, while the original Complaint lamented the exclusionary effect of the newer patents, the Amended Complaint suggests that the same patents would have benefitted CareFusion if only other competitors could have used them.  (*E.g.*, FAC ¶¶ 68–94.)  CareFusion complains about having to compete against only Medtronic/Kyphon, who allegedly shelved the acquired technologies, and that CareFusion would have been better off competing against an enlarged field of adversaries, each brandishing one of the technologies that the Amended Complaint now vaunts.

But courts have repeatedly held that a competitor does not suffer antitrust injury from acquisitions that eliminate its competitors or competing products.  *Alberta Gas*, 826 F.2d at 1243 (relying on *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 583 (1986)); *Datagate, Inc.*, 941 F.2d at 868–69.  This is because "that action . . . inevitably aids . . . every other producer" in the relevant market.  *Alberta Gas*, 826 F.2d at 1243.

CareFusion alleges that the elimination of competitors has allowed Defendants to charge "artificially high prices."  (FAC ¶ 403.)  But this too, if true, would aid rather than hurt Defendants' competitors, and so does not provide CareFusion with antitrust injury.  *Matsushita Elec. Indus. Co.,* 475 U.S. at 582–83 ("[A]s petitioners' competitors, respondents stand to gain from any conspiracy to raise the market price[.]").

Attempting to get around these doctrines, CareFusion alleges that it has nevertheless been harmed because the absence of rivals had the "effect of entrenching Defendants' products in the market[.]"  (*See* FAC ¶ 94; *see also id*.¶¶ 404, 430.)  The FAC alleges that Defendants "have an unfair advantage" "because doctors and hospitals are more willing to purchase from a monopolist with a larger sales force, more established clinical history, perceived market leadership, more widely

18

used product (i.e., doctors are more willing to use the product their colleagues use), and greater ability to offer favorable long-term contracts."  (*Id.*)

This new "entrenchment" theory fails for five independent reasons.  ***First***, to the extent it goes beyond conclusory epithet ("monopolist") to the concrete, the listed attributes (favorable clinical history, product appeal, etc.) are pro-competitive and benefit consumers, and hence cannot give rise to "antitrust injury."  *See Syufy Enters.*, 903 F.2d at 668–69 (advantages gained by "business acumen" are "off limits to the enforcer of our antitrust laws").  Antitrust law exists to protect competition and consumers, not competitors.  *Olin Corp.*, 258 F.3d at 1034 ("It is well established that the antitrust laws are only intended to preserve competition for the benefit of consumers." (quoting *Am. Ad Mgmt.*, 190 F.3d at 1055)).  The fact that one competitor's strengths may take sales away from another competitor is not legally cognizable "antitrust injury."  *Olin Corp.*, 258 F.3d at 1036 ("[s]hifting [the plaintiff's] sales to [the defendant] and other competitors in the market does not directly affect consumers and therefore does not result in antitrust injury").

***Second***, the "entrenchment" theory is defeated by allegations in CareFusion's other causes of action.  For example, the "*Handgards*" claim says that CareFusion deliberately waited until expiration of foundational patents to move into the market.  (*See* FAC ¶ 163); *see supra* note 7 (Court need not accept contradictory allegations).  So any build-up of Defendants' brand loyalty, market "leadership," or other "entrenchment," was the predictable result of CareFusion's own decision to delay.

The "entrenchment" theory is also contradicted by the "False Advertising" cause of action.  There, the Amended Complaint alleges, "but for Defendants' [advertising], CareFusion could have captured a significant market share."  (FAC ¶¶ 297, 317.)  Thus, in the "False Advertising" world, doctors were supposedly open to buying CareFusion's product until they heard a competing salesperson's badmouthing.  Whereas in the "Acquisitions Claim" world, doctors are so hidebound in their product loyalty from years of "entrenchment," that CareFusion's product never had a chance. In one claim CareFusion is as blithe in banishing the "entrenchment" as in another claim it is facile in conjuring it.  This kind of contradictory pleading is not acceptable in this Circuit.  *See infra* note 7.

A ***third*** flaw in the "entrenchment" theory is that it has not been pled with the factual specificity needed to comply with *Twombly*'s standard of plausibility. Courts regard with suspicion claims by competitors invoking the antitrust laws against their rivals. *See supra* note 9 and accompanying text. After the Supreme Court's decision in *Bell Atlantic v. Twombly*, allegations that a successful clinical history or other attributes of product quality or market acceptance constitute unlawful "monopoly power" must be more than conclusory. *See Twombly*, 550 U.S. at 554–58, 566–67 ("neutral" facts coupled with "naked" conclusory assertions do not suffice; courts should "insist upon some specificity in pleading" facts which make plaintiff's characterization not just possible, but plausible). *Twombly* requires that there be specific facts to show that it is not merely possible, but plausible, that (for example) Defendants' "established clinical history" excludes competition. *Id.*; *see also Syufy Enters.*, 903 F.2d at 671 n.21 (monopoly power is the power to exclude competition). Allegations of such specificity are lacking with respect to each of the five business or product attributes that CareFusion derides as "entrenchment."

Indeed, allegations elsewhere in the Amended Complaint negate the notion that CareFusion is helpless to compete in the dimensions in which it alleges Defendants are "entrenched." With respect to sales forces, CareFusion touts its own "experienced sales force" (*see* FAC ¶ 170) who "are well schooled and already have existing relationships with these customers" (*see id.* Ex. KK at 12–13). As to clinical history, an exhibit to the Amended Complaint says that the marketplace remains skeptical of the clinical record of any producer (*id.* Ex. E at 2–10),[13] and in any event CareFusion asserts that its clinical record shows superior product durability (*see id.* ¶ 306.A). The "entrenchment" factor of "long-term contracts" is not pled with any specificity. (*See id.* ¶¶ 404, 430.) There is not even an explanation of what these contracts are, let alone why Defendants are in a more favorable position to secure them, or whether such contracts harm consumers. *Cf. Olin Corp.*, 258 F.3d at 1034 ("[T]he antitrust laws are only concerned with acts that harm allocative efficiency and raise[ ] the price of goods above their competitive level or diminish[ ] their quality[.]") (internal quotations marks omitted).

---

[13] The Court need not assume the truth of allegations contradicted in the exhibits. *See supra* note 1.

1    Nor is there sufficient factual specificity to support the allegation that Defendants' products

2    are "entrenched" because doctors' buying patterns are immutable.  (*See* FAC ¶¶ 404, 430.)

3    CareFusion alleges that "doctors and hospitals are reluctant to switch manufacturers, . . .  and are

4    more prone to use a product that other doctors or physician's recommend."  (*Id.* ¶ 94.)  But in the

5    same month that CareFusion filed this Amended Complaint, CareFusion told the opposite story to

6    investors, touting how 80% of doctors surveyed would "strongly consider switching" to

7    CareFusion's product:



16

17   *Available at* http://ir.carefusion.com/phoenix.zhtml?c=229626&p=irol-reportsannual.

18    While CareFusion's presentation is not before the Court on this motion, this statement is

19   again illustrative of the games that litigants can play to try to get past the pleading stage with

20   generalizations like "entrenchment."  Under *Twombly*, more specificity is required to render the

21   alleged insurmountability of doctors' usage patterns plausible.

22    A ***fourth***, independent reason why the "entrenchment" theory fails is that CareFusion has not

23   alleged specific facts to show how each of these "entrenchment" factors would be ameliorated by

24   having different competitors armed with the acquired patents that supposedly led to Defendants'

25   "entrenchment."  With regard to sales forces, the "but-for" world supposedly preferred by

26   CareFusion would have included both an independent Kyphon and a separate Medtronic with its

27   "large sales force and general presence and recognition in the medical field."  (FAC ¶ 118.)  There is

28   no allegation of how the supposed sales-force-related "entrenchment" would have been lessened,

rather than multiplied, had CareFusion been faced with two, rather than one, market leaders. Likewise, if the premise of indelible doctor product preferences were correct, having more competitors would presumably result in more products to which doctors were indelibly wedded, to CareFusion's detriment.  And so forth.  CareFusion is required under *Twombly* to allege specific facts making plausible, not just possible, its counterintuitive assertion that more competitors would have lessened its competitive disadvantage in these areas.

*Fifth* and finally, CareFusion has not alleged that the product and marketing strengths achieved by Defendants could *not* have been obtained by lawful competition.  Indeed, common sense suggests otherwise.  And if these "entrenchment" achievements—quality, brand loyalty, and so forth—were achievable by lawful competition, then CareFusion's resulting losses cannot be considered "antitrust injury," because they are deemed not to "flow[] from that which makes defendants' acts unlawful."  *See* Part I.B.1.c; *Brunswick Corp.*, 429 U.S. at 487–88.

### c.   Individually the alleged acquisitions are not plausibly pled as furthering a monopoly.

In addition to being legally insufficient taken as a whole, the acquisition claims can be dismissed based on the legal insufficiency of its constituent parts.  Each alleged acquisition fails in one or more ways to provide a building block for a monopolization theory.

"Off-Label" and Other Use of Non-Kyphoplasty Patents.  The "Bonutti" patents cover injection not into vertebrae, but into "soft tissue."  (FAC ¶ 70.)  The Berger patents cover injections in "bones other than the spine."  (*Id.* ¶ 82.)  The Sanatis patents involved bone cement.  (*Id.* ¶ 77.)  Thus, by definition, none of these patents would empower their acquirer to exclude a potential competitor from marketing a product for injecting cement into spinal tissue.  CareFusion has not alleged specific facts showing how such exclusion would even be possible, let alone plausible.  *See Twombly*, 550 U.S. at 554–58 (courts should "insist upon some specificity in pleading" facts which make plaintiff's characterization not just possible, but plausible).  In addition to lacking plausible allegations of exclusivity, CareFusion fails to plausibly allege how these technologies could have "eliminated Defendants' monopoly" (FAC ¶ 399) with products practicing non-vertebrae patents for "off-label" use in VCF patients.  (*Id.* ¶¶ 72, 84.)  While the off-label use of a medical product can

occur, a company cannot generally market products for use in an off-label manner, and the penalties for doing so can be severe.[14]  There are no facts alleged to support the premise that the formidable "barriers to entry" described so dauntingly elsewhere in the Amended Complaint—the need for huge sales forces, the indelible product loyalty of doctors, the arduous clinical trials (*see, e.g.*, FAC ¶¶ 64, 86, 295.B, 364, 404, 430)—would permit non-advertised adoption of an off-label use sufficient to "eliminate Defendants' monopoly."  In particular, CareFusion does not allege its own readiness to have invested in such speculative ventures.  *Twombly*, 550 U.S. at 554–58 (to survive a motion to dismiss requires allegations showing right to relief beyond the speculative level).  Nor does CareFusion allege that these individual inventors or foreign companies were themselves ready to make such an investment or were likely to succeed.  *See id.* (courts should "insist upon some specificity in pleading" facts which make plaintiff's characterization not just possible, but plausible).  And if CareFusion were to contend that those barriers to entry did not exist at the time of these particular acquisitions, then the claim falls apart at the other end, because, as this Court observed, a patent acquisition is not unlawful if the acquirer at the time of the acquisition has no monopoly power.  (Dkt. 60 (Order) at 12 ("[T]he focus should be upon the market power that will be conferred by the [acquired] patent in relation to the *market position then occupied by the acquiring party*." (quoting *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1208 (2d Cir. 1981)) (emphasis added)).)

    <u>Medtronic's acquisition of Kyphon</u>.  Medtronic's acquisition of Kyphon cannot form the basis of an antitrust claim, because CareFusion fails to allege that Medtronic possessed market power *before* the acquisition.  (Dkt. 60 (Order) at 12 (to be actionable under the antitrust laws, an antitrust plaintiff must allege that the acquiring party possessed pre-existing market power) (quoting *SCM Corp.*, 645 F.2d at 1208).)  As CareFusion admits, the acquisition did nothing more than "provide[] Medtronic with Kyphon's monopoly," which already existed.  (FAC ¶ 113.)  As this

---

[14]  *Cf. United States v. Caronia*, 576 F. Supp. 2d 385, 392 (E.D.N.Y. 2008) (refusing to dismiss criminal action based on federal misbranding statute and holding that, "[i]t is well established that under the FDA's 'intended use' regulations, the promotion of a drug for an off-label use by the manufacturer or its representative is prohibited"); *see also Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 309 F. Supp. 2d 1156, 1169–70 (N.D. Cal. 2004) ("[A]n action under the antitrust laws will not lie where the business conducted by the plaintiff, and alleged to have been restrained by the defendant, was itself unlawful."), *aff'd* 158 Fed. App'x 807 (9th Cir. Dec. 12, 2005).

1   Court has stated, "[a] shift of monopoly power from one company to another does not create

2   monopoly power in violation of antitrust laws[.]"  (*See* Dkt. 60 (Order) at 12 (quoting *Columbia R.*

3   *People's Util. Dist. v. Portland Gen. Elec. Co.*, 217 F.3d 1187, 1190 (9th Cir. 2000)).)  Nevertheless,

4   CareFusion suggests that the acquisition was unlawful because, after the acquisition, Medtronic

5   allegedly ceased development of a product that would have been a "strong competitor" to Kyphon's

6   product.  (FAC ¶ 114.)  But CareFusion, who elsewhere praises Medtronic's "marketing and sales

7   resources," fails to allege a plausible explanation for why Medtronic would discard a competitive

8   device that would have broken Kyphon's monopoly, and instead pay $4 billion to acquire Kyphon.

9   (*Id.* ¶¶ 113–18.)  Moreover, if Medtronic's own products were as viable as CareFusion presupposes,

10   it is implausible that Medtronic would discontinue their sale after the acquisition of Kyphon.  The

11   sale of *two* viable products could only serve to increase Medtronic's sales.  Such implausible

12   allegations need not be taken as true.  And even if true, the removal of a potentially-competing

13   product line cannot constitute antitrust injury to a competitor.  *Alberta Gas*, 826 F.2d at 1243.

14   ## II.  THE LANHAM ACT CLAIM (COUNT IX) SHOULD BE DISMISSED.

15   CareFusion asserts that Defendants knowingly and willfully disseminated false and

16   misleading statements to CareFusion's prospective customers.  (FAC ¶¶ 220, 438, 445)  Because

17   these allegations "sound in fraud," they must be pled with particularity pursuant to Federal Rule of

18   Civil Procedure 9(b).  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003).

19   Courts have applied the "particularity" requirement of Rule 9(b) to false advertising claims where

20   the claims "sound in fraud" or are "grounded in fraud," as CareFusion's claims are here.[15]

21   Under Rule 9(b), the complaint must "state the time, place, and specific content of the false

22   representations as well as the identities of the parties to the misrepresentation."  *Ecodisc*, 711 F.

23

24   [15]  *See, e.g.*, *Ecodisc Tech. AG v. DVD Format/Logo Licensing Corp.*, 711 F. Supp. 2d 1074, 1085
     (C.D. Cal. 2010) (applying Rule 9(b) to Lanham Act claims based on allegations that defendants

25   were conspiring to keep plaintiff's products out of the market); *CollegeNet, Inc. v. Xap Corp.*,
     2004 WL 2303506 (D. Or. Oct. 12, 2004) (applying Rule 9(b) to a Lanham Act claim where the

26   plaintiff accused the defendant of knowingly and intentionally engaging in a pattern or practice
     of deceptive conduct); *Pestube Sys., Inc. v. HomeTeam Pest Defense, LLC*, 2006 WL 1441014,

27   at *4–5 (D. Ariz. May 24, 2006) (applying Rule 9(b) to the plaintiff's Lanham Act claim, which
     alleged that the defendant knowingly misrepresented the qualities of defendant's products, and

28   was "clearly analogous to a claim of fraud").

Supp. 2d at 1085 (internal citations omitted).  CareFusion's Lanham Act claim fails under this standard.  The FAC does not identify: (1) a particular author or speaker; (2) any of the specific parties allegedly receiving any given misrepresentations; or (3) precisely when and where the misrepresentations were allegedly made.[16]  Requiring such specificity is not unduly burdensome to CareFusion.  The FAC alleges that "certain hospitals and doctors have cited Defendants' false and misleading statements as reasons for not purchasing CareFusion's kyphoplasty products."  (FAC ¶ 227).  CareFusion is therefore capable of coming forward with any such specifics to satisfy Rule 9(b)'s particularity requirements so that Defendants can defend against the accusations.

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion should be granted, and Counts I through IX of the Amended Complaint should be dismissed.

DATED:  January 20, 2011                              Respectfully submitted,

                                                       */s/ Martin R. Boles*
                                                      Jeffrey S. Davidson (S.B.N. 143633)
                                                      jeff.davidson@kirkland.com
                                                      Luke L. Dauchot (S.B.N. 229829)
                                                      luke.dauchot@kirkland.com
                                                      Martin R. Boles (S.B.N. 124159)
                                                      martin.boles@kirkland.com
                                                      KIRKLAND & ELLIS LLP
                                                      333 South Hope Street
                                                      Los Angeles, CA  90071
                                                      Telephone:     (213) 680-8400
                                                      Facsimile:     (213) 680-8500

                                                      Attorneys for Defendants
                                                      MEDTRONIC INC.,
                                                      MEDTRONIC SPINE LLC,
                                                      and KYPHON SARL

---

[16]  *See CollegeNet*, 2004 WL 2303506, at *6 (holding that the general naming of an entire corporation as the speaker of the allegedly false and misleading statements along with unnamed recipients of the statements is insufficient to comply with Rule 9(b)); *Segal Co. (E. States), Inc. v. Amazon.com*, 280 F. Supp. 2d 1229, 1231 (W.D. Wash. 2003) (complaint's reference to certain "representatives" of defendant is too vague to sufficiently identify the alleged perpetrators); *see also Von Koenig v. Snapple Beverage Corp.*, 2011 WL 43577, at *3 (E.D. Cal., Jan. 6, 2011).